2

**IN THE CIRCUIT COURT FOR THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA**

INTERNATIONAL COMMERCIAL
ARBITRATION SECTION

CASE NO.:

ESTHER VENTURA DE RENDÓN and
JUAN MARÍA RENDÓN GUTIÉRREZ,

       Petitioners,

v.

VIVIANE VENTURA and MICHAEL D.
VENTURA,

       Respondents.

_____/

## PETITION TO CONFIRM INTERNATIONAL ARBITRATION AWARD

Pursuant to Florida International Commercial Arbitration Act ("FICAA"), Fla. Stat.

§ 684.0001 *et seq.*, Petitioners Esther Ventura de Rendón ("Esther Ventura") and Juan María

Rendón Gutiérrez ("Juan Rendón") (collectively, "Petitioners") petition this Court for an order

confirming an international arbitration award issued in Petitioners' favor and against Respondents

Viviane Ventura ("Viviane Ventura") and Michael D. Ventura ("Michael Ventura") (collectively,

"Respondents"). In support thereof, Petitioners state:

## I.   INTRODUCTION

1.    Petitioners bring this proceeding to confirm a foreign arbitration award against

Respondents issued by an International Chamber of Commerce, International Court of Arbitration

("ICC") arbitral panel on April 27, 2016 in Bogotá, Colombia under Case No. 19728/ASM (the "Award"). A certified copy of the Award in Spanish is attached hereto as **Exhibit "A."**[1]

2.      The Award is final and binding, and subject to recognition and enforcement in Florida pursuant to Fla. Stat. § 684.0047.

## II.    PARTIES

3.      Esther Ventura and Juan Rendón are both foreign citizens and residents of Lugano, Switzerland.

4.      Viviane Ventura is a United States citizen and resident of Key Biscayne, Florida.

5.      Michael Ventura is a British citizen and resident of London, England. Mr. Ventura owns property in Miami-Dade County, Florida including real property in Miami Beach.

## III.   JURISDICTION

6.      This Court has jurisdiction to recognize and enforce the Award issued in connection with an international commercial arbitration held in Colombia between the parties. *See* Fla. Stat. § 684.0002.

## IV.    BACKGROUND

### Arbitration Agreements

7.      On September 21, 2010 and September 22, 2010, Michael Ventura and Viviane Ventura each respectively executed settlement agreements (the "MV Agreement" and "VV Agreement," collectively, the "Agreements") with Esther Ventura, Juan Rendón, and Laboratorios LaFrancol, S.A. ("LaFrancol"), a Colombian entity.

---

[1] A certified translation to English will be filed once available.

2

8.      Through the Agreements, the parties settled then-pending and anticipated conflicts arising from their business and corporate relationships, particularly concerning their roles as shareholders and administrators of LaFrancol and its affiliates. *See* **Exhibit "B,"** MV Agreement, at 3, and **Exhibit "C,"** VV Agreement at 3.[2]

9.      Pursuant to Clause 11 of the Agreements, the parties agreed to resolve any disputes through and pursuant to the rules of the ICC.[3] Specifically, the clauses provide:[4]

> ELEVEN: Arbitration Clause. - The Parties agree to submit any and all controversies, disagreements, disputes or claims resulting from the efficacy, execution, interpretation, modification or termination of this Settlement Agreement to an arbitral tribunal composed of three (3) arbitrators appointed upon mutual agreement by the Parties. Should no agreement be reached within ten (10) business days upon receipt of the relevant request by one Party to the other, arbitrators shall be appointed by the Center of Conciliation and Arbitration of the International Chamber of Commerce of Paris. Bogota shall be the seat of the arbitration. The arbitral tribunal shall rule according to law and shall be subject to the rules of the ICC. The arbitration cost and expenses, including the arbitrators' fees, shall be borne by each party."

**Arbitral Proceeding**

10.     On September 21, 2013, Petitioners filed their Request for Arbitration against Respondents before the ICC. Ex. A ¶ 9.

11.     On October 1, 2013, the ICC Secretariat notified Respondents of the arbitration filing. *Id.* ¶ 11. On December 3, 2013, Respondents filed their Answer. *Id.* ¶ 16.

12.     On May 22, 2014, upon request of the parties, the ICC appointed the arbitral tribunal (the "Tribunal"). *Id.* ¶ 30.

---

[2] Certified translations of the Agreements from Spanish to English are included in each exhibit.

[3] The ICC Rules of Arbitration may be accessed at https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/ (last visited on August 8, 2017).

[4] Clause Eleven in each of the Agreements is identical, and has been translated into English.

3

13.     On April 13 and 14, 2015, the Tribunal held the hearing in Bogotá, Colombia. *Id.* ¶ 98.

14.     On April 27, 2016, the Tribunal issued the Award in favor of the Petitioners and against the Respondents, specifically finding in pertinent part:

   a. Michael Ventura breached the MV Agreement entitling Petitioners to recover damages in the sum of $800,000.00.

   b. Viviane Ventura breached the VV Agreement entitling Petitioners to recover damages in the sum of $100,000.00.

   c. Respondents must reimburse Petitioners for Respondents' share of the costs of arbitration in the sum of $173,878.50.

Ex. A ¶ 639.

15.     The Award expressly resolves all claims and submissions made by the parties. *Id.* ¶ 639.

16.     No matters remain pending before the Tribunal.  The Award is final, binding and remains unsatisfied.

## V.     ARGUMENT

17.     Florida policy favors "a high degree of conclusiveness attaching to an arbitration award." *Charbonneau v. Morse Operations, Inc.*, 727 So. 2d 1017, 1019 (Fla. 4th DCA 1999); *Marr v. Webb*, 930 So. 2d 734, 737 (Fla. 3d DCA 2006) (same).

18.     "An arbitral award, irrespective of the country in which it was made, shall be recognized as binding and, upon application in writing to the competent court, shall be enforced subject to this section and § 684.0048." Fla. Stat. § 684.0047(1).

19.     Here, Petitioners have met all grounds for confirmation, and no exception to confirmation exists within the meaning of Section 684.0048.  Additionally, in compliance with

Section 684.0047(2), Petitioners submit a certified copy of the Award, originally issued in Spanish.

Also submitted are certified copies of the parties' Agreements.

20.    Consequently, this Court should confirm the Award in Petitioners favor.

## VI.    CONCLUSION

WHEREFORE, Petitioners respectfully request the Court:

a.    confirm the Award;

b.    enter final judgment in Petitioners' favor and against Respondents in conformity with the Award; and

c.    award post-judgment interest at the statutory rate and costs.

Dated: September 6, 2017                    Respectfully submitted,

/s/ Carlos F. Concepción
Carlos F. Concepción
Florida Bar No. 386730
Adrian Nuñez
Florida Bar No. 048176
JONES DAY
600 Brickell Avenue
Brickell World Plaza
Suite 3300
Miami, FL 33131
Telephone: 305.714.9700
Facsimile: 305.714.9799
E-mail: cconcepcion@jonesday.com
E-mail: anunez@jonesday.com

5

# Exhibit A



INTERNATIONAL   INTERNATIONAL   LEADING DISPUTE
COURT OF         CENTRE          RESOLUTION
ARBITRATION*     FOR ADR         WORLDWIDE

# AWARD

INTERNATIONAL CHAMBER OF COMMERCE (ICC)
INTERNATIONAL COURT OF ARBITRATION
33-43 avenue du Président Wilson, 75116 Paris, France
T +33 (0)1 49 53 29 05  F +33 (0)1 49 53 29 33

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 19728/ASM

1. Esther Ventura de Rendón (Colombia)

2. Juan María Rendón Gutiérrez (Colombia)

vs/

1. Viviane Ventura (U.S.A.)

2. Michael D. Ventura (United Kingdom)

This document is a certified true copy of the original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

ARBITRAJE CCI N°19728 /ASM

CÁMARA DE COMERCIO INTERNACIONAL
CORTE INTERNACIONAL DE ARBITRAJE

ENTRE:

ESTHER VENTURA DE RENDÓN
JUAN MARÍA RENDÓN GUTIÉRREZ
DEMANDANTES

-y-

VIVIANE VENTURA
MICHAEL D.VENTURA
DEMANDADOS

## LAUDO FINAL

Tribunal Arbitral:
Rodrigo Zamora Etcharren
Eduardo Zuleta Jaramillo
Cristián Conejero Roos

27 de abril de 2016
Bogotá, D.C., Colombia

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 29 August 2017

Alexander G. FESSAS
Secretary General

# INDICE

I. CONSIDERACIONES PRELIMINARES.................................................................................. 1

II. EL PROCEDIMIENTO ARBITRAL.................................................................................... 2

III. LOS HECHOS.................................................................................................................. 14

IV. PRETENSIONES Y POSICIONES DE LAS PARTES........................................................ 19

V. CUESTIONES A RESOLVER............................................................................................. 26

1.- LAS OBJECIONES JURISDICCIONALES........................................................................ 29

2.- LAS ALEGACIONES DE INEXISTENCIA Y NULIDAD.................................................. 44

3.- LAS RECLAMACIONES DE LOS DEMANDANTES........................................................ 78

4.- LOS PERJUICIOS............................................................................................................ 103

5.- LOS COSTOS DEL ARBITRAJE...................................................................................... 122

VI. PARTE DISPOSITIVA.................................................................................................... 127

# I. CONSIDERACIONES PRELIMINARES

1. El presente arbitraje guarda relación con las disputas derivadas de la ejecución y alegado incumplimiento de los siguientes contratos:(i) Contrato de Transacción suscrito el 22 de septiembre de 2010 entre Viviane Ventura ("Viviane Ventura"), por una parte, y Laboratorios Lafrancol S.A. — que posteriormente pasó a llamarse Lafrancol S.A.S.- ("Lafrancol"), Esther Isabel Ventura de Rendón ("Esther Ventura") y Juan María Rendón Gutiérrez ("Juan María Rendón"), por la otra, y (ii) Contrato de Transacción suscrito el 21 de septiembre de 2010 entre Michael D. Ventura ("Michael Ventura"), de una parte, y Lafrancol, Esther Ventura y Juan María Rendón, por la otra (conjuntamente, los "Contratos de Transacción"), así como con las consecuencias jurídicas derivadas de los incumplimientos y los alegados incumplimientos de los mismos (el "Arbitraje").

## A. LAS PARTES Y SUS REPRESENTANTES

2. Los demandantes en el presente Arbitraje son: (ii) Esther Ventura; y, (ii) Juan María Rendón, ambos domiciliados en Calle 86 Nº 11-84. Apto. 1201, Bogotá, D.C., Colombia (ambos conjuntamente los "Demandantes").

3. Los Demandantes actuaron representados en el Arbitraje por el abogado Luis Alfredo Barragán Arango del estudio Brigard & Urrutia, con domicilio en Calle 70 A N°4-41 Bogotá, D.C., Colombia.

4. Por su parte, los demandados en el presente Arbitraje son: (i) Viviane Ventura, domiciliada en 789 Crandon Boulevard, Apt. 402, Key Biscayne, Florida 33149, Estados Unidos de América; y (ii) Michael D. Ventura, domiciliado en Grays 354/5. 58 Davies St., Londres, W1K5LP, Reino Unido (ambos conjuntamente los "Demandados").

5. El representante de los Demandados en el Arbitraje es el letrado Carlos Felipe Mayorga Patarroyo del estudio Mayorga & Mayorga, con domicilio en Calle 100 N°8ª -55. Oficina 601- World Trade Center, Bogotá, D.C., Colombia.

6. Para fines de referencia, los Demandantes y Demandados serán referidos conjuntamente como las "Partes".

## B. EL ACUERDO DE ARBITRAJE Y LA LEY APLICABLE

7. Los Demandantes basan su demanda arbitral en las Cláusulas Undécimas de los respectivos Contratos de Transacción, en las que se incluyó la siguiente cláusula arbitral de idéntico tenor:

> "*Cláusula Compromisoria.- Las Partes convienen en someter todas y cuales quiera controversias, diferencias, disputas o reclamos que surjan en torno a la eficacia, ejecución, interpretación, modificación o terminación de la presente Transacción, a un tribunal de arbitramento que estará integrado por tres(3) árbitros designados de mutuo acuerdo por las Partes, y de no ser posible de lograr dicho Contrato en un término de diez (10) días hábiles contados a partir del recibo dela solicitud al respecto realizada por una Parte a la otra, designados por el Centro de Arbitraje y Conciliación de la Cámara de Comercio Internacional de París. El tribunal funcionará en Bogotá, decidirá en derecho y se sujetará a las normas procesales de la CCI. Los gastos y costas del procedimiento, incluyendo los honorarios de los árbitros serán asumidos por cada parte*".

8. Por su parte, la Cláusula Novena de los Contratos de Transacción señalan que la ley aplicable es la ley colombiana.

## II. EL PROCEDIMIENTO ARBITRAL

### A. LA SOLICITUD DE ARBITRAJE Y TRÁMITES PREVIOS A LA CONSTITUCIÓN DEL TRIBUNAL

9. El 21 de septiembre de 2013, ingresó a la Secretaría (la **"Secretaría"**) de la Corte Internacional de Arbitraje (la **"Corte"**) de la Cámara de Comercio Internacional (la **"CCI"**) la Solicitud de Arbitraje de los Demandantes (la **"Solicitud"**).

10. Mediante comunicación de 24 de septiembre de 2013, la Secretaría comunicó a los Demandantes la recepción de su Solicitud e informó que se practicaría la notificación de ésta.

11. Mediante comunicación de 1 de octubre de 2013, la Secretaría notificó la Solicitud a los Demandados. Informó, asimismo, (i) el plazo de contestación a la Solicitud; (ii) cuestiones relativas a la incorporación de partes adicionales; (iii) la sede del arbitraje; y (iv) el idioma del arbitraje, entre otras cuestiones.

12. Por comunicación de 25 de octubre de 2013, los Demandados solicitaron a la Secretaría una prórroga para presentar la Contestación a la Solicitud.

13. Con fecha 30 de octubre de 2013, la Secretaría concedió a los Demandados una prórroga de plazo para contestar la Solicitud hasta el día 3 de diciembre de 2013.

14. Por comunicación de fecha 6 de noviembre de 2013 los Demandados confirieron su representación a los abogados María Ximena Lombana Villalba, del estudio Cremades & Calvo-Sotelo, y Carlos Felipe Mayorga Patarroyo.

15. Con fecha 8 de noviembre de 2013, la Secretaría (i) comunicó a las Partes que tomó nota de la representación de los Demandados; (ii) tomó nota de los comentarios de las Partes sobre la constitución del tribunal arbitral (el **"Tribunal Arbitral"**); e (iii) invitó a las Partes a mantener informada a la Secretaría sobre la constitución del Tribunal Arbitral.

16. Mediante correo electrónico de fecha 3 de diciembre de 2013, los Demandados presentaron su Contestación a la Solicitud ( **"Contestación a la Solicitud"**) y Demanda Reconvencional en contra de los Demandantes (**"Demanda Reconvencional"**), incluyendo además la incorporación como Parte Adicional de Lafrancol en calidad de Demandado Reconvencional (**"Solicitud de Incorporación"**).

17. Mediante comunicación de fecha 13 de diciembre de 2013, la Secretaría notificó a Lafrancol la Solicitud de Incorporación presentada por los Demandados. Informó, asimismo, (i) el plazo de contestación a la Solicitud de Arbitraje; (ii) cuestiones relativas a la incorporación de partes adicionales; (iii) la sede del arbitraje; y (iv) el idioma del arbitraje, entre otras cuestiones

procedimentales. Con igual fecha, la Secretaría acusó recibo de las copias de la Contestación a la Solicitud y la Demanda Reconvencional. Además acusó recibo de la Solicitud de Incorporación.

18. Mediante comunicación de fecha 18 de diciembre de 2013, los Demandados presentaron a la Secretaría la valuación de las pretensiones contenidas en su Demanda Reconvencional.

19. Con fecha 20 de diciembre de 2013, los Demandantes comunicaron a la Secretaría ciertos comentarios sobre la constitución del Tribunal Arbitral. Solicitaron además prórroga al plazo para contestar la Demanda Reconvencional.

20. Mediante comunicación de 30 de diciembre de 2013, la Secretaría acusó recibo de ciertas comunicaciones de las Partes y comunicó que la Corte había considerado la cuantía del litigio en US$11.600.000 para efectos de la fijación de la provisión de gastos. La Secretaría concedió prórroga a los Demandantes para presentar su respuesta a la Demanda Reconvencional hasta el 17 de febrero de 2014.

21. Con fecha 14 de enero de 2014, Lafrancol presentó ciertos comentarios relativos a (i) a su inclusión en el presente caso, (ii) la constitución del Tribunal Arbitral, (iii) la sede e idioma del arbitraje, así como (iv) una solicitud de prórroga del término para presentar su Contestación a la Solicitud de Incorporación.

22. Mediante comunicación de fecha 16 de enero de 2014, la Secretaría acusó recibo de la carta de 14 de enero enviada por Lafrancol e informó sobre diversas cuestiones procedimentales.

23. Mediante comunicación de fecha 27 de enero de 2014, la Secretaría invitó a las Partes a informar sobre la constitución del Tribunal Arbitral el o antes del 20 de febrero de 2014. Con la misma fecha, la abogada María Ximena Lombana renunció a la representación de los Demandados. Con fecha 29 de enero de 2014, la Secretaría tomó nota de la renuncia de poder referida.

24. Con fecha 31 de enero de 2014, la Secretaría acusó recibo de ciertas comunicaciones de las Partes y de la parte adicional y notó que los Demandantes y la Parte Adicional solicitan que (i) la Corte fije la sede del arbitraje, y (ii) que al fijar la sede, la Corte considere "*criterios de neutralidad y no coincidencia con el domicilio de las partes y que el lugar seleccionado cuente con un ordenamiento jurídico favorable al arbitraje internacional*".

25. Con fecha 20 de febrero de 2014, la Secretaría acusó recibo de la respuesta de los Demandantes a la Demanda Reconvencional de fecha 17 de febrero de 2014 y de la Contestación de la Parte Adicional a la Solicitud de Incorporación, también de fecha 17 de febrero de 2014.

26. Mediante comunicación de 6 de marzo de 2014, la Secretaría informó a las Partes que la Corte había tomado las siguientes decisiones: (i) fijó Bogotá, D.C., como la sede del arbitraje; y (ii) fijó la provisión para gastos en US$430.000, sin perjuicio de reajustes posteriores.

27. Mediante comunicación de fecha 12 de marzo de 2014, las Partes solicitaron a la Secretaría un aumento de plazo de 10 días para lograr un acuerdo respecto de la designación de los árbitros. Con fecha 13 de marzo de 2014, la Secretaría concedió el aumento de plazo solicitado.

28. Con fechas 1, 8 y 9 de abril de 2014, respectivamente, las Partes informaron en comunicaciones separadas a la Secretaría no haber llegado a acuerdo sobre la designación de árbitros, y solicitaron a

la Corte nombrar a dichos árbitros, realizando al efecto diversos comentarios acerca de las características que deberían tener los árbitros que integren el Tribunal Arbitral.

29. Mediante carta de fecha 11 de abril de 2014, la Secretaría acusó recibo de las comunicaciones enviadas por las Partes, tomó nota de los comentarios vertidos por ellas en relación a la constitución del Tribunal Arbitral e informó que la Corte tomaría las decisiones pertinentes en relación con la constitución del tribunal arbitral.

30. Mediante comunicación de fecha 22 de mayo de 2014 se notificó a las Partes la decisión de la Corte adoptada en su sesión de igual fecha de nombrar como co-árbitros en el presente caso a los señores Rodrigo Zamora Etcharren y Eduardo Zuleta Jaramillo, y nombrar al señor Cristián Conejero Roos como Presidente del Tribunal Arbitral, de conformidad con los acuerdos de arbitraje.

31. Mediante carta de 22 de mayo de 2014, la Secretaría procedió a hacer entrega del expediente a los miembros del Tribunal Arbitral.

32. Mediante comunicación de 29 de mayo de 2014, el Tribunal Arbitral comunicó a las Partes cuestiones relativas a la preparación del Acta de Misión en el Arbitraje y al establecimiento del calendario procesal.

33. Con fecha 9 de junio de 2014, el Tribunal Arbitral otorgó a las Partes, a solicitud de éstas, una prórroga del plazo para presentar la exposición sumaria de las Partes de sus pretensiones y posiciones a ser incluida en el Acta de Misión hasta el 26 de junio de 2014, y estableció el día 7 de julio de 2014 como la nueva fecha para la realización de la conferencia para discutir sobre la conducción del procedimiento (la "**Conferencia Preliminar**").

34. Con fecha 20 de junio de 2014, los Demandados y Demandantes Reconvencionales presentaron ante la Secretaría una solicitud de recusación del Presidente del Tribunal Arbitral, basada en el hecho que se trataba de un nacional chileno, y que la empresa Lafrancol había sido adquirida por una empresa de capitales chilenos.

35. El Tribunal Arbitral comunicó a las Partes con fecha 29 de junio de 2014 la recepción de la exposición de pretensiones y peticiones concretas formuladas por las Partes. A su vez, reiteró a las Partes que el día 7 de julio a las 9.30 am (Bogotá, D.C.) se realizaría la Conferencia Preliminar.

36. Con fecha 7 de julio de 2014 a las 9.30 am (hora Bogotá, D.C.) el Tribunal Arbitral y los representantes de las Partes sostuvieron la Conferencia Preliminar a que hace referencia el artículo 24 del Reglamento de Arbitraje de la CCI del año 2012 (el "**Reglamento**"), en la que discutieron diversas cuestiones procedimentales relacionadas con la conducción del procedimiento.

37. Con fecha 8 de julio de 2014, el Tribunal Arbitral invitó a las Partes a emitir comentarios adicionales sobre los medios de prueba a utilizar en el arbitraje y sobre la fecha, lugar y duración tentativa de la audiencia de prueba.

38. Con fecha 10 de julio de 2014, los Demandantes presentaron sus comentarios a la solicitud de recusación planteada por los Demandados.

39. En su sesión de fecha 31 de julio de 2014, la Corte decidió rechazar la recusación planteada en contra del Presidente del Tribunal Arbitral.

40. Con fecha 21 de julio de 2014, las Partes transmitieron comentarios adicionales sobre las medidas procesales a ser consideradas en la conducción del presente arbitraje.

## B. EL ACTA DE MISIÓN Y EL CALENDARIO PROCESAL

41. Con fecha 28 de julio de 2014, el Tribunal Arbitral envió a las Partes el texto definitivo del acta de misión (el "**Acta de Misión**").

42. Las Partes y el Tribunal Arbitral suscribieron el Acta de Misión con fecha 28 de julio de 2014, de conformidad con lo dispuesto por el artículo 23(2) del Reglamento. El Acta de Misión fue transmitida a la Secretaría con esa misma fecha y fue transmitida a la Corte en la sesión del 28 de agosto de 2014.

43. Con fecha 27 de agosto de 2014, y de conformidad con el artículo 24 del Reglamento, el Tribunal Arbitral emitió la Orden Procesal N°1, que estableció el calendario procesal y otras medidas procesales relativas a la conducción del procedimiento arbitral (el "**Calendario Procesal**").

44. A partir de nuevos trámites de discusión y prueba ordenados por el Tribunal Arbitral se invitó a las Partes a acordar un nuevo calendario procesal. Sin embargo las Partes no llegaron a un acuerdo, conforme lo comunicaron al Tribunal Arbitral con fecha 24 de diciembre de 2014. En atención a esta circunstancia, el Tribunal Arbitral emitió un nuevo calendario procesal mediante la Orden Procesal N°4 dictada el 13 de enero de 2015, comunicada a las Partes con esa misma fecha.

## C. LA ETAPA DE INSTRUCCIÓN

45. Durante la etapa de instrucción del Arbitraje, el Tribunal Arbitral debió resolver sobre las siguientes cuestiones:

### 1. NATURALEZA DEL ARBITRAJE

46. Las Partes discreparon acerca de la naturaleza del arbitraje. Por una parte, en la Contestación a la Demanda y Demanda Reconvencional los Demandados sostuvieron que el presente arbitraje tiene la naturaleza de un arbitraje nacional o doméstico colombiano, administrado por la CCI, con sujeción al Reglamento.

47. Por su parte en la Contestación a la Demanda Reconvencional, los Demandantes sostuvieron que los acuerdos de arbitraje contenidos en los Contratos de Transacción que dan origen al presente arbitraje son claros en cuanto al acuerdo de las partes de someter sus diferencias a un arbitraje internacional, de acuerdo con los elementos internacionales presentes en los Contratos de Transacción, los cuales además subsisten en la controversia objeto del presente Arbitraje.

48. Mediante la Orden Procesal N°1, el Tribunal Arbitral decidió finalmente que el presente arbitraje es de carácter internacional conforme a las disposiciones de la Ley 1563 de 2012 y que se rige por la Sección Tercera de la misma ley referida al Arbitraje Internacional. Dicha decisión no fue objetada por ninguna de las Partes[1].

---

[1] Los Demandados no presentaron ninguna objeción, solicitud o comentario a la decisión emitida por el Tribunal Arbitral en la Orden Procesal N°1 respecto de la naturaleza del arbitraje. Sin embargo, en su Memorial de Contestación presentaron

**2. MEDIDA CAUTELAR**

49. Por presentación de fecha 3 de octubre de 2014 los Demandantes y Demandados Reconvencionales presentaron una solicitud de medidas cautelares (la "**Solicitud de Medida Cautelar**") en la que solicitaron que se "*ordene a los Demandados, en calidad de medida cautelar, la constitución de una garantía, de la naturaleza que el Tribunal estime conveniente, orientada a asegurar el pago de las costos y gastos del presente arbitraje*".

50. Mediante presentación de 14 de octubre de 2014 los Demandados presentaron escrito (fechado el 13 de octubre de 2014) en el que solicitaron el rechazo de la Solicitud de Medida Cautelar y en todo caso argumentaron que una decisión en ese sentido debía ser adoptada "*una vez se efectúe por parte de la demandada la Contestación al Memorial de Demanda Principal*" y, asimismo, solicitaron que el Tribunal Arbitral esperase para su decisión al respecto que la Secretaría "*haya determinado el valor de la provisión de gastos para la demanda principal luego de aceptado el retiro de la demanda reconvencional*".

51. Mediante la Orden Procesal N°2 de fecha 21 de octubre de 2014, el Tribunal Arbitral rechazó la Solicitud de Medida Cautelar.

52. Posteriormente, mediante presentación de 16 de febrero de 2015 los Demandantes solicitaron al Tribunal Arbitral reconsiderar su decisión respecto a la Medida Cautelar ("**Solicitud de Reconsideración**"). En concreto, los Demandantes pidieron el "*decreto de medidas cautelares para garantizar el pago de los costos y gastos del presente arbitraje por parte de los Demandados, a fin de garantizar que Esther Ventura y Juan María Rendón puedan ejecutar el Laudo Arbitral en el que Viviane Ventura y Michael Ventura sean condenados al pago de dichos conceptos*".

53. En la Orden Procesal N°7, emitida el 6 de abril de 2015 y comunicada a las Partes esa misma fecha, el Tribunal Arbitral determinó que se reservaría la decisión sobre esta cuestión después de la audiencia a celebrarse en los días 13 y 14 de abril de 2015 en Bogotá, D.C., (la "**Audiencia**"). En la Audiencia, el Tribunal Arbitral decidió que era necesario oír los argumentos de los Demandados. Así, mediante comunicación de fecha 17 de abril de 2015, el Tribunal Arbitral dio plazo a los Demandados hasta el día 21 de abril de 2015 para emitir sus comentarios a la Solicitud de Reconsideración.

54. Con fecha 21 de abril de 2015, los Demandados emitieron sus comentarios a la Solicitud de Reconsideración, solicitando el rechazo de la misma. Señalaron al efecto que en la especie no se cumplen los siguientes presupuestos necesarios para ordenar una medida cautelar: (i) urgencia; y (ii) existencia de una posibilidad razonable de que las pretensiones de la solicitante prosperen.

55. Mediante la Orden Procesal N° 9 de 5 de mayo de 2015, el Tribunal Arbitral decidió desestimar la Solicitud de Reconsideración interpuesta por los Demandantes

56. Para el rechazo de la Solicitud de Reconsideración el Tribunal Arbitral consideró que la concesión de Medidas Cautelares exigía que concurriesen al menos las siguientes circunstancias: (i) necesidad de proteger un derecho del solicitante; y (ii) urgencia de la medida por existir la posibilidad de un grave perjuicio para el solicitante que la medida pretende evitar o porque no es posible esperar al

nuevamente su objeción relativa a la invalidez del pacto arbitral señalando que la interpretación el Tribunal había errado en su interpretación de la ley aplicable al resolver sobre la cuestión de la naturaleza del arbitraje en la Orden Procesal N°1.

laudo para resolver la situación que se pretende evitar. Analizados los antecedentes aportados, el Tribunal Arbitral estimó que los Demandantes no acompañaron elementos de juicio suficientes que permitieran acreditar las circunstancias antes mencionadas.

## 3. RETIRO DE LA DEMANDA RECONVENCIONAL Y PARTE ADICIONAL

57. Mediante comunicación de fecha 11 de septiembre de 2014, dirigida a la Secretaría, los Demandados y hasta entonces Demandantes Reconvencionales manifestaron acerca de su *"(…) absoluta imposibilidad de atender el pago de tales provisiones de gastos no obstante las gestiones adelantadas para procurar financiación para el pago de la misma"*. Y sobre esa base, anticiparon que *"[P]or tanto, a fin de contribuir a las más eficiente conducción del caso, a la brevedad posible estaremos formalizando ante el Tribunal Arbitral el retiro de la demanda reconvencional inicialmente promovida en el presente trámite arbitral, decisión basada exclusivamente en la imposibilidad financiera de atender el pago de la provisión de gastos, sin que ello implique reconocimiento a fundamento o argumento alguno presentado por las demandadas en reconvención, y sin perjuicio de la posibilidad de adelantar la discusión de las mismas o análogas demandas en otro trámite arbitral de conformidad con lo señalado en el Art. 36 (6) del Reglamento"*. (énfasis del Tribunal Arbitral)

58. Por comunicación del 23 de septiembre de 2014, y en respuesta a la solicitud de información de la Secretaría de la Corte Internacional de Arbitraje de la CCI del 19 de septiembre del mismo año, los Demandados y hasta entonces Demandantes Reconvencionales manifestaron que por *"medio del presente escrito informamos que procederemos a formalizar el retiro de la demanda reconvencional el o antes del próximo viernes 26 de Septiembre de 2014"*.

59. Mediante escrito de fecha 25 de septiembre de 2014, dirigido al Tribunal Arbitral, los Demandados y Demandantes Reconvencionales confirmaron su decisión de retirar la demanda reconvencional, *"sin que ello implique reconocimiento a fundamento o argumento alguno presentado por los demandantes y demandados en reconvención, y sin perjuicio de la posibilidad de adelantar la discusión de las mismas o análogas demandas en otro trámite arbitral de conformidad con lo señalado en el Art. 36 (6) del Reglamento"*, reiterando que la razón radicaba *"en la imposibilidad financiera por parte de los demandados y demandantes en reconvención para atender el pago de la provisión de gastos señalada por la Corte de Arbitraje (…)"*.

60. Con fecha 15 de octubre de 2014, y atendida la solicitud de retiro de la Demanda Reconvencional por parte de los Demandados y Demandantes Reconvencionales, el Tribunal Arbitral invitó a las Partes a que a más tardar el miércoles 22 de octubre de 2014 se pronunciasen sobre los efectos que tendría dicho retiro con relación a Lafrancol, la cual fue incluida en el presente arbitraje exclusivamente en calidad de demandada reconvencional.

61. El 22 de octubre de 2014, los Demandados y Demandantes Reconvencionales manifestaron lo siguiente: *"A este respecto, me permita manifestar que en nuestro entendimiento, el RETIRO de la Demanda Reconvencional formulada por VIVIANE VENTURA y MICHAEL VENTURA en contra de ESTHER VENTURA DE RENDON, JUAN MARIA RENDON y LAFRANCOL S.A., implica adicionálmente el RETIRO de la solicitud de vinculación de parte adicional LABORATORIO FRANCO COLOMBIANO SAS LAFRANCOL"*. Agregaron al efecto que esa circunstancia no conllevaba una aceptación o reconocimiento de su parte a los argumentos de la referida sociedad y sin perjuicio de *"la posibilidad de adelantar la discusión frente a dicha sociedad, de las mismas o análogas pretensiones en otro trámite arbitral de conformidad con lo señalado en el Art. 36(6) del Reglamento"*.

62. El 22 de octubre de 2014 los Demandantes y hasta entonces Demandados Reconvencionales solicitaron al Tribunal Arbitral (i) aceptar el retiro de la Demanda Reconvencional y, en consecuencia, (ii) desvincular a Lafrancol del presente trámite arbitral.

63. Mediante la Orden Procesal N°3 emitida y comunicada a las partes el 29 de octubre de 2014, el Tribunal Arbitral decidió: (i) aceptar el retiro de la Demanda Reconvencional planteada por los Demandados y Demandantes Reconvencionales en contra de los Demandantes y Demandados Reconvencionales, sin que dicho retiro implique reconocimiento a fundamento o argumento alguno presentado por los Demandantes Reconvencionales, y sin perjuicio de la posibilidad de que los Demandados y Demandantes Reconvencionales puedan adelantar la discusión de las mismas o análogas demandas en otro trámite arbitral de conformidad con lo señalado en el Art. 36 (6) del Reglamento; (ii) aceptar el retiro y desvinculación de Lafrancol en su calidad de Parte Adicional del presente procedimiento arbitral y (iii) ordenar que, en adelante, el presente arbitraje continuase únicamente entre Esther Ventura y Juan María Rendón como Demandantes, y Viviane Ventura y Michael Ventura, como Demandados, debiendo introducirse las modificaciones a la referencia del caso que así lo reflejen.

64. Atendida esta circunstancia, en lo sucesivo en el Laudo Arbitral se omitirán referencias innecesarias a la Demanda Reconvencional y a Lafrancol en su calidad de Parte Adicional.

4. MEMORIALES Y SOLICITUD DE PRODUCCIÓN DE DOCUMENTOS

   a. MEMORIALES

65. De acuerdo al Calendario Procesal, los Demandantes enviaron al Tribunal Arbitral su Memorial del Demanda Principal con fecha 26 de septiembre de 2014 ("**Memorial de Demanda**").

66. Por su parte, con fecha 27 de octubre de 2014 los Demandados enviaron al Tribunal Arbitral su Memorial de Contestación de la Demanda Principal ("**Memorial de Contestación**").

67. Con fecha 26 de noviembre de 2014 los Demandantes enviaron al Tribunal Arbitral el Memorial de Réplica al Memorial de Contestación ("**Memorial de Réplica**").

68. Conforme se dispuso en la Orden Procesal N°4, con fecha 2 de febrero de 2015 los Demandados enviaron su memorial de Pronunciamiento sobre el Memorial de Réplica ("**Memorial de Pronunciamiento sobre la Réplica**").

69. Con fecha 6 de marzo de 2015 ambas partes entregaron al Tribunal Arbitral su respectivo Memorial de Cierre. Asimismo, y con fecha 16 de marzo de 2015 ambas partes hicieron lo propio con el Memorial de Respuesta al Memorial de Cierre de la contraria.

70. Luego, con fecha 8 de julio de 2015 los Demandantes y Demandados presentaron su respectivo Memorial Posterior a la Audiencia.

71. Las Partes acompañaron a sus Memoriales la prueba documental, declaraciones escritas de testigos e informes de expertos en apoyo de sus pretensiones, de conformidad a lo señalado en la Orden Procesal N°1. También solicitaron emisión de oficios y citaciones de comparecencia de testigos.

**b.  SOLICITUD DE PRODUCCIÓN DE DOCUMENTOS**

72. Durante el Arbitraje, ambas Partes presentaron sendas solicitudes de prueba documental en posesión de la otra Parte.

73. En relación a la solicitud de producción de prueba documental realizada por los Demandantes, mediante Orden Procesal N°6 de fecha 16 de febrero de 2015, el Tribunal Arbitral acogió parcialmente la solicitud requiriendo a los Demandados que entregasen a los Demandantes el texto de la denuncia penal presentada por Viviane y Michael Ventura ante la Fiscalía General de la Nación de Colombia en contra de Esther Ventura, junto con todos sus anexos, la cual dio lugar a la apertura de los dos procedimientos investigativos que actualmente se tramitan (a) ante la Fiscalía número 139 Seccional Delegada- Unidad Indagación e instrucción Ley 600 · Ante Jueces Penales del Circuito y Municipales, con número de radicación 848319 y (b) ante la Fiscalía 243 Seccional – Unidad Tercera de Delitos contra la Fe Pública y Patrimonio Económico, con número de Radicación 110016000049201214409.

74. En relación a la solicitud de producción de prueba documental realizada por los Demandados, mediante la misma Orden Procesal N°6, el Tribunal Arbitral acogió parcialmente la solicitud, requiriendo a los Demandantes que entregasen a los Demandados (i) copia auténtica del documento que fue remitido a la emisora la W Radio por parte de Esther Ventura y sus asesores legales, en el cual se pronuncia sobre la controversia existente con Viviane y Michael Ventura, que fue leído en la entrevista radial efectuado por la emisora a Viviane Ventura el 8 de febrero de 2013 y sus anexos; y (ii) copia auténtica del documento suministrado por Esther Ventura y sus abogados, que fue citado en el artículo publicado por El Espectador el 7 de marzo de 2013 denominado "Un Lío de Sangre tras la venta de Lafrancol" y sus anexos.

**5.  CUESTIONES PROCESALES Y DE PRUEBA SUSCITADAS DURANTE LA INSTRUCCIÓN DEL PROCEDIMIENTO.**

75. Durante la etapa de instrucción se suscitaron una serie de cuestiones procesales y de prueba que fueron resueltas por el Tribunal Arbitral conforme se indica a continuación.

**a.  SOLICITUD DE LOS DEMANDADOS DE UN TÉRMINO PARA MEMORIAL DE COMENTARIOS AL MEMORIAL DE RÉPLICA.**

76. El 17 de diciembre de 2014 los Demandados solicitaron que se les concediese una oportunidad para emitir sus comentarios con relación al Memorial de Réplica. Con fecha 24 de diciembre los Demandados reiteraron esta solicitud mediante presentación al Tribunal Arbitral.

77. Mediante comunicación de fecha 24 de diciembre de 2014, los Demandantes contestaron dicha solicitud oponiéndose a lo solicitado por los Demandados.

78. Mediante la Orden Procesal N°4, emitida y comunicada a las partes el 13 de enero de 2015, el Tribunal Arbitral accedió a la solicitud de los Demandados, pero limitándola exclusivamente a aquellas alegaciones, argumentos y prueba nueva acompañada al Memorial de que no se refiera a aspectos ya contenidos en el Memorial de Demanda.

### b. SOLICITUDES RELATIVAS A TESTIGOS, PERITOS Y DECLARACIONES TESTIMONIALES.

79. Los Demandados, en el numeral 3.1 del Memorial de Contestación solicitaron al Tribunal Arbitral servirse de las declaraciones de su propia parte, los señores Michael Ventura y Viviane Ventura respectivamente, solicitando una prórroga para presentarlas. Los Demandantes se opusieron a la misma, solicitando su rechazo y, para el caso que ésta fuese acogida, los Demandantes pidieron al Tribunal Arbitral concederles una oportunidad para que replicasen lo que fuese pertinente de presentarse dichas declaraciones, incluyendo la posibilidad de aportar las propias declaraciones escritas de Esther Ventura y Juan María Rendón.

80. Mediante la Orden Procesal N°4 de 13 de enero de 2015, el Tribunal Arbitral decidió ordenar a los Demandados a que acompañaran las declaraciones escritas de los señores Viviane y Michael Ventura a más tardar el 1 de febrero de 2015. Al mismo tiempo se otorgó a los Demandantes la posibilidad de acompañar, a más tardar el 16 de febrero de 2015, las declaraciones de otros testigos cuyos testimonios escritos ya se hayan acompañado al presente arbitraje, única y exclusivamente con relación a los hechos y aseveraciones contenidas en las declaraciones a ser presentadas por los señores Viviane y Michael Ventura.

81. Los Demandados, en el numeral 3.1 del Memorial de Contestación solicitaron al Tribunal Arbitral que ordenara la comparecencia de los Demandantes Esther Ventura y Juan María Rendón a fin de que ambos pudieran ser examinados en la Audiencia. En el acápite VI. del Memorial de Réplica, los Demandantes no manifestaron comentarios particulares, aunque indicaron que, en caso que el Tribunal Arbitral autorizase la presentación de Michael y Viviane Ventura, debía darse una oportunidad para aportar las declaraciones de Esther Ventura y Juan María Rendón en calidad de testigos. Mediante la citada Orden Procesal N°4, el Tribunal Arbitral decidió otorgar plazo a los Demandantes para que acompañaran las declaraciones escritas de los señores Esther Ventura y Juan María Rendón a más tardar el 16 de febrero de 2015.

82. Los Demandados, en el numeral 3.1 del Memorial de Contestación solicitaron al Tribunal Arbitral ordenar la comparecencia de don Carlos Antonio Espinosa Pérez en calidad de testigo. Al respecto los Demandantes no indicaron nada ni manifestaron oposición. Mediante la Orden Procesal N°4, el Tribunal Arbitral decidió autorizar la declaración del Sr. Espinosa como testigo.

83. Los Demandados, en el numeral 3.1 del Memorial de Contestación a la Demanda ordenar la comparecencia de Pombo & Cía. a través de la persona que la represente. En el acápite VI. del Memorial de Réplica a la Contestación a la Demanda Principal, los Demandantes se opusieron expresamente a dicha solicitud. Mediante la Orden Procesal N°4, de 13 de enero de 2015, el Tribunal Arbitral decidió desestimar la solicitud de los Demandados de que se cite al representante legal de Pombo & Cía. a fin de que sea examinado en la Audiencia.

84. En el Memorial de Pronunciamiento sobre la Réplica, los Demandados acompañaron la declaración escrita del señor Jaime Lombana. Los Demandantes, en presentación de 16 de febrero de 2015, alegaron que no debería admitirse la declaración testimonial del señor Jaime Lombana acompañada al referido memorial, pidiendo al Tribunal Arbitral la rechazase por extemporánea. Mediante la Orden Procesal N°7 de fecha 6 de abril de 2015, el Tribunal Arbitral decidió admitir la declaración testimonial del señor Jaime Lombana acompañada por los Demandados.

85. En el acápite IV del Memorial de Demanda los Demandantes solicitaron al Tribunal Arbitral la comparecencia a la Audiencia de Siglo Data S.A.S. a través de la persona que legalmente la represente. Mediante presentación de 19 de enero de 2015, los Demandados se opusieron a la citación de Siglo Data S.A.S. como testigo; en cuanto a su citación como perito, solicitaron que se limitara a realizar una breve presentación del perito y se le realizara un interrogatorio directo de no más de 10 minutos, con el único fin de resaltar los aspectos relevantes del dictamen de que se trate,

o para interrogarlo en relación con aquellas cuestiones que fueren objeto de un contrainterrogatorio. Mediante la Orden Procesal N°5 de 30 de enero de 2015, el Tribunal Arbitral decidió rechazar la citación de Siglo Data S.A.S. a la Audiencia como testigo, autorizando su comparecencia como perito a través de un representante.

86. En el acápite VII del Memorial de Réplica los Demandantes solicitaron al Tribunal Arbitral la comparecencia a la Audiencia de los peritos Javier Ayala Álvarez y Eduardo Cifuentes Muñoz. Mediante presentación de 19 de enero de 2015, los Demandados se opusieron a su citación como testigos; en cuanto a su citación como peritos, solicitaron que se limitara a realizar una breve presentación de los peritos y se les realizara un interrogatorio directo de no más de 10 minutos, con el único fin de resaltar los aspectos relevantes de los dictámenes de que se trate, o para interrogarlos en relación con aquellas cuestiones que fueren objeto de un contrainterrogatorio. Mediante la Orden Procesal N°5 de 30 de enero de 2015, el Tribunal Arbitral decidió rechazar la citación de Javier Ayala Álvarez y de Eduardo Cifuentes Muñoz a la Audiencia como testigos, autorizando su comparecencia como peritos.

87. Mediante presentación de 16 de febrero de 2015, los Demandantes allegaron una declaración testimonial del señor Augusto J. Ibáñez Guzmánm, de fecha 13 de febrero de 2015, solicitando además su comparecencia como testigo a la Audiencia de Prueba. Mediante presentación de 18 de febrero de 2015, los Demandados solicitaron que dicho testimonio no se considerara por ser extemporáneo. Mediante la Orden Procesal N°7 de 6 de abril de 2015, el Tribunal Arbitral desestimó por improcedente la declaración testimonial del señor Augusto J. Ibáñez Guzmán.

88. Mediante presentación de 16 de febrero de 2015, los Demandantes solicitaron la citación como testigo del señor Julio José Seneor. Mediante presentación de 18 de febrero de 2015, los Demandados se opusieron a la citación del señalado testigo. Mediante la Orden Procesal N° 7 de 6 de abril de 2015, el Tribunal Arbitral rechazó la solicitud de citación del testigo señor Julio José Seneor.

c.   SOLICITUD DE LOS DEMANDADOS SOBRE INADMISIBILIDAD DE DOCUMENTOS ANEXOS A LAS DECLARACIONES TESTIMONIALES DE ESTHER VENTURA Y JUAN MARÍA RENDÓN.

89. Con fecha 16 de febrero de 2015, los Demandantes presentaron declaraciones testimoniales de Esther Ventura y Juan María Rendón y acompañaron ciertos documentos en apoyo de dichas declaraciones. Los Demandados se opusieron a que el Tribunal Arbitral considerare dichos documentos, por considerar extemporánea su presentación. Mediante la Orden Procesal N°8, el Tribunal Arbitral decidió reservar para el laudo final la decisión sobre la solicitud de inadmisibilidad de documentos formulada por los Demandados.

90. El Tribunal Arbitral, habiendo concluido que no existen razones fundadas para la presentación extemporánea de tales documentos, declara inadmisibles tales documentos los cuales no son considerados en el presente Laudo Arbitral. Sin embargo, el Tribunal Arbitral considera que aún si dichos documentos se hubieren tenido en cuenta, no cambiarían el sentido del presente Laudo Arbitral.

d.   SOLICITUDES DE REMISIÓN DE OFICIOS.

91. En su Memorial de Contestación, los Demandados solicitaron al Tribunal Arbitral la remisión de oficios a: (i) la Fiscalía General de la Nación, Fiscalía 139 Seccional Delegada Unidad de

Indagación e Instrucción Ley 600 de 2000 ante Jueces Penales del Circuito y Municipales de la República de Colombia, para que remitiera al Tribunal Arbitral copia de la denuncia penal que dio origen a la investigación con radicado interno No. 848319, incluyendo todos los elementos materiales probatorios anexos a la misma, y para que además expidiera una certificación sobre la existencia del proceso y el estado del mismo; (ii) la Fiscalía General de la Nación, Fiscalía 243 Seccional Unidad Tercera de Delitos contra la Fe Pública y Patrimonio Económico de la República de Colombia, para que remitiera al Tribunal Arbitral copia de la denuncia penal que dio origen a la investigación con radicado interno No. 110016000049201214409, incluyendo todos los elementos materiales probatorios anexos a la mismo y, asimismo, para que expidiera una certificación sobre la existencia del proceso y el estado del mismo; y (iii) la Cámara de Comercio de Cali, Colombia, a fin de que se sirviera: (a) certificar si Esther Ventura y Juan María Rendón, fueron elegidos e inscritos como administradores de la Sociedad, sea en calidad de miembros de Junta Directiva, Representantes Legales, Gerentes, tanto principales como suplentes, especificando los actos de la sociedad donde consten dichos nombramientos y el periodo por el cual fueron elegidos, (b) expedir copias auténticas de los actos, contratos y documentos sujetos a su registro que constan en sus archivos, respecto de Lafrancol mediante los cuales se haya designado a Esther Ventura y Juan María Rendón, como administradores de la Sociedad, sea en calidad de miembros de Junta Directiva, Representantes Legales y Gerentes, tanto principales como suplentes, (c) certificar si Lafrancol ha sido objeto de capitalizaciones, especificando a través de qué actos o reformas societarias se han efectuado; y (d) expedir copia de los actos, contratos y documentos registrados en esa entidad, a través de los cuales se hayan efectuado capitalizaciones de la sociedad, incluyendo los certificados emitidos por la Revisoría Fiscal sobre la composición accionaria de la compañía.

92. Mediante presentación de 19 de enero de 2015, los Demandantes se opusieron a la solicitud de remisión de los oficios señalados.

93. Mediante la Orden Procesal N°5 de fecha 30 de enero de 2015, el Tribunal Arbitral rechazó la remisión de oficios a la Cámara de Comercio de Cali. A su turno, pospuso la decisión sobre la remisión de oficios a la Fiscalía General de la Nación de la República de Colombia, en tanto no se hubiere completado la etapa de producción documental. Finalmente, rechazó la solicitud en la Orden Procesal N°8 de fecha 10 de abril de 2015.

e. **SOLICITUDES SOBRE PRODUCCIÓN DE PRUEBA DOCUMENTAL EN PODER DE TERCEROS.**

94. En el Memorial de Pronunciamiento sobre la Réplica, los Demandados solicitaron la producción de prueba documental en manos de terceros, correspondiente a los siguientes documentos que habrían estado en posesión de Lafrancol: (i) copia auténtica y parcial del libro de registro de accionistas de Lafrancol, específicamente los folios donde conste el registro de la cesión de las acciones de propiedad de Michael Ventura; (ii) copia auténtica y parcial del libro de registro de accionistas de Lafrancol, específicamente los folios en donde conste el registro de la adquisición de esas acciones de propiedad de Michael Ventura por parte de otros accionistas o terceras personas; y (iii) copia auténtica de las Actas de Asamblea de Accionistas y/o Junta Directiva en las cuales se haya autorizado a Roberto Ventura Crispino, en su condición de administrador de Lafrancol, para adquirir la participación accionaria de Michael Ventura.

95. Por su parte los Demandantes, mediante presentación de 16 de febrero de 2015 se opusieron a dicha solicitud.

96. Mediante la Orden Procesal N°7 de fecha 6 de abril de 2015, el Tribunal Arbitral rechazó la referida solicitud.

### 6. LA AUDIENCIA

97. Mediante la citada Orden Procesal N°7, el Tribunal Arbitral dio a conocer su decisión respecto a una serie de cuestiones procesales relevantes para la organización de la Audiencia relativa a:(i) la duración y su jornada diaria; (ii) la regulación de los alegatos de cierre; (iii) la identificación de testigos y peritos a ser interrogados; (iv) la secuencia del interrogatorio y examen de testigos y peritos; (v) la designación del tiempo para las interrogaciones de testigos y peritos; (vi) el lugar de desarrollo de la Audiencia; (vii) la asistencia de testigos y peritos durante la Audiencia; (viii) la utilización de elementos demostrativos en la Audiencia.

98. La Audiencia tuvo lugar en Bogotá, D.C. los días 13 y 14 de abril de 2015. Durante la Audiencia, (i) se realizaron alegatos de apertura; (ii) se rindió la prueba testimonial y pericial y; (iii) se efectuaron los alegatos de cierre de cada parte. La Audiencia fue enteramente transcrita.

### 7. ESCRITOS DE CONCLUSIONES Y COSTOS DEL ARBITRAJE

99. Con fecha 8 de julio de 2015, las Partes presentaron sus Memoriales Posteriores a la Audiencia que contenían las conclusiones sobre la base de la prueba rendida en el curso del Arbitraje.

100. Con fecha 24 de julio de 2015, las Partes presentaron sus Memoriales sobre Distribución de Costos del Arbitraje.

### 8. CIERRE DE LA ETAPA DE INSTRUCCIÓN Y SOLICITUDES DE SUSPENSIÓN DEL ARBITRAJE

101. El Tribunal Arbitral, una vez satisfecho de que contaba con todos los elementos de juicio y probatorios necesarios para la resolución de la presente disputa, procedió a dictar la Orden Procesal N°10 de fecha 3 de septiembre de 2015, mediante la cual (i) decretó, de conformidad con el artículo 27 del Reglamento, el cierre de la instrucción en el presente Arbitraje, y; (ii) ordenó que, a partir de la notificación de dicha orden, no podría presentarse ningún escrito, alegación, ni prueba en relación con las cuestiones a ser resueltas en el laudo arbitral, salvo requerimiento o autorización del Tribunal Arbitral.

102. Con fecha 14 de diciembre de 2015, los Demandados presentaron una solicitud de suspensión del arbitraje por prejudicialidad penal. Con fecha 23 de diciembre de 2015, los Demandantes emitieron sus comentarios con relación a dicha solicitud.

103. Mediante la Orden Procesal N°11 de fecha 13 de enero de 2016, el Tribunal Arbitral decidió desestimar la referida solicitud de suspensión planteada por los Demandados y reiteró el cierre de la instrucción.

104. Con fecha 28 de marzo de 2016, los Demandados presentaron una nueva solicitud de suspensión del arbitraje por prejudicialidad penal, la cual fue complementada y reiterada por escrito presentado el 22 de abril de 2016. Con fecha 1 y 25 de abril de 2016, los Demandantes emitieron sus respectivos comentarios con relación a dicha nueva solicitud y complementación.

105. Mediante la Orden Procesal N°12 de fecha 27 de abril de 2016, el Tribunal Arbitral decidió desestimar la nueva solicitud de suspensión planteada por los Demandados, como también el escrito que la complementa y ratifica, y reiteró el cierre de la instrucción.

106. Durante la Audiencia, ambas Partes expresaron su conformidad con la forma en que el procedimiento arbitral había sido conducido por el Tribunal Arbitral y manifestaron no tener ninguna objeción o reparo al mismo[2]. Con posterioridad a la Audiencia, el Tribunal Arbitral no ha recibido escritos o manifestaciones de las Partes en que hayan formulado objeción o reparo a la forma en que el procedimiento arbitral ha sido conducido.

## 9. PLAZO PARA DICTAR EL LAUDO ARBITRAL

107.  La Corte ha otorgado las siguientes prórrogas para la dictación del Laudo Arbitral: (i) en su sesión de fecha 11 de septiembre de 2014, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 31 de julio de 2015; (ii) en su sesión de fecha 23 de julio de 2015, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 31 de diciembre de 2015; (iii) en su sesión de fecha 17 de diciembre de 2015, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 29 de enero de 2016; (iv) en su sesión de fecha 21 de enero de 2016, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 29 de febrero de 2016; (v) en su sesión de fecha 18 de febrero de 2016, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 31 de marzo de 2016, y; (vi) en su sesión de fecha 17 de marzo de 2016, la Corte otorgó una prórroga para dictar el Laudo Arbitral hasta el 29 de abril de 2016.

# II.   LOS HECHOS

108. La presente sección contiene una descripción general de los hechos que dieron origen a la disputa objeto de este Arbitraje, según fueron presentados por las Partes. Otros hechos más específicos se describen más adelante, a propósito de reclamaciones particulares que se resuelven en el presente Laudo Arbitral. El Tribunal Arbitral ha tenido en cuenta todos los hechos, pruebas y alegaciones presentados por las Partes y la circunstancia de que no se haga referencia específica a un hecho o alegación no significa que el Tribunal Arbitral no le haya tenido en cuenta.

## A. Antecedentes de los Contratos de Transacción

109. A la muerte del padre de los Demandados, Viviane y Michael Ventura heredaron el 6,88% de las acciones de Lafrancol en partes iguales, es decir un 3,44% cada uno[3]. Los Demandados no

---

[2] "DR. CONEJERO: Yo creo que con eso estamos ya llegando a la conclusión de esta audiencia. Antes de concluir, formalmente, me gustaría invitar a las partes y a sus apoderados aquí que las representan[...], a que manifiesten si están satisfechas con el modo en que se ha conducido esta audiencia en particular, y el proceso arbitral hasta ahora en general, y si han contado con plena oportunidad para presentar su caso y si se les ha dado iguales oportunidades con igualdad de trato en términos tales que no existen objeciones o reparos a la manera como se ha conducido el proceso y en que se han dado, se han reconocido tales derechos y se ha ofrecido tal trato igual a las partes en este arbitraje. Invito primero al doctor Barragán a que confirme a que es así, en la medida evidentemente que esa sea su convicción, para que quede constancia de ello. DR. BARRAGAN: Por supuesto, doctor Conejero, sin ningún tipo de reservas manifiesto que estoy conforme con el trato que se ha dado a la parte que represento, entiendo que se ha dado una plena oportunidad para presentar sus casos e incluso, pues con la solicitud que ha sido resuelta por el Tribunal en relación con una nueva reclamación que entiendo está siendo analizada por el Tribunal, o sea que sin ningún tipo de reservas puedo afirmar que he sido tratado de manera justa, equitativa, razonable y, en lo que entiendo, de acuerdo con el reglamento. DR. CONEJERO: Muchas gracias, doctor Barragán. Doctor Mayorga, le hago la misma invitación. DR. MAYORGA: Por supuesto, presidente, ratifico que hemos sido escuchados; tratados con corrección, con oportunidades de contradicción y hasta el momento no tenemos ninguna salvedad al trámite observado por el Tribunal". (Transcripción de la Audiencia. Páginas 362-363).

[3] Memorial de Demanda. Párrafo 1, y; Memorial de Contestación. Párrafo 1.

participaban de la administración de dicha compañía, mientras que los Demandantes, además de tener la calidad de accionistas, se desempeñaron como ejecutivos de Lafrancol[4].

110. En el año 2007 Viviane Ventura habría solicitado se le reconociera su participación en Lafrancol[5]. Los Demandantes alegan que no podían atender las solicitudes de Viviane Ventura en torno a reconocer su calidad de accionista de Lafrancol dado que ella había vendido previamente todas sus acciones en dicha compañía[6], mientras que los Demandados niegan las circunstancias anteriores, y señalan que Viviane Ventura jamás vendió la totalidad de sus acciones en Lafrancol ni a los Demandantes ni a terceros[7].

111. Las Partes coinciden en el hecho que previo a la firma de los Contratos de Transacción, las acciones de Michael Ventura reclamaba como suyas se encontraban registradas a nombre de un tercero[8] y que, al menos a partir de 2009, Michael Ventura solicitó el reintegro a su nombre de las acciones de Lafrancol y que el reintegro se consignara en los registros societarios[9].

112. Además, las Partes coinciden en que en julio de 2010 Michael Ventura presentó una solicitud de conciliación convocando a Lafrancol, a Esther Ventura y a Juan María Rendón[10] en la que pidió: (i) la restitución del 3,44% de las acciones de Lafrancol a su nombre; (ii) que la restitución de dichas acciones se inscribiera debidamente en el libro de accionistas; (iii) que se le permitiera a Michael Ventura ejercer el derecho de inspección de los libros de Lafrancol; (iv) que se le informara a Michael Ventura sobre las políticas de distribución de dividendos desde el año 2005 a la fecha de solicitud de conciliación y la manera como ésta fuera aplicada a sus acciones (la "**Primera Solicitud de Conciliación**")[11]. Finalmente, ese procedimiento de conciliación no concluyó en acuerdo[12]. Posteriormente, los Demandantes llegaron a un acuerdo para adquirir las acciones de Lafrancol en poder de Michael Ventura. Las Partes concuerdan en que el precio de compra de dichas acciones fue convenido entre ellas[13].

113. En septiembre de 2010, las Partes suscribieron los Contratos de Transacción. En concreto, las partes del Contrato de Transacción firmado con Viviane Ventura consignaron que la causa de la misma eran las diferencias que sostenían en torno a si Viviane Ventura tenía o no la calidad de accionista de Lafrancol y en relación al rol de los Demandantes en tanto accionistas y/o administradores de Lafrancol[14].

114. A su turno, con relación al Contrato de Transacción firmado con Michael Ventura, los firmantes de la respectiva transacción consignaron que la causa de la misma eran las diferencias que sostenían en torno a la condición de accionista de Michael Ventura y sus relaciones

---

[4] Memorial de Demanda. Párrafo 2, y; Memorial de Contestación. Párrafo 2.
[5] Memorial de Demanda. Párrafo 4, y; Memorial de Contestación. Párrafo 4.
[6] Memorial de Demanda. Párrafo 5.
[7] Memorial de Contestación. Párrafo 5.
[8] Memorial de Demanda. Párrafo 7; y, Memorial de Contestación. Párrafo 7.
[9] Memorial de Demanda. Párrafos 6 y 10, y; Memorial de Contestación. Párrafos 6 y 10. Los Demandados alegan que Michael Ventura habría tenido contactos con Esther Ventura respecto de esta materia incluso antes de 2009.
[10] Memorial de Demanda. Párrafo 10, y; Memorial de Contestación. Párrafo 10.
[11] Anexo D-50. Solicitud de Conciliación de junio de 2010, suscrita por Michael Ventura.
[12] Memorial de Demanda. Párrafos 11 y 12, y; Memorial de Contestación. Párrafos 11 y 12.
[13] Memorial de Demanda. Párrafo 12, y; Memorial de Contestación. Párrafo 12.
[14] Anexo-D 1a. Consideraciones.

comerciales y societarias, incluyendo el rol de los Demandantes en tanto accionistas y/o administradores de Lafrancol[15].

## B. Los Contratos de Transacción

115. Con fecha 21 de septiembre de 2010, Michael Ventura, denominado como "Vendedor", de una parte, y Lafrancol, Esther Ventura y Juan María Rendón, denominados como el "Comprador", por la otra, celebraron un Contrato de Transacción, el cual tenía por objeto *"transigir de forma definitiva todas y cada una de las diferencias existentes, y precaver eventuales y/o contingentes litigios, (i) entre las Partes, derivados de la condición de accionista del Vendedor y/o de accionistas y/o administradores de los Compradores. Igualmente es interés explícito de las Partes precaver cualquier posible reclamación o acción judicial o extrajudicial entre ellas y con relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL. En consecuencia, en los términos del artículo 2469 y siguientes del Código Civil, las Partes suscriben la presente transacción (la 'Transacción'), en aras de transigir de toda forma definitiva las diferencias existentes y precaver litigios eventuales y con plenos efectos de cosa juzgada de conformidad con lo previsto en la ley colombiana, así como en toda otra Jurisdicción, País o Territorio donde una cualquiera de las Partes pudiere incoar reclamación o acción judicial o extra judicial en contra de uno cualquiera de los demás firmantes y vinculados, así como en relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL, respecto de las cuales las Partes renuncian expresamente a tales posibles acciones".*[16]

116. En dicho contrato, las referidas partes estipularon, entre otras cosas: (i) la renuncia o el desistimiento si se hubiesen iniciado, por parte del Vendedor de todo tipo de acciones, denuncias o reclamaciones, en contra del Comprador o cualquiera de sus filiales, subordinadas, matrices, o accionistas, entre otros; (ii) el Comprador se obligó al pago de US$3.800.000; (iii) la renuncia del Comprador al ejercicio de cualquier acción, queja, denuncia, etc. en contra del Vendedor; (iv) que la transacción ponía fin a todas las diferencias entre las partes respecto de su condición de accionistas y/o administradores de Lafrancol, acordando que la transacción surtiera efectos de sentencia ejecutoriada en última instancia; (v) confidencialidad, que alcanzaba a funcionarios y asesores de las partes, respecto a cualquier información relacionada a la transacción, salvo que se diesen condiciones excepcionales señaladas en el contrato; (vi) otorgar a la transacción mérito ejecutivo; (vii) declararse y garantizarse mutuamente: la válida constitución y existencia como personas jurídicas, poseer capacidad suficiente para suscribir el contrato y cumplir sus obligaciones, contar con las autorizaciones corporativas necesarias, entregar efecto vinculante a la transacción y que la transacción no violaba norma alguna ni suponía el incumplimiento de ningún contrato o acuerdo celebrado por las partes; y (viii) la existencia de una cláusula penal por la suma de US$1.000.000 en caso de incumplimiento de la transacción por alguna de las partes.

117. Con fecha 22 de septiembre de 2010, Viviane Ventura por una parte, denominada como "Solicitante", y Lafrancol, Esther Ventura y Juan María Rendón, denominados como "Solicitados", por la otra celebraron un Contrato de Transacción mediante el cual acordaron *"transigir de forma definitiva todas y cada una de las diferencias existentes, y precaver eventuales y/o contingentes litigios entre las Partes, derivados de la discusión en torno a si el Solicitante tendría o no en la actualidad la calidad de accionista de Lafrancol y/o respecto de actuaciones como accionistas y/o administradores de los Solicitados. Igualmente es interés explícito de las Partes precaver cualquier posible reclamación o acción judicial o*

---

[15] Anexo D-1b. Consideraciones.
[16] Anexo D-1b. Cláusula Primera.

*extrajudicial entre ellas y con relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL S.A.. En consecuencia, en los términos del artículo 2469 y siguientes del Código Civil, las Partes suscriben la presente transacción (la 'Transacción'), en aras de transigir de forma definitiva las diferencias existentes y precaver litigios eventuales y con plenos efectos de cosa juzgada de conformidad con lo previsto en la ley colombiana, así como en toda otra Jurisdicción, País o Territorio donde una cualquiera de las Partes pudiere incoar reclamación o acción judicial o extra judicial en contra de uno cualquiera de los demás firmantes y vinculados, así como en relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL, respecto de las cuales las Partes renuncian expresamente a tales posibles acciones*[17].

118. En dicho contrato, las referidas partes estipularon, entre otras cosas: (i) la renuncia o el desistimiento si se hubiesen iniciado por parte del Solicitante, de todo tipo de acciones, denuncias o reclamaciones, en contra del Solicitado o cualquiera de sus filiales, subordinadas, matrices o accionistas, entre otros; (ii) la obligación del Solicitado de pagar, a "título gratuito" y en las condiciones que se detallaron en la transacción, la suma de US$1.100.000; (iii) la renuncia por parte del Solicitado al ejercicio de cualquier acción, queja, denuncia, etc. en contra del Solicitante; (iv) que la transacción ponía fin a todas las diferencias entre las partes respecto de su condición de accionistas y/o administradores de Lafrancol, acordando que la transacción surtiera efectos de sentencia ejecutoriada en última instancia; (v) confidencialidad, que alcanzaba a funcionarios y asesores de las partes, respecto a cualquier información relacionada a la Transacción, salvo que se diesen condiciones excepcionales señaladas en el contrato; (vi) otorgar a la transacción mérito ejecutivo; (vii) declararse y garantizarse mutuamente: la válida constitución y existencia como personas jurídicas, poseer capacidad suficiente para suscribir el contrato y cumplir las obligaciones, contar con las autorizaciones corporativas necesarias, entregar efecto vinculante a la transacción y que la transacción no violaba norma alguna ni suponía el incumplimiento de ningún contrato o acuerdo celebrado por las partes; (vii) compromiso recíproco de respeto mutuo y reserva total respecto de la transacción y omitir referirse pública o privadamente a la conducta, modo de vida, costumbres de la otra parte, evitando el uso de calificativos y frases ofensivas; y (viii) la existencia de una cláusula penal por la suma de US$100.000 en caso de incumplimiento de la transacción por alguna de las partes.

### C. La venta de Lafrancol

119. En el año 2012, Lafrancol fue vendida a CFR Internacional SpA ("CFR"), empresa de capitales chilenos, por la suma de US$536.345.790[18].

120. Según la declaración testimonial de Juan María Rendón, los entonces propietarios de Lafrancol fueron contactados por CFR y luego de negociaciones se llegó a un acuerdo de compra en agosto de 2012, materializándose los documentos de cierre del negocio el 12 de diciembre de 2012[19].

### D. Hechos surgidos con posterioridad a la venta de Lafrancol

121. Con posterioridad a la venta de Lafrancol se desencadenaron una serie de hechos relevantes para la resolución de las disputas en el presente Arbitraje, entre ellos:

---

[17] Anexo D-1a. Cláusula Primera.
[18] Anexo D-7. Notificación de Reclamación de Terceros (en ella se señala un precio de venta equivalente a la suma de US$536.345.790). Los Demandados concuerdan con esta suma, según se desprende del párrafo 103 de Memorial de Contestación.
[19] Transcripción de la Audiencia. Página 216.

122. Denuncia penal por delito de estafa. Con fecha 20 de diciembre de 2012, Viviane Ventura y Michael Ventura, actuando por conducto de abogado, presentaron ante la Fiscalía General de la Nación de Colombia, una denuncia penal en contra de Esther Ventura por la comisión del delito de estafa (la "**Denuncia Penal**")[20]. Según lo señalado en la denuncia, Esther Ventura habría estafado a Viviane y Michael Ventura pagándoles a cambio de sus acciones, en el caso de Michael Ventura, y de desistirse de sus aspiraciones en torno a ser considerada accionista de Lafrancol, en el caso de Viviane Ventura, sumas de dinero muy inferiores a las que correspondían conforme el valor que la compañía tenía en el año 2010, cuando se celebraron los Contratos de Transacción, lo que habría quedado confirmado con el valor en el cual se vendió Lafrancol a capitales chilenos en el año 2012[21]. Concretamente, los Demandados reclaman que el valor convenido en los Contratos de Transacción se pactó considerando valorizaciones erradas de la compañía, que recién quedaron en evidencia cuando Lafrancol fue vendida a una empresa de capitales chilenos el año 2012, por una cifra mucho mayor[22].

123. Solicitud de Conciliación. Con fecha 26 de julio de 2013 Michael Ventura y Viviane Ventura presentaron una Solicitud de conciliación en contra de Lafrancol, en la que solicitaron: (i) se les restituyera el 6,88% de las acciones de Lafrancol a su nombre a razón de 3,44% cada uno; (ii) que la referida restitución de acciones sea inscrita en debida forma en el libro de accionistas de Lafrancol; y en subsidio (iii) se cancelara a Michael Ventura y Viviane Ventura el valor dejado de recibir entre los valores pagados en las Transacciones y los cancelados realmente por el valor de las acciones a los demás accionistas de la firma (la "**Segunda Conciliación**")[23].

124. Entrevista a Viviane Ventura en "La W Radio". Con fecha 8 de febrero de 2013 Viviane Ventura dio una entrevista en la "La W Radio", en la cual manifestó que Esther Ventura se había aprovechado de ella y la había defraudado, precisando que no había vendido sus acciones y que su hermano, Michael Ventura, había vendido las propias basado en información errónea que Esther Ventura les había proporcionado. Además, agregó que Esther Ventura les había ocultado libros de la compañía a ella y a su hermano y les había negado toda información de Lafrancol a ella y a sus abogados. En la referida entrevista, Viviane Ventura concluye que ella y su hermano Michael Ventura celebraron engañados los contratos de Transacción[24] (la "**Entrevista**").

125. En relación a la Entrevista dada por Viviane Ventura el 8 de febrero de 2013, los Demandados señalan que fue primero Esther Ventura quien ventiló estas situaciones, lo que se desprendería de una referencia del locutor del programa radial a un documento que habría recibido de Esther Ventura previo a la entrevista de Viviane Ventura[25], en la que se exponían los descargos de los Demandantes sobre esta polémica. Los Demandantes no niegan la entrega del documento, sino que explican que se trata de un documento que se preparó ante las consultas previas de los medios que advirtieron a Esther Ventura sobre la posibilidad de que Viviane Ventura declarare sobre estos hechos ante los medios, y que fue preparado sólo para el evento que le dieran a

---

[20] Memorial de Demanda. Párrafo 103; y, Memorial de Contestación. Párrafo 103.
[21] Anexo DR-93. Denuncia Penal.
[22] Memorial de Contestación. Párrafo 12.
[23] Anexo D-4. Solicitud de conciliación ante el Centro de Arbitraje y Conciliación, de fecha 26 de julio de 2013.
[24] Anexo D-48. En el párrafo 57 del Memorial de Contestación, los Demandados manifiestan que se atienen al texto de la entrevista cuya transcripción fue entregada por los Demandantes como Anexo D-6.
[25] Memorial de Contestación. Párrafo 57. Véase, Anexo D-6 que corresponde al Acta de Testimonio suscrita por notario y que contiene la transcripción de la entrevista dada por Viviane Ventura a La W Radio con fecha 8 de febrero de 2013; y, Anexo D-48, que contiene el audio de dicha entrevista.

Viviane Ventura espacio para declarar[26]. Esto fue reconocido por la propia Esther Ventura en la audiencia en la que declaró como testigo[27].

126. En resumen, el presente Arbitraje se refiere a diversas disputas surgidas entre las Partes, bajo o con relación a los Contratos de Transacción, derivadas de alegados incumplimientos por parte de los Demandados de los Contratos de Transacción que se habrían materializado a través de la Denuncia Penal, la Segunda Conciliación y la Entrevista, lo cual habría causado daños cuyo reconocimiento persiguen las Demandantes en el mismo Arbitraje. A su turno, los Demandados niegan el incumplimiento de los Contratos de Transacción y reclaman la nulidad de algunas de las cláusulas contenidas en dichos contratos.

## III.   PRETENSIONES Y POSICIONES DE LAS PARTES

127. El presente Laudo Arbitral tiene por objeto resolver acerca de las pretensiones sometidas por las Partes a la decisión del Tribunal Arbitral. Las pretensiones de las Partes, que se transcriben a continuación, resultan de las siguientes presentaciones realizadas en el curso del Arbitraje.

## A. LA POSICIÓN DE LOS DEMANDANTES

### 1.   ACTA DE MISIÓN:

128. Los Demandantes solicitan que en el presente arbitraje se reconozcan las siguientes pretensiones:
   a. Se declare que los Demandados incumplieron los Contratos de Transacción.

   b. Se declare que los Demandados incumplieron sus obligaciones de no adelantar acciones, judiciales o extrajudiciales, en contra de los Demandantes, Lafrancol, y sus vinculados.

   c. Se declare que los Demandados incumplieron sus obligaciones de no divulgar la existencia y características de los Contratos de Transacción.

   d. Se declare que la Demandada Viviane Ventura incumplió su obligación de no referirse a los Demandantes.

   e. Se declare que la Demandada Viviane Ventura incumplió su obligación de no referirse en términos ofensivos a los Demandantes.

   f. Se declare que la Demandada Viviane Ventura incumplió su obligación de no calificar las conductas, costumbres o actividades de los Demandantes.

   g. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados están obligados a pagar a los Demandantes el valor de las cláusulas penales contenidas en los mencionados contratos.

   h. Se condene a la Demandada Viviane Ventura a pagar a Esther Ventura la suma de cien mil dólares americanos (U$100.000).

---

[26] Memorial de Réplica. Párrafo 28.
[27] Transcripción de Audiencia de Prueba. Página 132.

i. Se condene a la Demandada Viviane Ventura a pagar a Juan María Rendón la suma de la suma de cien mil dólares americanos (U$100.000).

j. Se condene al Demandado Michael Ventura a pagar a Esther Ventura la suma de un millón de dólares americanos (U$1.000.000).

k. Se condene al Demandado Michael Ventura a pagar a Juan María Rendón la suma de un millón de dólares americanos (U$1.000.000).

l. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados le causaron perjuicios a los Demandantes.

m. Se declare que los Demandados le causaron perjuicios a los Demandantes como consecuencia de la retención del depósito en garantía constituido en virtud del contrato de compraventa de acciones de Lafrancol de fecha 10 de agosto de 2012.

n. Se declare que los Demandados deben indemnizar íntegramente los perjuicios causados a los Demandantes por su incumplimiento contractual.

o. Se declare que los Demandados deben indemnizar a los Demandantes los perjuicios causados como consecuencia de la retención del depósito en garantía constituido en virtud del contrato de compraventa de acciones de Lafrancol de fecha 10 de agosto de 2012.

p. Se declare que los Demandados han causado perjuicios a los Demandantes como consecuencia de su interferencia en la relación comercial de los Demandantes con CFR.

q. Se condene a los Demandados a pagar a los Demandantes el valor de los perjuicios derivados de su interferencia en la relación comercial de los Demandantes con CFR.

r. Se condene a los Demandados a pagar a los Demandantes el valor de todos los perjuicios que resulten probados en el curso del proceso.

129. Los Demandantes cuantifican su demanda en la suma de dos millones cuatrocientos mil dólares de los Estados Unidos de América.

## 2. OTROS ESCRITOS POSTERIORES:

130. Luego, en el Memorial de Demanda los Demandantes especificaron sus pretensiones, desglosándolas en 2 grupos:

### a. Primer grupo de pretensiones

i. Se declare que los Demandados, mediante maquinaciones y argucias, llevaron a los Demandantes a suscribir los Contratos de Transacción sin tener la intención de cumplirlos y únicamente con el objetivo de recibir pagos a su favor.

ii. Se declare que los Demandados son responsables por los perjuicios ocasionados a los Demandantes con ocasión de sus conductas de mala fe contractual.

iii. Se condene a los Demandados a pagar a los Demandantes la indemnización plena, incluyendo daño emergente y lucro cesante, de los perjuicios causados con sus conductas de mala fe contractual.

b. Segundo grupo de pretensiones

iv. Se declare que los Demandados incumplieron los Contratos de Transacción.

v. Se declare que los Demandados incumplieron sus obligaciones de no adelantar acciones judiciales en contra de los Demandantes.

vi. Se declare que los Demandados incumplieron sus obligaciones de no adelantar acciones extrajudiciales en contra de Lafrancol y sus vinculados.

vii. Se declare que los Demandados incumplieron sus obligaciones de no divulgar la existencia y características del Contrato de Transacción

viii. Se declare que los Demandados incumplieron su obligación de no referirse a los Demandantes.

ix. Se declare que los Demandados incumplieron su obligación de no referirse en términos ofensivos a los Demandantes.

x. Se declare que los Demandados incumplieron su obligación de no calificar las conductas, costumbres o actividades de los Demandantes.

xi. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados están obligados a pagar a los Demandantes el valor de las cláusulas penales contenidas en los mencionados contratos.

xii. Se condene a la Demandada Viviane Ventura a pagar a Esther Ventura la suma de cien mil dólares americanos (US $100.000).

xiii. Se condene a la Demandada Viviane Ventura a pagar a Juan María Rendón la suma de cien mil dólares americanos (US $100.000).

xiv. Se condene al Demandado Michael Ventura a pagar a Esther Ventura la suma de un millón de dólares americanos (US $1.000.000).

xv. Se condene al Demandado Michael Ventura a pagar a Juan María Rendón la suma de un millón de dólares americanos (US $1.000.000).

xvi. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados le causaron perjuicios a los Demandantes.

xvii. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción en que incurrieron los Demandados, se ocasionó un daño a la imagen de los Demandantes.

xviii. Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción en que incurrieron los Demandados, se ocasionó un daño a la reputación y buen nombre de los Demandantes.

xix. Se declare que los Demandados deben indemnizar integramente, incluyendo el daño emergente y lucro cesante, los perjuicios causados a los Demandantes por su incumplimiento contractual.

xx. Se condene a los Demandados a pagar a los Demandantes el valor de todos los perjuicios causados a los Demandantes que resulten probados en el curso del proceso, de conformidad con el principio de indemnización integral de perjuicios.

## B. LA POSICIÓN DE LOS DEMANDADOS

### 1. ACTA DE MISIÓN:

131. Los Demandados opusieron las siguientes excepciones frente a las pretensiones de los Demandantes.

a. Oposición y/o Excepciones de mérito relativas a la eficacia de los Contratos de Transacción:

i. Inexistencia de los Contratos de transacción: la ausencia de los elementos esenciales.

ii. La nulidad absoluta de los Contratos de Transacción: La causa ilícita de los Contratos de Transacción.

iii. La nulidad absoluta de los Contratos de transacción: el objeto ilícito de los Contratos de Transacción.

iv. La nulidad relativa de los Contratos de Transacción: El consentimiento otorgado está viciado por dolo.

v. La nulidad relativa de los Contratos de Transacción: El consentimiento otorgado está viciado por error.

b. Dado que estas defensas (excepciones) se fundamentan en lo esencial en las mismas razones en las que se fundamentan algunas de las pretensiones de la demanda reconvencional, los Demandados y entonces también Demandantes Reconvencionales solicitaron al Tribunal referirse al sumario de las pretensiones de la demanda reconvencional en lo relacionado con estas pretensiones y peticiones.

c. Oposición y/o excepciones de mérito relativas a la improcedencia legal de las pretensiones de los Demandantes:

i. Falta de legitimación en la causa por activa. La improcedencia de la declaración de incumplimiento formulada por sólo dos de los tres firmantes de los Contratos de Transacción.

ii. Improcedencia de declarar la terminación de los Contratos de Transacción por incumplimiento. El efecto de la cosa juzgada en la transacción. Para el caso de que los Contratos de Transacción resulten eficaces y en producción de sus efectos, dado que los mismos estarían dotados del efecto de cosa juzgada bajo la ley colombiana, no es procedente demandar su

terminación o resolución por incumplimiento. La parte cumplida solamente está habilitada para demandar el cumplimiento de lo acordado, más no para solicitar al Tribunal declarar su terminación o resolución.

d. Oposición y/o excepciones de mérito relativas a la inexistencia del incumplimiento demandado en los Contratos de Transacción:

i. La inexistencia de incumplimiento de la obligación de no adelantar acciones judiciales o extrajudiciales en contra de los demandantes, Lafrancol y sus vinculadas. La nulidad absoluta de la obligación de no hacer consistente en abstenerse de formular denuncia penal.

ii. Se declare que no ha existido la formulación de acciones judiciales o extrajudiciales en contra de Lafrancol. Asimismo, se solicita se tenga por ineficaz (absolutamente nula) toda obligación o previsión de los Contratos de transacción que tenga por objeto impedir el acceso a la administración de Justicia por tratarse de cláusulas abusivas y desproporcionadas, así como toda obligación o previsión de los Contratos de Transacción que tenga por objeto o efecto impedir la formulación de una denuncia penal o criminal ante las Autoridades Competentes. El deber de denunciar ante la autoridad de investigación criminal en Colombia (Fiscalía General de la Nación) las conductas que puedan constituir delitos es una carga pública y obligación legal de los particulares que no puede ser derogada por convenio particular. La formulación de una demanda criminal en contra de Esther Ventura de Rendón no constituye violación de los Contratos de Transacción.

iii. Inexistencia de actos de divulgación de la existencia y características de los Contratos de Transacción atribuibles a los Demandados y Demandantes Reconvencionales. Si bien la solicitud de arbitraje no identifica cuales serían los actos de divulgación de la existencia y características de los Contratos de Transacción atribuibles a los Demandados y Demandantes Reconvencionales, se solicita se declare que no han existido actos de divulgación de los Contratos de Transacción atribuibles a los Demandados y Demandantes Reconvencionales que constituyan infracción de los Contratos de Transacción.

iv. La inexistencia de la obligación a cargo de Viviane Ventura de no referirse a los demandantes. Ausencia de incumplimiento de Viviane Ventura de la obligación de no referirse en términos ofensivos. Se solicita se tenga por ineficaz (absolutamente nula) toda obligación o previsión de los Contratos de Transacción que tenga por objeto o efecto impedir a Viviane Ventura referirse a los demandantes, pues ello contraviene normas imperativas y garantías constitucionales que protegen derechos fundamentales personalísimos e irrenunciables que no pueden ser derogadas por convenio particular. Si bien la solicitud de arbitraje no identifica cuales serían los hechos y circunstancias en las que se habría producido una referencia por parte de Viviane Ventura respecto de los demandantes, se solicita se declare que no han existido por parte de Viviane Ventura referencias a los demandantes, que constituyan infracción de los Contratos de Transacción.

v. La inexistencia de obligación a cargo de Viviane Ventura de no calificar las conductas, costumbres o actividades de los demandantes. Ausencia de incumplimiento de Viviane Ventura de evitar el uso de calificativos, frases ofensivas y similares.

Se solicita se tenga por ineficaz (absolutamente nula) toda obligación o previsión de los Contratos de Transacción que tenga por objeto o efecto impedir a Viviane Ventura expresar su

opinión en relación con los demandantes, pues ello contraviene normas imperativas y garantías constitucionales que protegen derechos fundamentales personalísimos e irrenunciables que no pueden ser derogadas por convenio particular.

Si bien la solicitud de arbitraje no identifica cuales serían los hechos y circunstancias en las que se habría producido una referencia por parte de Viviane Ventura respecto de los demandantes, se solicita se declare que no han existido por parte de Viviane Ventura referencias ofensivas y similares públicas a los demandantes, que constituyan infracción de los Contratos de Transacción.

c.  Oposición y/o excepciones relativas a la improcedencia del pago de la cláusula penal e indemnización de perjuicios:

i.  Ausencia de presupuestos legales y contractuales para el cobro de la cláusula penal. Su carácter enorme.

Dado el carácter accesorio de la pena, la nulidad de la obligación principal acarrea la nulidad de la cláusula penal (Art. 1593 del Código Civil Colombiano). Resultando nulo, total o parcialmente los Contratos de Transacción, entonces resultara nula la cláusula penal que garantice el cumplimiento de obligaciones nulas.

De conformidad con la ley colombiana, si se ha estipulado una cláusula penal para el caso de incumplimiento de los Contratos de Transacción, hay lugar a la pena sin perjuicio de que los Contratos de Transacción se lleven a efecto en todas sus partes. Por tanto, no es procedente la solicitud de terminación de los Contratos de Transacción por incumplimiento y adicionalmente solicitar el pago de la pena.

De otra parte, según la disciplina contractual consignada en la cláusula penal de los Contratos de Transacción lo acordado fue que en caso de incumplimiento de los Contratos daría derecho para solicitar la declaración de terminación de los Contratos y por ende no verificada la transacción y además para que exija a la parte incumplida suma pactada a título de cláusula penal. Así, la procedencia del cobro de la cláusula a penal está contractualmente sujeta a que opere la terminación y no por el simple incumplimiento del demandado.

Por otro aspecto, las cláusulas penales pactadas resultan lesivas o enormes en relación con las obligaciones que dicen garantizar por lo cual se solicita al Tribunal moderarlas atendidas las circunstancias del caso particular.

ii.  Improcedencia del doble cobro de la cláusula penal. Pacto singular del monto de la cláusula penal para cada parte contractual.

En la demanda cada demandante reclama para sí el pago del valor de las cláusulas penales pactadas, es decir, el monto total de las cláusulas penales pactadas por cada uno de los demandantes. Dicha solicitud no sería procedente por cuando la cláusula penal está establecida en cada contrato de transacción en una suma única a favor de la parte cumplida y a cargo de la parte incumplida, y no para cada persona que integre la parte, en caso de parte plural.

iii.  Inexistencia de perjuicio indemnizable y/o limitación del perjuicio indemnizable.

Es improcedente el cobro de las cláusulas penales y simultáneamente la indemnización de perjuicios. Para el caso en que se opte por la indemnización de perjuicios, estos deberán ser acreditados pues no existe relevo de prueba en esta materia.

Si no se puede imputar dolo al deudor, éste sólo es responsable de los perjuicios que se previeron o pudieron preverse al tiempo del contrato. (Art. 1616 Código Civil Colombiano).

f. Oposición y/o excepciones o defensas genéricas:

i. Cualquier otro hecho exceptivo o constitutivo de defensa que se oponga a la prosperidad de las pretensiones del demandante y que aparezca debidamente probado durante el trámite arbitral.

## 2. OTROS ESCRITOS POSTERIORES:

132. En el Memorial de Contestación los Demandados se opusieron en general a la prosperidad de todas las acciones de los demandantes.

133. Además, opusieron las siguientes excepciones:

a. Invalidez del pacto arbitral. No existe un acuerdo de arbitraje válidamente celebrado bajo la ley colombiana. La ausencia de voluntad real.

b. Invalidez del pacto arbitral. No existe un acuerdo de arbitraje internacional válidamente celebrado bajo la ley colombiana vigente para la época de celebración del pacto.

c. Limitación de la cláusula arbitral. Ausencia de pacto arbitral para las controversias a que se refieren el primer grupo de pretensiones subsidiarias.

d. Falta de competencia del Tribunal para conocer y decidir la pretensión relacionada con el cobro de la cláusula penal prevista en los contratos.

e. La nulidad parcial de los Contratos de Transacción, conforme a lo siguiente:
   (i)   La nulidad absoluta por objeto ilícito de las cláusulas 2.1 y 2.2 de los Contratos de Transacción sobre la renuncia a iniciar acciones judiciales y extrajudiciales de cualquier naturaleza.
   (ii)  La nulidad absoluta por objeto ilícito de las cláusulas de los Contratos de Transacción que contienen la renuncia a la interposición de una denuncia penal.
   (iii) La nulidad absoluta por objeto ilícito de cláusulas de los Contratos de Transacción que contienen obligaciones de no referirse, ni referirse en términos ofensivos a los Demandantes, y de las obligaciones de no calificar las conductas, costumbres o actividades de los Demandantes.

f. Inexistencia de mala fe de Viviane y Michael Ventura.

g. Inexistencia de incumplimiento de los demandados de los Contratos de Transacción conforme a lo siguiente.

(i)     Inexistencia de incumplimiento de la obligación de no adelantar acciones judiciales contra los Demandantes.

(ii)    Inexistencia de incumplimiento de la obligación de no adelantar acciones extrajudiciales en contra de Lafrancol y sus vinculados.

(iii)   La inexistencia de incumplimiento de la obligación de no divulgar la existencia y características del Contrato de Transacción.

(iv)    La inexistencia de incumplimiento de la obligación de no referirse, ni referirse en términos ofensivos a los Demandantes y la inexistencia de incumplimiento de la obligación de no calificar las conductas, costumbres o actividades de los Demandantes.

h. Ausencia de presupuestos legales y contractuales para el cobro de la cláusula penal.

i. El carácter enorme de la cláusula penal.

j. Inexistencia de daño a la imagen, reputación y buen nombre de los Demandantes.

k. Inexistencia del deber de indemnizar a los Demandantes.

l. Inexistencia de los Contratos de Transacción[28].

m. Ineficacia y nulidad de los Contratos de Transacción por violación al principio de buena fe[29].

n. Oposición y/o excepciones o defensas genéricas. Invocó cualquier otro hecho exceptivo o constitutivo de defensa que se opusiere a la prosperidad de las pretensiones de las Demandante y que resultare probado.

## V.   CUESTIONES A RESOLVER

134. Como cuestión preliminar, el Tribunal Arbitral nota que las pretensiones, alegaciones y defensas de las Partes se modificaron a lo largo del Arbitraje y, en especial, desde aquéllas contenidas en el Acta de Misión a las que finalmente fueron desarrolladas por las Partes en los memoriales escritos. Por ello, y a la luz de las pretensiones, alegaciones y defensas efectivamente desarrolladas, el Tribunal Arbitral ha elaborado una lista de cuestiones a resolver que se enuncia a continuación. Todas aquellas cuestiones que no se indican deben entenderse desestimadas por cuanto fueron meramente enunciadas en el Acta de Misión o en escritos posteriores pero no fueron desarrolladas desde el punto de vista fáctico ni desde el punto de vista legal y carecen, además, de soporte probatorio de cargo de la Parte a quien incumbía su presentación.

135. El primer grupo de cuestiones a resolver, corresponde a las objeciones jurisdiccionales planteadas por los Demandados, a saber:

A.     Invalidez del pacto arbitral por no existir acuerdo de arbitraje válidamente celebrado bajo la ley colombiana ante la ausencia de voluntad real de los Demandados al efecto.

---

[28] Esta pretensión es invocada por primera vez en el Memorial de Pronunciamiento sobre la Réplica.
[29] Esta pretensión es invocada por primera vez en el Memorial de Pronunciamiento sobre la Réplica.

B. Invalidez del pacto arbitral al no existir acuerdo de arbitraje internacional válido celebrado bajo la ley colombiana vigente a la época de celebración del pacto arbitral.

C. Ausencia de competencia del Tribunal Arbitral respecto del primer grupo de pretensiones de los Demandantes.

D. Ausencia de competencia del Tribunal Arbitral respecto de la pretensión sobre cobro de cláusula penal prevista en los Contratos de Transacción.

136. El segundo grupo de cuestiones a resolver, corresponde a las reclamaciones de inexistencia y nulidad de ciertas cláusulas de los Contratos de Transacción planteadas por los Demandados, específicamente:

A. La inexistencia derivada de la ausencia de los elementos esenciales de los Contratos de Transacción

B. La nulidad absoluta por objeto ilícito de las Cláusulas 2.1 y 2.2 de los Contratos de Transacción sobre la renuncia a iniciar acciones judiciales y extrajudiciales de cualquier naturaleza.

C. La nulidad absoluta por objeto ilícito de las Cláusulas 2.1 y 2.2 de los Contratos de Transacción que contienen la renuncia a la interposición de una denuncia penal.

D. La nulidad absoluta por objeto ilícito de las Cláusulas del Contrato de Transacción de Viviane Ventura que contiene obligaciones de no referirse, ni referirse en términos ofensivos a los Demandantes, y obligaciones de no calificar las conductas, costumbres o actividades de los Demandantes.

137. El tercer grupo de cuestiones a resolver, corresponde a las pretensiones de los Demandantes que se señalan a continuación, lo cual incluirá el pronunciamiento sobre las excepciones y defensas respectivas que han opuesto los Demandados a fin de que no se haga lugar a tales pretensiones:

A. Que se declare que los Demandados, mediante maquinaciones y argucias, llevaron a los Demandantes a suscribir los Contratos de Transacción sin tener la intención de cumplirlos y únicamente con el objetivo de recibir pagos a su favor.

B. Que se declare que los Demandados incumplieron los Contratos de Transacción. Esto incluye los siguientes incumplimientos reclamados:

(i) Que se declare que los Demandados incumplieron sus obligaciones de no adelantar acciones judiciales en contra de los Demandantes.

(ii) Que se declare que los Demandados incumplieron sus obligaciones de no adelantar acciones extrajudiciales en contra de Lafrancol y sus vinculados.

(iii) Que se declare que los Demandados incumplieron sus obligaciones de no divulgar la existencia y características del Contrato de Transacción.

(iv) Que se declare que los Demandados incumplieron su obligación de no referirse a los Demandantes.

(v) Que se declare que los Demandados incumplieron su obligación de no referirse en términos ofensivos a los Demandantes.

(vi) Que se declare que los Demandados incumplieron su obligación de no calificar las conductas, costumbres o actividades de los Demandantes.

C. Que se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción en que incurrieron los Demandados, se ocasionó un daño a la imagen, reputación y buen nombre de los Demandantes.

D. Que se condene a los Demandados a indemnizar los perjuicios ocasionados a los Demandantes por sus incumplimientos contractuales. Esto incluye las siguientes peticiones:

(i) Se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados están obligados a pagar a los Demandantes el valor de las cláusulas penales contenidas en los mencionados contratos. Lo anterior supone:

(i.a) Que se condene a la Demandada Viviane Ventura a pagar a Esther Ventura la suma de US $100.000.

(i.b) Que se condene a la Demandada Viviane Ventura a pagar a Juan María Rendón la suma de US $100.000.

(i.c) Que se condene al Demandado Michael Ventura a pagar a Esther Ventura la suma de US $1.000.000.

(i.d) Se condene al Demandado Michael Ventura a pagar a Juan María Rendón la suma de US $1.000.000[30].

(ii) Que se condene a los Demandados a pagar a los Demandantes la indemnización plena, incluyendo daño emergente y lucro cesante, de los perjuicios causados con sus conductas de mala fe contractual.

(iii) Que se condene a los Demandados a pagar a los Demandantes los perjuicios asociados al daño de la reputación y buen nombre de los Demandantes.

(iv) Que se condene a los Demandados a pagar a los Demandantes el valor de todos los perjuicios causados a los Demandantes que resulten probados en el curso del proceso, de conformidad con el principio de indemnización integral de perjuicios.

---

[30] El Laudo Arbitral también resolverá sobre las defensas específicas planteadas por los Demandados al cobro de la cláusula penal como el carácter enorme de la misma, y el hecho que los Demandantes no pueden individualmente cobrar la cláusula penal.

138. El Tribunal Arbitral también deberá resolver sobre los costos del presente arbitraje.

139. Finalmente, el Tribunal Arbitral advierte que en las decisiones que se consignan a continuación se refiere únicamente a las alegaciones y la prueba presentada en este arbitraje en relación con los Contratos de Transacción y que en forma alguna tales decisiones implican un pronunciamiento general o específico sobre asuntos no debatidos en este arbitraje o sobre asuntos que se debaten en otras sedes o foros, civiles o penales, sobre los cuales no tiene competencia este Tribunal.

# 1.- LAS OBJECIONES JURISDICCIONALES

140. Como se ha advertido, los Demandados han planteado cuatro objeciones a la jurisdicción del Tribunal Arbitral: primero, la invalidez del pacto arbitral por falta de voluntad real de los Demandados; segundo, la invalidez del pacto arbitral al no existir acuerdo de arbitraje internacional válido celebrado bajo la ley colombiana vigente a la época de celebración del pacto arbitral; tercero, la ausencia de competencia del Tribunal Arbitral respecto del primer grupo de pretensiones de los Demandantes contenidas en el literal e. del Memorial de Demanda, y; por último, la ausencia de competencia del Tribunal Arbitral respecto de la pretensión sobre cobro de cláusula penal prevista en los Contratos de Transacción.

## A.   INVALIDEZ DEL PACTO ARBITRAL POR FALTA DE VOLUNTAD REAL DE LOS DEMANDADOS.

### 1.   POSICIÓN DE LAS PARTES

#### a.   Posición de los Demandados

141. Los Demandados alegan que no existe un acuerdo de arbitraje que se haya celebrado válidamente bajo la ley colombiana. Indican que no existió voluntad real por parte de quienes lo celebraron.

142. Señalan que el artículo 1502 del Código Civil Colombiano (el "**CCC**") establece los requisitos para obligarse válidamente, disponiendo que "*[p]ara que una persona se obligue a otra por un acto o declaración de voluntad es necesario: 1. Que sea legalmente capaz; 2. Que consienta en dicho acto o declaración y su consentimiento no adolezca de vicio; Que adolezca sobre un objeto ilícito; 4. Que tenga una causa lícita*"[31]. Agregan que frente al defecto de cualquiera de estos requisitos no surge obligación alguna.

143. En particular, aluden a la voluntad real como un requisito necesario para obligarse señalando que la misma "*sólo se presenta cuando existe en el agente la plena conciencia y deliberación sobre el objeto respecto del cual está consintiendo, voluntad real que es la tutelada por el ordenamiento y que genera efectos obligatorios, y la cual no puede ser sustituida por la simple declaración de voluntad*"[32].

144. En este sentido, sostienen que no basta una manifestación de voluntad aparente, sino que se requiere la existencia de una voluntad real que no se satisface mediante la "*apariencia material*

---

[31] Memorial de Contestación. Párrafo 206. *Véase*: Anexo DR-45. Artículo 1502 del CCC.

[32] Memorial de Contestación. Párrafo 207.

*mediante la firma de un documento que dice contenerla*[33] y que así se ha orientado el sistema jurídico colombiano en el que prevalece la voluntad real por sobre la declarada. En definitiva, señalan los Demandados, *"lo que le da la vida a la declaración externa es su verdadera correspondencia con la intención y voluntad intrínseca del agente"*[34].

145. Finalmente, concluyen señalando que el pacto arbitral consignado en la Cláusula Décimo Primera de los Contratos de Transacción resulta ser simplemente una manifestación aparente de voluntad, no precedida de voluntad real de los agentes atendido a las siguientes circunstancias: *"i. Nunca existió un proceso de discusión para llegar a una voluntad convergente y coincidente en su celebración. Jamás fue un elemento introducido en las tratativas que hubieren adelantado las partes de los contratos; ii. Nunca estuvo precedido de una invitación u oferta que fuese aceptada por los aquí demandados; iii. Jamás fue materia de la más mínima discusión sobre su conveniencia o extensión; iv. Simplemente fue introducido unilateralmente por los abogados de los demandantes, en el documento que habría de recoger los acuerdos de las partes en relación con el único negocio discutido; v. No fue materia de análisis por parte de Profesionales del Derecho; vi. El negocio discutido por las partes, para el caso de Michael Ventura lo era la venta de su participación accionaria y la determinación de un precio a cambio de ella; y para el caso de Viviane el reconocimiento de una suma a cambio de sus renuncias, la cual se otorgaba a título gratuito. vii. Se suscribieron en idioma español, que no es la lengua nativa de los suscriptores"*[35].

    b. <u>Posición de los Demandantes</u>

146. Por su parte, los Demandantes rechazan esta objeción de los Demandados. Señalan que las afirmaciones de los Demandados en este punto *"carecen de todo sustento probatorio"*[36] y además son *"abiertamente contrarias a los hechos que antecedieron la celebración de los Contratos de Transacción"*[37].

147. Los Demandantes sostienen, en primer lugar, que los Demandados contaron durante todo el proceso de negociación y suscripción de los Contratos de Transacción, incluyendo el pacto arbitral, con asesoría legal de reputados abogados, que habrían participado en la propia redacción de los referidos contratos. Se apoyan para ello en la declaración testimonial del Dr. Carlos Espinosa Pérez[38].

148. Indican además que la extensión y conveniencia del pacto arbitral se determinó precisamente en consideración al carácter internacional de la transacción, nacionalidad y domicilio de los propios Demandados y que la nacionalidad de éstos fue determinante para pactar un arbitraje internacional ante la CCI, en lugar de pactar un arbitraje doméstico colombiano[39].

149. Adicionalmente, los Demandantes reclaman que el pacto arbitral era perfectamente comprensible para los Demandados, quienes tienen un *"conocimiento y manejo amplio del español"*[40]. Además, reprochan que los Demandados aleguen falta de consentimiento frente a las respectivas cláusulas compromisorias que son parte de contratos en virtud de los cuales recibieron sendas sumas de

---

[33] Memorial de Contestación. Párrafo 208.
[34] Memorial de Contestación. Párrafo 209. Párrafo incluye cita de doctrina de, Teoría General del Contrato y de los Demás Actos o Negocios Jurídicos. Ospina Fernández G. Y Ospina Acosta G. que corresponde al Anexo DR-DJ N°8.
[35] Memorial de Contestación. Párrafo 210.
[36] Memorial de Réplica. Párrafo 265.
[37] Memorial de Réplica. Párrafo 265.
[38] Memorial de Réplica. Párrafos 266 y 267. La declaración citada se refiere al Anexo D-5 y corresponde a la declaración testimonial del Dr. Carlos Espinosa de fecha 25 de septiembre de 2014.
[39] Memorial de Réplica. Párrafo 268.
[40] Memorial de Réplica. Párrafo 270.

dinero, sin manifestar ningún reparo al momento de recibir el dinero y lo hagan ahora cuando disfrutan de él[41].

150. Los Demandantes señalan además que las alegaciones de los Demandados de no haber prestado consentimiento para la cláusula compromisoria, importarían un incumplimiento a la Cláusula Séptima del Contrato que dispone en su numeral 7.4 *"Efecto Vinculante. Una vez contraídas y sujetas a las condiciones previstas en el presente contrato, las obligaciones a su cargo bajo el presente contrato son obligaciones plenamente vinculantes y exigibles respecto de cada una de ellas en caso de incumplimiento"*[42]. Concluyen que del tenor literal de dicha cláusula, en la que se reconoce la fuerza vinculante de los Contratos de Transacción, también se está reconociendo que éstos, y el pacto arbitral contenidos en ellos, *"cumplían el lleno de los requisitos legales, entre ellos el consentimiento"*[43].

151. Por último, los Demandantes indicaron que la suscripción por parte de los Demandados de los Contratos de Transacción supone una acreditación de la voluntad y consentimiento del suscriptor, invocando al efecto doctrina colombiana[44].

## 2. DECISIÓN DEL TRIBUNAL

152. El Tribunal Arbitral no está convencido por las alegaciones formuladas por los Demandados en cuanto a la ausencia de una voluntad real por parte de ellos para obligarse.

153. El Tribunal Arbitral no considera que los Demandados hubiesen probado que haya habido una falta de voluntad, o una mera voluntad aparente, por parte de los signatarios de los Contratos de Transacción que haga tales disposiciones aplicables.

154. Al respecto, es importante destacar que, desde el punto de vista del derecho colombiano y en concreto de acuerdo con el artículo 1602 del CCC, *"[t]odo contrato legalmente celebrado es una ley para los contratantes, y no puede ser invalidado sino por su consentimiento mutuo o por causas legales"*.

155. Los Demandantes presentaron los Contratos de Transacción firmados por ambas Partes. Los Demandados jamás alegaron no haber firmado los Contratos ni objetaron el texto firmado. La firma de los Contratos de Transacción corresponde entonces a la manifestación externa de la voluntad de los Demandados, y es esa la voluntad que debe prevalecer y tenerse en cuenta a menos que se pruebe, o bien que existió una voluntad real diferente, o bien alguna de las circunstancias que vician dicha voluntad, lo cual no ocurre en el presente caso.

156. En este sentido, y no obstante haber firmado los Contratos de Transacción en señal de aceptación de sus términos, los Demandados alegan que esa declaración de voluntad no corresponde con la voluntad real o interna y, por tanto, los Contratos de Transacción no cumplen con el requisito de validez que exige el artículo 1502 del CCC (norma invocada por los Demandados). En otras palabras, los Demandados alegan que su voluntad para consentir al arbitraje o no existió o estaba viciada.

---

[41] Memorial de Réplica. Párrafo 271.
[42] Memorial de Réplica. Párrafos 272 y 273.
[43] Memorial de Réplica. Párrafo 274.
[44] Memorial de Réplica. Párrafo 276. Párrafo incluye cita de doctrina de, DEVIS ECHANDÍA, Hernando. Teoría General de la Prueba Judicial, Tomo II, Editorial Temis. P. 543. que corresponde al Anexo D-DJ-36.

157. El artículo 1502 del CCC establece que "*[p]ara que una persona se obligue a otra por un acto o declaración de voluntad, es necesario: 1. que sea legalmente capaz; 2. que consienta en dicho acto o declaración y su consentimiento no adolezca de vicio; 3. que recaiga sobre un objeto lícito; 4. que tenga una causa lícita*". (énfasis del Tribunal)

158. El artículo 1502 del CCC debe ser leído en conjunto con el artículo 1508 del mismo código. Según el artículo 1508 del CCC "*[l]os vicios de que puede adolecer el consentimiento, son error, fuerza y dolo*".

159. Así, quien alega un vicio del consentimiento como causal de anulación de un acto jurídico, o la ausencia total de consentimiento, tiene que probar los hechos constitutivos del vicio alegado y que tales hechos tienen la entidad de viciar el consentimiento. En este caso, los Demandados no han alegado, y mucho menos probado, que su consentimiento hubiese sido viciado por error, fuerza o dolo. Ninguna de las circunstancias referidas por los Demandados constituyen un vicio del consentimiento en los términos del artículo 1508 del CCC ni tienen la entidad para alterar el consentimiento o para que no se tenga en cuenta la voluntad externa declarada. En cuanto a la alegada ausencia de consentimiento, las pruebas llegadas al Arbitraje[45] demuestran que los Demandados consintieron plenamente en la celebración de los Contratos de Transacción.

160. Incluso en el hipotético caso en que las circunstancias alegadas por los Demandados como circunstancias que excluyeron o viciaron el consentimiento (no haber sido incluida la cláusula arbitral en las tratativas, ausencia de discusión entre las Partes, ausencia de abogado, falta de presentación de oferta, no entender el español y referirse los contratos realmente a una venta de acciones y al pago de unas suma de dinero a cambio de ciertas renuncias) llevasen a una ausencia de consentimiento (que no es el caso) o constituyesen error, fuerza o dolo (que no lo constituyen), el Tribunal encuentra que los Demandados no han probado que tales circunstancias se hubiesen presentado.

161. Pero, además de que los Demandados no han aportado elementos probatorios que soporten sus alegaciones en cuanto a la falta de una voluntad real al momento de suscripción de los Contratos de Transacción y del pacto arbitral contenido en ellos, es decir, no han cumplido con la carga de la prueba y, sin perjuicio de que el Tribunal Arbitral volverá sobre estas cuestiones más adelante[46], es posible adelantar que, a juicio del Tribunal Arbitral y sobre la base de la prueba acompañada en el Arbitraje[47]: (i) sí hubo una etapa de negociación con miras a determinar el precio, en el caso del Contrato de Transacción con Michael Ventura y de la suma a pagar a favor de Viviane Ventura en el Contrato de Transacción con ésta última; (ii) en concreto, en ambos casos, hubo una oferta de parte de los Demandantes que dio pie a negociaciones que llevaron a los montos finalmente acordados en los Contratos de Transacción; (iii) los Demandados tuvieron la posibilidad de revisar el texto de los Contratos de Transacción antes de proceder a su firma; (iv) en forma previa a la firma de los Contratos de Transacción, hubo participación e involucramiento de abogados letrados por cuenta de las Partes; (v) el hecho que los Contratos de Transacción fuesen otorgados en idioma español no supuso un problema para los Demandados, dado que ambos comprenden y

---

[45] Laudo Arbitral. Párrafos 260 a 272. Adicionalmente, en la audiencia Michael Ventura declaró: "*pensé que estamos todos, in good faith, llegando a un arreglamiento, a una pelea que queremos cerrar y eso es todo*". (Testimonio de Michael Ventura, Transcripción de la Audiencia, p. 48, párrafo 6.) Por su parte, y también en la audiencia, ante la pregunta de si había revisado y leído el contrato de transacción, Viviane Ventura respondió: "*Yo lo leí, si me dice si lo entendí muy bien, bien que hablo el español como lo estoy hablando, que es bastante bien, no siempre entiendo lo que lee, pero lo que sí entendí porque me recuerdo, se lo dije a Jaime, esto es that you up contract money, esto es para que me calle (...)*". (Testimonio de Viviane Ventura, Transcripción de la Audiencia, Página 185, párrafo 1)
[46] Ver, Sección 2.- del Laudo Arbitral ("Las Alegaciones de Inexistencia y Nulidad").
[47] Laudo Arbitral. Párrafos 246 a 272.

hablan dicho idioma; y (vi) como se analiza más adelante, los Contratos de Transacción son acuerdos para resolver un litigio eventual o potencial sobre controversias que las partes determinaron en los mismos contratos.

162. En razón de lo anterior, el Tribunal desestima la alegada inexistencia y la alegada invalidez del pacto arbitral por ausencia de voluntad real de las partes de someterse al arbitraje.

## B. INVALIDEZ DEL PACTO ARBITRAL POR INEXISTENCIA DE ACUERDO DE ARBITRAJE INTERNACIONAL VÁLIDO CELEBRADO BAJO LA LEY COLOMBIANA.

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandados

163. Los Demandados reclaman la invalidez del pacto arbitral, alegando que no existió un acuerdo de arbitraje internacional válidamente celebrado bajo la ley colombiana. Insisten en lo anterior, sin perjuicio de la decisión adoptada por el Tribunal Arbitral en la Orden Procesal N° 1[48].

164. Al efecto, señalan que conforme a la Cláusula Novena de los Contratos de Transacción, la ley aplicable a los mismos es la ley colombiana. Indican que, en mérito de ello, le resulta aplicable la ley 315 de 1996, ley de arbitraje internacional para la República de Colombia, vigente en la época de celebración del pacto arbitral. Explican que el artículo 1° de la Ley 315 de 1996 señala los criterios determinante para los pactos de arbitraje internacional celebrados en Colombia, agregando que conforme a la misma *"es requisito de validez para pactar un arbitraje de carácter de internacional que exista pacto expreso de las partes sobre el carácter internacional del arbitraje y que, además, se presente cualquiera de los eventos listados en el citado artículo 1"*[49].

165. En efecto, sostienen los Demandados que conforme al artículo 1° de la mencionada ley de arbitraje internacional colombiana, se requiere no sólo un acuerdo de arbitraje sino además *"1. Que las partes, al momento de la celebración del pacto arbitral, tengan su domicilio en estados diferentes. 2. Que el lugar de cumplimiento de aquella parte sustancial de las obligaciones directamente vinculada con el objeto del litigio se encuentre situada fuera del Estado en el cual las partes tienen su domicilio principal. 3. Cuando el lugar del arbitraje se encuentra fuera del Estado en que las partes tienen sus domicilios, siempre que se hubiere pactado tal eventualidad en el pacto arbitral. 4. Cuando el asunto objeto del pacto arbitral, vincule claramente los intereses de más de un Estado y las partes así lo hayan convenido expresamente. 5. Cuando la controversia sometida a decisión arbitral afecte directa e inequívocamente los intereses del comercio internacional. PAR. —En el evento de que aun existiendo pacto arbitral alguna de las partes decida demandar su pretensión ante la justicia ordinaria, la parte demandada podrá proponer la excepción de falta de jurisdicción con sólo acreditar la existencia del pacto arbitral"*[50].

166. A juicio de los Demandados, en este caso falta el requisito esencial de existir *"pacto expreso de las partes sobre el carácter internacional del arbitraje"*[51]. Agregan que la falta de uno de los requisitos establecidos por ley para pactar válidamente arbitraje, determina la invalidez del pacto, atendido lo dispuesto por los artículos 1740 y 1741 del CCC[52]. Indican que es un error lo resuelto por el

---

[48] Memorial de Contestación. Párrafo 212.
[49] Memorial de Contestación. Párrafo 215.
[50] Memorial de Contestación. Párrafo 215.
[51] Memorial de Contestación. Párrafo 215.
[52] Memorial de Contestación. Párrafo 216.

Tribunal Arbitral en la Orden Procesal N°1 en cuanto a que dicha exigencia sería un elemento adjetivo o procesal[53]. Por el contrario, los Demandados sostienen que se trataría de un requisito sustancial, regulado por una ley de esa naturaleza[54].

167. Los Demandados concluyen señalando que por estas razones el Tribunal Arbitral *"carece absolutamente de competencia para tramitar y decidir como un arbitraje internacional las controversias materia del presente proceso, dada la invalidez del pacto arbitral aquí denunciada, y así solicita se decida en el laudo que ponga término al presente trámite"*[55].

b. Posición de los Demandantes

168. Los Demandantes se oponen a esta solicitud, argumentando que la misma ya fue resuelta por la Orden Procesal N°1 y que la insistencia de los Demandados en ella supone desconocer *"abiertamente la obligatoriedad de las decisiones adoptadas por el Tribunal Arbitral y el principio de preclusión establecido en el numeral 65 de la citada Orden Procesal"*[56].

169. Señala que el Tribunal Arbitral ya adoptó una decisión en este sentido, señalando precisamente que la tomaba como una cuestión preliminar en función de determinar las reglas aplicables al presente Arbitraje[57].

170. Por ello, los Demandantes piden finalmente atenerse a lo resuelto por el Tribunal en esta materia[58].

2. DECISIÓN DEL TRIBUNAL

171. El Tribunal Arbitral concluye que los Demandados pretenden aquí revivir alegaciones que ya fueron debidamente analizadas y consideradas en forma previa en la dictación de la Orden Procesal N°1 del 27 de agosto de 2014. En realidad, los Demandados pretenden, a partir de una divergencia con la decisión adoptada por el Tribunal Arbitral, volver a abrir el debate sobre una cuestión que ya ha sido zanjada y que no fue objetada por los Demandados.

172. Sin perjuicio de lo anterior, el Tribunal Arbitral reitera que el presente Arbitraje califica plenamente como un arbitraje internacional válidamente instituido conforme al derecho colombiano, por las razones consignadas en la Orden Procesal N°1 y que se reproducen a continuación.

173. Como punto de partida, el Tribunal Arbitral nota que la ley sustantiva que regula los Contratos de Transacción es la ley colombiana. El Tribunal comparte la opinión de los Demandados en cuanto a que el derecho sustantivo que rige los Contratos de Transacción es la ley vigente al momento en que las Partes celebraron los Contratos de Transacción. Esta conclusión no parece resultar controvertida respecto del derecho sustantivo, es decir aquél que determina los derechos y obligaciones que corresponden a las partes de un contrato, y no estaría controvertida respecto al pacto de arbitraje, pues si se considera que dicho pacto es un contrato, se regiría por la ley vigente al tiempo de su celebración.

---

[53] Memorial de Contestación. Párrafo 218.
[54] Memorial de Contestación. Párrafo 217.
[55] Memorial de Contestación. Párrafo 220.
[56] Memorial de Réplica. Párrafo 279.
[57] Memorial de Réplica. Párrafo 280.
[58] Memorial de Réplica. Párrafo 282.

174. Pero la cuestión a resolver no es la ley que debe aplicarse al pacto de arbitraje, sino la ley que se aplica al arbitraje como proceso, y las normas que rigen la ley aplicable en materia sustantiva no pueden extenderse a cuestiones adjetivas o procesales.

175. En efecto, las normas procesales, que establecen y regulan el procedimiento para ejercer las acciones y reclamar los derechos que nacen de los Contratos de Transacción rigen *in actum* y no se entienden incorporadas a los Contratos de Transacción al momento de su celebración, de conformidad con los artículos 38[59] y 40[60] de la ley 153 de 1887 que, en su Parte Primera, establece reglas generales sobre la validez y aplicación de las leyes.

176. Aunque como mecanismo de resolución de controversias el arbitraje tiene un origen esencialmente contractual, ello no altera el hecho de que puede ser objeto de regulación legal en la sede en cuanto constituye un procedimiento que las partes disponen de común acuerdo para reclamar los derechos que tienen bajo las relaciones jurídicas subyacentes que los vinculan, y resolver así las posibles disputas que surjan al amparo de un determinado contrato que contiene un pacto arbitral. Así, como las normas que regulan el arbitraje en la sede, que han sido invocadas por las partes, son normas procesales, éstas rigen *in actum*, es decir, con efecto inmediato al momento de su entrada en vigencia.

177. Ello es particularmente relevante en el caso en cuestión, dado que, en el tiempo que medió entre la celebración de los Contratos de Transacción y el inicio del presente arbitraje, el estatuto legal aplicable al arbitraje en Colombia fue modificado. En efecto, la Ley 315 de 1996 (la "Ley 315") entró en vigencia en dicho año y dejó de subsistir en 2012, año en que entró en vigencia un nuevo estatuto de arbitraje denominado "Estatuto de Arbitraje Nacional e Internacional" promulgado mediante la ley 1563 del 12 de julio de 2012 (la "Ley 1563").

178. La Ley 1563 contiene un régimen dualista de arbitraje, esto es, con disposiciones distintivas según si trata de un arbitraje doméstico (Sección Primera) o internacional (Sección Tercera). Además, la Ley 1563 incorpora criterios para determinar la internacionalidad del arbitraje en el artículo 62 de la citada ley.

179. Es indiscutible que al momento de iniciarse el presente arbitraje, la Ley 1563 ya se encontraba en vigencia. Asimismo, y como hemos concluido anteriormente, dado que la ley aplicable al procedimiento arbitral es de naturaleza procesal o adjetiva, rige *in actum* y por ende el estatuto legal aplicable al presente arbitraje es precisamente la Ley 1563 pues es la ley arbitral vigente al momento de iniciarse el presente procedimiento arbitral.

---

[59] Artículo 38. En todo contrato se entenderán incorporadas las leyes vigentes al tiempo de su celebración. Exceptúanse de esta disposición: 1. Las leyes concernientes al modo de reclamar en juicio los derechos que resultaren del contrato (...).

[60] Artículo 40 (modificado por el artículo 624 de la Ley 1564 de 2012). Las leyes concernientes a la sustanciación y ritualidad de los juicios prevalecen sobre las anteriores desde el momento en que deben empezar a regir. Sin embargo, los recursos interpuestos, la práctica de pruebas decretadas, las audiencias convocadas, las diligencias iniciadas, los términos que hubieren comenzado a correr, los incidentes en curso y las notificaciones que se estén surtiendo, se regirán por las leyes vigentes cuando se interpusieron los recursos, se decretaron las pruebas, se iniciaron las audiencias o diligencias, empezaron a correr los términos, se promovieron los incidentes o comenzaron a surtirse las notificaciones. La competencia para tramitar el proceso se regirá por la legislación vigente en el momento de formulación de la demanda con que se promueva, salvo que la ley elimine dicha autoridad.

180. Para despejar cualquier duda, la misma Ley 1563 dispone en su artículo 119 que se aplicará a los arbitrajes iniciados con posterioridad a su vigencia.

181. El artículo 62 párrafo 4 de la Ley 1563 dispone, entre otras cosas, que "[s]e *entiende que el arbitraje es internacional cuando*: [...] *(a) Las partes en ese acuerdo arbitral tengan, al momento de la celebración de ese acuerdo, sus domicilios en Estados diferentes* [...]".

182. Los Contratos de Transacción involucran a las siguientes partes: Michael Ventura, Esther Ventura, Viviane Ventura, Juan María Rendón y Lafrancol. Así, en los Contratos de Transacción constan al menos dos partes, Michael Ventura y Viviane Ventura, cuyos domicilios están fuera de Colombia y se sitúan en Estados diferentes al Estado correspondiente al domicilio de las demás partes signatarias (Reino Unido y Estados Unidos de América, respectivamente). Por lo tanto, conforme a la Ley 1563, el presente arbitraje claramente constituye un arbitraje de carácter internacional.

183. En todo caso, *ad arguendo*, aun cuando el Tribunal Arbitral hubiese estimado que la ley aplicable al presente arbitraje fuese la Ley 315, lo cual ha expresamente desestimado, existen razones para afirmar que el presente arbitraje tiene la naturaleza de un arbitraje internacional y no de uno doméstico colombiano.

184. La Ley 315 dispone en su artículo 1, que [s]*erá internacional el arbitraje cuando las partes así lo hubieran pactado, siempre que además se cumpla con cualquiera de los siguientes eventos: (1) Que las partes, al momento de la celebración del pacto arbitral, tengan su domicilio en Estados diferentes* [...]".

185. Es claro que las partes del convenio arbitral, al momento de su celebración, estaban domiciliadas en Estados diferentes. Por lo tanto el requisito del numeral 1 de artículo 1 de la Ley 315 resulta claramente satisfecho en el presente arbitraje.

186. Ahora bien, cabe preguntarse si, como lo afirman los Demandados, la Ley 315 exige que las partes expresamente hayan pactado que el arbitraje es internacional para poder calificarlo como tal conforme al artículo 1 de la Ley 315. La respuesta es claramente negativa.

187. En efecto, la exposición de motivos de la Ley 315 señala que basta el pacto de arbitraje y la presencia de uno de los elementos de internacionalidad para que el arbitraje sea internacional[61]. La doctrina más relevante señala que el artículo 1 de la Ley 315 "*no puede interpretarse sino como exigiendo la presencia de un pacto arbitral válido y no como la mención expresa del término "arbitraje internacional"*"[62]. Así, según esta doctrina, el requisito en análisis se vería satisfecho por el solo hecho de que las partes hayan pactado un convenio arbitral válido.

188. Adicionalmente, el Tribunal Arbitral entiende que las Partes en los Contratos de Transacción tuvieron la intención de dar al presente arbitraje el carácter de internacional. El artículo 1 de la Ley

---

[61] La exposición de motivos de la Ley 316 de 1996 establece lo siguiente en relación con el artículo 1° de la ley: "*Se incluye así mismo un parágrafo en el que se deja claro que cuando quiera que opere alguno de los criterios determinantes del arbitraje internacional y adicionalmente medie un pacto arbitral, el trámite procedente para la solución del conflicto será el del arbitraje internacional previsto en este (sic) ley*". (Clopatofsky Ghisays, Jairo. "Exposición de motivos al Proyecto de Ley por el cual se regula el arbitraje internacional y se dictan otras disposiciones". Gaceta del Congreso No. 231/1995).

[62] BEJARANO GUZMÁN, Ramiro & MANTILLA-SERRANO, Fernando. *La autonomía de las partes frente al proceso arbitral: el centro del debate*. p.9. En el mismo sentido Gil Echeverry, Jorge Hernán. *Nuevo régimen de arbitramento*. Manual práctico. Tercera Edición. Bogotá, D.C., Cámara de Comercio de Bogotá, 2004, p. 687. Mantilla Serrano, Fernando. Ámbito Jurídico No. 117, en Gil Echeverry, op. cit., p. 687.

315 ciertamente no exige una declaración expresa de las partes del carácter internacional del arbitraje y el Tribunal Arbitral considera que es razonable entender que, al menos indiciariamente, las partes le atribuyeron al arbitraje un carácter internacional. Ello es así porque, salvo por el domicilio de Michael Ventura y Viviane Ventura que se situaba fuera de Colombia, el resto de los elementos efectivamente está vinculado con Colombia. Sin perjuicio de ello, las Partes, en lugar de acudir a una institución arbitral de carácter u origen doméstico, eligieron un arbitraje sometido al Reglamento de la CCI y eligieron a la CCI como institución administradora del arbitraje. El Tribunal Arbitral entiende dicha sumisión como reveladora de la intención de los suscriptores del convenio arbitral de darle al arbitraje un carácter de internacional. Si bien es efectivo, como lo sostienen los Demandados, que la CCI está facultada para administrar arbitrajes de carácter doméstico, el Tribunal Arbitral estima que, teniendo en cuenta las circunstancias del presente caso, la decisión de las Partes de designarla como institución administradora del arbitraje, a falta de mención expresa de las Partes, debe ser entendida como un indicio de que la voluntad de las Partes fue considerar al arbitraje como internacional. Los Demandados no han dado suficientes razones o pruebas para desvirtuar este indicio o presunción.

189. En conclusión, el Tribunal estima que la ley aplicable al presente arbitraje para determinar su naturaleza es la Ley 1563 y que se da al menos uno de los elementos consagrados en el artículo 62 de dicha ley para considerar al arbitraje como internacional. En virtud de dicho estatuto legal, este Arbitraje debe ser entendido como un arbitraje de carácter internacional.

190. Además de lo anterior, resulta importante anotar que los Demandados han sostenido que lo que realmente pactaron fue un arbitraje doméstico administrado por la CCI, con sujeción al Reglamento de Arbitraje de la CCI[63]. Es decir, que los Demandados han aceptado que el arbitraje se debía tramitar conforme al Reglamento de la CCI. En este sentido, el Tribunal Arbitral concluye que, independientemente de la discusión sobre la naturaleza del proceso, el arbitraje fue administrado por la CCI y se tramitó son sujeción al Reglamento de Arbitraje de dicha entidad, según lo pactado por las Partes. Así, desde el punto de vista del reglamento aplicado, no existe ninguna diferencia con la posición de los Demandados en relación con las reglas de procedimiento aplicables al presente trámite ni se puede haber causado perjuicio alguno desde el punto de vista del debido proceso a los Demandados en cuanto se aplicó el reglamento acordado por las Partes, y las Partes declararon estar satisfechas con la forma en que el procedimiento había sido conducido por el Tribunal Arbitral[64].

191. Teniendo en consideración las razones antes indicadas, el Tribunal Arbitral desestima las alegaciones realizadas por los Demandados y mantiene la decisión adoptada en la Orden Procesal N°1 en cuanto a que el presente arbitraje es de carácter internacional conforme a las disposiciones de la Ley 1563 y que se rige por la Sección Tercera de la misma ley referida al arbitraje internacional.

---

[63] Memorial de Cierre de los Demandados. Párrafos 27 a 30.
[64] Transcripción de la Audiencia. Páginas 362 y 363.

## B. INCOMPETENCIA DEL TRIBUNAL ARBITRAL RESPECTO DEL PRIMER GRUPO DE PRETENSIONES DE LOS DEMANDANTES.

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandados

192. En el Memorial de Contestación los Demandados señalaron que la cláusula arbitral de los Contratos de Transacción otorgaría al Tribunal Arbitral competencia exclusivamente para pronunciarse en relación con las disputas surgidas respecto de la eficacia delos Contratos de Transacción, lo que se aplica a discusiones relacionadas con la existencia, validez, oponibilidad del Contrato y adicionalmente relacionadas con hechos ocurridos durante su ejecución, modificación o terminación[65].

193. Los Demandados citan al efecto la Cláusula Décimo Primera de los Contratos de Transacción, señalando que la misma establece que las Partes convinieron en someter "... *todas y cualesquiera controversias, diferencias, disputas o reclamos que surjan en torno a la eficacia, ejecución, interpretación, modificación o terminación de la presente Transacción, a un tribunal de arbitramento...*"[66].

194. Concluyen que el pacto arbitral referido de modo alguno le otorga al Tribunal Arbitral competencia para dirimir controversias o establecer responsabilidades por presuntos hechos o conductas que los Demandados alegan constituyeron una estrategia de inducción para celebrar el Contrato de Transacción, todas las cuales habrían incurrido con anterioridad, 3 años en algunos casos e incluso 10 años en otros[67].

195. En consecuencia, los Demandados solicitan que se declare la incompetencia del Tribunal Arbitral para pronunciarse en relación con el primer grupo de pretensiones soportadas en el literal e. del Memorial de Demanda denominado "la mala fe en que incurrieron los demandados"[68].

#### b. Posición de los Demandantes

196. En el Memorial de Réplica los Demandantes se opusieron a la solicitud de incompetencia formulada por los Demandados[69].

197. Al respecto, señalan que no es efectivo que las conductas aludidas tengan una antigüedad de 10 años o más o que se refieran a antecedentes de la celebración de los Contratos de Transacción, sino que se trata de conductas de mala fe desplegadas por los Demandados durante la celebración y ejecución de dichos contratos que les condujeron a los Demandantes a pagar cuantiosas sumas de dinero como contraprestación a obligaciones que los Demandados jamás estuvieron dispuestos a cumplir[70].

---

65 Memorial de Contestación. Párrafo 221 y siguientes.
66 Memorial de Contestación. Párrafo 221.
67 Memorial de Contestación. Párrafo 223, y; Memorial de Cierre de los Demandados. Párrafos 31 y siguientes.
68 Memorial de Contestación. Párrafo 224.
69 Memorial de Réplica. Párrafos 283 y siguientes.
70 Memorial de Réplica. Párrafo 285.

198. Señalaron que el primer grupo de pretensiones se sustentaban *"en el incumplimiento de la obligación legal establecida en la legislación colombiana de ejecutar los contratos de buena fe"* invocando el artículo 1603 del CCC y que los Demandados faltaron a esta buena fe tanto al celebrar contratos que nunca estuvieron realmente dispuestos a cumplir, como al incumplirlos, incurriendo en la mismas conductas que se comprometieron a evitar[71].

## 2. DECISIÓN DEL TRIBUNAL

199. Para resolver este punto, el Tribunal Arbitral ha tenido a la vista las presentaciones de las Partes, y las cláusulas arbitrales contenidas en los Contratos de Transacción acompañados en los Anexos D-1a y D-1b.

200. La voluntad de las Partes respecto de las materias que acordaron someter a arbitraje está reflejada en la Cláusula Undécima de los respectivos Contratos de Transacción.

201. De la lectura de las citadas cláusulas arbitrales se aprecia que las mismas entregan al presente Tribunal Arbitral competencia para conocer *"todas y cualesquiera controversias, diferencias, disputas o reclamos que surjan en torno a la eficacia, ejecución, interpretación, modificación o terminación"* de los respectivos Contratos de Transacción (subraya el Tribunal). A juicio del Tribunal Arbitral la anterior cita implica que su competencia se extiende en forma amplia (i) a todas y cualesquiera controversias, diferencias, disputas o reclamos que surjan (ii) en torno a cualquiera de los aspectos de los Contratos de Transacción (iii) relacionados con su eficacia, ejecución, interpretación, modificación o terminación.

202. En primer lugar, la expresión *"todas o cualesquiera controversias, diferencias, disputas o reclamos"* con la que da inicio a la frase recién citada, y que se halla contenida en las cláusulas de arbitraje, no limita *a priori* en forma alguna el tipo controversias, diferencias, disputas o reclamos que las Partes pueden someter a arbitraje en relación con los Contratos de Transacción.

203. En segundo lugar, la expresión *"que surjan en torno a"* indica, a juicio del Tribunal Arbitral, una conceptualización bastante amplia del vínculo que debe existir entre las controversias, diferencias, disputas o reclamos que surjan entre las Partes y los aspectos o asuntos a los cuales se refieran tales disputas. Tales aspectos son, según el tenor de las mismas cláusulas, la eficacia, la ejecución, la interpretación, la modificación o la terminación de los Contratos de Transacción.

204. De este modo, a juicio del Tribunal Arbitral el análisis que se debe realizar para determinar la competencia del mismo respecto de las pretensiones formuladas por las Partes, supone establecer si la diferencia, conflicto o controversia planteado ha surgido en torno de algunos de los aspectos de los Contratos de Transacción que las Partes han incluido en la cláusula arbitral, esto es que la disputa de algún modo haya surgido en torno a la eficacia, la ejecución, la interpretación, la modificación o la terminación de los Contratos de Transacción.

205. En este punto, la reclamación que los Demandados han tachado de exceder la competencia del Tribunal, corresponde a las alegaciones de los Demandantes en cuanto a que Michael Ventura y Viviane Ventura habrían obrado de mala fe desde antes que se celebraran los Contratos de Transacción para inducir la firma de éstos bajo engaño de que serían cumplidos en circunstancias

---

71 Memorial de Réplica. Párrafos 288 y siguientes.

que no era su intención dar cumplimiento a los mismos, y también habrían obrado de mala fe en cuanto a la ejecución de los Contratos de Transacción, puesen los hechos éstos fueron incumplidos de mala fe por los Demandados.

206. Los Demandantes en el Memorial de Réplica, expresamente precisaron que su reclamación sobre conductas de mala fe de su contraparte se sustentaban *"en el incumplimiento de la obligación legal establecida en la legislación colombiana de ejecutar los contratos de buena fe"* aludiendo al artículo 1603 del CCC. De este modo, los propios Demandantes han precisado que su reclamación en comento surge en torno a la mala fe desplegada por los Demandados durantela ejecución de los Contratos de Transacción.

207. En todo caso, ambos aspectos, esto es, tanto la mala fe al momento de celebrar los Contratos de Transacción, como la mala fe durante la vida de tales contratos, se refieren a controversias, diferencias, disputas o reclamos en torno a la eficacia de los Contratos de Transacción, por una parte, y al cumplimiento de los mismos, por la otra, y en consecuencia, a controversias que por voluntad de las Partes pueden someterse a arbitraje y respecto de las cuales este Tribunal Arbitral es competente.

208. De este modo, el Tribunal Arbitral concluye que la controversia planteada por los Demandantes respecto de la alegada mala fe con que los Demandados supuestamente incumplieron los Contratos de Transacción se encuentra bajo el amparo de las cláusulas arbitrales establecidas en dichos Contratos y que por lo tanto el Tribunal Arbitral es competente para conocer de las mismas.

209. En consecuencia, se rechaza esta objeción de los Demandados a la competencia del Tribunal Arbitral.

## C. INCOMPETENCIA DEL TRIBUNAL ARBITRAL RESPECTO DE LA PRETENSIÓN SOBRE COBRO DE CLÁUSULA PENAL PREVISTA EN LOS CONTRATOS DE TRANSACCIÓN

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandados

210. En el Memorial de Contestación los Demandados plantearon que los Contratos de Transacción excluyeron de la cláusula arbitral contenida en los mismos el cobro de la cláusula penal (la "Cláusula Penal"), razón por la cual estiman que el Tribunal Arbitral carecería de competencia para conocer y decidir la pretensión de los Demandantes relacionada con el cobro de la Cláusula Penal[72].

211. Para justificar su posición, citan la Cláusula Sexta de los Contratos de Transacción en la cual las Partes señalaron *"SEXTA: Carácter Ejecutivo: Las Partes manifiestan que es su voluntad que esta*

---

[72] Memorial de Contestación, Párrafos 225 y siguientes.

*Transacción constituya título ejecutivo para el cumplimiento de todas las obligaciones en ella contenidas y específicamente las de pagar sumas de dinero*[73].

212. Junto con ello, los Demandados invocan la Cláusula Octava que contiene la Cláusula Penal de los Contratos de Transacción, aludiendo a que la misma excluía del alcance del Tribunal Arbitral el cobro de la Cláusula Penal. La Cláusula Octava indica: *"OCTAVA: Cláusula Penal. El simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas, además para declarar terminado este contrato y por ende no verificada la transacción, para que exija a la parte incumplida, inmediatamente y a título de pena, el pago de la suma de UN MILLÓN DE DÓLARES ($ U.S. 1.000.000,oo), suma que podrá ser exigida por la vía ejecutiva ante la jurisdicción ordinaria, con la simple presentación de este contrato y la afirmación de la parte cumplida acerca del incumplimiento de la parte incumplida y sin necesidad de requerimiento o constitución en mora, derechos estos a los cuales renuncian las Partes en su recíproco beneficio. Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados por el incumplimiento, y en consecuencia la parte cumplida tendrá derecho a cobrar la totalidad de los perjuicios ocasionados más la pena que aquí se establece. Las partes declaran que excluyen expresamente del alcance de la cláusula compromisoria pactada en este contrato, el cobro ejecutivo de esta cláusula penal"*[74].

213. A partir de lo dispuesto en dicha cláusula, los Demandados argumentan que fue claro que las Partes convinieron que los Contratos de Transacción constituían título ejecutivo para cobro de sumas de dinero, y que el cobro de la Cláusula Penal prevista en ellos debía realizarse por la vía ejecutiva ante la jurisdicción ordinaria de Colombia, para lo cual bastaba la sola presentación a cobro del contrato y la afirmación del ejecutante del incumplimiento[75]. Es más, los Demandados señalaron que las Partes excluyeron del alcance de la cláusula arbitral toda decisión relacionada con la exigibilidad de la Cláusula Penal, no siendo necesario proceso declarativo alguno para establecer incumplimiento del Contrato, sino que bastaba simplemente la sola afirmación de incumplimiento para acreditar dicha circunstancia[76].

214. Así, los Demandados concluyen que: (i) la cláusula compromisoria sólo comprende las controversias relacionadas con la eficacia, ejecución, interpretación, modificación y terminación del contrato, y no incluye el cobro de la Cláusula Penal; (ii) el contrato constituye título ejecutivo para el cobro de las obligaciones de pagar sumas de dinero; (iii) para el cobro de la Cláusula Penal, se pactó la vía ejecutiva ante la jurisdicción ordinaria en Colombia, constituyendo el título ejecutivo el contrato y la declaración de incumplimiento; y (iv) el cobro de la Cláusula Penal está expresamente excluido de la cláusula compromisoria[77].

215. En definitiva, sostienen los Demandados que la voluntad de las Partes fue que sólo fuera posible ejecutar el cobro de la Cláusula Penal ante la jurisdicción ordinaria en Colombia, careciendo el Tribunal Arbitral de competencia para ordenar el pago de las mismas[78].

216. En el Memorial de Pronunciamiento sobre la Réplica, los Demandados mantuvieron idéntica posición al respecto, reafirmando que el contrato daba derecho al cobro de la Cláusula Penal sin declaración previa de incumplimiento y por lo mismo sin necesidad de recurrir a arbitraje, al

---

[73] Memorial de Contestación. Párrafo 226.
[74] Memorial de Contestación. Párrafo 227.
[75] Memorial de Contestación. Párrafo 229.
[76] Memorial de Contestación. Párrafo 230.
[77] Memorial de Contestación. Párrafo 232.
[78] Memorial de Contestación. Párrafo 233.

punto que las respectivas Cláusulas Penales se encontraban excluidas del conocimiento del Tribunal Arbitral[79].

b. Posición de los Demandantes

217. En el Memorial de Réplica, los Demandantes contradicen lo planteado por los Demandados, argumentando que en los Contratos de Transacción no existe exclusión alguna ni tácita ni expresa, relacionada con la Cláusula Penal[80].

218. Los Demandantes sostiene que los Contratos de Transacción simplemente establecieron una posibilidad o un derecho de cobrar por la vía ejecutiva la Cláusula Penal, pero no una obligación de proceder ante la jurisdicción ordinaria, por lo que nada obsta perseguir el reconocimiento y pago de dichas penas en esta sede arbitral[81]. Agregan que es posible que de una Cláusula Penal como la señalada surjan controversias declarativas y de ejecución, siendo para las primeras improcedente recurrir al proceso ejecutivo aludido en los Contratos de Transacción[82].

219. Asimismo, señalan que para que la Cláusula Penal sea exigible se requiere la verificación del hecho que se haya señalado como condición, en este caso, la declaratoria de incumplimiento[83], citando al efecto doctrina y jurisprudencia en ese sentido[84].

220. Los Demandados argumentan que la razón de las Partes para incluir en la Cláusula Penal la potestad de acudir a la jurisdicción ordinaria para su cobro se debió a que desde hace un tiempo la jurisprudencia colombiana niega la posibilidad de conducir procedimientos de ejecución ante árbitros, citando al efecto jurisprudencia que respaldaría esa afirmación[85]. Los Demandantes plantearon alegaciones similares en su Memorial de Cierre[86].

2. DECISIÓN DEL TRIBUNAL

221. El Tribunal Arbitral aprecia aquí nuevamente una objeción jurisdiccional sobre la base del alcance de las cláusulas arbitrales contenidas en los Contratos de Transacción, esta vez referida precisamente a las pretensiones de los Demandantes sobre el cobro de la Cláusula Penal.

222. Al respecto, el Tribunal Arbitral nota que los Demandados se basan en una supuesta limitación respecto de la competencia del Tribunal Arbitral para pronunciarse sobre la Cláusula Penal contenida en la Cláusula Octava de los Contratos de Transacción. El Tribunal Arbitral no comparte esta posición.

223. Al contrario, el Tribunal Arbitral concluye que de una interpretación sistemática de las cláusulas de los Contratos de Transacción resulta claro que no existen las limitaciones a la competencia del

---

[79] Memorial de Pronunciamientos sobre la Réplica. Párrafos 266 y siguientes.
[80] Memorial de Réplica. Párrafo 296.
[81] Memorial de Réplica. Párrafo 298.
[82] Memorial de Réplica. Párrafo 299.
[83] Memorial de Réplica. Párrafo 299.
[84] Memorial de Réplica. Párrafos 300 y 301.
[85] Memorial de Réplica. Párrafos 305 y 306.
[86] Memorial de Cierre de los Demandantes. Párrafo 296.

Tribunal para pronunciarse sobre el alcance y/o efecto de la Cláusula Penal pactada por las Partes.

224. En efecto, la Cláusula Undécima respectiva, señala *"Cláusula Compromisoria. Las partes convienen someter todos y cualesquiera controversias, diferencias, disputas o reclamos que surjan en torno a la eficacia, ejecución, interpretación, modificación o terminación de la presente Transacción, a un Tribunal de Arbitramiento que estará integrado por tres (3) árbitros designados de mutuo acuerdo por las Partes, y de no ser posible lograr dicho Contrato en un término de diez (10) días hábiles contados a partir del recibo de la solicitud al respecto realizada por una Parte a la otra, designados por el Centro de Arbitraje y conciliación de la Cámara de Comercio Internacional de París. El tribunal funcionara en Bogotá, decidirá en derecho y se sujetará a las normas procesales de la CCI. Los gastos y costas del procedimiento, incluyendo los honorarios de los árbitros serán asumidos por cada parte"*. No existe pues ninguna limitación en esta cláusula para que el Tribunal Arbitral se pronuncie sobre cualquier cláusula de los Contratos de Transacción, incluyendo aquella relativa a la Cláusula Penal.

225. Ahora bien, los Demandados sostienen que la Cláusula Octava que regula la Cláusula Penal hace expresa referencia a que el cobro de la misma podrá ser exigido *"por la vía ejecutiva ante la jurisdicción ordinaria"*, lo cual excluiría la competencia de este Tribunal Arbitral. Sin embargo, si se analiza la Cláusula Penal contenida en la cláusula citada, el Tribunal Arbitral no encuentra que exista una exclusión de su competencia para pronunciarse sobre dicha cláusula.

226. En efecto, las alegaciones de los Demandados en cuanto a que se habrían excluido del arbitraje las controversias respecto de la Cláusula Penal y que para el cobro de la misma se habría pactado en forma excluyente la vía ejecutiva ante los tribunales ordinarios colombianos, deben descartarse con la sola lectura de la Cláusula Octava. En ella se indica expresamente que la suma a que alude la Cláusula Penal *"podrá ser exigida"* por la vía ejecutiva ante la jurisdicción ordinaria.

227. El Tribunal coincide con la Demandante en que respecto de la cláusula penal pueden existir pretensiones declarativas o de ejecución y, en consecuencia, las Partes tendrían la facultad de acudir al Tribunal para efectos de presentar pretensiones declarativas respecto de la Cláusula Penal. Pero además, el cobro de la Cláusula Penal por la vía ejecutiva implicaría que de dieran los requisitos procesales para iniciar la vía ejecutiva (una obligación clara, expresa y actualmente exigible). En consecuencia, una interpretación en el sentido de que solamente pueda acudirse al proceso ejecutivo para cualquier declaración relativa a la Cláusula Penal implicaría que la cláusula no produzca efectos en cuanto, de no cumplirse los requisitos para iniciarse un proceso ejecutivo, y pretenderse, como en este caso, una declaración de incumplimiento para hacer efectiva la Cláusula Penal, la parte correspondiente no tendría acción respecto de la Cláusula Penal. Pero además, el tenor de la Cláusula Penal es claramente facultativo (*"podrá ser exigida"*), es decir, otorga a las Partes el derecho de acudir a la vía ejecutiva, derecho que podrán ejercer en la medida en la que tengan un título ejecutivo, o al arbitraje si no tienen un título ejecutivo o si buscan una pretensión meramente declarativa o de condena.

228. De este modo, el Tribunal Arbitral concluye que no puede admitirse esta objeción planteada por los Demandados.

229. Por esta razón, el Tribunal Arbitral rechaza también esta solicitud de incompetencia promovida por los Demandados.

## 2.- LAS ALEGACIONES DE INEXISTENCIA Y NULIDAD

230. Los Demandados han solicitado la declaración de inexistencia de los Contratos de Transacción y/o de nulidad de ciertas cláusulas contenidas en los mismos. El Tribunal, antes de analizar el mérito de las pretensiones sobre incumplimiento de los Contratos de Transacción planteadas por los Demandantes, determinará el mérito de las alegaciones de inexistencia y nulidad planteadas por los Demandados por vía de defensa.

231. Como punto de partida, es importante destacar que, si bien en el Acta de Misión los Demandados plantearon diversas pretensiones relativas a la declaración de nulidad de los Contratos de Transacción[87], en definitiva no todas dichas alegaciones fueron desarrolladas con posterioridad por parte de los Demandados. En concreto, los Demandados no desarrollaron sus alegaciones iniciales meramente enunciadas en el Acta de Misión en torno a la nulidad relativa de los Contratos de Transacción por dolo y error. De hecho, ni en los memoriales de Contestación a la Demanda y de Pronunciamiento sobre la Réplica ni en los escritos subsiguientes de Memorial de Cierre y Memorial Posterior a la Audiencia se desarrollan estas alegaciones de nulidad, las que por lo mismo el Tribunal Arbitral entiende desestimadas por falta de argumentación legal, contractual, y fáctica que las soporte. En cualquier caso, el Tribunal Arbitral no aprecia que existan méritos para que tales causales de nulidad se hayan configurado en los hechos que han dado origen a la presente disputa, ni pruebas que demuestren esa alegada nulidad. Asimismo, aunque fue enunciada, tampoco fue desarrollada ni probada la nulidad por causa ilícita. Por el contrario, como se analiza más adelante, los Contratos de Transacción reflejan un acuerdo para resolver disputas entre las partes y no otro negocio jurídico diferente y no está demostrado en este Arbitraje que haya existido una causa ilícita en la celebración de los Contratos de Transacción.

232. En concreto, las alegaciones que fueron especificadas y desarrolladas por los Demandados a partir del Memorial de Contestación[88] han sido exclusivamente: primero, la inexistencia de los Contratos de Transacción derivados de la falta de determinación de su objeto y por ausencia del consentimiento de los Demandados sobre su contenido; segundo, la nulidad absoluta por objeto ilícito de las Cláusulas 2.1 y 2.2 de los Contratos de Transacción sobre la renuncia a iniciar acciones judiciales y extrajudiciales de cualquier naturaleza; tercero, la nulidad absoluta por objeto ilícito de las cláusulas de los Contratos de Transacción en cuanto a la renuncia a la interposición de una denuncia penal; cuarto, la nulidad absoluta por objeto ilícito de la cláusula del Contrato de Transacción suscrito por Viviane Ventura en cuanto a las obligaciones de no referirse, ni referirse en términos ofensivos a los Demandantes, y de las obligaciones de no calificar las conductas, costumbres o actividades de los Demandantes, y quinto, la nulidad de la Cláusula Penal como consecuencia de la declaratoria de nulidad de estas cláusulas.

233. Asimismo, en el Memorial de Pronunciamiento sobre la Réplica, los Demandados introdujeron y desarrollaron una nueva defensa consistente en la ineficacia o nulidad de los Contratos de Transacción por la falta de buena fe objetiva de los Demandantes.

234. Analizaremos cada una de las defensas indicadas a continuación.

---

[87] Laudo Arbitral. Párrafo 131.
[88] Laudo Arbitral. Párrafo 133.

A.    LA INEXISTENCIA DE LOS CONTRATOS DE TRANSACCIÓN POR AUSENCIA
DE SUS ELEMENTOS ESENCIALES Y POR FALTA DE CONSENTIMIENTO DE LOS
DEMANDADOS

1.  POSICIÓN DE LAS PARTES

a. Posición de los Demandados

235. Los Demandados aluden a una supuesta inexistencia de los Contratos de Transacción
atendiendo a que los mismos no contendrían los elementos esenciales de ese tipo de contratos[89].

236. Indican que las Partes no precisaron cuáles eran las diferencias específicas que existían entre
ellas, y que los Contratos contienen referencias vagas respecto a que las Partes han tenido
"*algunas diferencias*" sobre la calidad de accionista,- en el caso de Viviane Ventura- y en torno a la
actuaciones de los solicitados o compradores en su condición de accionistas o administradores
de Lafrancol[90].

237. En el mismo orden de ideas, señalan que con este tipo de generalidades no se especifica cuáles
son las precisas diferencias entre las Partes, ni se señala en los Contratos cómo han sido
solucionadas, todo lo cual impediría considerar que los acuerdos de las Partes constituyen un
contrato de transacción, sobre el cual pueda predicarse el efecto de cosa juzgada.

238. A juicio de los Demandados, lo anterior determinaría a su vez la inexistencia de los Contratos de
Transacción[91].

239. Finalmente, los Demandados advierten que los Contratos de Transacción no habían sido
discutidos por las Partes y que los Demandados no habían firmado los mismos siendo
conocedores de, y con pleno entendimiento de lo allí pactado. Agregan que no contaron con
asistencia letrada, que los Contratos de Transacción fueron redactados exclusivamente por los
apoderados de Esther Ventura sin que fueran conocidos previamente por los Demandados ni
por su asesor legal y que firmaron los Contratos de Transacción sin la presencia de su abogado[92].

240. Sobre dicha base, se invoca la inexistencia de los Contratos de Transacción por falta de
consentimiento de los Demandados.

b. Posición de los Demandantes

---

[89] Memorial de Pronunciamiento sobre la Réplica. Párrafos 77 y siguientes.
[90] Memorial de Pronunciamiento sobre la Réplica. Párrafo 87.
[91] Memorial de Pronunciamiento sobre la Réplica. Párrafo 88.
[92] Memorial de Comentarios a la Réplica. Párrafos 139 a 141. Como respaldo a dicha afirmación invocan los Anexos DR-71
y DR-72 que corresponden a las declaraciones testimoniales de Viviane Ventura y Michael Ventura, respectivamente.

241. Los Demandantes rechazan los planteamientos formulados por los Demandados respecto de la imprecisión o falta de especificidad de las disputas entre las Partes, señalando que eso no es un requisito exigible para los Contratos de Transacción.

242. Según los Demandantes, el artículo 2469 del CCC sólo exige que exista una controversia o disputa[93]. Concluyen los Demandantes que en los Contratos de Transacción se contienen, con claridad y precisión, no sólo las concesiones recíprocas, sino también las controversias, o la "relación jurídica incierta"[94].

243. En definitiva, los Demandantes solicitan que se rechace la solicitud de inexistencia de los Demandados respecto de los Contratos de Transacción por carecer de precisión la descripción de las controversias dado que esto último no es un requisito del contrato de transacción conforme al derecho colombiano.

244. En todo caso, y para el evento que el Tribunal Arbitral considere que los Contratos de Transacción si requieren de la precisión reclamada por los Demandados, los Demandantes alegan que losContratos de Transacción cuentan con los elementos echados en falta, lo que se desprende de la descripción que los Demandados hacen del contenido de los Contratos de Transacción en su propio Memorial de Pronunciamiento sobre la Réplica[95].

245. Por último, los Demandantes también solicitan que se rechace la alegada inexistencia de los Contratos de Transacción por falta de consentimiento, atendido que los Demandados consintieron en los términos de los mismos[96].

## 2. DECISIÓN DEL TRIBUNAL

246. Los Demandados señalan que los Contratos de Transacción serían inexistentes atendido que carecerían de un requisito esencial de los mismos consistente en la precisión de las disputas que se solucionan por vía de transacción.

247. En primer término, el Tribunal Arbitral advierte que si bien los Demandados incluyeron una defensa en el Acta de Misión relativa a la inexistencia de los Contratos de Transacción por ausencia de sus elementos esenciales, esta defensa solo fue efectivamente desarrollada con la presentación del Memorial de Pronunciamiento sobre la Réplica.

248. En todo caso, el Tribunal Arbitral nota que la supuesta falta de precisión de las controversias que se transigen no conlleva a la inexistencia o invalidez de los Contratos de Transacción, como lo alegan los Demandados. Ni hay falta de precisión de las controversias que se transigen, ni la ley colombiana sanciona con la inexistencia o la nulidad la alegada falta de precisión.

249. Al respecto, el Tribunal Arbitral nota que las normas relevantes para dilucidar este punto son los artículos 2469 y siguientes del CCC, ninguno de los cuales establece el requisito de que las

---

[93] Memorial de Cierre de los Demandantes. Párrafo 178.
[94] Memorial de Cierre de los Demandantes. Párrafo 186.
[95] Memorial de Cierre de los Demandantes. Párrafos 194 y 195.
[96] Memorial Posterior a la Audiencia de los Demandantes. Párrafos 180 a 270.

disputas estén pormenorizadamente detalladas a la firma de la transacción. En concreto, el artículo 2469 dispone:

"Artículo 2469. Definición de la Transacción. La transacción es un contrato en que las partes terminan extrajudicialmente un litigio pendiente o precaven un litigio eventual.

No es transacción el acto que sólo consiste en la renuncia de un derecho que no se disputa".

250. De la lectura de dicha norma, se advierte que para que se celebre un contrato de transacción válido es fundamental que exista una disputa entre las partes, sea judicializada o no, sobre un objeto que sea transigible.

251. En el mismo sentido se pronunció el experto señor Eduardo Cifuentes, perito designado por los Demandantes, en su informe[97], y durante la Audiencia. En ella, tuvo lugar el siguiente intercambio de opiniones sobre este punto:

"DR. MAYORGA: [...] quería que nos precisara usted si los contratos de transacción, bajo la regulación colombiana, tienen que cumplir o satisfacer ciertos elementos estructurales, esenciales para poder considerarse contratos de transacción, y cuáles serían esos elementos imprescindibles.

DR. CIFUENTES: En el escrito he señalado claramente cuál es el objeto del contrato de transacción a la luz de la legislación colombiana y como lo señala muy bien el artículo 2469 del Código Civil, la transacción es un contrato en el que las partes terminan extrajudicialmente un litigio pendiente o precaven un litigio eventual, por consiguiente, el objeto debe versar sobre materias que sean transigibles, que sean susceptibles de convertirse en el objeto de este tipo específico de contrato, por lo demás, los requisitos de existencia están referidos a este objeto esencial ya mencionado, y los requisitos de validez son los requisitos de cualquier otro contrato, y eso se explica suficientemente en el texto, de modo que no creo que sea necesario ahondar más allá de eso"[98].

252. De igual forma, según la Corte Suprema de Justicia, los elementos esenciales del contrato de transacción son tres: (i) la existencia actual o potencial de diferencia litigiosa o materia susceptible de transacción; (ii) la intención de poner fin a un litigio existente o precaver uno futuro y (iii) la existencia de concesiones recíprocas[99]. Asimismo, los propios Demandados coinciden con esta posición de la Corte Suprema de Justicia[100].

253. Por otro lado, la jurisprudencia de cortes y tribunales arbitrales colombianos han señalado que las diferencias objeto de la transacción deben estar determinadas de forma tal que pueda predicarse el efecto de cosa juzgada sobre las mismas[101].

254. En razón de lo anterior, el Tribunal no considera que exista un requisito legal que exija la absoluta determinación y precisión de cada una de las materias objeto de la transacción siempre que ello no torne el objeto de la transacción ininteligible o indeterminado, lo cual ciertamente no acontece en el presente caso.

---

[97] Anexo D-IP-03. Reporte elaborado por el experto Eduardo Cifuentes Muñoz. Páginas 162 a 166.
[98] Transcripción de la Audiencia. Página 269.
[99] Anexo D-IP-03. Ver, sentencia citada en la página 165 del informe del Dr. Eduardo Cifuentes.
[100] Memorial de Pronunciamiento sobre la Réplica. Párrafo 78.
[101] Ver, por ejemplo, Anexo DR-DJ-No. 24. *Representaciones Caijao y Cortés Ltda., Gregorio Caijao Roa Vs. Servicio Aéreo a Territorios Nacionales "Satena"*, Laudo Arbitral del 17 de noviembre de 1993.

255. En efecto, y en relación con la precisión de las controversias objeto de la transacción, el Tribunal considera que éstas deben estar determinadas de manera tal que el objeto de la transacción no se torne ininteligible o indeterminado. Los Contratos de Transacción cumplen con este requisito.

256. Con independencia de que el derecho colombiano no requiere que las disputas estén pormenorizadas, el Tribunal Arbitral considera que, en todo caso, los Contratos de Transacción sí contienen una descripción lo suficientemente clara como para que las Partes y el Tribunal Arbitral puedan identificar las disputas que fueron materia de los Contratos de Transacción. De la simple lectura de los Contratos de Transacción, aparece con claridad que los mismos sí han explicado en qué consisten las disputas entre las Partes. Así, en el Contrato de Transacción celebrado por Viviane Ventura, se precisa que la disputa de las partes es respecto a la calidad de accionista de Lafrancol de esta última[102], en los siguientes términos:

"1. Que las Partes han sostenido en el pasado diversas relaciones jurídicas y negociales, entre las cuales se encuentra la de Accionista del Solicitante en LAFRANCOL S.A., calidad que este perdió años atrás;
2. Que las Partes han tenido algunas diferencias, específicamente en torno a si El Solicitante tendría o no la calidad de accionista de LAFRANCOL S.A, razón por la cual buscan a través del presente documento precaver eventuales conflictos en torno a la totalidad de sus relaciones comerciales y societarias, incluyendo lo relacionado con el rol de los Solicitados en tanto accionistas y/o administradores de LAFRANCOL y sus vinculadas".

[...]

"El objeto del presente contrato es transigir de forma definitiva todas y cada una de las diferencias existentes, y precaver eventuales y/o contingentes litigios entre las Partes, derivados de la discusión en torno a si el Solicitante tendría o no en la actualidad la calidad de accionista de LAFRANCOL S.A. y/o respecto a las actuaciones como accionistas y/o administradores de los Solicitados. Igualmente es interés explícito de las Partes precaver cualquier posible reclamación o acción, judicial o extrajudicial entre ellas y con relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL".

257. Por su parte, lo mismo sucede con el Contrato de Transacción que suscribió Michael Ventura, en el cual se detalla que se trata de los conflictos entre las partes por sus relaciones comerciales y societarias, incluyendo el rol de los Compradores en la Transacción como accionistas y/o administradores de Lafrancol y sus vinculadas, para luego precisarlo en la Cláusula Primera, indicando que se pretende precaver litigios derivados de la condición de accionista de Lafrancol que ostentaba Michael Ventura y de la condición de administradores que ostentaban los Demandantes. Así, el texto del Contrato[103] indica:

"1. Que las Partes han sostenido en el pasado diversas relaciones jurídicas y negociales, entre las cuales se encuentra la de Accionista del Vendedor en LAFRANCOL S.A.;

2. Que las Partes, en desarrollo de tales relaciones, han tenido algunas diferencias, razón por la cual buscan a través del presente documento precaver eventuales conflictos en torno a la totalidad de sus relaciones comerciales y societarias, incluyendo lo relacionado con el rol del Comprador en tanto accionistas y/o administradores de LAFRANCOL y sus vinculadas".

258. En consecuencia, a juicio del Tribunal Arbitral, las disputas entre las Partes sí fueron descritas en los Contratos de Transacción de manera tal que se da cuenta de que entre las Partes existía un conflicto inminente sobre tales cuestiones que pretendía ser solucionado por la vía de una transacción.

---

[102] Anexo D-1a. Consideraciones.
[103] Anexo D-1b. Consideraciones.

259. Por lo que toca al requisito específico de existencia del contrato de transacción, consistente en la existencia de una controversia sobre una materia transigible que sea resuelta por la Transacción, el Tribunal advierte que la disputa que oponía a las Partes y que fue objeto de los Contratos de Transacción guardaba relación con la supuesta calidad de accionista de Lafrancol de Viviane Ventura, y con los conflictos suscitados entre Michael Ventura y los Compradores en su calidad de accionista, por un lado, y de accionistas y/o administradores de Lafrancol, por el otro. Es decir, ambos Contratos de Transacción dejan en claro la existencia de una controversia entre las Partes sobre una materia particular y la intención de las mismas de resolverla por esa vía autocompositiva.

260. Adicionalmente, las declaraciones de los Demandados en el Arbitraje demuestran que los Demandados estaban perfectamente conscientes de cuáles eran las disputas con los Demandantes que las Partes habían identificado, y que se pretendió resolver mediante la suscripción de los Contratos de Transacción. Resulta ilustrativa en este sentido la declaración de Viviane Ventura:

"DR. ZULETA: Entonces en ese momento cuando usted firmó, si no conocía todo eso que ahora nos dice que conoce, ¿usted entendió que le estaban pagando US$1 millón 100 mil para que se callara sobre qué?
SRA. VENTURA: El contrato, que habíamos firmado estos contratos.
DR. ZULETA: Para que no dijeran nada sobre estos contratos.
SRA. VENTURA: Correcto.
[...] DR. ZULETA: Sí. El contrato que usted firmó dice que usted y su prima, y su esposo o el esposo de su prima, estaban firmando un contrato para, y eso es lo que dice el contrato, transigir, transigir significa para solucionar en forma definitiva todas las diferencias que ustedes tenían, ¿qué entendió usted que eran las diferencias que ustedes tenían cuando leyó eso?
SRA. VENTURA: Dónde estaban mis acciones y por qué no me las restituyó. Esa era la diferencia, ella puso diferencias, pero esa era la diferencia, esa era la pelea"[104].

261. El Tribunal Arbitral también debe desestimar las alegaciones de inexistencia de los Contratos de Transacción derivada de la alegada falta de consentimiento de los Demandados como elemento esencial del contrato (artículo 898 del Código de Comercio). En efecto, los Demandados consintieron plenamente en la celebración de los Contratos de Transacción y ninguna de las circunstancias que los Demandados alegaron relativas a la pretendida ausencia del consentimiento fue probada. Por el contrario, la prueba apunta a que tales circunstancias no se presentaron.

262. En primer lugar, el Tribunal Arbitral concluye que los Contratos de Transacción fueron negociados libremente por las Partes, con el apoyo de asesores externos.

263. En el caso de Michael Ventura, dicho Demandado confirmó durante su interrogatorio en la Audiencia su acuerdo a los términos del Contrato de Transacción:

"[...] Esther, hacémoslo [sic] en Colombia porque allí tenía mi valuador, Pombo y todo el mundo, y de esa manera yo pensé que sería mejor de hacerlo allí, y entonces arreglamos una fecha y yo llegué a esa fecha y ella me recogió en la mañana temprano, me llamó y me dijo Michael, te recojo y vamos a discutir la cosa, entonces yo dije, bueno, estaba preparado, me recogió Juan María, Esther y creo un conductor y nos fuimos a un club cerca del hotel, creo que se llamaba el Gun Club, creo, I think [yo creo] so, es privado, es muy conocido, y entramos en un cuarto y empezó a discutir y arreglamos ese contrato, llegamos a ese acuerdo"[105].

---

[104] Transcripción de la Audiencia. Páginas 194 y 195.
[105] Transcripción de la Audiencia. Página 24.

264. El señor Ventura también confirmó el haber contado con la asistencia de asesores externos durante el proceso que precedió a la firma del Contrato de Transacción:

"DR. BARRAGÁN: En las dos cartas enviadas por usted a Esther dice lo siguiente: "I think that it would be a good idea that we both have our advisors present as they will help us both to understand each other's position" Yo creo que sería una buena idea que ambos tuviéramos nuestros asesores presentes, ya que ellos nos podrían ayudar a los dos a entender cada una de las posiciones de la otra parte", a qué, esto es el 24 de agosto de 2010, es decir, unos días previos a la firma del contrato de transacción. ¿A qué asesores se refería usted en esa carta?
SR. VENTURA: Bueno, por supuesto a Pombo, que era mi valuador, and si necesitaba un abogado.
DR. BARRAGÁN: ¿Y en qué abogado estaba usted pensando en ese momento que pudiera hacerse presente?
SR. VENTURA: Bueno, en ese momento había, tenía Julio Seneor, y había contratado a Jaime Lombana porque como no llegué a nada con Esther pensé que posiblemente había una otra manera para empujar la situación para llegar a un arreglamiento.
DR. BARRAGÁN: ¿En ese momento el 24 de agosto de 2010 estaban contratados si doctor Jaime Lombana y Julio Seneor para tratar de explicar todos los temas relacionados con la finalización de esta relación con los señores de Lafrancol?
SR. VENTURA: Sí, Jaime, el señor Lombana, no verdaderamente para solucionar, eso era más el señor Julio Seneor porque el señor Lombana era solamente para experimentar, para preparar si necesitamos una cosa más fuerte para que Esther venga, que arregle mi situación"[106][107].

265. En particular, Michael Ventura reconoció el haber contado con el apoyo de la firma Pombo y Cía. en la entrega de una valuación de su participación accionaria. También consta que, a pesar de las indicaciones del señor Pombo en cuanto a la insuficiencia de la información suministrada por Lafrancol como base para dicha valuación, el señor Ventura decidió seguir adelante y firmar el Contrato de Transacción, sin haber reprochado dicha aparente insuficiencia a Lafrancol o a los Compradores[108]. Más aún, atendidas las posiciones iniciales de las Partes en torno al precio de compra de las acciones de Michael Ventura, y aquél que en definitiva se acordó en el Contrato de Transacción, es evidente que hubo una negociación en torno al referido precio[109].

266. En cuanto a Viviane Ventura, ella misma relató cómo el Contrato de Transacción fue negociado a través de su abogado Jaime Lombana:

"[...] y en ese momento yo le dije a Jaime: yo 500 mil no los acepto, yo voy a pedir 1 millón 500, que es casi la mitad de lo que le ofrecieron a mi hermano y ese fue el precio, y creo que Jaime, Jaime hizo una llamada a Espinosa, creo

---

[106] Transcripción de la Audiencia. Páginas 24 y 25.
[107] En el mismo sentido se pronunció Viviane Ventura (SR. VENTURA: "Mi prima Joyce fue la testigo, pero mi prima Joyce sólo llegó al momento de la firma, él no fue testigo de las negociaciones durante las siete horas que tenían a mi hermano secuestrado en el Gun Club"). Transcripción de la Audiencia. Página 195.
[108] Transcripción de la Audiencia. Páginas 22 y 23, y Anexo D-68 que contiene una comunicación enviada por el señor Michael Ventura en la que no se representa o se formula reproche alguno en cuanto a la insuficiencia de la información.
[109] El Tribunal advierte que el precio de compra pactado fue de US$3.800.000. El precio habría sido un valor intermedio entre la valuación realizada por los Compradores, y aquélla realizada por Pombo y Cía. por solicitud de Michael Ventura ("DR. CONEJERO: Tengo una sola pregunta, señor Ventura, con relación al mismo tema. ¿Usted recuerda si hubo alguna negociación en cuanto a los montos a pagar por concepto de compra de sus acciones, la cantidad que se le ofreció en definitiva y que se acordó en el contrato de transacción, fue objeto de negociaciones o ellos hicieron una oferta y usted dijo me parece bien y firmaron el contrato? SR. VENTURA: No, empezó a un precio y yo empecé en otro precio y llegamos a la mitad. You know, it's just negotiation [Usted sabe, es solo negociación]". Transcripción de la Audiencia. Página 55. En el mismo sentido, ("SR. VENTURA: No me recuerdo exactamente de los números, pero la de Estrategias, de memoria me recuerdo era un número de 900 a 1 millón 2, 1 millón 3, y Pombo pensaba que la valuación de mis acciones con la información que él tenía, él siempre decía eso, valían alrededor de 5 millones, 6 millones, entonces la diferencia era enorme y es por eso que escribí la carta a Esther diciéndole que la diferencia es tan grande que por favor devuélveme las acciones y paramos esta pelea"). Transcripción de la Audiencia. Páginas 39 y 40.

que fue para decirle que yo no aceptaba los 500, pero que 1.500 tal podríamos llegar a un acuerdo, entonces creo que Espinosa llamó de vuelta y dijo, bueno 1 millón 100"[110].

267. Este relato coincide, por lo demás, con los testimonios del propio abogado que asistía a Viviane Ventura, el señor Jaime Lombana[111], y del señor Michael Ventura[112].

268. También el señor Carlos Antonio Espinosa se refirió al rol activo que desempeñó Jaime Lombana en la negociación de los Contratos de Transacción:

"DR. BARRAGÁN: Usted menciona algunas cláusulas que el doctor Lombana solicitó incluir, ¿nos puede por favor hacer referencia a esas cláusulas?
DR. ESPINOSA: Sí, hubo varios cambios, pero hubo dos muy específicas, en el contrato del señor Michael Ventura, él pidió incluir una cláusula en la que nos comprometíamos a prestar toda la colaboración necesaria, desde el punto de vista fiscal, para diseñar una forma de pago que fuera aceptable para ambas partes, digamos esa parte fue exigencia mía, pero que al señor Ventura le permitiera manejar la problemática fiscal del pago. Esa cláusula está sólo en el acuerdo de transacción del señor Ventura, y la cláusula en el contrato de la señora Viviane, ella pidió incluir dos estipulaciones, una que quedara claro que el pago era a título gratuito, lo cual para nosotros estaba perfectamente bien porque literalmente entendíamos que estábamos regalando el dinero, y después me pidió que incluyéramos desde el contrato, que el contrato indicara que era un regalo familiar, yo a esa parte sí me negué, por considerar que afectaba el hecho que estábamos solucionando una disputa y podía desnaturalizar el contrato de transacción, entonces esa parte no se incluyó. Se incluyó únicamente en el mensaje swift al final, porque cuando él pide eso, un poquito para que el Tribunal entienda por qué yo ejerzo la profesión en Colombia y en los Estados Unidos, donde resido permanentemente, la familia Rendón me pregunta si eso genera algún riesgo para ellos, colocar esa cláusula en la transferencia swift yo les indico que no porque la ley tributaria americana establece que quien paga el impuesto es quien hace el regalo, no quien lo recibe, y con esa aprobación mía se incluye en el Swift, pero no en el contrato. Esas son dos muy específicas, en lo demás, comentarios menores de modificaciones a la redacción"[113].

269. En segundo lugar, el Tribunal Arbitral concluye que los Demandados sí tuvieron conocimiento de los términos de los Contratos de Transacción, y decidieron firmarlos de todos modos. Así, Michael Ventura indicó durante la Audiencia que discutió acerca del precio del Contrato y de cómo se iba a pagar[114] y que, si bien no había discutido o negociado ningún otro aspecto del mismo Contrato, decidió firmarlo sin reparar en ello[115] y sin siquiera (por su propia voluntad y decisión) consultar los términos de dicho Contrato durante o después de la firma[116], lo cual sólo puede ser objeto de reproche al propio Demandado Michael Ventura.

270. En el mismo sentido, Viviane Ventura confirmó que ella había entendido el objeto del Contrato de Transacción y que, de hecho, lo había firmado pese al consejo que le dio Jaime Lombana de que no lo firmara:

"DR. BARRAGÁN: [...] yo quiero preguntar, ¿usted revisó y leyó el contrato de transacción que suscribió en el 2010?
SRA. VENTURA: Yo lo leí, si me dice si lo entendí muy bien, bien que hablo el español como lo estoy hablando, que es bastante bien, no siempre entiendo lo que leo, pero lo que sí entendí porque me recuerdo, se lo dije a Jaime,

---

[110] Transcripción de la Audiencia. Página 171.
[111] El señor Lombana declaró sobre este punto: "[...] Gracias por su pregunta, doctor Barragán, me acuerdo que en ese instante, señores Árbitros, le dije, le dije: "Viviane, no firmes ese acuerdo, sigamos con el proceso penal, no firmes; y ella me dijo: Jaime, yo firmo. Esa sí fue una asesoría". Transcripción de la Audiencia. Página 153.
[112] Transcripción de la Audiencia. Páginas 27 y 49.
[113] Transcripción de la Audiencia. Página 236.
[114] Transcripción de la Audiencia. Página 47.
[115] Transcripción de la Audiencia. Página 48
[116] Transcripción de la Audiencia. Páginas 51 y 52.

esto es "shut you up contract money" [guarda silencio por el dinero del contrato], esto es para que me calle, pero yo todavía en ese momento no sabía que querían que me callara por la estafa que nos habían montado.

DR. BARRAGÁN: ¿Y qué le dijo Jaime Lombana?

SRA. VENTURA: No lo firmes, no lo firmes, Viviane, yo me quedo contigo[117]".

Es decir, no obstante el consejo del asesor legal Jaime Lombana, Viviane Ventura procedió a firmar el Contrato de Transacción cuya nulidad ahora alegan los Demandados.

271. Finalmente observa el Tribunal que en el caso del Contrato de Transacción de Viviane Ventura los Demandados han traído a colación, como un defecto que afectaría la existencia o validez del contrato, la referencia a que el pago se hará a título gratuito. Sin embargo, como quedó plenamente acreditado en la audiencia, tal referencia se incluyó específicamente a solicitud de Viviane Ventura para efectos fiscales y no porque no existiera causa para el pago o porque la razón del pago era diferente a la señalada en el Contrato de Transacción[118].

272. Por todas las razones anteriores, la alegación de inexistencia de los Demandados debe ser desestimada.

## B.   LA NULIDAD ABSOLUTA POR OBJETO ILÍCITO DE LAS CLÁUSULAS 2.1 Y 2.2 DE LOS CONTRATOS DE TRANSACCIÓN.

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandados

273. Los Demandados han pedido que se declare la nulidad absoluta de las Cláusulas 2.1 y 2.2 de los Contratos de Transacción alegando que las mismas adolecen de objeto ilícito[119].

274. La Cláusula 2.1 del Contrato de Transacción celebrado entre los Demandantes y Michael Ventura dispone:

"2.1. En beneficio del Comprador, el Vendedor se obliga a no iniciar o si lo hubiese hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa, en contra del Vendedor y/o cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal; En igual sentido, el Vendedor renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Comprador y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, accionistas, aseguradores, directores, asesores y/o personal, cuyo objeto y/o naturaleza se relacione con (sic)".

275. La Cláusula 2.2 del mismo Contrato señala:

"En igual sentido, el Comprador renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o

---

117 Transcripción de la Audiencia. Página 185.

118 Transcripción de la Audiencia. Página 236.

119 Memorial de Contestación. Párrafos 244 y siguientes.

extrajudicial, arbitral o administrativa, en contra del Comprador y/o cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, asesores y/o personal".

276. La Cláusula 2.1 del Contrato de Transacción celebrado entre los Demandantes y Viviane Ventura establece:

"2.1. En beneficio del Solicitado, el Solicitante se obliga a no iniciar o si lo hubiese hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitante y/o cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal; En igual sentido, el Solicitante renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitado y/o cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, accionistas, aseguradores, directores, asesores y/o personal, cuyo objeto y/o naturaleza se relacione con la reclamación del Solicitante, directa o indirectamente".

277. La Cláusula 2.2 de dicho Contrato señala:

"En igual sentido, el Solicitado renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitado y/o cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, asesores y/o personal".

278. A la luz de las cláusulas antes citadas, los Demandados sostienen que mediante el contenido de las mismas se impuso a los Demandados la obligación de no iniciar o, de haberse iniciado, renunciar a toda actuación bien judicial o extrajudicial en contra de los Demandados, lo que en su opinión es contrario al derecho fundamental de acceso a la administración de justicia que asiste a los Demandados[120].

279. Agregan al efecto que el acceso a la administración de justicia es un derecho constitucional, consagrado en el artículo 229 de la Constitución Política de Colombia, el que señala: "*Se garantiza el derecho de toda persona para acceder a la administración de justicia. La ley indicara* [sic] *en que* [sic] *casos podrá hacerlo sin la representación de abogado*"[121]. Los Demandados invocan, asimismo, jurisprudencia de la Corte Constitucional que confiere al derecho de acceso a la justicia la calidad de derecho fundamental y de aplicación inmediata[122] y que en ese entendido ha declarado la ilicitud de cláusulas contractuales que han pretendido eliminar tal derecho fundamental[123].

280. Los Demandados argumentan que en los Contratos de Transacción no se pactaron cláusulas similares de los Demandantes en beneficio de los Demandados.

281. Finalmente, los Demandados terminan concluyendo que dichas cláusulas tienen objeto ilícito por cuanto implicarían una renuncia total de los Demandados a un derecho fundamental como lo es el de acceso a la administración de justicia, colocando a los Demandados en absoluta imposibilidad de obtener una tutela judicial efectiva y en evidente grado de indefensión. Alegan, además, que dichas cláusulas son absolutamente desproporcionadas, abusivas y evidencian un

---

[120] Memorial de Contestación. Párrafo 244.
[121] Memorial de Contestación. Párrafo 245.
[122] Memorial de Contestación. Párrafo 246.
[123] Memorial de Contestación. Párrafo 247.

grave desequilibrio entre las Partes, lo que además vulneraría el artículo 95 de la Constitución Política de Colombia que impone la obligación a todas las personas de *"respetar los derechos ajenos y no abusar de los propios"*[124].

282. En el Memorial de Pronunciamiento sobre la Réplica, los Demandados argumentan que la existencia de una transacción no supone necesariamente renunciar al derecho a la acción y al acceso a la justicia[125]. A su juicio, el efecto de cosa juzgada que se deriva de la transacción sólo alcanza a las controversias solucionadas por las partes en ella, pero no impide el control judicial del contrato de transacción, o de las demás obligaciones que surjan de éste, a través de los mecanismos legales para discutir la eficacia o la nulidad de los contratos por vía general[126].

283. Finalmente, los Demandados alegan también la nulidad absoluta de los Contratos de Transacción por falta de consentimiento en cuanto al contenido de los mismos.

b. Posición de los Demandantes

284. En el Memorial de Réplica los Demandantes rechazaron la alegación de nulidad planteada por los Demandados respecto de las cláusulas de los Contratos de Transacción que impiden iniciar acciones judiciales y extrajudiciales de cualquier naturaleza.

285. Según los Demandantes, los Contratos de Transacción en cuanto importan renuncia al ejercicio de acciones judiciales y extrajudiciales, no violan ninguna norma de orden público ni tampoco restringen el acceso a la administración de justicia. Señalan que, al contrario, son en sí mismos un acto de acceso a la justicia permitido y avalado por la ley, e incluso promovido por la jurisprudencia de las cortes colombianas como mecanismo para resolver las controversias[127].

286. Señalan que los Contratos de Transacción no suponen una denegación de justicia, sino que la realización de la justicia por la vía de un mecanismo alternativo de solución de conflictos de autocomposición que permite la solución de las disputas entre las Partes, citando en su respaldo jurisprudencia de la Corte Suprema de Justicia de Colombia[128].

287. Indican los Demandantes que el acceso a la justicia les fue garantizado a los Demandados mediante la suscripción de los Contratos de Transacción, y que si las Partes renunciaron a iniciar acciones extrajudiciales y judiciales, fue precisamente porque los hechos y controversias estaban siendo resueltas mediante la suscripción de los Contratos de Transacción, lo que vaciaba de objeto y fin toda reclamación posterior fundada en los mismos hechos y controversias[129]. Citan al efecto jurisprudencia de la Corte Suprema de Justicia de Colombia que señala el absurdo de suponer que un juicio puede coexistir con una transacción[130].

288. Respecto a los desequilibrios entre las Partes de que dan cuenta los Contratos de Transacción en desmedro de los Demandados, los Demandantes niegan también la concurrencia de ese hecho.

---

[124] Memorial de Contestación. Párrafo 258.
[125] Memorial de Pronunciamiento sobre la Réplica. Párrafos 100 y siguientes.
[126] Memorial de Pronunciamiento sobre la Réplica. Párrafo 91.
[127] Memorial de Réplica. Párrafo 192.
[128] Memorial de Réplica. Párrafo 193.
[129] Memorial de Réplica. Párrafo 196.
[130] Memorial de Réplica. Párrafo 197.

Señalan que: (i) los Contratos de Transacción fueron producto de una negociación[131] y no de una imposición, (ii) el supuesto sacrificio que habrían hecho los Demandados al suscribir los mismos nunca se materializó porque Michael y Viviane Ventura decidieron no honrar lo allí pactado y transgredirlo completamente, (iii) tal supuesto sacrificio no fue injustificado pues a cambio de que cumplieran el mismo –lo que no sucedió– recibieron cuantiosas sumas de dinero que aún conservan y (vi) en las cláusulas segundas de los Contratos de Transacción los Demandantes también renunciaron a iniciar acciones judiciales y extrajudiciales en contra de los Demandados. Así, los Demandantes concluyen que las concesiones fueron recíprocas y equilibradas[132].

289. Agregan sobre este punto que la reciprocidad que la ley colombiana exige para los contratos de transacción supone que existan concesiones recíprocas, pero no significa que las mismas sean equivalentes ni significa que deba existir identidad entre lo que las partes conceden, ni siquiera que las concesiones sean conmutativas ni equivalentes, citando al efecto el reporte del experto señor Eduardo Cifuentes[133].

290. Los Demandantes apuntan a que no ha existido el desequilibrio en las prestaciones reprochado por los Demandados a los Contratos de Transacción[134] y tampoco ha habido una supuesta vulneración al derecho a la acción y acceso a la justicia[135].

291. Finalmente, los Demandantes sostienen que la alegación de nulidad por falta de consentimiento también debe ser desestimada porque los Demandados suscribieron los Contratos de Transacción con conocimiento de sus términos, los cuales fueron negociados[136].

## 3. DECISIÓN DEL TRIBUNAL

292. El Tribunal Arbitral advierte que los Demandados han invocado diversos hechos o circunstancias que acarrearían la nulidad absoluta de los Contratos de Transacción, respecto de los cuales los Demandantes discrepan.

293. Por lo mismo, y a la luz de las alegaciones de las Partes, el Tribunal Arbitral estima que debe pronunciarse respecto de las cuestiones controvertidas entre las Partes en esta materia. En primer lugar, el Tribunal analizará los supuestos invocados por los Demandados como base de sus alegaciones de nulidad causados por la alegada existencia de desequilibrios en los Contratos de Transacción y en las prestaciones pactadas entre las Partes. En seguida, se examinarán las alegaciones de nulidad derivadas de la supuesta vulneración del derecho de acceso a la justicia y defensa jurídica de los Demandados.

      (i)      Existencia de desequilibrio en los Contratos de Transacción y en las prestaciones pactadas por las Partes

---

[131] Memorial de Réplica. Párrafo 201. Citan en respaldo los Anexos D -68 y D -69. Comunicación del 17 de marzo de 2010 enviada por Michael Ventura a Esther Ventura y cadena de correos electrónicos enviados entre marzo 24 de 2012 y marzo 26 de 2012, intercambiados entre Luis Carlos Pombo y Juan María Rendón.
[132] Memorial de Réplica. Párrafo 205.
[133] Memorial de Réplica. Párrafos 203 y 204. *Véase* Anexo D-IP-03.
[134] Memorial de Cierre de los Demandados. Párrafos 201 y siguientes.
[135] Memorial de Cierre de los Demandados. Párrafos 210 y siguientes.
[136] Memorial Posterior a la Audiencia de los Demandantes. Párrafos 259 y siguientes.

294. Los Demandados apuntan a la existencia de desequilibrios en las prestaciones de los Contratos de Transacción.

295. Este aparente desequilibrio se invoca por los Demandados en cuanto a la forma en que fueron negociados y firmados los Contratos de Transacción, y en cuanto a la naturaleza de las prestaciones otorgadas por las Partes, incluyendo el alegado desequilibrio en las renuncias a las acciones judiciales y extrajudiciales.

296. En lo tocante al desequilibrio en la negociación y cierre de los Contratos de Transacción, los Demandados alegan que dicho desequilibrio deriva de que: (i) los Contratos de Transacción no habrían sido discutidos por las Partes y que los Demandados no habrían firmado los mismos conocedores y con pleno entendimiento de lo allí pactado, (ii) los Demandados no habrían contado con asistencia letrada, (iii) los Contratos de Transacción habrían sido redactados exclusivamente por los apoderados de Esther Ventura sin que fueran conocidos previamente por los Demandados o por su asesor legal y (iv) los Contratos de Transacción fueron firmados sin la presencia del abogado de los Demandados.

297. El Tribunal Arbitral, luego de ponderar toda la prueba rendida, no comparte estas apreciaciones de los Demandados.

298. En primer lugar, el Tribunal Arbitral ya ha resuelto con motivo de las alegaciones de inexistencia de los Contratos de Transacción por falta de consentimiento, que los Contratos de Transacción fueron negociados por las Partes, y que en dicha negociación los Demandados contaron con el apoyo de asesores externos, incluyendo asesores legales, tal y como se desprende de los testimonios de los señores Michael Ventura, Viviane Ventura, Jaime Lombana y Carlos Espinosa[137]. Asimismo, el Tribunal también estableció que los Demandados tuvieron conocimiento de los términos de los Contratos de Transacción, y decidieron libremente suscribirlos.

299. En cuanto al segundo aspecto del alegado desequilibrio, los Demandados argumentan que los Contratos de Transacción también son desproporcionados en cuanto a sus términos, pues no se pactaron cláusulas similares de los Demandantes en beneficio de los Demandados. A juicio de los mismos, tales cláusulas serían absolutamente desproporcionadas y abusivas y evidencian un grave desequilibrio entre las Partes, lo que además vulneraría el artículo 95 de la Constitución Política de Colombia que impone la obligación a todas las personas de *"respetar los derechos ajenos y no abusar de los propios"*.

300. El Tribunal Arbitral discrepa de esta conclusión. Si bien el contenido de los Contratos de Transacción apunta a una serie de obligaciones para los Demandados, el Tribunal Arbitral advierte que los Demandantes también otorgaron concesiones recíprocas relevantes asociadas (i) al pago de sumas de dinero a favor de Michael Ventura y Viviane Ventura, y (ii) a la renuncia a iniciar acciones judiciales y extrajudiciales en contra de los Demandados conforme se establece en la cláusula segunda de los Contratos de Transacción.

301. En efecto, en las respectivas Cláusulas 2.2 de cada uno de los Contratos de Transacción, los Demandantes se obligaron a pagar la suma de USD $3.800.000 en favor de Michael Ventura, y la suma de USD $1.100.000 en favor de Viviane Ventura. En las mismas cláusulas los

---

[137] Laudo Arbitral. Párrafos 262 a 268.

Demandantes renuncian a iniciar acciones judiciales o extrajudiciales en contra de Michael Ventura y de Viviane Ventura respectivamente. Estas cláusulas no pueden ser interpretadas en forma aislada, sino en el contexto de cada Contrato de Transacción.

302. La Cláusula Primera de cada uno de los Contratos de Transacción describe, como ya lo señaló el Tribunal, la controversia que las Partes quieren transigir y la reclamación de cada uno de los Demandados que da origen a esa controversia, es decir, la alegada calidad de accionista de Lafrancol de cada uno de los Demandados y sus cuestionamientos a la actuación de los Demandantes en relación con las acciones de Lafrancol que alegan tener los Demandados.

303. Las Partes no parecen disputar que los Demandados fueron accionistas de Lafrancol. Tampoco disputan que por diversas circunstancias se llegó a la controversia de si los Demandados mantenían o no su carácter de accionistas antes citada.

304. En el caso de Viviane Ventura, la alegada pérdida de la calidad de accionista derivaría de los acuerdos a los que ésta llegó con Esther Ventura y en virtud de los cuales Esther Ventura le entregó sumas de dinero que al no ser pagadas le habrían dado derecho a Esther Ventura a traspasar las acciones de Viviane Ventura, derecho que Viviane Ventura disputaba[138]. En el caso de Michael Ventura, la disputada pérdida de la calidad de accionista derivaría del hecho de haber traspasado sus acciones a un tercero para efectos fiscales y de las dificultades y diferencias que habrían surgido entre las Partes en cuanto a la procedencia, forma y oportunidad del traspaso de tales acciones del tercero a Michael Ventura[139].

305. De la lectura de los Contratos de Transacción y de las manifestaciones de las Partes en el Arbitraje[140], concluye el Tribunal que sí se dieron unas concesiones recíprocas. Por una parte, los Demandados desistirían de disputar su calidad de accionistas y las actuaciones de los Demandantes a las cuales atribuían los Demandados la pérdida de la calidad de accionistas y, por la otra, los Demandados reconocerían unas sumas de dinero a cambio de tales desistimientos.

306. Finalmente, el Tribunal advierte que no hay nada en la ley colombiana que permita concluir que la falta de una equivalencia total entre las concesiones recíprocas conlleve a una nulidad absoluta. Las nulidades absolutas son taxativas y de interpretación restrictiva y más allá de la invocación del Artículo 95 de la Constitución, no explican las Demandadas —y mucho menos prueban— cómo puede derivarse el supuesto objeto ilícito por la sola circunstancia de que las concesiones recíprocas no sean exactamente equivalentes[141]. Lo que exige la ley colombiana es la existencia de tales concesiones recíprocas, sin que sea necesario que las mismas sean de una entidad equivalente o que revistan un carácter conmutativo. No puede el Tribunal por vía de interpretación declarar la nulidad absoluta de los Contratos de Transacción por la simple aseveración de que se violó el Artículo 95 de la Constitución, cuando los Contratos de Transacción y las declaraciones de las Partes en el expediente, y especialmente en la Audiencia, llevan a la conclusión de que se cumplió con el requisito de la transacción consistente en hacer concesiones recíprocas para resolver una controversia.

---

[138] Memorial de Demanda. Párrafo 3; Memorial de Pronunciamiento sobre la Réplica. Párrafo 111.

[139] Memorial de Demanda. Párrafo 3. Memorial de Réplica, párrafo 18.

[140] Memorial de Demanda. Párrafos 32 y 46.

[141] El Artículo 95 de la Constitución Política de Colombia establece que "son deberes de la persona y del ciudadano", entre otros, "respetar los derechos ajenos y no abusar de los propios". Los Demandados no probaron que los Demandantes hubiesen incurrido en un abuso de sus derechos en la negociación, celebración y ejecución de los Contratos de Transacción. Por ende, no probaron que los Demandantes hubiesen violado el Artículo 95 de la Constitución Política de Colombia.

307. En razón de lo anterior, el Tribunal Arbitral considera que no está probada ninguna de las causales de nulidad absoluta contempladas en la ley colombiana y que la alegación de una supuesta desproporcionalidad o abuso, que tampoco están probados, no puede afectar la validez de los Contratos de Transacción.

        (ii)    **Vulneración del derecho de acceso a la justicia y defensa jurídica de los Demandados**

308. Según los Demandados, la obligación de no iniciar o renunciar a toda actuación judicial o extrajudicial en contra de los Demandantes, sería contrario al derecho fundamental de acceso a la administración de justicia y violaría un derecho constitucional consagrado en el artículo 229 de la Constitución Política de Colombia, el que señala: "*Se garantiza el derecho de toda persona para acceder a la administración de justicia. La ley indicará en qué casos podrá hacerlo sin la representación de abogado*". Lo anterior acarrearía, a juicio de los Demandados, la nulidad absoluta de dichas cláusulas por adolecer de objeto ilícito por cuanto implicarían una renuncia total de los Demandados a un derecho fundamental como lo es de acceso a la administración de justicia, colocando a los Demandados en absoluta imposibilidad de obtener una tutela judicial efectiva y en evidente grado de indefensión.

309. Como punto de partida, el Tribunal Arbitral advierte que si las Partes renunciaron a iniciar acciones extrajudiciales y judiciales, dicha renuncia debe entenderse realizada en cuanto a los hechos y controversias que precisamente habían sido resueltas mediante la suscripción de los Contratos de Transacción. Este es el efecto de cosa juzgada que naturalmente despliega todo contrato de transacción como equivalente jurisdiccional y este aspecto no es controvertido por las Partes. La renuncia no es absoluta e ilimitada, sino restringida a los hechos y controversias resueltas mediante la suscripción de los Contratos de Transacción. Así lo dispone el artículo 2485 del CCC al señalar que "*Si la transacción recae sobre uno o más objetos específicos, la renuncia general de todo derecho, acción o pretensión, deberá sólo entenderse de los derechos, acciones o pretensiones relativas al objeto u objetos sobre que se transige*".

310. En seguida, el Tribunal comparte la apreciación de los Demandados en cuanto a que una transacción no supone renunciar al derecho a la acción y al acceso a la justicia y que es posible que se puedan ventilar controversias relativas al control de validez del contrato de transacción, o acerca del alcance o contenido de las obligaciones que nacen del mismo.

311. Sin embargo, las cláusulas de los Contratos de Transacción que impedían iniciar acciones judiciales y extrajudiciales de cualquier naturaleza no se oponen para nada a este derecho fundamental de acceso a la justicia, por cuanto los mismos Contratos de Transacción han previsto el arbitraje como vía que permite resolver cualquier disputa que surja entre las Partes. Ello ha sido refrendado por los tribunales colombianos que reconocen en el arbitraje un mecanismo de tutela efectiva, equivalente al judicial.[342]

312. En resumen, el Tribunal concluye que no existe una violación del derecho de acceso a la justicia y a la tutela efectiva que pueda incidir en la validez de los Contratos de Transacción.

---

342 Memorial de Réplica. Párrafos 190 y siguientes.

C.   **LA NULIDAD ABSOLUTA POR OBJETO ILÍCITO DE LAS CLÁUSULAS DE LOS CONTRATOS DE TRANSACCIÓN QUE CONTIENEN UNA RENUNCIA A LA INTERPOSICIÓN DE LA DENUNCIA PENAL.**

I.   POSICIÓN DE LAS PARTES

   a. Posición de los Demandados

313. Los Demandados han solicitado que se declare la nulidad absoluta de las cláusulas que contienen la renuncia a la interposición de una denuncia penal[143].

314. Señalan que está fuera del comercio y es irrenunciable la obligación de poner en conocimiento de las autoridades, la posible comisión de delitos, razón por la cual el pacto es nulo absolutamente y no puede predicarse ningún incumplimiento por este respecto en los contratos de transacción. Señalan que la formulación de una denuncia no es un acto facultativo para los ciudadanos y no puede ser objeto de convención o de autorización contractual. Se trata más bien de un deber constitucional y una carga pública general. La omisión de denunciar la posible comisión de delitos, puede a su vez traer consigo consecuencias penales al configurarse el tipo penal de encubrimiento.

315. Agregan que las únicas excepciones legales al deber que tiene todo ciudadano de denunciar los delitos de que tenga conocimiento, están previstos en los artículos 33 y 74 de la Constitución Política, que se refieren al derecho a la no incriminación y el secreto profesional, respectivamente. El artículo 33 dispone: *"Nadie podrá ser obligado a declarar contra sí mismo o contra su cónyuge, compañero permanente o parientes dentro del cuarto grado de consanguinidad, segundo de afinidad o primero civil"*. Dicho principio constitucional está desarrollado en el artículo 68 del Código de Procedimiento Penal estableciendo la exoneración del deber de denunciar, cuando se trata de parientes cercanos. Los Demandados señalan que el principio de no incriminación no le otorga validez a un pacto de disposición de la denuncia penal, sino que únicamente consagra una causal de exoneración para que una persona no sea forzada a declarar contra quienes tiene un vínculo familiar cercano. Así, puede excusarse de la obligación de denuncia, pero no por ello es válido el pacto por el cual se renuncia a ese derecho para recibir una contraprestación económica.

316. A mayor abundamiento, señalan los Demandados que el real alcance del pacto contenido en los Contratos de Transacción no se limita a la presentación de una denuncia penal en contra de Esther Ventura. En dicha cláusula se estableció que la renuncia a iniciar todo tipo de acciones, investigaciones y denuncias se dirigía contra el Comprador y/o Solicitado y cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal. Es decir, el pacto de renuncia a la denuncia penal es respecto de múltiples sujetos, más allá de las personas con vínculos familiares cercanos, lo que reforzaría la ilicitud del pacto.

317. Respecto de los límites legales del contrato de transacción, los Demandados citan el artículo 2472 del CCC, que regula el límite de la transacción en materia penal, al expresar: *"La transacción puede recaer sobre la acción civil que nace de un delito, pero sin perjuicio de la acción criminal"*. En el mismo sentido, citan el artículo 16 del mismo cuerpo legal que señala: *"No podrán derogarse por convenciones*

---

143 Memorial de Cierre de los Demandados. Párrafos 90 y siguientes.

*particulares las leyes en cuya observancia están interesados el orden público y las buenas costumbres".* Agregan que la transacción es un contrato que tiene contenido patrimonial y que no opera frente a intereses de diversa naturaleza, como tampoco aquéllos que siendo valorables pecuniariamente, no son susceptibles de enajenación.

318. Agregan a este respecto, que un contrato de transacción no puede tener por objeto la calificación criminal de una conducta, ya que dicho objeto está fuera del comercio por ser exclusivo del legislador y las autoridades penales. No es posible que la autonomía de las partes pueda determinar la naturaleza criminal o ilícita de un comportamiento, en contra de lo señalado por la ley, cuando ésta lo considere delictual. Además, los Contratos de Transacción no hacen mención a que las Partes hayan acordado la inexistencia de tipos penales o actos de carácter ilícito.

b. Posición de los Demandantes

319. Los Demandantes señalan que el argumento dado por los Demandados en orden a que la formulación de una denuncia penal no es un acto facultativo sino un deber jurídico de todo ciudadano carece de sustento, pues en la especie, no existe ningún delito o actos ilícitos que los Demandados hubieran estado obligados a denunciar. En efecto, en la celebración de los Contratos de Transacción, los Demandados convinieron en que ninguna de las materias tenía repercusiones penales o de ninguna otra naturaleza. Así, habiendo declarado que su objeto no involucraba hecho alguno que pudiera constituir una conducta punible, no habría una limitación para un pacto de disposición relativa a las denuncias penales que estuvieran basadas en dichos hechos. Agregan que dicha posición no se ajusta al concepto jurídico de deber, ya que para la existencia de un deber jurídico se requieren dos elementos: (i) un comportamiento imperativo y (ii) una sanción para la inobservancia de dicho comportamiento.

320. De acuerdo a las excepciones al deber de formular una denuncia penal, establecida en los artículos 33 de la Constitución Política y 68 del Código de Procedimiento Penal, queda claramente establecido que no existe sanción alguna para el denunciante que omita informar y denunciar a las autoridades correspondientes la comisión de los delitos o hechos potencialmente punibles de que tenga conocimiento. En este sentido, concluyen que no existe el deber jurídico de denunciar penalmente los delitos cometidos por un familiar cercano, pues no se trata de un comportamiento imperativo sino de una facultad o potestad del eventual denunciante. Al no haber en el presente caso una obligación de denunciar sino una facultad discrecional por parte del potencial denunciante, las Partes tenían libertad de pactar y convenir en no hacerlo.

321. En lo relativo a las consecuencias penales que los Demandados señalan que puede traer consigo la omisión de formular una denuncia penal, los Demandantes responden que el tipo penal que sanciona el quebrantamiento del deber de formular la denuncia (cuando existe dicho deber) se refiere únicamente a la omisión de poner en conocimiento de las autoridades aquellas conductas que atentan contra los bienes jurídicos de mayor entidad o cuando se trata de delitos más graves y de mayor impacto social, como los delitos de lesa humanidad, el narcotráfico, el lavado de activos, entre otros.

322. En otro orden de ideas los Demandantes resaltan el hecho de que *"el ordenamiento jurídico colombiano distingue entre el concepto de acción penal, facultad exclusiva del Estado de perseguir y sancionar a una persona natural por considerar que realizó un actuar delictivo, y la denuncia, acto que ejerce el particular,*

*mediante el cual se pone de presente a la autoridad la supuesta comisión de hechos delictivos?*[144]. Sobre la base de esta distinción realizada por el ordenamiento, los Demandantes argumentan que los Contratos de Transacción no contienen la renuncia o disposición de la acción penal o la acción criminal, sino la renuncia a denunciar y de no iniciar *"cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar"*[145].

323. Por último, señalan los Demandantes que si los Demandados consideraban que estaban en una situación que implicara el deber de denunciar, bajo eventuales consecuencias legales, debieron abstenerse de suscribir dichos contratos los cuales negociaron y celebraron con la debida asesoría legal.

## 2. DECISIÓN DEL TRIBUNAL

324. Los Demandados sostienen la nulidad de la cláusula segunda de los Contratos de Transacción en cuanto, según alegan, contienen una prohibición para los Demandados de iniciar acciones penales. Según los Demandados, un contrato de transacción no puede tener por objeto la calificación criminal de una conducta, ya que dicho objeto está fuera del comercio por ser exclusivo del legislador y las autoridades penales. Además, las partes no pueden, en virtud de la autonomía de la voluntad, determinar la naturaleza criminal o ilícita de un comportamiento, en contra de lo señalado por la ley, cuando ésta lo considere delictual. Lo anterior, sumado al deber de todo ciudadano de denunciar ilícitos penales, justifica que los Demandados hayan presentado la Denuncia Penal.

325. Observa el Tribunal Arbitral que, por una parte, la Cláusula 2.1 de los Contratos de Transacción no tiene una referencia expresa a denuncias penales, y por la otra, no tiene ni podría tener una referencia a la Denuncia Penal, ya que la misma fue presentada dos años después de celebrados los Contratos de Transacción.

326. En efecto, la cláusula 2.1 citada se refiere a la obligación de *"no iniciar o si lo hubiese hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"*.

327. Lo que debe dilucidar el Tribunal, a la luz de las alegaciones de las Partes y de las pruebas aportadas al expediente en este Arbitraje, es, por una parte, si la referencia a *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"* incluye denuncias penales en general y si incluye la Denuncia Penal en particular, y por la otra, si, de estar incluidas, tal inclusión conlleva la nulidad absoluta por objeto ilícito de las referidas cláusulas.

328. Como se ha señalado reiteradamente en este Laudo Arbitral, mediante los Contratos de Transacción las Partes pusieron fin a las disputas existentes entre ellas, disputas que están descritas en la Cláusula Primera de los Contratos de Transacción. Es con respecto a esas diferencias o controversias, y no a otras, que las Partes acordaron, entre otras cosas, el pago, por una parte, y el desistimiento y las renuncias, por la otra, a través del mecanismo de la transacción, renunciando a llevar esas controversias ante el juez.

---

[144] Memorial de Cierre de los Demandantes. Párrafo 239.
[145] Memorial de Cierre de los Demandados. Párrafo 240.

329. De lo anterior se sigue que la renuncia a presentar cualquier *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"* solamente podría referirse a las controversias que fueron transigidas. Ni el texto de los Contratos de Transacción, ni las pruebas aportadas por las Partes llevan al Tribunal al convencimiento de que las Partes hicieron una renuncia general a demandarse o a reclamar a presentar acciones, judiciales o extrajudiciales, por asuntos diferentes a los que son materia de la transacción. Por el contrario, una interpretación sistemática de los Contratos de Transacción[146], atendiendo a su contexto, lleva a la inevitable conclusión son esas diferencias las que las Partes renunciaron a llevar ante los jueces y a ellas se contrae la renuncia a presentar cualquier *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"*.

330. Las Partes han debatido si, sobre la base de los hechos conocidos a la época de la transacción y que sirven de base a la misma, podían haber considerado que no había mérito o justificación para realizar denuncias o iniciar acciones penales en relación con las diferencias materia de la transacción. Sobre el particular el doctor Cifuentes, experto de los Demandantes, señaló:

"DR. MAYORGA: Si le he interpretado bien, dentro de este ámbito contractual se puede pactar entonces, legítimamente, que no se adelante, no se promueva una investigación criminal. Como anexo a este proceso obra el artículo 2472 del Código Civil colombiano, que textualmente señala: "La transacción puede recaer sobre la acción civil que nace de un delito pero sin perjuicio de la acción criminal", de conformidad con ello, ¿usted cree que es válido obligarse a no denunciar aún en perjuicio de la acción criminal?
DR. CIFUENTES: Parto de la base que si se celebra un contrato de transacción en estos términos efectivamente las partes concurren a él de buena fe y no para sembrar en este contrato un objeto ilícito, como sería efectivamente el de esconder, ocultar y oscurecer una conducta que ha sido calificada como elemento integrante de un delito, en consecuencia, no se trata, en mi concepto, de disponer de una acción penal, es un tema propio del derecho público, es un tema que tiene que ver con la autoridad como tal, que tiene que ver con el juzgamiento de esa conducta desde la perspectiva del juez penal, sino de los hechos como tales y para esos efectos las partes deben estar suficientemente persuadidas y convencidas de que no se trata de hacer un pacto sobre un delito. Por el contrario, actúan de tal manera que luego de la reflexión correspondiente aciertan a determinar que no estando frente a un delito no habrá en el futuro denuncia penal alguna por las partes, fruto precisamente de cómo se elabora y cómo se llega a ese entendimiento por quienes participan como sujetos de la transacción, no creo que se trate, de ninguna manera, de disponer de la acción penal como tal, ni tampoco en este caso se estaría disponiendo inclusive los efectos civiles del delito. Por el contrario, se descarta de plano que se trate de confeccionar un pacto a partir de que se ha cometido un delito, yo creo que en ese evento efectivamente la transacción tendría un objeto ilícito, claramente. Entiendo que no lo tiene cuando las partes, de manera honesta, transparente, con suficientes elementos de información y de conocimiento analizan y examinan los hechos y descartan que estos hechos coloquen a una persona bajo un compromiso penal, y eso lleva precisamente a este tipo de obligación de no denunciar"[147].

331. Por su parte el testigo Jaime Lombana, presentado por los Demandados, señaló:

"DR. ZAMORA: Contestaba usted que en los casos de delitos de querella, si entiendo bien, la legislación colombiana permite la conciliación, yo entendería que en esos casos si se logra un efecto favorable en la conciliación se elimina el tema penal, ¿que no esa conciliación pudiera interpretarse, si se llega al acuerdo, como una posibilidad de renuncia a querellarse o a denunciar esos hechos en los casos de delitos de querella?
DR. LOMBANA: Doctor, la pregunta es sumamente válida y muy importante, usted puede conciliar los hechos pasados, pero usted no puede conciliar hechos futuros o actuales o concomitantes al momento de la conciliación, ese documento, según mi entender, conciliaba los dos episodios que he referido reiteradamente, pero tendría

146 CCC. Artículo 1622: Interpretaciones Sistemática, por comparación y por aplicación práctica. Las cláusulas de un contrato se interpretarán unas por otras, dándosele a cada una el sentido que mejor convenga al contrato en su totalidad. Podrán también interpretarse por las de otro contrato entre las mismas partes y sobre la misma materia. O por la aplicación práctica que hayan hecho de ellas ambas partes, o una de las partes con aprobación de la otra parte.
147 Transcripción de la Audiencia. Páginas 274 y 275.

objeto ilícito conciliar el que yo sea una supuesta o eventual, para respetar con vehemencia el principio de presunción de inocencia, una supuesta víctima de un acuerdo de transacción, cuando a mí me hacen creer un precio que no lo es, si es que eso es lo que se demuestra en juicio y era 10 veces superior, cuál fue mi interpretación en ese momento, doctor, todos y especialmente ante juristas de la jerarquía como ustedes, estudiamos en la universidad la diferencia del dolo civil y del dolo penal, y el dolo civil contempla, la discrepancia en un precio, una discrepancia normal en todos los negocios, que puede llegar, nuestros profesores y me da vergüenza hablar de estos temas que no conozco, hablaban del límite de la lesión enorme, no manejo esos temas, pero en lo penal el dolo de la estafa es un dolo que requiere conocimiento y voluntad de yo estar induciendo en error a mi víctima, de hacerle creer que con este monto le estoy adquiriendo sus acciones. Es que en el caso de Michael era mucho más sensible, porque Michael Ventura no había vendido sus acciones, luego la transacción es una compraventa de sus acciones, él no había vendido sus acciones entonces no puede caber la conciliación, en mi sentir, y eso es lo que piensa la Fiscalía General al decidir imputar, esa cláusula de no puede involucrar hechos concomitantes o futuros frente a la jurisdicción penal, la jurisdicción penal no se podría vender a futuro, permítame que lo diga así. Y no quisiera oír a un juez de la república en lo penal diciendo que se concilió en lo civil el que yo pueda delinquir a futuro"[148].

332. El comportamiento de las Partes en la celebración de los Contratos de Transacción sugiere que su entendimiento era que los hechos que dieron lugar a las controversias que fueron transigidas no tenían consecuencias de naturaleza penal y que si las tenían las partes podían desistir de las mismas.

333. En efecto, en el contexto de la firma de los Contratos de Transacción, en el mes que precedió dicha firma, los Demandados ya estaban considerando presentar una denuncia penal por los hechos que dieron lugar a la controversia, posteriormente transigida. Así resulta de la declaración de Michael Ventura:

"DR. BARRAGÁN: ¿En ese momento el 24 de agosto de 2010 estaban contratados el doctor Jaime Lombana y Julio Seneor para tratar de explicar todos los temas relacionados con la finalización de esta relación con los señores de Lafrancol?
SR. VENTURA: Sí, Jaime, el señor Lombana, no verdaderamente para solucionar, eso era más el señor Julio Seneor porque el señor Lombana era solamente para experimentar, para preparar si necesitamos una cosa más fuerte para que Esther venga, que arregle mi situación.
DR. BARRAGÁN: ¿O sea que en el año 2010, en agosto del año 2010, usted había contratado al doctor Jaime Lombana para preparar una posible denuncia penal en contra de Esther y de Juan María Rendón?
SR. VENTURA: Porque me estaba completamente ignorando me, cómo se dice ignorándome, ahora yo estaba en una posición muy débil, and desesperado porque estaba pensando por qué estaba demorando de arreglar algo conmigo y no comprendía"[149].

334. Sin embargo, la mencionada denuncia no fue presentada y de la declaración del Dr. Jaime Lombana, quien estaba a cargo de la presentación de dicha denuncia, se podría inferir que los Contratos de Transacción habían puesto término a las disputas sobre titularidad y transferencia material de las acciones de los Demandados, y que las eventuales diferencias entre las Partes respecto de si los hechos que dieron lugar a las diferencias materia de la transacción tenían consecuencias penales, esas diferencias habían quedado igualmente transigidas.[150]

---

[148] *Ibídem.* Páginas 159 y 160.
[149] Transcripción de la Audiencia. Página 25. En el mismo sentido: Declaración de Carlos Antonio Espinoza (Transcripción de la Audiencia. Página 251.)
[150] "DR. MAYORGA: Muchas gracias, doctor Lombana. Por último, muy brevemente y con esto cierro, aconsejó usted presentar una denuncia penal por el delito de estafa agravada en contra de Esther Ventura y sea por favor muy sintético, que no tengo sino cinco minutos para que comience el interrogatorio.
DR. LOMBANA: El tema es procesalmente muy simple, y trataré de ser lo más claro. Ellos me consultaron examinar la posible relevancia jurídico penal, en el caso de Viviane Ventura, de que Esther decía que le había adquirido, comprado unas acciones por un préstamo que si mal no recuerdo era de US$50 mil y Viviane sostenía haber reembolsado la plata con sus respectivos intereses, y me mostró la factura de eso. En el caso de Michael, él decía: yo no he vendido nada pero a mí nunca me han entregado mis acciones. Cuando yo estaba preparando esa

335. Pero, reitera el Tribunal, aún si se entendiere que lo que transigieron las Partes no fueron sus diferencias sobre las eventuales consecuencias penales, o aún si se interpretare que, como lo sugiere el experto Cifuentes, las Partes de buena fe entendieron que los hechos que originaron la controversia transigida no eran constitutivos de delito y por ello la renuncia a iniciar acciones, lo determinante es que cualquier renuncia de una Parte a presentar acciones contra la otra sólo se refiere a las acciones que se habrían intentado ante los jueces de no haberse celebrado los Contratos de Transacción. Ni del texto de los Contratos de Transacción, ni de las pruebas aportadas al Arbitraje puede inferirse que la renuncia cobija cualquier *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"* que corresponda a diferencias distintas de las transigidas, o a hechos no conocidos por las Partes al tiempo de la transacción.

336. Lo anterior no solamente surge de la interpretación de las cláusulas de los Contratos de Transacción, unas con otras como manda el CCC[151], sino de la aplicación del artículo 2484 del mismo estatuto, según el cual "Si la transacción recae sobre uno o más objetos específicos, la renuncia general a todo derecho, acción o pretensión, deberá sólo entenderse de los derechos, acciones o pretensiones relativas al objeto sobre que se transige".

337. En relación con la Denuncia Penal, preparada y presentada por el propio testigo doctor Jaime Lombana,[152] tanto su texto como la declaración rendida por el denunciante indican que fue un hecho posterior - la venta de Lafrancol a la empresa chilena CFR en agosto de 2012 – el que motivó la interposición de la Denuncia Penal. :

"DR. MAYORGA: Muchas gracias, doctor Lombana. Por último, muy brevemente y con esto cierro, aconsejó usted presentar una denuncia penal por el delito de estafa agravada en contra de Esther Ventura y sea por favor muy sintético, que no tengo sino cinco minutos para que comience el interrogatorio.
DR. LOMBANA: El tema es procesalmente muy simple, y trataré de ser lo más claro. Ellos me consultaron examinar la posible relevancia jurídico penal, en el caso de Viviane Ventura, de que Esther decía que le había adquirido, comprado unas acciones por un préstamo que si mal no recuerdo era de US$50 mil y Viviane sostenía haber reembolsado la plata con sus respectivos intereses, y me mostró la factura de eso. En el caso de Michael, él decía: yo no he vendido nada pero a mí nunca me han entregado mis acciones. Cuando yo estaba preparando esa denuncia se dio el "acuerdo de transacción", lo que evidentemente terminaba cualquier conflicto. Después, mucho tiempo después, casi año y medio después del año 2010, puede ser marzo, no tengo las fechas con claridad, ellos se enteran que la compañía había sido vendida por una suma más de 10 veces superior a la supuesta valoración que le presentaron a Michael Ventura [...]".[153] (énfasis del Tribunal).

338. Dicho relato es consistente con la declaración de Michael Ventura en el sentido de que el acuerdo era aceptable, y que esa percepción sólo cambió con posterioridad al enterarse dos años después del valor en que se había comprado Lafrancol:

"DR. ZAMORA: Ha mencionado usted también que antes de la reunión se le solicitó que la reunión fuera simplemente ustedes sin asesores, abogados, etc., ¿una vez que se le mostró ese día este documento y dio en ese momento 1 ó 2 días para llevarlo con abogados o ya lo dio por entendido?
SR. VENTURA: No, porque yo pensé que era un arreglamiento que yo pensé era bueno para todos, que no había engaño, que había, bueno, estoy seguro que cuando hice el arreglamiento yo pensé que ella ganó un

---

denuncia se dio el "acuerdo de transacción", lo que evidentemente terminaba cualquier conflicto. (énfasis del Tribunal).
[151] CCC. Artículo 1622.
[152] DR-93. Denuncia Penal. Página 18.
[153] Transcripción de la Audiencia. Página 143.

poquito más porque ís normal in business, pero cosas que uno piensa que es normal, pero no la diferencia que después me han hecho saber"[154]. (énfasis del Tribunal)

339. La lectura de la Denuncia Penal indica que si bien en la misma se califica como engaño (i) el que Viviane Ventura nunca fuese inscrita como accionista de Lafrancol, y Michael no figurase personalmente como accionista[155], y (ii) el que se hubiesen "maquillado" una serie de préstamos personales que se dieron a Viviane Ventura y otras transacciones no constitutivas de compraventa, como operaciones de transferencia de la participación accionaria de Viviane Ventura que nunca fueron consentidas por ella[156], el hecho fundamental que daría lugar a la comisión del delito habría sido que, en el año 2012 Lafrancol hubiese sido vendida a un valor que era más de 10 veces mayor que el valor utilizado como base para los Contratos de Transacción[157]. Es decir, el elemento determinante de la Denuncia Penal es la venta de Lafrancol a CFR, lo cual ocurrió dos años después de la firma de los Contratos de Transacción. Así resulta de diversas afirmaciones contenidas en la misma:

"No es sino hasta el año 2012 cuando finalmente [los Demandados] se dieron cuenta del gran engaño del que habían sido víctimas. Los valores sobre los cuales se adelantó la negociación no podían haber sido más distantes de la realidad. En agosto 14 del año 2012, mediante publicaciones en prensa, se enteraron que CFR INTERNATIONAL había reportado sus intenciones de adquirir la totalidad de LAFRANCOL por QUINIENTOS SESENTA Y DOS MILLONES DE DÓLARES (US$562.000.000), más de diez veces el valor que ESTHER había reportado originalmente"[158].

"Finalmente, séptimo, creímos que el pago que recibimos [con los Contratos de Transacción] había sido relativamente aceptable dadas las circunstancias. Ciertamente, en el momento no se consideró que se tratara de un pago justo, pero al menos se trataba de una pérdida tolerable frente al valor que creíamos era debido"[159].

340. De manera particularmente ilustrativa, la Denuncia Penal señala que, a partir del valor de venta de Lafrancol en la suma indicada, los Demandados habrían tenido derecho a obtener una suma aproximada de US$39.670.000 correspondientes al 7% que les correspondería a ambos como accionistas[160], de modo que -descontando de dicha suma el valor de los montos pagados bajo los Contratos de Transacción- habrían sufrido una pérdida patrimonial cercana a las US34.670.000[161]. Es decir, nuevamente la Denuncia Penal, más allá de los pasajes relativos a eventos previos o concomitantes a los Contratos de Transacción, se articula en torno al valor de venta de Lafrancol en el año 2012, y a partir de allí se plantea el delito o delitos denunciados.

341. En resumen: de las declaraciones prestadas durante la Audiencia así como de los hechos descritos en la Denuncia Penal se concluye que, a la fecha de firma de los Contratos de Transacción, si bien los Demandados consideraban que tenían derecho a un pago más alto del recibido en virtud de tales contratos, aceptaron dicho pago a cambio de la firma de los referidos contratos porque se trataba de una *pérdida razonable*. Asimismo, aceptan que con los Contratos de Transacción se puso término a los conflictos que se arrastraban desde antes, específicamente,

---

[154] Transcripción de la Audiencia. Página 51.
[155] DR-93. Denuncia Penal. Página 8.
[156] *Ibidem*.
[157] *Ibidem*. Páginas 7 y 9.
[158] *Ibidem*. Página 7.
[159] *Ibidem*. Página 11.
[160] *Ibidem*. Página 2.
[161] *Ibidem*. Página 14.

la titularidad de acciones por parte de Viviane Ventura y la transferencia material de las acciones que reclamaba Michael Ventura.

342. El hecho fundamental en que descansa la Denuncia Penal ocurrió dos años después de la celebración de los Contratos de Transacción y en consecuencia no podría haber formado parte del consentimiento prestado por las Partes en los Contratos de Transacción, ni podía estar incluido en las renuncias a cualquier *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"* en cuanto no era un hecho conocido por los Demandados ni la diferencia entre el precio de venta de Lafrancol a CFR y el precio pagado por los Contratos de Transacción era materia de las diferencias transigidas.

343. Una situación similar se presenta con la oferta no vinculante de compra realizada por Eurofarma en el año 2008, a la cual las Partes se han referido en varias ocasiones durante el Arbitraje[162].

344. En efecto, si bien dicha oferta se formuló antes de la celebración de los Contratos de Transacción, ésta no fue conocida entonces por los Demandados y sólo llegó a su conocimiento mucho tiempo después de la firma de los Contratos de Transacción e incluso después de la presentación de la Denuncia Penal. Así quedó acreditado con la declaración escrita de los Demandados y con su interrogatorio durante la Audiencia. Michael Ventura reconoció en su declaración que habían recibido dicha oferta recién en el año 2012, incluso luego de la venta de Lafrancol[163], y lo confirmó en la Audiencia en los siguientes términos:

"DR. BARRAGÁN: Usted nos dice: "Con posterioridad a hacerse pública la venta de Lafrancol en 2012 nos animamos a investigar y pudimos constatar que Juan María Rendón y Esther Ventura de Rendón recibieron en agosto de 2008 ofertas para la compra de la compañía por una suma aproximada de los 300 millones de dólares, lo cual no se nos reveló ni se puso en nuestro conocimiento por Esther y Juan María ni Lafrancol…" ¿A qué ofertas hace usted referencia en su declaración, recibidas en 2008, por 300 millones de dólares?
SR. VENTURA: ¿No digo allí de quién es la oferta?
DR. BARRAGÁN: No.
SR. VENTURA: Eurofarma.
DR. BARRAGÁN: ¿Cómo llegó a su poder esa oferta de Eurofarma?
[…]
SR. VENTURA: ¿Cuándo la recibimos?
DR. CONEJERO: Cuándo recibió la información relativa a la oferta que formuló Eurofarma por la compra de Lafrancol, si lo recuerda.
SR. VENTURA: Hay un papel con todos los detalles que recibimos de Eurofarma.
DR. MAYORGA: ¿La pregunta es cuándo?
DR. CONEJERO: ¿Usted, señor Ventura, recuerda cuándo recibió esa información?
SR. VENTURA: Este año. Tengo que contestar de quién porque ésta ya está, puedo decir que lo recibimos de los abogados de la compañía. That is all I am prepared to say.
DR. ZAMORA: ¿Qué compañía, perdón?
SR. VENTURA: Eurofarma, pero no… I won't … that is it"[164].

345. Por su parte, la Demandada Viviane Ventura también ratificó que sólo tuvo conocimiento de la oferta de Eurofarma tiempo después de la celebración de los Contratos de Transacción:

"DR. BARRAGÁN: ¿En el momento en que se interpone la denuncia penal ustedes tenían conocimiento del documento proveniente de Eurofarma?

162 DR-86. Oferta de compra no vinculante de Eurofarma.
163 Declaración de Michael Ventura. Anexo DR-72. Página 5.
164 Transcripción de la Audiencia. Páginas 40 y 41.

SRA. VENTURA: No, eso lo supimos hace como un año, y fueron los abogados de Eurofarma que nos dieron el contrato, esta fue la gran evidencia para nosotros confirmando, porque lo de Violy McCausland was hearsay [fue de oídas], ¿cómo se dice en español?, fue una historia que nos contaron, pero Violy McCausland nunca nos dio papel confirmando que esto fue lo que pasó, pero sí tenemos, tenemos la valuación que Estrategias Colombianas le hizo a Violy McCausland para la venta de Lafrancol en el 2007. Esto fue un accidente del destino, no sé cómo explicarle, a través de mis amigos en Brasil, recibimos una llamada y yo pedí, hablé con el presidente de Eurofarma y le expliqué qué estaba pasando, y él me dijo: no, no queremos meternos en un lío, no, y entonces el día antes de Navidad me llama su subgerente para decir que los abogados tuvieron un meeting [una reunión] el viernes, esto fue un lunes me voy a acordar siempre, llamaron a las 8 de la mañana, y el viernes tuvieron un meeting [una reunión] con los abogados y el presidente de Eurofarma y que han visto toda la documentación porque evidentemente nosotros le mandamos lo que teníamos y se han dado cuenta que usted y su hermano han sido de verdad, de verdad defraudados. Hemos decidido entregarles el contrato nuestro de oferta para comprar Lafrancol, un regalo de Navidad, yo creí que el Papá Noel había entrado en mi cuarto esa mañana".[169]

346. Lo anterior confirma que, al momento de celebrarse los Contratos de Transacción, los Demandados no tenían conocimiento acerca de la existencia de la oferta realizada por Eurofarma. Se trata así de hechos que si bien fueron anteriores a la firma de los Contratos de Transacción, no eran conocidos por los Demandados en dicho momento. En tal carácter, tales hechos no podían integrar el consentimiento prestado por las Partes al momento de celebración de los Contratos de Transacción y su eventual invocación en el contexto del procedimiento iniciado por la Denuncia Penal no podría quedar comprendido dentro del alcance de la renuncia contenida en los Contratos de Transacción.

347. De este modo, el Tribunal concluye que los Contratos de Transacción no pudieron haber adolecido de objeto ilícito por contener una alegada renuncia al deber de denunciar un ilícito penal. Primero, porque los Contratos de Transacción no contienen una renuncia expresa a denunciar ilícitos penales. Segundo, porque el texto del Contrato, la interpretación sistemática de sus cláusulas y las pruebas que obran al expediente no permiten llegar a la conclusión de que las Partes hayan acordado una renuncia general a todo tipo de acciones entre ellas, independientemente de su origen. Por el contrario, a la conclusión a la que permiten llegar es a que las partes renunciaron a iniciar cualquier *"queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral, o administrativa"* en relación con las controversias específicas que fueron materia de la transacción, es decir, a reclamar por la vía judicial o extrajudicial los asuntos específicos que las partes transigieron. Tercero, porque lo anterior está confirmado por lo dispuesto en el artículo 2484 del CCC. Cuarto, porque la existencia de un eventual objeto ilícito debe reputarse al momento de la celebración del contrato, el cual nace a la vida del derecho con ese vicio que lo hace anulable. Eso no es lo que ocurre en este caso. Aquí los Contratos de Transacción no integraron en su génesis los hechos que han servido de base a la Denuncia Penal, por lo cual no puede sostenerse que los Demandados habrían renunciado en los Contratos de Transacción a emprender acciones penales sobre la base de los hechos materia de la misma. En efecto, el contrato de transacción no puede suponer renuncias o finiquitos con relación a hechos o circunstancias anteriores o concomitantes que no hayan sido conocidas por las Partes, o con relación a hechos futuros que no habían acaecido a la fecha de su celebración.

348. Por último, si hipotéticamente los Demandantes hubiesen ocultado información relevante con el fin de inducir a las Demandadas a celebrar los Contratos de Transacción, a lo sumo, estaríamos en presencia de una eventual conducta que podría haber incidido en la concurrencia de una voluntad exenta de vicios, pero no en la existencia de un objeto lícito en los referidos Contratos

---

[169] Transcripción de la Audiencia. Páginas 181 y 182.

de Transacción. Pero, en cualquier caso, el Tribunal desestima las alegaciones de los Demandados en torno a un supuesto dolo o error en la celebración de los Contratos de Transacción, porque como se ha indicado en el párrafo 229 del Laudo Arbitral los Demandados jamás desarrollaron argumentos relativos a tales supuestos de nulidad de los Contratos de Transacción, ni presentaron prueba que los respalde.

349. Siendo así, resulta irrelevante a juicio del Tribunal examinar si en el presente caso los Demandados habrían tenido un deber legal de denunciar un ilícito penal o si estaban exonerados legalmente de dicho deber y, en su caso, cuál era el alcance de tal deber y las consecuencias legales de su omisión.

350. En razón de lo anterior, el Tribunal desestima la alegación de nulidad por objeto ilícito de las cláusulas de los Contratos de Transacción.

351. Sin perjuicio de ello, y en la misma línea, el Tribunal anticipa que -según se indica más adelante- no puede reprocharse el incumplimiento de los Demandados de las cláusulas 2.1 y 2.2 de los Contratos de Transacción por la interposición de la Denuncia Penal, en atención a que éstas se han basado en hechos o circunstancias que no han formado parte del alcance de los Contratos de Transacción.

D.  LA NULIDAD ABSOLUTA POR OBJETO ILÍCITO DE LAS CLÁUSULAS DE LOS CONTRATOS DE TRANSACCIÓN EN CUANTO A LAS OBLIGACIONES DE NO REFERIRSE, NI REFERIRSE EN TÉRMINOS OFENSIVOS, A LOS DEMANDANTES, Y DE LAS OBLIGACIONES DE NO CALIFICAR CONDUCTAS, COSTUMBRES O ACTIVIDADES DE LOS DEMANDANTES

1. POSICIÓN DE LAS PARTES

a. Posición de los Demandados

352. Los Demandados alegaron la nulidad de la Cláusula 7.6 del Contrato de Transacción celebrado entre los Demandantes y Viviane Ventura, que le imponía a ésta la obligación de no referirse, ni referirse en términos ofensivos, a los Demandantes, y de las obligaciones de no calificar conductas, costumbres o actividades de los Demandantes.

353. Fundamentan su reclamo de nulidad, en que la referida cláusula adolecería de objeto ilícito toda vez que contraría *"el ejercicio mismo de la autonomía personal y por consiguiente atenta contra derechos personalísimos y fundamentales, que además, son inalienables e irrenunciables"*[166].

354. Indican que su solicitud de nulidad se basa en lo dispuesto en el artículo 16 de la Constitución Política de Colombia que señala *"[t]odas las personas tienen derecho al libre desarrollo de su personalidad sin más limitaciones que las que imponen los derechos de los demás y el orden jurídico"*[167]. Indican que se trata de un derecho que ha sido catalogado como fundamental, e invocan doctrina y jurisprudencia

---

[166] Memorial de Contestación, Párrafo 274.
[167] Anexo DR-54, Artículo 16 de la Constitución Política de Colombia.

que establece que las limitaciones al mismo sólo pueden ser de origen constitucional y no pueden anular la autodeterminación de los individuos[158].

355. Agregan que cuando se impide a una persona referirse de cualquier manera sobre otra, no existe un bien jurídico a proteger, sino que sólo una coerción a la persona en sí misma considerada: impedirle su libre autodeterminación y desenvolvimiento personal[169].

356. Los Demandados también reprochan que el deber de abstención que consagra la cláusula citada sea indefinida y no se circunscriba a un espacio temporal determinado[170].

357. En consideración a todo lo anterior señalan que con la Cláusula 7.6 referida se ha pretendido *"limitar un derecho fundamental de Viviane Ventura: su libertad de expresión y su autonomía personal, derecho que por corresponder a la esfera más íntima de la persona, no puede ser objeto de coerción por vía contractual, mucho menos para pactar su renuncia"*[171]. En consecuencia, alegan los Demandados, dicha cláusula es *"ilícita y por consiguiente, no puede producir ningún efecto, ni mucho menos predicarse incumplimiento contractual sobre la misma y así le solicito al Tribunal lo declare negando la prosperidad de las pretensiones 8, 9 y 10 en contra de Viviane Ventura"*[172].

### b. Posición de los Demandantes

358. Los Demandantes se opusieron a dicha solicitud, señalando que las obligaciones contempladas en la cláusula 7.6 se fundaban en derechos constitucionales de los Demandantes como la protección a su buen nombre, derechos que son precisamente el límite del derecho a la autonomía que invocan los Demandados[173]. Agregan que han sido los propios Demandados quienes en su Memorial de Contestación señalaron que ese derecho constitucional que les asistía, reconocía como límite *"el respeto a los derechos ajenos y la posibilidad de cada individuo de autodeterminarse"*[174].

359. Señalan los Demandantes que las disposiciones de la cláusula referida eran perfectamente legales y perseguían la protección de un bien jurídico, toda vez que *"[e]l interés de las personas en proteger bienes tales como su buen nombre, "goodwill" e imagen no sólo es legítimo en el ordenamiento colombiano sino que están protegidos por el derecho, igualmente fundamental, a la intimidad, sin que esto obste para que, adicionalmente, sean sujetos de protección mediante mecanismos contractuales"*[175].

360. Agregan que en todo caso no se entiende cómo es que la obligación asumida por Viviane Ventura de referirse a su prima Esther Ventura pudiese afectar de modo alguno el desarrollo de la autonomía personal de aquélla, ni como el derecho que ésta invoca sería parte de su dignidad personal ni de las condiciones mínimas que requeriría para desarrollarse íntegramente como ser humano y ciudadana[176].

---

[158] Memorial de Contestación. Párrafo 276.
[169] Memorial de Contestación. Párrafo 277.
[170] Memorial Comentarios a la Réplica de los Demandados. Párrafo 138 y siguientes.
[171] Memorial de Contestación. Párrafo 280.
[172] Memorial de Contestación. Párrafo 281.
[173] Memorial de Réplica. Párrafo 223.
[174] Memorial de Réplica. Párrafo 222.
[175] Memorial de Réplica. Párrafo 224.
[176] Memorial de Réplica. Párrafo 228.

361. Indican los Demandantes en este sentido que las personas poseen amplia autonomía y pueden disponer de sus derechos y obligaciones para proteger sus intereses, con la única limitación de respetar el orden público. De este modo, la cláusula reprochada por los Demandados se encuadra dentro de las facultades de disposición de las partes de la Transacción celebrada por Viviane Ventura[177], y citan jurisprudencia de apoyo. Además, los Demandantes plantean que de seguirse la tesis de los Demandados *"se estaría desconociendo la fuerza vinculante de los contratos y contradiciendo la característica principal de una fuente de las obligaciones clásica en las tradiciones jurídicas mundiales consistente en que dos o más partes convengan, en favor de la otra u otras, la realización de ciertas conductas, teniendo como único límite el orden público"*[178].

362. En relación a la alegación de la obligación de no hacer consagrada en la Cláusula 7.6 citada, los Demandantes señalan que la ley colombiana no hace ninguna exigencia en ese sentido[179] y que en cualquier caso, la falta de plazo no acarrearía la nulidad de dicha cláusula toda vez que en el derecho colombiano las causales de nulidad son taxativas y entre ellas no se encuentra el hecho de que el plazo de una obligación de no hacer no esté determinado[180].

363. Agregan, además, los Demandantes que las normas de interpretación contractual aplicables a este caso, exigen la aplicación del principio de interpretación útil según el cual *"el sentido en que una cláusula puede producir algún efecto, deberá preferirse a aquel en que no sea capaz de producir efecto alguno"* y el principio de prevalencia de la intención de los contratantes, que dispone que *"conocida claramente la intención de los contratantes, debe estarse a ella más que a lo literal de las palabras"*[181]. En este sentido la única interpretación que respeta estos principios es una que le de valor y eficacia jurídica a la cláusula y que *"reconozca que la intención de los contratantes al estipularla fue la de evitar definitivamente cualquier manifestación o pronunciamiento de una de las partes respecto del resto de los contratantes"*[182].

## 2.  DECISIÓN DEL TRIBUNAL

364. El Tribunal Arbitral nota que los Demandados solicitan que se declare nula por objeto ilícito la Cláusula 7.6 del Contrato de Transacción celebrado entre los Demandantes y Viviane Ventura, en cuanto impone a esta última la obligación de no referirse, ni referirse en términos ofensivos, a los Demandantes, y de no calificar conductas, costumbres o actividades de los Demandantes, sobre la base de que atenta contra el ejercicio de la autonomía personal, y por lo tanto contra derechos personalísimos y fundamentales, los cuales son inalienables e irrenunciables.

365. El Tribunal Arbitral reconoce la existencia del derecho al libre desarrollo de la personalidad, sin más limitaciones que el derecho de los demás y el orden jurídico[183]. De ello surgen dos aspectos relevantes para resolver esta cuestión: primero, si el derecho al libre desarrollo de la personalidad de Viviane Ventura se ve afectado por la Cláusula 7.6 del Contrato, y; segundo, si la Cláusula 7.6 busca proteger o respetar algún derecho susceptible de tutela jurídica de parte de los Demandantes.

---

[177] Memorial de Réplica. Párrafo 231.
[178] Memorial de Réplica. Párrafo 234.
[179] Memorial Cierre de los Demandantes. Párrafo 246.
[180] Memorial Cierre de los Demandantes. Párrafo 247.
[181] Memorial Cierre de los Demandantes. Párrafo 248.
[182] Memorial Cierre de los Demandantes. Párrafo 249.
[183] Anexo DR-54. Artículo 16 de la Constitución Política de Colombia.

366. En lo concerniente al resguardo del derecho de los Demandantes, el Tribunal Arbitral discrepa de la posición de los Demandados en cuanto a que la Cláusula 7.6 no buscaba proteger ningún bien jurídico.

367. En opinión del Tribunal, atendidas las circunstancias que rodearon la firma de los Contratos de Transacción y que aparecen probadas en el expediente, es plausible concluir que las Partes no tuvieron una finalidad caprichosa o coercitiva al pactar la obligación contenida en esa cláusula, sino que buscaban resguardar su derecho a la imagen, la reputación o el buen nombre, derechos que también tienen un reconocimiento constitucional. La cláusula en cuestión señala que:

> "[s]o pena que se haga exigible la cláusula [sic] penal aquí acordada, las Partes se comprometen recíprocamente a mantener en sigilo este Contrato, pero sobre todo, a omitir referirse en el futuro, pública o privadamente a la conducta, modo de vida, costumbres o actividades de la otra Partes, evitando el uso de calificativos, frases ofensivas o similares, todo lo cual se considerará violación material del Contrato. De ser posible, las Partes simplemente omitirán referirse a la otra Parte en el futuro".

368. De lo anterior se sigue que las Partes acordaron (i) mantener en sigilo el Contrato, es decir, una obligación de confidencialidad; (ii) abstenerse de referirse pública o privadamente a la "conducta, modo de vida, costumbres o actividades de la otra Parte"; y (iii) "[d]e ser posible", abstenerse de referirse a la otra Parte.

369. El Tribunal Arbitral no está convencido de que la existencia de las obligaciones contenidas en la Cláusula 7.6 efectivamente incidan o afecten el derecho al libre desarrollo de la personalidad de las Partes. Es evidente que supone una limitación en su conducta, en cuanto por la Cláusula 7.6 cada una de las Partes de ese contrato ha contraído una serie de obligaciones de no hacer consistente en no poder referirse a la "conducta, modo de vida, costumbres o actividades" de la otra Parte. Pero, por una parte, las mismas Partes entendieron que una obligación general de no referirse a la otra Parte sólo aplicaría "de ser posible", y por la otra, la limitante busca —como se ha indicado en el párrafo precedente— proteger o resguardar los derechos de las Partes y, a juicio del Tribunal, la observancia de tales obligaciones no acarrea una violación al derecho a la personalidad de ninguna de las Partes.

370. En este sentido, los Demandados no han logrado acreditar siquiera remotamente cómo puede entenderse que una obligación limitada a no referirse a "la conducta, modo de vida, costumbres o actividades" de la otra Parte, podrían afectar el desarrollo de la autonomía personal de Viviane Ventura. En el mismo sentido, los Demandados tampoco han establecido que la existencia de esta obligación limitada atenta en algún modo con la dignidad personal de Viviane Ventura o con las condiciones que ella requeriría para su desarrollo integral. Por último, tampoco han acreditado los Demandados que las conductas que se ordena observar bajo la Cláusula 7.6 citada no sean susceptibles de libre disposición, o que afecten el orden público.

371. Asimismo, no debe olvidarse que los Contratos de Transacción fueron considerados y negociados por los Demandados, incluso con el apoyo de asistencia letrada, de modo que no parece razonable que ahora se alegue la nulidad por objeto ilícito de cláusulas que los Demandados tuvieron plena posibilidad de considerar y valorar en cuanto a las obligaciones que venían impuestas por tales Contratos.

372. El Tribunal Arbitral advierte, por último, el reproche de los Demandados a que la obligación contenida en la Cláusula 7.6 sea indefinida y no se circunscriba a un espacio corporal temporal determinado. Si bien es cierto que la obligación referida, tal como ha sido recogida en la Cláusula 7.6, no define un plazo determinado de ejecución ni tampoco un ámbito territorial preciso, ello sólo puede significar que la obligación debe observarse continuamente, sin límite temporal, y en cualquier territorio o espacio.

373. En realidad, la pregunta clave es si una cláusula contractual, descrita de este modo, podría acarrear la nulidad absoluta de la misma por el gravamen que supone esta obligación. El Tribunal concluye que los Demandados no han demostrado que la falta de determinación del plazo o el espacio en el que rige esta obligación debería acarrear la nulidad de dicha cláusula. Por el contrario, en el derecho colombiano las causales de nulidad son taxativas y entre ellas no se encuentra el hecho de que el plazo de una obligación de no hacer o el espacio en el que la misma debe observarse, no esté determinado. El Tribunal Arbitral comparte la apreciación de los Demandantes en cuanto a que el derecho colombiano no contempla ninguna exigencia o requisito en este sentido.

374. Por otro lado, aún si el reproche de los Demandados mira al carácter desproporcionado que supondría una medida como la descrita en cuanto no está delimitada a un tiempo o lugar específico, las conclusiones del Tribunal no podrían cambiar en tanto los Demandados no han demostrado como esa indeterminación de tiempo y lugar constituiría una desproporcionalidad, y autorizaría al Tribunal Arbitral a sancionar la misma con nulidad de la cláusula 7.6 de los Contratos de Transacción[184]. Tampoco se ve afectado ello en tanto que los hechos materia de este Arbitraje tuvieron lugar en un espacio temporal cercano a la suscripción de los Contratos de Transacción, razón por la que el análisis de lejanía en el tiempo no afectaría ni modificaría esta determinación del Tribunal Arbitral.

375. La falta de determinación del plazo o del espacio temporal podría tener otras consecuencias jurídicas pero ellas no fueron invocadas ni alegadas por las Partes.

376. En razón de lo anterior, el Tribunal Arbitral desestima esta solicitud de los Demandados de declarar la nulidad de la Cláusula 7.6 del Contrato de Transacción entre los Demandantes y Viviane Ventura por objeto ilícito.

# E. LA INEFICACIA O NULIDAD DE LOS CONTRATOS DE TRANSACCIÓN POR VIOLACIÓN DEL PRINCIPIO DE BUENA FE OBJETIVA

## 1. POSICIÓN DE LAS PARTES

---

[184] Finalmente, el Tribunal llega a la misma conclusión si se examina el estándar de análisis propuesto por el experto Dr. Cifuentes. Al efecto, dicho experto indica que, en principio, es válido restringir por vía contractual el derecho fundamental a la libertad de expresión, siempre y cuando tal restricción (i) no comprometa de forma integral, desproporcionada o irrazonable esa libertad; (ii) posea una finalidad legítima y (iii) proteja otros derechos e intereses de rango constitucional. (Ver: Anexo D-IP-03. Informe del Dr. Eduardo Cifuentes. Página 151). En el presente, el Tribunal ha concluido que la restricción contenida en la cláusula 7.6 del Contrato de Transacción entre los Demandantes y Viviane Ventura (i) no compromete la libertad de ninguna de las Partes, incluida Viviane Ventura, en forma integral, desproporcionada o irrazonable (párrafos 368 a 376 del Laudo Arbitral); (ii) persigue una finalidad legítima de protección a favor de ambas Partes, y (iii) protege derechos de rango constitucional (párrafos 364 a 367 del Laudo Arbitral).

a. Posición de los Demandados

377. Los Demandados alegan que los Demandantes se habrían comportado de mala fe desde el inicio de las relaciones con los Demandados, cuyo máximo de abuso e incorrección se habría materializado con la suscripción de los Contratos de Transacción, en la que se configuraron desequilibrios contractuales[185].

378. Señalan los Demandados que la supuesta mala fe de los Demandantes se acreditaría de las siguientes circunstancias que dan cuenta los anexos que se indican: (i) Fax enviado por Michael Ventura que contiene la respuesta de Esther Ventura al mismo del 29 de octubre de 2009[186]; (ii) Comunicación suscrita por Michael Ventura de 14 de diciembre de 2009[187]; (iii) Comunicación elaborada por Michael Ventura de 3 de febrero de 2010[188]; (iv) Comunicación firmada por John J. Spittler de 17 de diciembre de 2009[189]; (v) Comunicación suscrita por Michael Ventura de 5 de marzo de 2010[190]; (vi) Comunicación suscrita por Viviane Ventura de 27 de julio de 2007[191]; (vii) Documento de acuerdo suscrito por Michael Ventura y Esther Ventura de 17 de enero de 2010[192]; (viii) Comunicación Luis Carlos Pombo de 17 de enero de 2010[193]; (ix) Transferencias a Juan María Rendón[194]; (x) Informe Valoración Grupo Lafrancol elaborado por Pombo & Cía.[195]; (xi) Análisis de Valoración Grupo Lafrancol elaborado por Estrategias Corporativas[196]; (xii) Oferta de compra indicativa Eurofarma[197] y (xiii) Declaración de Luis Carlos Pombo[198] [199].

379. Para fundar esta solicitud, los Demandados invocan normas civiles, comerciales y constitucionales de derecho colombiano que establecen el deber de las partes de celebrar y ejecutar los contratos de buena fe[200]. Asimismo, en igual sentido invocan normas de *lex mercatoria* reconocidas en los Principios Unidroit[201].

380. En este sentido, señalaron que debe distinguirse entre la buena fe subjetiva y la buena fe objetiva. Según los Demandados la buena fe subjetiva es aquella que *"propende por el respeto -o tutela- de una determinada apariencia que ha sido forjada con antelación, o por una creencia o confianza específicas que se han originado en un sujeto, en el sentido de estar actuando con arreglo a derecho, sin perjuicio de que se funden, en realidad, en un equívoco, todas son evidentes repercusiones legales, no obstante su claro y característico tinte subjetivo ('actitud de conciencia' o 'estado psicológico'), connatural a la situación en que se encuentra en el marco de una relación jurídica, por vía de ejemplo la posesoria"[202].*

---

[185] Párrafo 301 Memorial de Réplica de los Demandados.
[186] DR-25. Fax de Michael Ventura que contiene respuesta de Esther Ventura al mismo, de fecha 29 de octubre de 2009.
[187] DR-26. Comunicación suscrita por Michael Ventura, de fecha 14 de diciembre de 2009.
[188] DR-27. Comunicación elaborada por Michael Ventura de fecha 3 de febrero de 2010.
[189] DR-26. Comunicación firmada por John J. Spittler de fecha 17 de diciembre de 2009.
[190] DR-29. Comunicación suscrita por Michael Ventura de fecha 5 de marzo de 2010.
[191] DR-42. Comunicación suscrita por Viviane Ventura de fecha 27 de julio de 2007.
[192] DR-81. Documento de acuerdo entre Michael Ventura y Esther Ventura de fecha 17 de enero de 2010.
[193] DR-82. Comunicación elaborada por Luis Carlos Combo de fecha 22 de febrero de 2010.
[194] DR-83. Transferencia a Juan María Rendón.
[195] DR-84. Informe de Valoración Grupo Lafrancol elaborado por Pombo y Cía, de fecha de marzo de 2010.
[196] DR-85. Análisis de Valoración Grupo Lafrancol, estrategias Corporativas, de febrero de 2010.
[197] DR-86. Oferta de compra indicativa Eurofarma, de fecha 28 de agosto de 2008.
[198] DR-87. Declaración testimonial de Luis Carlos Pombo.
[199] Memorial de Pronunciamiento sobre la Réplica. Párrafo 312.
[200] Memorial de Pronunciamiento sobre la Réplica. Párrafos 288, 289 y 292.
[201] Memorial de Pronunciamiento sobre la Réplica. Párrafo 302.
[202] Memorial de Pronunciamiento sobre la Réplica. Párrafo 295.

381. A su turno, señalaron que la buena fe objetiva sería aquella que *"se traduce en una regla —o norma— orientadora del comportamiento (directiva o modelo tipo conductual) que atañe al dictado de precisos deberes de conducta que, por excelencia, se proyectan en la esfera pre-negocial y negocial, en procura de la satisfacción y salvaguarda de intereses ajenos (deberes de información; de claridad o precisión; de guarda material de la cosa; de reserva o secreto, etc.)"*[203].

382. Argumentan que las conductas de los Demandantes –que no detallan- habrían supuesto violación a la buena fe y que de la infracción a dicho principio se seguiría la ineficacia o nulidad de los Contratos de Transacción.

383. Al efecto, agregaron que si bien la legislación colombiana no contiene norma positiva que establezca expresamente la sanción de ineficacia o invalidez del contrato por violación al principio de buena fe objetiva, la circunstancia de haberse elevado la cláusula general de buena fe a rango constitucional, exige que la interpretación de los códigos se haga de *"manera sistemática y coordinada para darle aplicación a las normas constitucionales es procedente la integración al bloque de derecho aplicable para dirimir al presente asunto, los principios generales de Unidroit de los contratos comerciales internacionales"*[204]. En mérito de lo anterior solicitaron al Tribunal Arbitral que decidiese la eventual nulidad de los Contratos de Transacción por la infracción a los principios de buena fe.

b. Posición de los Demandantes

384. Los Demandantes se opusieron a esta solicitud. Señalaron en primer término que los Demandados *"no solo no aportan pruebas de la supuesta mala fe bajo la cual habrían actuado mis representados, sino que ni siquiera describen ni detallan cuáles serían tales conductas, simplemente porque no existen"*[205].

385. Reprochan además que los Demandados aleguen por esta misma circunstancia simultáneamente la ineficacia y la nulidad de los contratos de Transacción, cuando dichas instituciones *"están reguladas independientemente. son procedentes por causas divergentes y acarrean diferentes consecuencias jurídicas, siendo excluyentes entre sí."*[206].

386. Asimismo, agregan que la violación al principio de buena fe objetiva no está establecida ni como causal de ineficacia ni de nulidad[207], y que ambas *"son de origen legal, taxativas y de interpretación restrictiva, por lo que no puede solicitarse que se reste valor a un acto jurídico, cuando el fundamento de tal solicitud no se encuentre expresamente consagrado por la ley"*[208].

387. De este modo concluyen que las alegaciones de las Demandadas a este respecto carecen completamente de mérito fáctico y jurídico[209].

2. DECISIÓN DEL TRIBUNAL

---

[203] Ibidem.
[204] Ibidem.
[205] Memorial de Cierre de los Demandantes. Párrafo 160.
[206] Memorial de Cierre de los Demandantes. Párrafos 161 y 162.
[207] Memorial de Cierre de los Demandantes. Párrafo 165.
[208] Memorial de Cierre de los Demandantes. Párrafo 166.
[209] Memorial de Respuesta al Memorial de Cierre presentado por las Demandantes. Párrafo 290.

388. Como cuestión preliminar, el Tribunal Arbitral nota que esta defensa de los Demandados recién se introdujo por primera vez en el Arbitraje con el último escrito de la fase de intercambio de escritos consistente en el Memorial de Pronunciamiento sobre la Réplica. Su inclusión tardía en la fase de intercambio de escritos nunca fue explicada y, en estricto rigor, podría sostenerse que la misma escapa del alcance y sentido que el Artículo 23(4) del Reglamento, el cual autoriza solo excepcionalmente, y siempre que exista motivo fundado, la presentación de reclamaciones y/o defensas a reclamaciones nuevas que no se hayan ventilado antes. Con todo, en atención a que los Demandantes no objetaron la introducción de esta defensa, y más bien se defendieron de esta alegación en el Memorial de Cierre y en el Memorial Posterior a la Audiencia, el Tribunal Arbitral se abocará al análisis de esta solicitud de los Demandados.

389. Los Demandados solicitan la nulidad o la ineficacia de los Contratos de Transacción por infracción de la buena fe objetiva, entendida ésta como una norma orientadora conductual que impone ciertos deberes de conducta durante la fase pre-negocial y negocial.

390. El Tribunal nota que los Contratos de Transacción están gobernados por el derecho colombiano. Asimismo, conforme al derecho colombiano, no existe una norma que autorice la declaración de nulidad por una supuesta falta de buena fe objetiva, y como se ha indicado en este Laudo Arbitral, las causales de nulidad han sido taxativamente establecidas por la ley.

391. De hecho, los mismos Demandados aceptan esto: *"No existe en el código civil ni en el de comercio colombianos norma positiva que establezca de manera expresa la sanción de la ineficacia o invalidez del contrato por violación del principio de la buena fe objetiva"*[210].

392. Por otra parte, la ineficacia tampoco aparece recogida en el derecho colombiano como una figura que permita privar de validez a los Contratos de Transacción por una supuesta violación del deber de buena fe objetiva. De hecho, los Demandados no han aportado elementos de juicio que permitan al Tribunal concluir que la ineficacia en general es una vía para dejar sin efecto los Contratos de Transacción.

393. Los Demandados, conscientes de ello, han solicitado que la declaración de nulidad sea hecha sobre la base de integrar los principios Unidroit 2010. Como punto de partida, el Tribunal acepta que, en principio, el Código de Comercio Colombiano ("C.C.Com.") permitiría la integración de "principios generales del derecho comercial" conforme al artículo 7 del mismo cuerpo legal[211].

394. Sin embargo, los Demandados no han explicado cómo se integrarían los Principios Unidroit por la vía del citado artículo 7. Los Demandados tampoco han explicado por qué el Tribunal, aún en el supuesto de considerar a los Principios Unidroit bajo el alcance del artículo 7, debería privilegiar su aplicación por sobre las normas contenidas en los artículos 1 a 6 del C.C.Com. en circunstancias que el mismo artículo 7 señala que éste sólo regirá para "cuestiones mercantiles que no puedan resolverse conforme a las reglas precedentes". En este sentido, los Demandados han fallado en establecer cómo podrían establecerse tales principios para aplicar una nueva causal de ineficacia como la violación de la buena fe objetiva, que no se encuentra contenida en el CCC, en circunstancias que el propio artículo 822 del C.C.Com. refiere las cuestiones relativas

---

[210] Memorial de Pronunciamiento sobre la Réplica. Párrafo 304.
[211] C.C.Com. Art. 7: Aplicación de tratados, convenciones y costumbre internacionales. Los tratados o convenciones internacionales de comercio no ratificados por Colombia, la costumbre mercantil internacional que reúna las condiciones del artículo 3º, así como los principios generales del derecho comercial, podrán aplicarse a las cuestiones mercantiles que no puedan resolverse conforme a las reglas precedentes.

a la nulidad o rescisión de los contratos a las normas contenidas en el CCC. Al efecto, dicha norma dispone:

"Art. 822. Aplicación de normas del derecho civil. Los principios que gobiernan la formación de los actos y contratos y las obligaciones de derecho civil, sus efectos, interpretación, modo de extinguirse, anularse o rescindirse, serán aplicables a las obligaciones y negocios jurídicos mercantiles, a menos que la ley establezca otra cosa. La prueba en derecho comercial se regirá por las reglas establecidas en el Código de Procedimiento Civil, salvo las reglas especiales establecidas en la ley".

395. En conclusión, atendido a que las Partes han convenido soberanamente que el derecho colombiano rige los Contratos de Transacción, y los Demandados no han establecido que el Tribunal pueda declarar la ineficacia de los Contratos de Transacción, por la vía de integración de normas a-nacionales como los Principios Unidroit, más allá y en violación de los supuestos taxativamente designados por la ley colombiana, esta alegación tampoco puede prosperar.

396. Al respecto, debe advertirse que el Tribunal Arbitral tiene un mandato de aplicar las normas contenidas en el derecho colombiano, tanto de conformidad con el Reglamento de Arbitraje de la CCI como de la Ley Colombiana de Arbitraje.

397. El artículo 21 del Reglamento establece:

"Artículo 21
Normas jurídicas aplicables al fondo.
1 Las partes podrán acordar libremente las normas jurídicas que el tribunal arbitral deberá aplicar al fondo de la controversia. A falta de acuerdo de las partes, el tribunal arbitral aplicará las normas jurídicas que considere apropiadas.
2 El tribunal arbitral deberá tener en cuenta las estipulaciones del contrato celebrado entre las partes, si lo hubiere, y cualesquiera usos comerciales pertinentes.
3 El tribunal arbitral tendrá los poderes de amigable componedor o decidirá ex aequo et bono únicamente si las partes, de común acuerdo, le han otorgado tales poderes" (énfasis del Tribunal)

398. Por su parte, la Ley 1563, que constituye la ley del lugar de la sede del presente Arbitraje, contiene una disposición similar:

"Artículo 101. Normas aplicables al fondo del litigio. El tribunal arbitral decidirá de conformidad con las normas de derecho elegidas por las partes. La indicación del derecho u ordenamiento jurídico de un Estado se entenderá referida, a menos que se exprese lo contrario, al derecho sustantivo de dicho Estado y no a sus normas de conflicto de leyes.
Si las partes no indican la norma, el tribunal arbitral aplicará aquellas normas de derecho que estime pertinentes.
El tribunal arbitral decidirá ex aequo et bono solo si las partes lo hubieren autorizado. En todo caso, el tribunal arbitral decidirá con arreglo a las estipulaciones del contrato y teniendo en cuenta los usos mercantiles aplicables al caso". (énfasis del Tribunal)

399. Como puede advertirse de ambas disposiciones, la elección de un derecho nacional debe respetarse, y ello es así porque la elección de un derecho nacional como aplicable a los contratos es una decisión relevante que vincula a las Partes. Como se admite en doctrina:

"Hay mucho sentido en dicha elección. Las Partes que eligen un derecho para gobernar su contrato, o cualquier disputa posterior entre ellos, generalmente elegirán un sistema autónomo de leyes. Ese sistema no es simplemente un set de principios generales o normas legales aisladas. Más bien, es una colección interconectada e interdependiente de leyes, regulaciones, ordenanzas, promulgadas por uno en representación de un Estado, e interpretadas y aplicadas por los tribunales locales. Es un sistema legal completo, designado para dar una respuesta a cualquier cuestión legal que sea planteada. Más aún, un sistema nacional de leyes será, en principio, un sistema

conocido y existente, capaz de dar una interpretación razonablemente acertada por practicantes con experiencia. En el derecho, como en la vida, no hay certidumbre. Sin embargo, un sistema nacional de leyes entrega un estándar legal conocido (o al menos, determinable) en el cual todos los derechos y responsabilidades de las partes pueden ser medidos. En caso de disputas, las partes pueden ser asesoradas con razonable confianza en cuanto a su posición legal -o, a lo menos, se les puede dar una indicación general de sus probabilidades de éxito o fracaso-."[212]

400. Asimismo, el rol de la *lex mercatoria* y de los Principios Unidroit cobra mayor importancia en los casos en que las Partes no han elegido un derecho nacional, o en que éste presente un claro vacío o laguna legal sobre una cierta materia, y el Tribunal Arbitral considera que tiene la facultad para llenar dicho vacío por la vía de integrar normas a-nacionales. Pero este no es el caso aquí en que una cuestión tan capital como la nulidad se encuentra claramente regulada dentro del derecho colombiano, y no podría el Tribunal introducir por la vía de "soft law" una causal de nulidad no prevista en dicho derecho.

401. El Tribunal considera que los motivos antes indicados justifican plenamente el rechazo de la solicitud de los Demandados de declarar la nulidad o ineficacia de los Contratos de Transacción por la causa bajo análisis.

402. En todo caso, bajo derecho colombiano la buena fe se presume y la mala fe deberá probarse. En efecto, así lo establece el Artículo 769 del CCC:

"La buena fe se presume, excepto en los casos en que la ley establece la presunción contraria. En todos los otros, la mala fe deberá probarse".

403. Los Demandados alegan la mala fe de los Demandantes y, en consecuencia, les corresponde probarla. A la luz de la prueba presentada en el Arbitraje, el Tribunal concluye que los Demandados no han satisfecho la carga de la prueba en cuanto a que los Demandantes habrían obrado de mala fe.

404. En consecuencia, los Contratos de Transacción se consideran válidos y vinculantes para las Partes, lo cual hace que las diferencias objeto de los mismos hayan sido resueltas con carácter y fuerza de cosa juzgada a través de tales contratos. Así las cosas, no es rol del Tribunal Arbitral pronunciarse sobre las razones que motivaron las diferencias entre las Partes en forma previa a los Contratos de Transacción pues éstas han sido zanjadas con los Contratos.

405. Como nota final de esta sección, el Tribunal Arbitral advierte que los Demandados habían invocado la ineficacia o nulidad de la Cláusula Penal como consecuencia de las distintas causales de ineficacia y nulidad invocadas con relación a los Contratos de Transacción que contienen dicha cláusula. En la medida que el Tribunal Arbitral ha desestimado todas y cada una de las

---

[212] Traducción libre del inglés: "*There is much tense in such a choice. Parties who choose a law to govern their contract, or any subsequent dispute between them, will generally choose an autonomous system of law. Such a system is not merely a set of general principles or of isolated legal rules; rather, it is an interconnecting, interdependent collection of laws, regulations, and ordinances, enacted by or on behalf of the state, and interpreted and applied by the courts. It is a complete legal system, designed to provide an answer to any legal question that might be posed. Furthermore, a national system of law will, in principle, be a known and existing system, capable of reasonably accurate interpretation by experienced practitioners. In law, as in life, there is no certainty. However, a national system of law provides a known (or at least determinable) legal standard against which the rights and responsibilities of their legal position—or, at the very least, they can be given a broad indication of their chances of success or failure*". Nigel Blackaby, Constantine Partasides, en Redfern y Hunter, International Arbitration, sexta edición, Oxford University Press, 2015, Páginas 124 y 125.

causales de ineficacia y nulidad invocadas por los Demandados, debe también rechazarse la nulidad de la Cláusula Penal que se pretende como consecuencia de dichas diversas causales.

# 3.- LAS RECLAMACIONES DE LOS DEMANDANTES

406. Los Demandantes han solicitado en el curso del Arbitraje una declaración general en cuanto a que los Demandados los indujeron, mediante maquinaciones y argucias, a la firma de los Contratos de Transacción sin tener la intención de cumplirlos (A.), y además; la declaración de una serie de incumplimientos particulares de los Contratos de Transacción (B.). El Laudo Arbitral aborda ambas peticiones por separado.

## A. LAS ALEGADAS MAQUINACIONES Y ARGUCIAS DE LOS DEMANDADOS QUE INDUJERON A LOS DEMANDANTES A LA FIRMA DE LOS CONTRATOS DE TRANSACCIÓN, SIN TENER LA INTENCIÓN DE CUMPLIRLOS.

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandantes

407. Los Demandantes sostienen que los Demandados han obrado de mala fe y que los hechos que antecedieron y sucedieron a la suscripción de los Contratos de Transacción dan cuenta de una estrategia implementada por los Demandados para inducir a los Demandantes *"a pagarles, sin contraprestación alguna, unas sumas de dinero a las que no tenían derecho, mediante la ejecución de actos jurídicos, cuyas consecuencias jurídicas desconocen, niegan o controvierten, eventualmente"*[213].

408. Señalan que en el caso de Viviane Ventura, no obstante haber recibido la totalidad del valor de su participación en Lafrancol, de haber recibido un dinero a cambio de dar concluida cualquier disputa con los Demandados y haber declarado en el respectivo Contrato de Transacción que había perdido la calidad de accionista de Lafrancol, con posterioridad a ello ha señalado a los medios que nunca vendió sus acciones[214]. Esto supondría que cuando suscribió el Contrato de Transacción respectivo indujo a los Demandantes a pensar que tenía la intención de cumplir dicho contrato en circunstancias que su intención nunca fue tal[215].

409. Asimismo, los Demandantes sostienen que Michael Ventura les indujo a celebrar el Contrato de Transacción, dándoles a entender que les vendía sus acciones en Lafrancol, cerrando así cualquier controversia entre las partes, en circunstancias que esa no era su voluntad real, lo que se ha manifestado con sus actitudes posteriores en las que ha controvertido el respectivo Contrato de Transacción exigiendo el pago de lo que él estima le correspondía por la venta de sus acciones[216].

---

[213] Memorial de Demanda. Párrafo 133.
[214] Memorial de Demanda. Párrafo 138.
[215] Memorial de Demanda. Párrafo 139.
[216] Memorial de Demanda. Párrafos 141 y siguientes.

410. En este sentido, los Demandantes alegan que los Demandados desconocen sus actos propios cuando ya no les resultan útiles para ver satisfechas sus pretensiones dinerarias. Así, (i) Viviane Ventura desconoció haber vendido sus acciones y, mediante amenazas y una conducta errática sobre sus actos pasados, persiguió y persigue el pago de sumas de dinero sin causa; (ii) Michael Ventura desconoce que otorgó un poder a Roberto Ventura Pauly mediante comparecencia personal; (iii) Michael Ventura desconoce haber dado instrucciones para la transferencia de sus acciones a un tercero; y (iv) los Demandados desconocen los Contratos de Transacción al punto que los incumplen y alegan su inexistencia y nulidad. También alegan que, a lo largo de los años los Demandados ejercieron diversos mecanismos de presión en contra de los Demandantes y Lafrancol, incluyendo presiones judiciales y mediáticas, así como amenazas, para ver satisfechas sus pretensiones dinerarias. Sin embargo, no explican con mucho detalle en qué consisten esas presiones[217].

411. En la misma línea, los Demandantes alegan que los Demandados suscribieron los Contratos de Transacción y aceptaron sus obligaciones *"no porque realmente creyeran en ello o estuvieran dispuestos a honrarlo, sino porque, para ellos, los Contratos de Transacción eran meros mecanismos para recibir el dinero de mis representados y que, posteriormente, como ha sucedido, desconocerían"*[218]. Según los Demandantes, esta mala fe ha quedado en evidencia incluso durante el presente proceso arbitral, toda vez que en el Memorial de Contestación los Demandados niegan que Viviane Ventura haya perdido su calidad de accionista de Lafrancol, lo que contradice expresamente lo declarado en el Contrato de Transacción que ella misma firmó[219]. Reclaman que Michael Ventura cae en esta misma falta a la buena fe, al haber firmado el respectivo Contrato de Transacción y reprochar ahora que los Demandantes no les devolvieron oportunamente sus acciones en Lafrancol, desconociendo que las mismas estaban a nombre de Roberto Ventura, un tercero distinto de los Demandantes, por lo que no correspondía a los Demandantes devolver nada a Michael Ventura[220].

412. Los Demandantes también reprochan que los Demandados reconozcan que recibieron dinero por la firma de los Contratos de Transacción y se hayan beneficiado de eso, pero ahora nieguen valor a dichos Contratos[221]. A juicio de los Demandantes, todo ello supondría que los pagos realizados en los Contratos de Transacción se hicieron sin contraprestación alguna por parte de los Demandados[222].

413. Por último los Demandantes contradicen las aseveraciones de los Demandados en cuanto a no haber sido asesorados por abogados y haber suscrito los Contratos de Transacción en idioma español a pesar de que sólo dominan el inglés[223]. Respecto de Viviane Ventura, los Demandantes señalan que ella misma les comunicó que para esos efectos el abogado asesor para dichos fines sería el señor Jaime Lombana[224] lo que consta además en la declaración testimonial de Esther Ventura y en los antecedentes acompañados con ella[225]. Respecto de Michael Ventura, sostienen que éste sí contó con asistencia letrada del señor Lombana al momento de celebrar los Contratos

---

[217] Memorial de Réplica. Párrafo 137.
[218] Memorial de Réplica. Párrafo 138.
[219] Memorial de Réplica. Párrafo 140.
[220] Memorial de Réplica. Párrafos 143 y siguientes.
[221] Memorial de Réplica. Párrafo 147.
[222] Memorial de Réplica. Párrafo 148.
[223] Memorial de Cierre de los Demandantes. Párrafos 104 y 114.
[224] Memorial de Cierre de los Demandantes. Párrafo 104.
[225] Memorial de Cierre de los Demandantes. Párrafo 105.

de Transacción, lo que consta en la propia declaración como testigo de Michael Ventura aportada por los Demandados[226].

b. Posición de los Demandados

414. Los Demandados niegan en general las acusaciones formuladas por los Demandantes, e indican que se trata de simples alegaciones de éstos[227], afirmando que *"no han actuado de mala fe, no han causado daño alguno que les genere obligación de indemnizar. Por lo demás, los hechos en los que se hace consistir la pretendida mala fe de los demandados son todos hechos anteriores a la celebración del contrato y no se entiende cómo se puede pretender que los mismos constituyan un incumplimiento al contrato"*[228].

415. Agregan, en este sentido, que no concurrieron a celebrar los Contratos de Transacción debidamente asesorados por abogados[229]. De hecho dichos Contratos habrían sido elaborados unilateralmente por abogados de los Demandantes[230]. Alegan también que los Contratos de Transacción no se habían suscrito en inglés, que era el idioma que mejor manejaban, sino en español[231].

416. Asimismo, señalan que las actuaciones en base a las cuales los Demandantes reprochan mala fe a los Demandados habrían ocurrido en todo caso antes de la suscripción de los Contratos de Transacción[232].

417. Los Demandados sostienen que en realidad son los Demandantes quienes han obrado de mala fe y que los antecedentes de los Contratos de Transacción fueron en realidad varias actuaciones fraudulentas, engañosas y contrarias a la buena fe por parte de los Demandantes, quienes pretendieron despojar a los Demandados de sus derechos de accionistas de Lafrancol y les engañaron respecto del valor real de su participación en la misma[233]. En este sentido, agregan que todas las actuaciones de las Demandantes fueron de hecho objeto de la Denuncia Penal por el delito de estafa[234], y a partir de ello plantean que en realidad son los Demandantes quienes han cometido una infracción a la buena fe[235].

## 2. DECISIÓN DEL TRIBUNAL

418. El Tribunal nota, en primer término, que las alegaciones formuladas por los Demandados, por vía de defensa, en cuanto a (i) la ausencia de asesoría legal de los Demandados en la negociación y cierre de los Contratos de Transacción, y (ii) la supuesta infracción de un deber de buena fe objetiva por parte de los Demandantes, deben desestimarse por las razones ya consignadas en el Laudo Arbitral[236].

---

[226] Memorial de Cierre de los Demandantes. Párrafo 117.
[227] Memorial de Contestación. Párrafo 133.
[228] Memorial de Contestación. Párrafo 148
[229] Memorial de Contestación. Párrafo 16.
[230] Memorial de Contestación. Párrafo 25.
[231] Transcripción de la Audiencia. Página 46.
[232] Memorial de Contestación. Párrafo 284.
[233] Memorial de Contestación. Párrafo 286.
[234] Memorial Contestación. Párrafo 287.
[235] Memorial de Cierre de los Demandados. Párrafo 463.
[236] Laudo Arbitral. Párrafos 262 a 268 y 389 a 404.

419. Los Demandantes sostienen que los Demandados han obrado de mala fe y que los hechos que antecedieron y sucedieron a la suscripción de los Contratos de Transacción dan cuenta de una estrategia implementada por los Demandados para inducir a los Demandantes *"a pagarles, sin contraprestación alguna, unas sumas de dinero a las que no tenían derecho, mediante la ejecución de actos jurídicos, cuyas consecuencias jurídicas desconocen, niegan o controvierten, eventualmente"*[237]. Esta pretensión que formularon los Demandantes desde el inicio del Arbitraje, tuvo su contracara en la solicitud correlativa de los Demandados de que se declarase la nulidad o ineficacia de los Contratos de Transacción por una infracción de la buena fe objetiva de los Demandantes antes, y con motivo de la firma de los Contratos de Transacción. Es decir, ambas Partes se reprochan recíprocamente el haber obrado de mala fe en el cierre de los Contratos de Transacción.

420. El punto de partida del análisis del Tribunal descansa en la normatividad colombiana, específicamente en el CCC, según el cual (a) todo contrato legalmente celebrado es ley para las partes y no puede ser invalidado sino por mutuo consentimiento o por causas legales[238], y; (b) la buena fe se presume y la mala fe debe probarse[239], ambos principios ya explicados en el Laudo Arbitral[240]. Lo que parecen estar alegando los Demandantes es el supuesto de dolo como vicio del consentimiento, por una parte, y de conducta que agrava el incumplimiento contractual, por la otra.

421. En cuanto al primer aspecto, esto es, el dolo como un vicio del consentimiento, éste derivaría — a juicio de los Demandantes- de las maquinaciones y argucias de los Demandados para inducir a la celebración de los Contratos de Transacción que habrían viciado el consentimiento de los Demandantes.

422. Al respecto, el Tribunal advierte que la carga de la prueba del dolo le corresponde a quien la alega[241] y no está demostrado que los Demandados tuvieran, al momento de negociar y firmar el contrato, la intención clara de no cumplirlo o que la negociación y posterior firma de los Contratos fueran el resultado de una maquinación

423. En efecto, el Tribunal Arbitral, luego de consideradas las alegaciones y pruebas aportadas por las Partes, desestima esta pretensión de los Demandantes porque no hay en el expediente prueba que demuestre que los Demandados habrían suscrito los Contratos de Transacción mediante maquinaciones o argucias y a sabiendas de que no los cumplirían o con la intención de no cumplirlos. El Tribunal Arbitral concluye que los Contratos de Transacción fueron celebrados por las Partes con la genuina intención de ser cumplidos y que fueron fundamentalmente hechos posteriores a la firma de los Contratos de Transacción los que dieron lugar a las conductas que ahora se reprochan las partes[242].

424. La prueba que obra en el expediente indica que es a partir del momento en que se hace pública la venta de Lafrancol a CFR, realizada en agosto de 2012, que los Demandados incurren en las actuaciones que cuestionan los Demandantes, actuaciones que, como se concluye más adelante en el Laudo Arbitral, suponen en algunos casos un incumplimiento de los Contratos de

---

[237] Memorial de Demanda. Párrafo 133.
[238] CCC. Artículo 1602.
[239] CCC. Artículo 769.
[240] Laudo Arbitral. Párrafos 152 a 162 y 402 a 404.
[241] CCC. Artículo 1757: Persona con la carga de la prueba. Incumbe probar las obligaciones o su extinción al que alega aquéllas o ésta.
[242] Laudo Arbitral. Párrafos 324 a 351.

Transacción. Así, de modo consistente las declaraciones de Esther Ventura[243], Viviane Ventura[244], Michael Ventura[245] y del asesor de los Demandados, Jaime Lombana[246] confirman que la venta de Lafrancol a CFR fue lo que determinó la conducta de los Demandados que ahora cuestionan los Demandantes.

425. Lo anterior es aplicable a la conducta de ambos Demandados. Tanto la posición de Viviane Ventura en cuanto a que no habría perdido la calidad de accionista de Lafrancol, como la posición de Michael Ventura en cuanto a que los Demandantes no le habían devuelto sus acciones (que se habían colocado en cabeza de una tercera persona) pese a sus requerimientos y que no le han pagado el precio que le correspondía recibir por tales acciones, se han manifestado con posterioridad a la venta de Lafrancol, esto es, más de dos años después de la celebración de los Contratos de Transacción que habían sido -hasta ese momento- cumplidos por las Partes, sin que medias en disputas o conflictos.

426. Los Demandados manifestaron tener alguna experiencia en la celebración de contratos internacionales en sus respectivos ámbitos de actuación profesional[247]. Si bien los Contratos de Transacción fueron redactados por el abogado de los Demandantes y propuestos para firma en un período relativamente corto de tiempo, fueron precedidos en el caso de Michael Ventura por meses de negociación en cuanto a la valoración de su participación en Lafrancol. Asimismo, ambos Demandados participaron en la negociación de los Contratos de Transacción con asistencia letrada, y decidieron cerrar con carácter definitivo las diferencias que los oponían a los Demandantes con relación a la titularidad y transferencia de sus acciones en Lafrancol al suscribir los Contratos de Transacción. Ambos Demandados percibieron los pagos convenidos en los referidos Contratos de Transacción, los cuales incluso elevaron al carácter de "Condición Suspensiva" para la exigibilidad y ejecutabilidad de los Contratos de Transacción[248].

---

[243] Transcripción de la Audiencia. Páginas 93 y 94 (Sin embargo, a los 2 años, 2 años de esfuerzo, de trabajo, que nombramos un gerente de multinacional, 2 años de reforzar la empresa más y más, y 2 años en que apareció una empresa chilena que estaba muy necesitada de comprar, que iba a tener unas sinergias importantísimas dentro de su grupo, por el aporte de Lafrancol a su grupo, entonces nos ofreció un dinero bastante interesante, nosotros no queríamos vender, pero la verdad es que la mayoría de los socios de la familia, mis hermanos y mis otros primos sí querían vender. Entonces vendimos, pero ahí empezaron los problemas. Apenas Viviane y Mickey supieron que habíamos vendido a ese precio empezaron a desplegar una serie de actividades, lo primero fue que me demandaron penalmente por estafa agravada, después Viviane empezó a contactar los medios de comunicación, porque me lo dijeron varios amigos, y logró sacar, por La W, que es una, tal vez ustedes deben conocer, es una emisora que tiene toda la audiencia de los empresarios, de los políticos y de la gente que en realidad está activa en este país". -énfasis del Tribunal-)

[244] Transcripción de la Audiencia. Página 180 ("Sí, pero tengo que decirle algo, en ese momento [que se presenta la Segunda Conciliación] Laftancol ya estaba vendida a Recalcine y en ese momento nosotros dijimos: si este contrato nos quita todos nuestros derechos judiciales, porque eso es lo que ese contrato hace, ese contrato nos bloquea la boca y nos amarra las manos y nos pone contra el fusilamiento; no podemos hablar, ni decir, ni contar; nos dimos cuenta que fuimos estafados…" -énfasis del Tribunal-)

[245] Transcripción de la Audiencia. Página 11 ("Pues firmamos un contrato que me compraba mis acciones por 3.800.000 y pensé que era un contrato en good faith de ellos y de yo, y después cuando descubrí un año y medio alrededor que la compañía había vendido por 50 y pico millones, pensé que me habían engañado".-énfasis del Tribunal-).

[246] Transcripción de la Audiencia. Página 143 ("[...] Cuando yo estaba preparando esa denuncia se dio el "acuerdo de transacción", lo que evidentemente terminaba cualquier conflicto. Después, mucho tiempo después, casi año y medio después del año 2010, puede ser marzo, no tengo las fechas con claridad, ellos se enteran que la compañía habría sido vendida por una suma más de 10 veces superior a la supuesta valoración que le presentaron a Michael Ventura…").

[247] Transcripción de la Audiencia. Páginas 12 y 13, y Página 184, respectivamente.

[248] D-1.a y D-1.b. Cláusula Décima Segunda.

427. Así, el Tribunal Arbitral considera que en ausencia de elementos probatorios que revelen la existencia de un engaño o falta de buena fe de parte de los Demandados, el Tribunal no puede acceder a la pretensión de los Demandantes.

428. En los Contratos de Transacción habían sendas cláusulas que atribuían a la solución alcanzada por las Partes en los mismos el carácter de cosa juzgada, con efecto vinculante, y con una expresa declaración de que dichos acuerdos no violaban ninguna ley o norma específica:

"TERCERA: Responsabilidad.- Las Partes reconocen expresamente que esta Transacción pone fin a todas y cada una de las diferencias existentes entre las Partes respecto de su condición de accionistas y/o administradores de LAFRANCOL S.A. y en consecuencia, se relevan mutuamente de cualquier tipo de responsabilidad por dichos conceptos, con la amplitud y alcance que en la parte anterior de este contrato se ha indicado.

CUARTA: Efecto.- Las Partes expresan su voluntad de que esta Transacción surta los efectos de una sentencia ejecutoriada en última instancia en los términos del artículo 2483 del Código Civil, y de que las renuncias contenidas en este Contrato, surtan plenos efectos y tengan plena validez y fuerza legal, sea cual fuere la jurisdicción en que sean invocadas, alegadas o defendidas. Las Partes dejan constancia que celebran esta Transacción para precaver un litigio eventual en los términos y para los efectos previstos por el Título 39 del Libro 4° del Código Civil Colombiano.
[...]
7.4 Efecto Vinculante. Una vez contraídas y sujetas a las condiciones previstas en el presente contrato, las obligaciones a su cargo bajo el presente contrato son obligaciones plenamente vinculantes y exigibles respecto de cada una de ellas en caso de incumplimiento.

7.5 Ausencia de Violación o Conflicto. La celebración, ejecución y cumplimiento de este Contrato no generará para ninguna de las Partes (i) el incumplimiento o la violación de las disposiciones de cualquier contrato del que sean partes; y (ii) la violación de alguna ley, decreto, resolución, reglamento y, en general, cualquier normatividad u orden judicial o administrativa que les fuere aplicable"[249].

429. De ello se sigue que, en ausencia de otros elementos distintos de los previstos por las Partes al momento de celebrar los Contratos de Transacción, que pudiesen revelar una intención o ánimo defraudatario, y que no fueron probados en este Arbitraje, el Tribunal concluye que los Demandantes no demostraron que los Demandados hubiesen celebrado los Contratos de Transacción con la intención de incumplirlos.

430. En atención a lo anterior, el Tribunal Arbitral rechaza la solicitud de los Demandantes de que se declare que los Demandados, mediante maquinaciones y argucias, indujeron a los Demandantes a suscribir los Contratos de Transacción, cuando no tenían la intención de cumplirlos.

## B. SOBRE LOS INCUMPLIMIENTOS DE LOS CONTRATOS DE TRANSACCIÓN

431. Los Demandantes atribuyen a los Demandados el incumplimiento de una serie de cláusulas contenidas en los Contratos de Transacción, entre ellas: (i) la obligación de no adelantar acciones judiciales y extrajudiciales, (ii) la obligación de confidencialidad y no divulgación, y (iii) la obligación de no referirse a Esther Ventura y Juan María Rendón, de manera pública o privada, y no referirse a ellos en términos ofensivos o despectivos.

---

[249] D-1.a que contiene el Contrato de Transacción entre Michael Ventura y los Demandantes. El Anexo D-1.b que contiene el Contrato de Transacción entre Viviane Ventura y los Demandantes replica el mismo lenguaje.

432. Sin embargo, el análisis sobre el incumplimiento de tales obligaciones se hace en el contexto de tres hechos o situaciones concretas que habrían provocado los mismos consistentes en: (i) la presentación de la Denuncia Penal y su impacto público a través de la difusión por medios de comunicación, (ii) la presentación de la Segunda Conciliación, y (iii) la participación de Viviane Ventura en una entrevista en La W Radio. En consecuencia, más adelante, el Tribunal analizará cada una de estas situaciones a fin de determinar si han configurado un incumplimiento de los términos de los Contratos de Transacción.

1. POSICIÓN DE LAS PARTES

   a. Posición de los Demandantes

433. Los Demandantes estiman incumplida la obligación de no adelantar acciones judiciales en contra de los Demandantes, basados en el hecho de que con fecha 20 de diciembre de 2012, Viviane y Michael Ventura presentaron ante la Fiscalía General de la Nación, en Colombia, la Denuncia Penal en contra de Esther Ventura por la posible comisión del delito de estafa[250]. Los Demandantes estiman incumplidas las obligaciones adquiridas en los Contratos de Transacción de no "iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole..."[251]. Alegan que el incumplimiento consiste en haber presentado una denuncia penal, basada en hechos sucedidos con anterioridad a la suscripción de dichos contratos, a pesar de haber declarado en ellos que las actuaciones de los Demandantes no constituían delitos y que, por tanto, renunciaban a iniciar acciones de dicha naturaleza.

434. A mayor abundamiento, respecto de los hechos en que se basa la Denuncia Penal, los Demandados habían asumido una obligación de confidencialidad, la cual también fue incumplida al momento de presentarla, poniendo en conocimiento público la disputa[252]. Lo anterior porque la información relativa a la Denuncia Penal y los hechos en que se funda fue objeto de difusión por diversos medios de comunicación, mediante publicaciones impresas y digitales e incluso emisiones radiales[253].

435. Así, los Demandantes alegan que la presentación de la Denuncia "representó múltiples violaciones a los Contratos de Transacción, puesto que no solo implicó un desconocimiento a la obligación de no interponer acciones judiciales en contra de los Demandantes, sino que significó la divulgación de las circunstancias que rodearon la celebración del Contrato de Transacción y la referencia expresa en medios de comunicación a los demandantes"[254].

436. Frente a los argumentos otorgados por los Demandados relativos a la nulidad de las Cláusulas 2.1 y 2.2 de los Contratos de Transacción, los Demandantes alegan que mientras no exista declaratoria de nulidad de un contrato, éste es completamente válido y las Partes están obligadas a cumplirlos de manera íntegra. Por otro lado, los Demandantes señalan que la transacción no impide el acceso a la justicia sino que por el contrario, la materializa con efecto de cosa juzgada, por lo que mal podrían los demandados alegar que no tuvieron acceso a la misma. Por último, al haber declarado los Demandados que las materias sobre las cuales recaen los Contratos de

---

[250] Memorial de Demanda. Párrafo 103.
[251] Memorial de Demanda. Párrafo 105.
[252] Memorial de Demanda. Párrafos 107 y 108.
[253] Memorial de Demanda. Párrafos 110 y siguientes.
[254] Memorial de Demanda. Párrafo 124.

Transacción no tenían contenido penal, la presentación posterior de la Denuncia Penal referida a los mismos hechos constituye un desconocimiento e incumplimiento de sus propias declaraciones[255].

437. Por último, los Demandantes sostienen que la suscripción de los Contratos de Transacción implica que las Partes ya habían sometido las inconformidades respecto de las actuaciones de cada uno a un mecanismo de solución de conflictos, como es el referido contrato, y que, como consecuencia de ello, las habían resuelto con todos los efectos propios de una resolución judicial[256]. Por otro lado, y en respuesta a la defensa de los Demandados en orden a que la denuncia no es en estricto sentido una acción sino un acto de carácter meramente informativo, alegan los Demandantes que no cabe hacer una interpretación restrictiva del objeto de la transacción, cuando no cabe duda que las Partes previeron y transigieron sobre la posibilidad de presentar denuncias o dar inicio a investigaciones[257]. Así, *los Demandados incumplieron la obligación de no demandar, no denunciar y no dar inicio a investigaciones y procedimientos similares con ocasión de las controversias zanjadas en los Contratos de Transacción*[258].

438. Adicionalmente, los Demandantes señalan que los Demandados también han incumplido la obligación de no adelantar acciones extrajudiciales en contra de Lafrancol y sus vinculados. Dicho incumplimiento se funda en una solicitud de convocatoria a Audiencia de Conciliación ante el Centro de Arbitraje y Conciliación de la Cámara de Comercio de Bogotá presentada por los Demandados con fecha 26 de julio de 2013, con el propósito de citar a Lafrancol para dirimir una controversia en la cual los solicitantes pretendían, cada uno, la restitución del 3.44% del total de las acciones de Lafrancol[259] (ya identificada en este Laudo como la Segunda Conciliación).

439. Los Demandantes indican que esta Segunda Conciliación se orientó directamente a desconocer la obligación de no *divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción*[260]. En primer lugar, la solicitud de convocatoria a la conciliación se hizo respecto de Lafrancol y no se citó a dicha audiencia a Esther Ventura o a Juan María Rendón, aun cuando sus acciones ya habían sido vendidas a CFR y sabiendo los Demandados que Lafrancol había firmado los Contratos de Transacción únicamente en calidad de beneficiaria. Por lo tanto, las disputas eran entre Viviane Ventura y Michael Ventura, por un lado, y Esther Ventura y Juan María Rendón, por el otro, respecto de su calidad de accionistas en Lafrancol, y nada tenía que ver Lafrancol con dichas disputas ni con los hechos relacionados con la celebración del Contrato[261]. Agregan los Demandantes que tampoco era procedente la pretensión de restitución de acciones por parte de Lafrancol, ya que ésta no era titular de dichas acciones y mal podría disponer de ellas[262].

440. Sin perjuicio de todo lo anterior, Viviane y Michael Ventura presentaron la Segunda Conciliación *únicamente en contra de Lafrancol, a sabiendas de su improcedencia, de la violación contractual que ella implicaba y de la divulgación de información en contra de los Demandantes que la misma generaría y que*

---

[255] Memorial de Réplica. Párrafo 116.
[256] Memorial de Réplica. Párrafo 123.
[257] Memorial Posterior a la Audiencia de los Demandantes. Párrafo 88.
[258] Memorial Posterior a la Audiencia de los Demandantes. Párrafo 89.
[259] Memorial de Demanda. Párrafo 79.
[260] Memorial de Demanda. Párrafo 84.
[261] Memorial de Demanda. Párrafo 85.
[262] Memorial de Demanda. Párrafo 86.

*tendría como efecto generar cuestionamientos entre los posteriores accionistas de Lafrancol*[263]. Dicho efecto se produjo, pues la Solicitud hizo creer a los nuevos accionistas de Lafrancol que existía una controversia real con los accionistas anteriores que no había sido resuelta y que podría poner en riesgo la titularidad de su participación accionaria. Esto incluso llevó a ejercer los mecanismos de indemnización contenidos en el contrato de compraventa de acciones entre los anteriores accionistas de Lafrancol y CFR. Los Demandantes señalan que es evidente que la estrategia seguida con la presentación de esta Segunda Conciliación era ejercer presión sobre los Demandantes y así aumentar su capacidad negociadora[264]. Todo esto ya que la conciliación es un mecanismo diferente e innecesario para el trámite de resolución de controversias escogido por las partes, el cual es el arbitraje.

441. A juicio de los Demandantes, la presentación de la Segunda Conciliación implicó igualmente el evidente incumplimiento de la obligación de no *"iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, sea judicial o extrajudicial..."*. Tal incumplimiento es evidente ya que en el mismo texto de la Solicitud se hace referencia a las disputas que dieron origen a los Contratos de Transacción.[265] Los Demandantes también alegan que con la presentación de la Segunda Conciliación se violó la obligación de confidencialidad contenida en los Contratos de Transacción[266].

442. Respecto del argumento de los Demandados consistente en que la Segunda Conciliación no constituyó el ejercicio de una acción, sostienen los Demandantes que la conciliación es un mecanismo alternativo de solución de conflicto, por tanto, *"quien presenta una solicitud de conciliación, está buscando resolver un conflicto con la contraparte"*[267]. Pero si dicho conflicto ya fue solucionado previamente mediante un contrato de transacción, la solicitud implica desconocer que dicho conflicto ya fue resuelto mediante un acuerdo con efectos de cosa juzgada[268].

443. En cuanto al argumento de los Demandados según el cual el objeto de la Segunda Conciliación no fue el mismo que el objeto de los Contratos de Transacción, los Demandantes indican que las partes establecieron como objeto de los Contratos de Transacción *"todas las diferencias surgidas con ocasión de todas sus relaciones societarias"* dentro de las cuales se cuentan los conflictos sobre sus calidades de accionistas- lo que incluye los derechos derivados de tal calidad- y los conflictos derivados de su calidad de accionistas y/o administradores de Lafrancol. De esto concluyen que los valores supuestamente adeudados a los Demandados por concepto de dividendos sí estaban incluidos dentro del objeto de los Contratos de Transacción[269].

444. Finalmente, los Demandantes señalan que los Demandados han incumplido, además, las obligaciones de no divulgar cualquier información relacionada con la existencia y características de los Contratos de Transacción, la obligación de no referirse a Esther Ventura y Juan María Rendón, de manera pública o privada, y no referirse a ellos en términos ofensivos o despectivos.

---

[263] Memorial de Demanda. Párrafo 87.
[264] Memorial de Demanda. Párrafos 88 y siguientes.
[265] Memorial de Réplica. Párrafo 72.
[266] Memorial de Réplica. Párrafos 96 a 112.
[267] Memorial de Demanda. Párrafos 88 y siguientes.
[268] Memorial de Réplica. Párrafos 74 y 75.
[269] Memorial de Réplica. Párrafos 86 y siguientes.

445. El incumplimiento de estas obligaciones está dado por la Entrevista radial otorgada por Viviane Ventura el día 8 de febrero de 2013 para la radio "La W", una emisora de gran cobertura en Colombia y en la franja de mayor "rating". En dicha entrevista Viviane Ventura describió lo que a su juicio habían sido las actuaciones de su prima Esther Ventura, en relación con las acciones de Lafrancol, y cómo había logrado establecer que Esther Ventura había incurrido en un fraude en perjuicio suyo, por lo que había presentado una denuncia penal en su contra[270].

446. Concluyen los Demandantes que con estas declaraciones Viviane Ventura violó varias disposiciones del Contrato de Transacción suscrito con los Demandantes, en la medida en que *"no sólo divulgó y dio a conocer a terceros toda la información relacionada con dicho Contrato, sino que, además, se refirió públicamente a su prima Esther y a su conducta, modo de vida, costumbres o actividades, usando calificativos y frases ofensivas"*[271]. Por otro lado, respecto de Michael Ventura su incumplimiento se reputa del hecho que éste *"permitió, toleró y aprovechó las declaraciones públicas"*[272] hechas por su hermana, en donde ésta lo mencionaba como partícipe de los hechos y circunstancias anteriores a la suscripción de los Contratos de Transacción; como críticos de las actuaciones de Esther Ventura y Juan María Rendón; y como sujeto activo de las denuncias penales ejercidas.

447. Agregan que, como era de esperarse, de la cobertura de las declaraciones realizadas en medios de comunicación de amplia difusión a nivel nacional, se creó una ola expansiva respecto de ellas ampliándose así el alcance de la divulgación hecha por los Demandados. En efecto, las declaraciones se hicieron noticia, siendo objeto de reseñas en sitios de noticias de internet, en diarios impresos de circulación nacional y se hizo referencia al tema en las secciones de noticias de las radios.[273]

448. Indican también que Viviane Ventura acusó públicamente y sin fundamento a Esther Ventura de haber cometido fraudes y el delito de estafa, y divulgó que había efectuado una denuncia penal en su contra. Con estas afirmaciones los Demandados incumplen la obligación de no referirse a su contraparte y de no referirse a ella en términos ofensivos, ya que la imputación de delitos debe ser considerado ofensivo. Con esto, además, Viviane Ventura violó la reserva sumarial de una investigación que había sido iniciada por la Fiscalía General de la Nación con ocasión de la denuncia penal interpuesta por ella un tiempo atrás. Incluso, los Demandantes alegan que conocieron la denuncia penal interpuesta en su contra por las declaraciones realizadas por Viviane Ventura[274].

449. Frente al argumento de los Demandados de que la divulgación de los antecedentes y suscripción de los Contratos de Transacción se dio con ocasión de la Denuncia Penal, los Demandantes responden que aun cuando el inicio de dicha cobertura mediática fuera la referida denuncia, ello no los exonera de su incumplimiento contractual pues la sola presentación de la Denuncia Penal constituye, por sí sola, un incumplimiento de las obligaciones de reserva y confidencialidad relativa a los Contratos de Transacción y a las personas de los Demandantes[275]. Es más, aún si se aceptara que la presentación de la Denuncia Penal y los hechos relacionados con ella ya eran de público conocimiento al momento de la entrevista radial de Viviane Ventura, ello no excluye el

---

[270] Memorial de Demanda. Párrafo 56.
[271] Memorial de Demanda. Párrafo 58.
[272] Memorial de Demanda. Párrafo 60.
[273] Memorial de Demanda. Párrafos 63 y siguientes. Se acompañan además como prueba los Anexos D-26, D-27, D-28, D-29, D-30, D-31, los cuales contienen artículos de prensa o emisiones de radio en que se hace referencia a esta noticia.
[274] Memorial de Demanda. Párrafos 70 y siguientes.
[275] Memorial de Réplica. Párrafos 13 y siguientes.

incumplimiento de parte de Viviane Ventura al haber dado la entrevista. Además, el interés de los medios por la noticia de la disputa entre las Partes aumentó considerablemente con posterioridad a dicha declaración lo que contribuyó a la difusión de la noticia[276].

450. Por otro lado, los Demandantes expresan que no fue Esther Ventura quien divulgó primero los antecedentes de los Contratos de Transacción y su suscripción, sino que fue Viviane Ventura quien contactó a los medios de comunicación para hacer pública su versión de los hechos. Señalan que prueba de ello es que antes de la entrevista, en los meses de enero y febrero de 2013 varios periodistas contactaron a Esther Ventura para que ella declarara en los medios y diera también su versión de la controversia. Fue así como Esther Ventura supo que existía la posibilidad de que Viviane Ventura realizara una declaración pública en su contra, y es ésta la razón por la cual preparó un escrito de réplica que se leyó luego de la declaración de Viviane Ventura. Dicho documento fue remitido para su lectura sólo si Viviane Ventura se refería a dicho tema, pero Esther Ventura no hizo llegar a los medios los Contratos de Transacción suscritos por las Partes[277].

451. Los Demandantes señalan que era de esperarse que la cobertura de la controversia generara una onda expansiva y que precisamente, lo que pretendió evitarse con las obligaciones de confidencialidad, no divulgación y no hacer referencia a la contraparte en los Contratos de Transacción era que la información respectiva no se trasmitiera a terceros, incluidos los medios, y se perdiera así el control sobre los términos en que la misma fuera divulgada y reproducida[278].

452. Finalmente, en el Memorial posterior a la Audiencia, los Demandantes alegan que Viviane Ventura entregó al presidente de Eurofarma información sobre la existencia y contenido de los Contratos de Transacción, lo cual también constituyó una violación de su obligación de confidencialidad y no divulgación[279].

b. Posición de los Demandados

453. En cuanto a la obligación no adelantar acciones judiciales en contra de los Demandantes, los Demandados señalan que no ha existido incumplimiento alguno a esta obligación por cuanto no han iniciado una acción judicial contra Esther Ventura y Juan María Rendón[280]. En efecto, argumentan que la Denuncia Penal como acto procesal no corresponde en estricto sentido a una acción judicial, pues tiene carácter meramente informativo *"en tanto se limita a poner en conocimiento de la autoridad encargada, la perpetración de una conducta posiblemente ilícita. No constituye la imputación en sí misma de responsabilidad, ni la presentación de una pretensión contra el posible autor"*. Agregan que sólo la autoridad penal competente es titular del ejercicio de la acción penal[281]. Los Demandados concluyen que la denuncia es un acto puramente informativo presentado ante la autoridad encargada de investigar y es dicha autoridad la que decide, en base a su investigación, si procede o no la iniciación de un proceso penal[282]. No equivale a una pretensión contra el posible infractor ni constituye adelantamiento de acción judicial alguna en contra de los Demandantes.

---

[276] Memorial de Réplica. Párrafo 16.
[277] Memorial de Réplica. Párrafos 25 y siguientes.
[278] Memorial de Réplica. Párrafo 47.
[279] Memorial Posterior a la Audiencia de los Demandantes. Párrafo 120.
[280] Memorial de Contestación de Demanda. Párrafo 300.
[281] Memorial de Contestación de Demanda. Párrafo 301.
[282] Memorial de Contestación de Demanda. Párrafo 303.

454. Respecto de la infracción a la obligación de confidencialidad, los Demandados señalan que la presentación de una denuncia no hace por sí sola de público conocimiento las controversias existentes entre las partes. Lo anterior porque la denuncia se hace en forma exclusiva ante la Fiscalía General de la Nación, autoridad que debe realizar sus actuaciones en observancia de los principios de reserva y confidencialidad propios de una investigación penal. Si se infringieron dichos principios en el procedimiento llevado por la Fiscalía, las violaciones deben predicarse de dicha autoridad y no de los Demandados por haber efectuado la Denuncia Penal[283].

455. En segundo lugar, respecto de la obligación de no adelantar acciones judiciales en contra de Lafrancol y sus vinculados, los Demandados estiman que tampoco existe incumplimiento ya que, aun cuando la renuncia de acciones contenidas en las Cláusulas 2.1 y 2.2 de los Contratos de Transacción se haya efectuado con expresiones o enunciaciones genéricas, por mandato de la ley, éstas sólo deben entenderse realizadas en relación con las controversias precisas que han sido objeto de los Contratos de Transacción[284].

456. Los Demandados indican que respecto de Michael Ventura, las disputas existentes con anterioridad a la suscripción de los Contratos de Transacción estaban referidas a la solicitud de restitución de su participación accionaria y a su registro como accionista en los libros de la Compañía junto con la expedición del certificado correspondiente. Los Demandantes señalan que tales controversias fueron objeto de una conciliación anterior entre las Partes, en julio del año 2010. Sin embargo, los Demandados argumentan que *"ninguna de las solicitudes materia de la citada conciliación estaba referida al reconocimiento y pago de los dividendos que hubiere producido su participación accionaria con anterioridad a dicha fecha ni el reconocimiento de perjuicios derivados de un mayor valor de las acciones"*[285]. La única materia relacionada con dividendos consistía en conocer cuál era la política de dividendos, pero no se solicitaba que éstos fueran reconocidos y pagados. Agregan que lo mismo ocurría respecto de Viviane Ventura: las reclamaciones previas no hacían referencia al reconocimiento y pago de los dividendos, sino simplemente al reconocimiento de su condición de accionista y a la restitución de su condición de tal.

457. Así, respecto de los Demandados Viviane y Michael Ventura afirman que la materia relacionada con el reconocimiento y pago de los dividendos no hacía parte de la disputas previas entre las partes y por lo mismo la renuncia a los derechos y acciones contenidas con los Contratos de Transacción no pueden entenderse *"extensivas a las acciones procedentes para solicitar el reconocimiento y pago de los dividendos causados y pendientes a favor de ellos"*[286].

458. De otra parte señalan los Demandados que la Segunda Conciliación no constituye el ejercicio de una acción, si no que la conciliación regulada por la ley 640 de 2001 constituye un mecanismo alternativo de solución de conflictos, la cual no supone la formulación de pretensiones en contra de la parte citada al procedimiento, sino *"únicamente la invitación a explorar arreglos voluntarios en relación con las cuestiones materia de la misma"*[287]. Aun cuando la conciliación extrajudicial, de la forma en que está regulada en el ordenamiento jurídico, es actualmente un requisito de procedibilidad para acudir a la administración de justicia, ello no desnaturaliza su esencia de mecanismo alternativo de solución de controversias.

---

[283] Memorial de Contestación de Demanda. Párrafo 304.
[284] Memorial de Contestación. Párrafos 307 y siguientes.
[285] Memorial de Contestación. Párrafo 313.
[286] Memorial de Contestación. Párrafos 316 y siguientes.
[287] Memorial de Contestación. Párrafo 319.

459. Junto con esto, señalan que los Demandantes no tienen legitimación para solicitar que se declare dicho incumplimiento ya que la única parte del contrato que tiene interés jurídico para solicitar dicha declaración es Lafrancol, por ser la parte frente a la cual se habría infringido la obligación de no hacer.

460. Respecto del incumplimiento de la obligación de confidencialidad referida a la existencia y características de los Contratos de Transacción, los Demandados señalan que dicho incumplimiento no puede ser imputado a Michael Ventura, por cuanto éste no ha hecho declaración alguna a los medios de comunicación ni a terceros respecto del Contrato de Transacción y sus antecedentes. Por otro lado, indican que la presentación de la Denuncia Penal no constituye una violación al deber de confidencialidad, ya que la Fiscalía General de la Nación no puede considerarse como un tercero. Tampoco la Denuncia Penal implica que la información y antecedentes denunciados se hagan públicos[288].

461. Por otro lado al tiempo de la entrevista realizada por Viviane Ventura el día 8 de febrero de 2013, la Denuncia Penal y los hechos en que se fundaba ya eran de conocimiento público pues habían sido informados por la misma emisora en diciembre de 2012. Además, señalan que fue Esther Ventura quien divulgó primero dichos antecedentes, mediante un comunicado escrito que otorgó a la misma emisora, en la cual *"hizo alusión a los antecedentes del contrato y el contenido y características mismas de los contratos de transacción celebrados con Viviane y Michael Ventura"*[289]. Asimismo, fue la demandante la que entregó a la emisora el documento suscrito por Viviane Ventura. Así, señalan los Demandantes que cuando Viviane Ventura se pronunció sobre el Contrato de Transacción por primera vez y se refirió al pago aceptado por el valor de sus acciones, la información ya había sido divulgada por Esther Ventura y, por consiguiente, había autorizado su divulgación y ya no era confidencial[270]. Los Demandados añaden que se podría considerar que operó el mutuo disenso de las Partes en relación con la obligación de confidencialidad pactada en los Contratos de Transacción, toda vez que tanto Esther Ventura como Viviane Ventura hicieron referencia, a través de los medios de comunicación, a la existencia de los Contratos de Transacción y a los antecedentes que llevaron a su celebración[291].

462. En lo relativo al incumplimiento de la obligación de no referirse, ni referirse en términos ofensivos a los Demandantes, así como de la obligación de no calificar las conductas, costumbres o actividades de los Demandantes, señalan los Demandados que dicha estipulación no fue consignada en el Contrato de Transacción con Michael Ventura y por ende, ninguna violación puede imputarse al mismo. Por lo pronto, Michael Ventura no ha hecho declaración alguna en ese sentido. En relación con Viviane Ventura, ninguna referencia se ha hecho por parte de ella respecto de Juan María Rendón[292].

463. Los Demandados expresan que si dicha obligación produce algún efecto queda a juicio del Tribunal Arbitral el *"verdadero alcance que puede tener el deber de evitar el uso de calificativos, frases ofensivas o similares para determinar si ha existido una obligación al mismo"*[293]. Señalan los Demandados que no

---

[288] Memorial de Contestación. Párrafos 326 y 327.
[289] Memorial de Contestación. Párrafo 330.
[290] Memorial de Contestación. Párrafo 331.
[291] Memorial de Contestación. Párrafos 331 y 332.
[292] Memorial de Contestación. Párrafos 336 y 337.
[293] Memorial de Contestación. Párrafo 338.

injurian quienes efectúan aseveraciones ciertas, pues la *"veracidad de las mismas excluye toda antijuridicidad o todo reproche al acto de expresar tales afirmaciones"*.[294]

## 2. DECISIÓN DEL TRIBUNAL

464. El Tribunal Arbitral examinará los eventuales incumplimientos de los Demandados al hilo de los tres hechos sobre los cuales los Demandantes descansan para atribuir tales incumplimientos: esto es, (i) la Denuncia Penal y su difusión por medios de comunicación, (ii) la Segunda Conciliación, y (iii) la Entrevista de Viviane Ventura en W Radio.

465. En forma previa a su examen detallado, el Tribunal nota que las siguientes son las cláusulas de los Contratos de Transacción invocadas por los Demandantes como incumplidas con motivo de tales hechos:

- Contrato de Transacción suscrito entre los Demandantes y Michael Ventura:

*"2.1 En beneficio del Comprador, el Vendedor se obliga a no iniciar o si lo hubiere hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Vendedor [sic] y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal.*

*En igual sentido, el Vendedor renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Comprador y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal..."* (en adelante, la **"obligación de no adelantar acciones judiciales y/o extrajudiciales"**)

*"QUINTA: Confidencialidad.- Salvo por lo que se determine en la presente Transacción, ninguna de las Partes, incluidos sus funcionarios o asesores, podrá divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción, a menos que (i) dicha información sea de dominio público en la fecha de suscripción del presente contrato; (ii) ello sea solicitado o exigido por la autoridad competente, en cuyo caso, antes de proceder a entregar la información solicitada, la Parte respectiva deberá enviar copia de la solicitud en cuestión a las demás Partes junto con los antecedentes del caso; ó (iii) la divulgación de la información sea autorizada por la otra Parte, autorización que no será negada de manera injustificada".*(en adelante, la **"obligación de confidencialidad"**)

- Contrato de Transacción suscrito entre los Demandantes y Viviane Ventura:

*"2.1 En beneficio del Solicitado, el Solicitante se obliga a no iniciar o si lo hubiere hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación. trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitante y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal"* (en adelante, la **"obligación de no adelantar acciones judiciales y/o extrajudiciales"**)

*"QUINTA: Confidencialidad.- Salvo por lo que se determine en la presente Transacción, ninguna de las Partes, incluidos sus funcionarios o asesores, podrá divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción, a menos que (i) dicha información sea de dominio público en la fecha de suscripción del presente contrato; (ii) ello sea solicitado o exigido por la autoridad competente, en cuyo caso, antes de proceder a entregar la información solicitada, la Parte respectiva deberá enviar copia de la solicitud en cuestión a las demás Partes junto con los antecedentes del caso; ó (iii) la divulgación de la información sea autorizada por la otra Parte, autorización que no será negada de manera injustificada".*(en adelante, la **"obligación de confidencialidad"**)

---

[294] Memorial de Contestación. Párrafo 342.

*"7.6 Respeto mutuo y reserva total: so pena que se haga exigible la cláusula penal aquí acordada, las Partes se comprometen recíprocamente a mantener en sigilo este Contrato, pero sobre todo, a omitir referirse en el futuro, pública o privadamente a la conducta, modo de vida, costumbres o actividades de la otra Parte, evitando el uso de calificativos, frases ofensivas o similares, todo lo cual se considerará una violación material del Contrato. De ser posible, las Partes simplemente omitirán referirse a la otra Parte en el futuro". (en adelante, la "obligación de respeto y reserva")*

466. Asimismo, el Tribunal Arbitral aprecia que los Demandados han sostenido que los Demandantes carecerían de legitimidad activa para promover estas reclamaciones, ante la ausencia de Lafrancol del presente Arbitraje. Estas alegaciones deben desestimarse.

467. En primer lugar, el Tribunal aprecia de la lectura de los Contratos de Transacción que ciertas obligaciones asumidas por los Demandados se asumen específicamente a favor del *"Comprador"* y del *"Solicitado"*, según dichos términos aparecen definidos en los Contratos suscritos con Michael Ventura y con Viviane Ventura, respectivamente. Asimismo, hay obligaciones recíprocas que se dan las *"Partes"* bajo tales contratos, y el término *"Partes"* también aparece definido.

468. En segundo lugar, no es controvertido y resulta de la misma lectura de los Contratos de Transacción que los Demandantes son ambos signatarios de los Contratos de Transacción y comprendidos bajo la enunciación de la expresión *"Comprador"* en el Contrato de Transacción suscrito con Michael Ventura, y de la expresión *"Solicitado"* en el Contrato de Transacción suscrito por Viviane Ventura. Asimismo, no es controvertido que el *"Comprador"* y el *"Vendedor"* son las *"Partes"* en el Contrato de Transacción suscrito con Michael Ventura, y que el *"Solicitado"* y el *"Solicitante"* son las *"Partes"* en el Contrato de Transacción suscrito con Viviane Ventura, respectivamente.

469. Adicionalmente, y en cuanto a la alegada falta de legitimación, si bien Lafrancol también integra el concepto de *"Comprador"* y *"Solicitado"* con los Demandantes, el propósito confesado de la Segunda Conciliación no era obtener un pronunciamiento de Lafrancol sino presionar a los Demandantes para reabrir los temas que ya habían sido transigidos[295]. No pueden los Demandados pretender que porque formalmente dirigieron la Segunda Conciliación contra Lafrancol, incumpliendo la obligación frente a los Demandados, no puedan estos iniciar la acción por incumplimiento y que sea Lafrancol el legitimado para iniciar este Arbitraje. De hecho, el que la Segunda Conciliación sólo se haya presentado frente a Lafrancol, y no frente a los Demandantes, es justamente lo que provoca el incumplimiento de los Demandados a los Contratos de Transacción, pues implica la divulgación de la disputa en un foro no autorizado por los Contratos de Transacción, siendo ello razón adicional de legitimación de los Demandantes en este Arbitraje.

470. Por último, y como se establece en el Laudo Arbitral, los incumplimientos reprochados a los Demandados son incumplimientos respecto de obligaciones cuyos beneficiarios eran los Demandantes en las calidades que el propio Contrato les asigna como *"Comprador"*, *"Solicitado"* y *"Parte"* de modo que están legitimados activamente para reclamar respecto de tales alegados incumplimientos y sus consecuencias. No existe ninguna cláusula de los Contratos de Transacción, ni los Demandados han invocado norma legal alguna que exijan que los Demandantes deban actuar conjuntamente con Lafrancol en este Arbitraje.

**(i) La Denuncia Penal y su difusión por medios de comunicación**

---

[295] Laudo Arbitral. Párrafos 480 a 491.

471. El Tribunal Arbitral nota que los Demandantes alegan el incumplimiento de las obligaciones de no adelantar acciones judiciales y la obligación de confidencialidad mediante la presentación de la Denuncia Penal, en cuanto algunos de los hechos en los que descansa fueron anteriores a la firma de los Contratos de Transacción.

472. Como se ha establecido en el Laudo Arbitral[296], el eje central —aunque no exclusivo- de la Denuncia Penal descansa en hechos posteriores a los Contratos de Transacción, sobre los cuales no se pronuncia este Tribunal, y al eventual impacto que éstos tendrían en los Contratos de Transacción. El Tribunal Arbitral ha advertido, asimismo, que aún tratándose de hechos anteriores a la firma de los Contratos de Transacción como la oferta de Eurofarma, dado que no está probado en este Arbitraje que estos hechos fueran conocidos por los Demandados en ese momento, también quedarían sustraídos del alcance de los mismos contratos[297].

473. El presente Laudo se refiere exclusivamente a los Contratos de Transacción, a los antecedentes de su celebración y a su ejecución tal como fueron alegados y probados o no por las Partes para los exclusivos efectos de este Arbitraje. En ese mismo contexto y como ya se ha señalado en el presente Laudo, cualquier renuncia a presentar acciones, para los exclusivos efectos de este arbitraje, solamente podría referirse a acciones relacionadas con los hechos que dieron lugar a las controversias posteriormente transigidas y no podrían incluir hechos posteriores o hechos que no hayan sido conocidos por ambas partes al momento de celebrar los Contratos de Transacción.

474. Este Tribunal no se pronuncia, ni puede pronunciarse, sobre los efectos de los Contratos de Transacción desde el punto de vista penal, ni sobre las consecuencias penales de hechos anteriores, concomitantes o posteriores a la celebración de los Contratos de Transacción. Este Laudo únicamente analiza los argumentos y pretensiones de las Partes, desde el punto de vista de derecho privado, y con base en las pruebas y elementos aportados en este procedimiento, con independencia de los demás trámites entre las Partes.

475. En todo caso, como ya se señaló en apartados anteriores de este Laudo[298], la Denuncia Penal se refiere a una serie de hechos que involucran tanto conductas anteriores (que no eran conocidas por los Demandados al momento de la celebración de los Contratos de Transacción) como posteriores a la celebración de los Contratos de Transacción, como conductas concatenadas que llevan a la posibilidad de un ilícito penal. Dichas conductas así concatenadas no solamente no pueden ser juzgadas por este Tribunal, en cuanto no fueron alegadas ni probadas, ni este Tribunal puede pronunciarse sobre sus efectos penales, sino que además no está probado de forma alguna que la intención de las Partes fuera la de renunciar de manera ilimitada a acciones derivadas de circunstancias posteriores a la celebración de los Contratos de Transacción.

476. No está probado que las partes tuvieran la intención de renunciar a acciones penales derivadas de hechos posteriores o de conductas anteriores concatenadas con conductas posteriores, por lo que tal renuncia no podría incluir la Denuncia Penal[299]. Por lo tanto el Tribunal debe desestimar este alegado incumplimiento.

---

[296] Laudo Arbitral. Párrafos 330 a 342.
[297] Laudo Arbitral. Párrafos 343 a 346.
[298] Laudo Arbitral. Párrafos 324 a 351.
[299] Laudo Arbitral. Párrafos 330 a 342.

477. En cuanto a la difusión del contenido de la Denuncia Penal a medios de comunicación lo cual habría importado el incumplimiento de la obligación de confidencialidad por parte de los Demandados, el Tribunal también debe desestimar este incumplimiento. En efecto, ante la ausencia de elementos probatorios que permitan establecer un vínculo de causalidad directa entre alguna actuación de los Demandados y la posterior difusión de la Denuncia Penal, esto es, alguna prueba que establezca que los Demandados directamente divulgaron el contenido de los Contratos de Transacción o de la Denuncia Penal a los medios de comunicación, el Tribunal no puede atribuir directamente la difusión de su contenido a la responsabilidad de los Demandados.

478. Los Demandantes han alegado que, aún bajo este supuesto, los Demandados serían igualmente responsables por haber presentado la Denuncia Penal. Sin embargo, en la medida que el Tribunal Arbitral ha resuelto que con la presentación de la Denuncia Penal los Demandados no han incurrido en un incumplimiento contractual, tampoco puede seguirse que habría un incumplimiento por el impacto que la Denuncia Penal hubiese podido tener en los medios de comunicación y en su posterior difusión al público.

479. En consecuencia, el Tribunal Arbitral desestima el incumplimiento de los Demandados consistente en la violación de las obligaciones de no adelantar acciones judiciales y/o extrajudiciales y de confidencialidad con motivo de la Denuncia Penal.

(ii) La Segunda Conciliación

480. Los Demandantes invocan, asimismo, el incumplimiento de los Contratos de Transacción por los Demandados con motivo de la presentación de la Segunda Conciliación en base a una solicitud de conciliación de 26 de julio de 2013, mediante la cual los Demandados solicitan que se cite a Lafrancol "*a fin de solucionar las diferencias presentadas con ocasión de QUE SEAN RESTITUIDAS EL 6,88% DEL TOTAL DE LAS ACCIONES DE LA SOCIEDAD, QUE SEAN INSCRITAS EN EL LIBRO DE ACCIONISTAS, QUE CANCELEN LOS DIVIDENDOS DECRETADOS EN LOS PORCENTAJES DE SUS PARTICIPACIONES, QUE SE CANCELE EL VALOR DEJADO DE PERCIBIR EN LAS TRANSACCIONES DE FECHA 20 Y 21 DE SEPTIEMBRE DE 2010*"[300].

481. El Tribunal advierte que esta Segunda Conciliación ya había sido precedida de una Primera Conciliación que tuvo lugar en julio de 2010, en la que compareció solamente Michael Ventura. En dicha oportunidad, fueron citados tanto los Demandantes como Lafrancol, y Michael Ventura pidió: (i) la restitución del 3,44% de las acciones de Lafrancol a su nombre; (ii) que se inscribieran dichas acciones debidamente en el libro de accionistas; (iii) que se le permitiera a Michael Ventura ejercer el derecho de inspección de los libros de Lafrancol y; (iv) que se le informara a éste sobre las políticas de distribución de dividendos del año 2005 a la fecha de dicha solicitud de conciliación[301].

482. El Tribunal nota que los Demandados han alegado que el objeto de la Segunda Conciliación difiere del objeto de los Contratos de Transacción, dado que las disputas zanjadas por éstos últimos se referían, en el caso de Michael Ventura, a la solicitud de restitución de la participación accionaria de Michael Ventura y a su registro como accionista en los libros de la Compañía junto con la expedición del certificado correspondiente y, en el caso de Viviane Ventura, al

---

[300] Anexo D-4. Solicitud de Conciliación de 5 de agosto de 2013.
[301] Anexo D-50. Solicitud de Conciliación de junio de 2010.

reconocimiento de su condición de accionista y a la restitución de su condición de tal. En cambio, la Segunda Conciliación comprendía también otras pretensiones como el pago de dividendos adeudados.

483. Sin embargo, a juicio del Tribunal, es evidente que en tanto se reclama el reconocimiento de la calidad de accionista, ello lleva aparejado como un derecho económico a dicha calidad el derecho a percibir dividendos. Así, el pago de dividendos deriva del reconocimiento de la titularidad de acciones y ello ha sido el preciso objeto de las disputas que se zanjaron con los Contratos de Transacción. El Tribunal no advierte así ninguna diferencia substancial en el objeto de los Contratos de Transacción y de la Segunda Conciliación.

484. El Tribunal también advierte que el Demandado Michael Ventura ha ido contra sus propios actos, sin una justificación fundada. Ello porque en la Primera Conciliación, se buscaba el mismo objetivo de pedir la restitución de las acciones que le correspondían a Michael Ventura en Lafrancol y la solicitud fue dirigida contra los Demandantes y Lafrancol. En tanto, en la Segunda Conciliación, los Demandados omitieron a los Demandantes y optaron por dirigir su solicitud solamente a Lafrancol.

485. Los Demandados han argumentado que en la Segunda Conciliación solamente se citó a Lafrancol y no a los propios Demandantes, porque Lafrancol era la única parte de los Contratos de Transacción que tenía un interés jurídico porque se pedía la restitución de acciones de dicha sociedad, y los Demandantes ya habían vendido sus acciones.

486. Sin embargo, el Tribunal considera más creíble la posición de los Demandantes en cuanto a que los Demandados habrían instado por la Segunda Conciliación únicamente en contra de Lafrancol, a sabiendas que la empresa ya había pasado a manos de nuevos accionistas —CFR—, ya que esta disputa con la sociedad iba a causar una presión indebida en los Demandantes lo cual facilitaría un acuerdo.

487. Ello se concluye, primero, porque en realidad quien tenía registradas a su nombre las acciones de los Demandados no era la propia sociedad Lafrancol, sino los Demandantes o terceros diferentes a Lafrancol, de modo que si había alguna disputa con relación a dichas transferencias y, como consecuencia de ello, se exigía la restitución de las mismas, correspondía reclamarles a los propios Demandantes dicha restitución o, en su defecto, una indemnización sustitutiva de perjuicios. Por lo mismo, no era procedente ni parece justificado el que los Demandados hayan exigido dicha restitución de acciones a la propia Lafrancol, pues ésta no era titular de tales acciones.

488. Pero, sobre todo, a partir del análisis de la prueba rendida, y en particular de los testimonios dados por los propios Demandados durante la Audiencia, el Tribunal Arbitral concluye que el inicio de la Segunda Conciliación por los Demandados se enmarcó dentro de una estrategia que tenía por objeto poner las disputas con los Demandantes en conocimiento de los nuevos accionistas de Lafrancol, esto es, CFR, a fin de presionar a los Demandantes con miras a cerrar un acuerdo económico. Así resulta de la declaración de Michael Ventura:

"DR. BARRAGÁN: ¿En la segunda conciliación que se presentó en el año 2012 se llegó a alguna conclusión? Perdón, 2013, año 2013. [...]
DR. BARRAGÁN: ¿En esta conciliación usted recuerda si se llegó a algún resultado específico?
SR. VENTURA: Esta era la mediación que Julio Señeor pidió con Lafrancol. [...]

SR. VENTURA: No comprendo todo. Bueno, de todas maneras, si es la segunda, Julio Seneor pensó que era una idea de posiblemente hacer una conciliación con Lafrancol para posiblemente empujar a Esther para arreglar la situación conmigo, pero si mi memoria es buena, Esther, si no es usted, los otros abogados interrumpieron esta conciliación diciendo que se iban a los árbitros. I think that's what I remember [Creo que eso es lo que recuerdo].

DR. BARRAGÁN: ¿Qué quiere decir usted con empujar a Esther?

SR. VENTURA: Que posiblemente Lafrancol, los nuevos propietarios, pudieran decir: Esther, por qué no arreglas eso con tu primo y de esa manera esta situación se puede acabar. Pienso, pienso"[302]. (énfasis del Tribunal)

489. El propio Michael Ventura confirmó en una segunda oportunidad su mismo entendimiento al respecto:

"DR. BARRAGÁN: ¿Por qué razón en la solicitud de conciliación del año 2013, que la tiene usted al frente, no se incluyó a Esther Ventura y a Juan María Rendón como llamados a conciliar?

SR. VENTURA: No sé. [...]

SR. VENTURA: No sé por qué no.

DR. BARRAGÁN: ¿Cuáles fueron sus instrucciones específicas en relación con esa conciliación?

SR. VENTURA: Verdaderamente esto era una idea de Seneor que él pensó que podía empujar la situación con Esther, yo no sabía que hubiera un problema para hacer esta conciliación"[303]. (énfasis del Tribunal)

490. A su turno, la Demandada Viviane Ventura también reconoció que se instó por esta instancia de conciliación, a sabiendas de que los Contratos de Transacción contemplaban el arbitraje como mecanismo de resolución de controversias, y porque entendía que *"una mediación con Lafrancol podía ser la solución sin tener que ir más adelante"*:

DR. BARRAGÁN: Cuénteme una cosa, ¿en qué momento decide usted iniciar una solicitud de conciliación en contra de Esther, Juan María y Lafrancol y relátenos cuál fue la motivación para hacerlo?

SRA. VENTURA: Yo no inicié, pero estoy con mi hermano, así que culpable de eso mi hermano es, también lo soy yo, pero Julio Seneor, nosotros tenemos un entendimiento en Inglaterra que hacer una conciliación con una compañía no es un delito, es una sentada para hablar, entender y ver si hay manera de ver si se pueden solucionar misterios que teníamos y queríamos aclarar, y Julio Seneor, que en ese momento nos representaba, sugirió que hiciéramos una mediación con Lafrancol para entender, ese fue el pecado.

DR. BARRAGÁN: ¿Para entender qué, cuál era el objeto de eso?

SRA. VENTURA: Entender todo lo que no habíamos podido entender por falta de información, de bloqueo.

DR. BARRAGÁN: ¿Usted en ese momento conocía la existencia de una cláusula de arbitraje en el contrato de transacción que había firmado?

SRA. VENTURA: Sí, pero tengo que decirle algo, en ese momento Lafrancol ya estaba vendida a Recalcine y en ese momento nosotros dijimos: si este contrato nos quita todos nuestros derechos judiciales, porque eso es lo que ese contrato hace, ese contrato nos bloquea la boca y nos amarra las manos y nos pone contra el fusilamiento, no podemos hablar, ni decir, ni contar; nos dimos cuenta que fuimos estafados, nosotros tenemos derechos en este país que es democrático, tenemos derechos, nosotros ya habíamos decidido que íbamos a volver a la mesa y pedirle a Esther que por favor rectifara el robo que nos había hecho.

DR. BARRAGÁN: ¿Y por qué razón no se escogió el mecanismo del arbitraje que era el previsto en ese contrato que usted nos describe de esa forma?

SRA. VENTURA: Porque teníamos a Jaime Lombana y contactamos a Jaime que ya había estado en contacto con nosotros y Jaime dijo: déjame revisar la situación y vamos entonces a ver, pero Jaime revisó todo y él decidió que sí, que aquí hay, es criminal, es criminal lo que nos hicieron. [...]

DR. BARRAGÁN: Sí, de acuerdo, pero ¿por qué razón si usted hacía ese reclamo a Esther Ventura sobre esas acciones, no la incluyó dentro de la solicitud de conciliación, la cual dirigió en el año 2013, solamente y exclusivamente contra Lafrancol?

SRA. VENTURA: Porque nuestro abogado en el momento, que era Julio Seneor, que había decidido hacer el, nosotros nos estamos guiando con él, nosotros no sabíamos nada prácticamente y no entendíamos

tampoco pero él dijo que una mediación con Lafrancol podría ser la solución sin tener que ir más adelante, ese es mi entendimiento"[304]. (énfasis del Tribunal)

491. De las declaraciones referidas, el Tribunal concluye que mediante la Segunda Conciliación los Demandados buscaron poner en conocimiento de los nuevos accionistas de Lafrancol – CFR- la existencia de una disputa con los Demandantes, de modo de lograr que estos últimos se avinieran a una solución sin pasar a otras instancias, ante el riesgo de tener problemas con el comprador y nuevo dueño de Lafrancol. De hecho, los Demandados lograron parcialmente su objetivo en el sentido que lograron alertar a los dueños de Lafrancol sobre la existencia de una disputa que podía afectar la titularidad accionarial de ellos, lo cual determinó que éstos últimos congelaran el pago y liberación de un saldo de precio de la compraventa suscrita con los Demandantes en una cuenta escrow. Al respecto, declaró Esther Ventura:

"[…] Bueno, después de eso viene la solicitud que hizo ante la Cámara de Comercio para llamar a CFR hoy en día Abbott, para que le devolviera sus acciones. Eso se sabía que no era procedente, sin embargo, lo hizo y dañó las relaciones de esa empresa con nosotros. En este momento tenemos un dinero grande retenido en el escrow y está siendo perjudicada la familia, la familia entera. Y la familia, estoy hablando de una mamá de 95 años, de 6 hermanos, de 3 otros primos, de mis hijos, etc"[305].

492. Hay dos argumentos adicionales planteados por los Demandados que merecen la atención del Tribunal. El primero de ellos consiste en que la conciliación no constituye una instancia judicial sino un mecanismo alternativo de solución de conflictos que opera como requisito de procedibilidad para instar por un litigio pero no es en sí misma una instancia judicial[306].

493. A juicio del Tribunal, esta alegación es errónea e irrelevante. Es errónea porque, en el presente caso, la conciliación no es un requisito de procedibilidad para acudir a la instancia del arbitraje pactado en los Contratos de Transacción. De hecho, tampoco se presenta o menciona como tal en la misma Segunda Conciliación. Pero, sobre todo, dicha alegación es irrelevante porque los Contratos de Transacción claramente establecen la obligación de no adelantar acciones, bien sea judicial o extrajudicial, y la Segunda Conciliación sería, como mínimo, una instancia o mecanismo extrajudicial para resolver conflictos de modo que entra de lleno en el alcance de la referida obligación. Los Demandados podrían haber ventilado exactamente las mismas diferencias promovidas a través de la Segunda Conciliación por la vía del arbitraje pactado en los Contratos de Transacción.

494. Por último, el Tribunal tampoco concuerda con las alegaciones formuladas por Viviane Ventura en cuanto a que los Contratos de Transacción habían vedado a los Demandados el derecho de acceso a la justicia. Tal como se ha resuelto en el Laudo Arbitral[307], en primer término, los Contratos de Transacción en sí mismos ofrecen un mecanismo autocompositivo de resolución de disputas con efecto de cosa juzgada, es decir, constituyen un ejercicio soberano de autonomía de voluntad por las Partes. Pero, más aún, si los Demandados realmente consideraban que habían sido víctimas de un engaño al momento de suscribir los Contratos de Transacción, y tenían la intención de instar por la nulidad de los mismos y solicitar la restitución de sus acciones, los mismos contratos habían previsto la vía del arbitraje internacional. Ello se

---

[304] Transcripción de la Audiencia. Páginas 179 a 181.
[305] Transcripción de la Audiencia. Página 94. Ver también, Anexos DR-10 y DR-12 que corresponden a comunicaciones de CFR Pharmaceuticals S.A.S.
[306] Memorial de Contestación. Párrafo 319.
[307] Laudo Arbitral. Párrafos 308 a 312.

confirma, por lo demás, con el hecho que los Demandados plantearon inicialmente demandas reconvencionales con miras a obtener la declaración de nulidad de los Contratos de Transacción y, una vez retiradas las demandas reconvencionales, siguieron invocando como defensas sendas alegaciones de nulidad de los mismos Contratos de Transacción. Todo ello refuerza la idea de que los Demandados promovieron la Segunda Conciliación para presionar a los Demandantes a buscar un arreglo sobre puntos que habían sido materia de los Contratos de Transacción, en abierta violación de la obligación de no adelantar acciones extrajudiciales prevista en ambos Contratos de Transacción.

495. En consecuencia, el Tribunal Arbitral concluye que los Demandados Michael y Viviane Ventura han incumplido los Contratos de Transacción, en particular la Cláusula 2.1 de los mismos, al instar por la Segunda Conciliación. El Tribunal establecerá los eventuales daños que acarrea la responsabilidad de los Demandados por este incumplimiento en la Sección 4. ("Los Perjuicios") del Laudo Arbitral.

### (iii) La Entrevista en W Radio

496. Los Demandantes atribuyen a los Demandados el incumplimiento de la obligación de confidencialidad, y además específicamente a Viviane Ventura el incumplimiento de la obligación de respeto y reserva establecida solamente en el Contrato de Transacción suscrito por esta última, con motivo de la entrevista que Viviane Ventura prestó a La W Radio con fecha 8 de febrero de 2013, cuyo audio consta de los Anexos D-48 y D-49, y cuyo texto íntegro se acompañó a este Arbitraje como Anexo D-IP-1 (Acta de Testimonio Especial 025-2013).

497. El Tribunal, en primer término, no considera que exista un incumplimiento de Michael Ventura respecto a dicha Entrevista, atendido a que dicho Demandado no participó directamente, ni consta que lo haya hecho de algún otro modo, en la Entrevista en W Radio. En realidad, se trató de una actuación en la que únicamente intervino su hermana Viviane Ventura. Los Demandantes han argumentado que Michael Ventura también sería responsable porque permitió, toleró y aprovechó las declaraciones públicas hechas por su hermana Viviane Ventura, y por el hecho de que Viviane Ventura se refirió en distintas oportunidades durante la Entrevista a Michael Ventura. A juicio del Tribunal, ninguna de tales alegaciones permite establecer la responsabilidad de Michael Ventura derivada de su intervención, aquiescencia o apoyo a la Entrevista en W Radio prestada por Viviane Ventura. En consecuencia, esta pretensión de los Demandantes debe ser rechazada con relación a Michael Ventura.

498. Sin embargo, a juicio del Tribunal, la situación de Viviane Ventura es distinta. Como se ha señalado, Viviane Ventura había asumido bajo el Contrato de Transacción suscrito por ella una obligación de confidencialidad[308], y además una obligación de respeto y reserva con relación a los Demandantes[309].

---

[308] "QUINTA: Confidencialidad.- Salvo por lo que se determine en la presente Transacción, ninguna de las Partes, incluidos sus funcionarios o asesores, podrá divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción, a menos que (i) dicha información sea de dominio público en la fecha de suscripción del presente contrato; (ii) ello sea solicitado o exigido por la autoridad competente, en cuyo caso, antes de proceder a entregar la información solicitada, la Parte respectiva deberá enviar copia de la solicitud en cuestión a las demás Partes junto con los antecedentes del caso; ó (iii) la divulgación de la información sea autorizada por la otra Parte, autorización que no será negada de manera injustificada".

[309] "7.6. Respeto mutuo y reserva total: so pena que se haga exigible la cláusula penal aquí acordada, las Partes se comprometen recíprocamente a mantener en sigilo este Contrato, pero sobre todo, a omitir referirse en el futuro, pública o

499. El Tribunal Arbitral, luego de examinar la integridad de la Entrevista prestada por Viviane Ventura, concluye que ésta ha incumplido el Contrato de Transacción.

500. Como primera cuestión, el Tribunal advierte que, en esta determinación, ha tenido en cuenta el hecho que Esther Ventura también reveló términos relativos al Contrato de Transacción y a las disputas que fueron resueltas por el mismo, así como a la posterior venta de Lafrancol en el año 2012. Ella misma reconoció durante la Audiencia las circunstancias en que hizo esta revelación:

"DR. MAYORGA: [...] Doña Esther, obra en el expediente una transcripción de una entrevista dada o atendida por Viviane Ventura a La W, en esa entrevista se hace referencia a un documento que habría enviado usted, firmado por Viviane Ventura, en relación con la forma en que se habían superado las tensiones relacionadas con las acciones de Lafrancol, ¿usted qué nos puede decir de la forma en que envió usted ese documento a La W?
[...]
SRA. VENTURA: Cuando supimos, porque los periodistas también son amigos míos, cuando supimos, yo supe un martes que Viviane declaraba ese jueves, yo enseguida llamé a Yesid Reyes y le dije: ¿Yesid qué hago?, y los periodistas amigos míos de La W me están diciendo: venga Esther a declarar a aquí, y yo les digo: no, yo tengo un contrato, porque me habían dicho, desde que supieron de la demanda penal en diciembre, desde el 26 de diciembre nos contactaron los periodistas de La W, pero yo me negué, porque yo tengo un contrato en que yo no puedo hablar de esto.
Entonces llamé a Yesid Reyes, y Yesid Reyes me dijo: no, usted tiene un contrato, usted no puede ir a una entrevista, usted no puede hablar de esto, pero los abogados tienen un término ahí, una excusa, cómo podré decir eso, una ley, que para evitar un mal mayor se podía en ese momento, y fue autorizado por Yesid y él me revisó el texto, para evitar un mal mayor yo podía entregar ese documento, siempre y cuando yo no fuera la que iba a abrir el tema sino, si después de que Viviane hablara, si hablara, yo podía entregar ese documento, donde, qué digo yo ahí. Yo no tenía ni idea Viviane qué iba a decir, pero yo digo ahí cómo fue el proceso de venta de las acciones de Viviane, etc., etc. Eso es lo que dice ese documento, y eso se lo entregué a mi amigo Alberto Casas, a los periodistas no les gusta que los citen pero es para que usted me crea"[310].

501. Los Demandantes han argumentado que dicha revelación sería justificada por el hecho que Viviane Ventura había sido la primera en contactar a W Radio y era inminente que iba a dar una entrevista revelando aspectos relativos a los Contratos de Transacción. También argumentan que, en materia periodística, existiría una regla o principio ontológico según el cual cuando alguien ofrece una declaración que se relaciona con otra persona, los periodistas llaman a esa otra persona para prevenir que eso va a suceder y para, en lo posible, obtener su propia versión de los hechos a fin de contrastarla con la información inicial[311].

502. Sobre el primer aspecto, esto es, el hecho que Esther Ventura solamente haya reaccionado a una iniciativa de Viviane Ventura de acudir a W Radio, si bien el Tribunal Arbitral considera creíble sobre este punto la explicación de la Demandante Esther Ventura en cuanto a que ella habría suministrado una explicación sólo una vez que se enteró que Viviane Ventura acudiría a dar una entrevista con Julio Sánchez Cristo ("JSC") en W Radio y que había dado indicaciones que sólo se diese lectura al mismo una vez que Viviane Ventura hubiese transmitido su posición sobre el tema, ello no la liberaba de la observancia de la obligación de confidencialidad que también le imponía a ella la cláusula Quinta del Contrato de Transacción, máxime cuando la información fue preparada y suministrada a W Radio, antes de que comenzara la Entrevista a Viviane Ventura, lo cual reconoce la propia Esther Ventura cuando dice: *"Yo no tenía ni idea Viviane qué*

---

privadamente a la conducta, modo de vida, costumbres o actividades de la otra Parte, evitando el uso de calificativos, frases ofensivas o similares, todo lo cual se considerará una violación material del Contrato. De ser posible, las Partes simplemente omitirán referirse a la otra Parte en el futuro".
310 Transcripción de la Audiencia. Páginas 131 y 132.
311 Transcripción de la Audiencia. Página 294 (Declaración del perito Javier Ayala).

*iba a decir, pero yo digo ahí cómo fue el proceso de venta de las acciones de Viviane, etc., etc. Eso es lo que dice ese documento, y eso se lo entregué a mi amigo Alberto Casas, a los periodistas no les gusta que los citen pero es para que usted me crea".*

503. En segundo lugar, el Tribunal concluye que, aun cuando existiere un principio deontológico que permitiese a los periodistas invitar la opinión de una parte cuando se sabe que otra persona hará referencias a ella durante una entrevista, este principio opera evidentemente con relación al gremio de los periodistas, pero no respecto de las personas llamadas a prestar su declaración o dar su opinión. En este sentido, el Tribunal reitera que Esther Ventura estaba vinculada por una obligación de confidencialidad asumida voluntariamente bajo el Contrato de Transacción, obligación que fue incumplida al preparar y enviar una nota explicativa sobre la operación subyacente al Contrato de Transacción, así como la posterior venta de Lafrancol.

504. Atendidas las circunstancias anteriores, el Tribunal concluye que tanto Viviane Ventura como Esther Ventura incumplieron las obligaciones de confidencialidad impuestas por el Contrato de Transacción, aunque Esther Ventura lo hizo sobre la base de una creencia amparada por la información que le transmitieron desde W Radio de que Viviane Ventura abordaría cuestiones relativas a dicho contrato, y con la indicación de que su opinión sólo fuese transmitida a continuación de la de Viviane.

505. En cuanto al alegado mutuo disenso invocado por los Demandados, el Tribunal ha llegado a la conclusión de que tanto Esther Ventura como Viviane Ventura hicieron referencia a través de los medios de comunicación a la existencia de los Contratos de Transacción y los antecedentes que llevaron a su celebración. Es decir, ambas Partes incumplieron su obligación de confidencialidad en cuanto contactaron al mismo medio casi de manera simultánea y no pueden reprocharse incumplimiento en esas circunstancias. No obstante, no hay elementos probatorios que permitan concluir que la actuación de las Partes en esa Entrevista puntual implicó un mutuo disenso tácito de la obligación de confidencialidad. Por el contrario, la actuación de las Partes posterior a la entrevista demuestra que ambas Partes consideran que la obligación de confidencialidad existe y es exigible.

506. Por otra parte, el Contrato de Transacción de Esther Ventura también contiene la obligación de respeto y reserva, la cual establece que las Partes se comprometen recíprocamente a mantener en sigilo el Contrato de Transacción, pero *"sobre todo, a omitir referirse en el futuro, pública o privadamente a la conducta, modo de vida, costumbres o actividades de la otra Parte, evitando el uso de calificativos, frases ofensivas o similares, todo lo cual se considerará una violación material del Contrato".*

507. El Tribunal Arbitral, luego de analizar la Entrevista en W Radio prestada por Viviane Ventura, concluye que Viviane Ventura incumplió la referida obligación de respeto y reserva.

508. En lo tocante al contenido de la Entrevista, el Tribunal concluye que, con sus dichos, Viviane Ventura incumplió esta obligación del Contrato de Transacción en tanto se refirió pública y específicamente a la Demandante Esther Ventura y a su conducta, usando además calificativos y frases ofensivas.

*"JSC: Doña Viviane, ¿ese fraude supuestamente la habría cometido su prima [refiriéndose a Esther Ventura]?*

VIVIANE VENTURA: Tristemente, es un fraude que mi prima parece que lo ha…, que posiblemente lo ha cometido, yo creo que ella se aprovechó mucho"[312]. (énfasis del Tribunal)

"VIVIANE VENTURA: … y yo tristemente tengo que decir hoy que Esther se aprovechó mucho de nuestra distancia, y bueno así fue que el fraude ha sido a base de una suma errónea por nuestro porcentaje en Laftancol"[313]. (énfasis del Tribunal)

"JSC: [a propósito de la venta de Lafrancol realizada a CFR International en 2012]…y usted lo que reclama es su 15%?
VIVIANE VENTURA: Reclamamos 35 millones de dólares, sí, aproximadamente.
JSC: ¿Y por qué se niega su prima Esther a reconocerlos?
Mira sí supiera yo la contestación de eso, no me atrevería a adivinar cuál es la contestación de esa pregunta. En este momento por eso estamos tratando de resolverlo. No queremos destruir a la familia, no queremos destruir a Esther, pero para mí ella, ella no ha actuado como le gustaría que la gente creyera que ella actúa. Esto ha sido para nosotros, para mí personalmente y para mi hermano una desilusión enorme.
JSC: ¿Qué argumento da [Esther] para negar que usted es socia de la empresa?
VIVIANE VENTURA: Bueno, en eso estamos y yo espero que vamos a poder resolver este problema sin que se alargue y se complique la situación. Es que mi abogado sí está convencido ahora de que nosotros hemos sido defraudados, un posible fraude"[314]. (énfasis del Tribunal)

509. En ese momento de la Entrevista, JSC le da la palabra a Alberto Casas de la misma W Radio, quien -a partir del audio- el Tribunal infiere que comienza a dar lectura a una nota escrita debido a que no hay interrupciones en el relato que se narra en forma continua y que, en resumen, describe cómo se zanjaron las disputas relativas a la titularidad y transferencia de las acciones que pertenecían a Viviane Ventura y Michael Ventura antes y con motivo de los Contratos de Transacción, así como ciertas particularidades relativas a la venta de Lafrancol a manos de CFR. Ello es además consistente con el testimonio de Esther Ventura de que, junto con su abogado Yesid Reyes, habrían preparado una nota explicativa escrita. Luego, interviene nuevamente Viviane Ventura y continúa con la siguiente declaración:

"JSC: Doña Viviane, si usted ya había firmado con su abogado un documento zanjando cualquier duda o discusión, pero lo más grave que dice este documento de su prima Esther es que ustedes voluntariamente vendieron sus acciones al precio comercial, ¿cómo se explica que ahora estén reclamando?

VIVIANE VENTURA: Bueno, ese precio que ella, primero que todo tienes que saber que yo nunca, nunca vendí mis acciones. Mi hermano negoció un precio para sus acciones basado en un gran error por las informaciones erróneas que Esther nos dio. Nosotros tratamos durante tres años de entrar en los libros de Lafrancol para entender la valorización de Lafrancol, ella nos cerró todas las puertas, es verdad que ella hizo una valorización de Lafrancol que nos presentó a nosotros, es verdad que mi hermano también tomó una contable para tratar de valorizar Lafrancol que tampoco pudo hacerlo correctamente, él anunció una valorización que él iba a hacer era un asesoramiento que él hacía, una calculación, pero no estaba basado en números. Ella nunca nos dejó entrar como shareholders ni a una asamblea de Lafrancol, ni a ver los libros cuando nosotros empezamos hace cuatro años casi ya a pedir nuestros derechos de accionistas. Lo mío es una historia un poco complicada y todo va a salir al abierto para que se entienda el fraude que ella me hizo a mí a través de los años, poco a poco se fue apoderando de mis acciones. Ella en su mente piensa que se apoderó de mis acciones legalmente y por 50.000 dólares, pero la verdad es otra que vamos a comprobar. Lo de mi hermano fue un precio, él quería sus acciones, él nunca quiso vender sus acciones, pero Esther categóricamente rehúso devolverle las acciones a mi hermano, que llegó un momento que el vino de Londres tres veces aquí para tratar de resolver el tema. Finalmente, él sin poder hacer otra cosa, con un asesoramiento que era un fraude, tuvo que aceptar una suma que Esther le pagó que era totalmente irrisoria y en ese precio, ahí es donde está nuestro engaño. Lo que ella me pagó a mí en ese momento no fue por la venta de mis acciones, fue más para que me callara y me fuera, por

312 D-48 – Emisión de W Radio de 8 de febrero de 2013-1. Minuto 03:10 a 03:29.
313 Ibídem. Minuto 04:00-04:19
314 Ibídem. Minuto 06:50-08:25.

circunstancias personales que yo tenía en ese momento que fue hace dos años...tuve que aceptarlo, aceptar el regalo porque fue un regalo para que yo me callara y me fuera..."[315] (énfasis del Tribunal)

"Es increíble que una persona que estuviera tan cerca de mí, tan cerca de mi corazón, tan cerca de la familia, nos haya hecho algo de este tamaño, es inaceptable. Ella nos ocultó los documentos para poder valorar nuestras acciones, nos ocultó los libros, no cerró las puertas de Lafrancol, trató a nuestros abogados que trataban y trataban de hacer entrevistas con ella y con Lafrancol, que ella nunca les dejó ver nada, nunca les dio ninguna información que fuera verdadera"[316]. (énfasis del Tribunal)

510. De la sola lectura de los pasajes citados de la Entrevista en W Radio, se concluye que Viviane Ventura se refirió específicamente a actuaciones de Esther Ventura relacionadas con los hechos que dieron lugar a las controversias materia del Contrato de Transacción. No de otra manera pueden entenderse las afirmaciones de Viviane Ventura en el sentido de que *"yo nunca, nunca vendi mis acciones [...] [e]lla nunca nos dejó entrar como shareholders ni a una asamblea de Lafrancol, ni a ver los libros[...]poco a poco se fue apoderando de mis acciones [...][e]lla en su mente piensa que se apoderó de mis acciones legalmente y por 50.000 dólares, [...] [l]o que ella me pagó a mí en ese momento no fue por la venta de mis acciones, fue más para que me callara y me fuera"*[317].

511. Con estas afirmaciones, Viviane Ventura claramente incumplió, por una parte, la obligación de reserva relacionada con los Contratos de Transacción y, por otra parte, la obligación consistente en no referirse a la "conducta, modo de vida, actividades, costumbres o actividades" de Esther Ventura respecto de los hechos objeto de la transacción y de no referirse a ella en términos ofensivos.

512. En lo concerniente a las circunstancias, el Tribunal ha concluido de la prueba rendida en el Arbitraje que "La W" o W Radio es una emisora que tiene amplia cobertura en Colombia, y que en la Entrevista se prestó además en una franja de alto rating, ambos extremos que han sido alegados por los Demandantes sin que hubiesen sido controvertidos por los Demandados, y se han respaldado en prueba[318]. Por otra parte, los Demandantes han demostrado que, a partir de la Entrevista en W Radio por Viviane Ventura, se produjo un incremento en la difusión de lo narrado por Viviane Ventura, lo cual provocó en palabras de los Demandantes una "ola expansiva", con lo cual se extendió el impacto y alcance de la divulgación realizada por Viviane Ventura. Así lo demuestran sendas noticias publicadas en los días y meses posteriores a la Entrevista en W Radio que básicamente replican los términos de lo narrado por Viviane Ventura[319].

513. En consecuencia, el Tribunal Arbitral concluye que la Demandada Viviane Ventura ha incumplido la cláusula 7.6 del Contrato de Transacción suscrito por ella, en particular la cláusula 7.6 del mismo que contiene la obligación de respeto y reserva, la cual le impedía referirse públicamente a la conducta, modo de vida, costumbres o actividades de Esther Ventura, y a usar calificativos, frases ofensivas o similares, lo cual constituye una violación material del Contrato. El Tribunal establecerá los eventuales daños que acarrea la responsabilidad de Viviane Ventura por este incumplimiento en la Sección 4. ("Los Perjuicios") del Laudo Arbitral.

---

[315] *Ibídem*. Minuto 14:07 – 17:20
[316] *Ibídem*. Minuto 18:08 – 18:43
[317] *Ibídem*. Minuto 14:07 – 17:20
[318] Ver, D-IP-1.
[319] Ver, D- 26, D- 27, D- 28, D- 29, D- 30, D- 31, los cuales contienen artículos de prensa o emisiones de radio en que se hace referencia a la información suministrada por Viviane Ventura en la Entrevista.

## 4.- LOS PERJUICIOS

514. En esta sección el Tribunal Arbitral abordará todas las reclamaciones de daños y perjuicios reclamadas por los Demandantes, las que se agrupan del siguiente modo:

(i) La aplicación de la Cláusula Penal contenida en los Contratos de Transacción: Dentro de esta reclamación, los Demandantes pretenden:

(a) Que se condene a la Demandada Viviane Ventura a pagar a Esther Ventura de Rendón la suma de US $100.000 (cien mil dólares americanos).

(b) Que se condene a la Demandada Viviane Ventura a pagar a Juan María Rendón la suma de US $100.000 (cien mil dólares americanos).

(c) Que se condene al Demandado Michael D. Ventura a pagar a Esther Ventura de Rendón la suma de US $1.000.000 (un millón de dólares americanos).

(d) Se condene al Demandado Michael D. Ventura a pagar a Juan María Rendón la suma de US $1.000.000 (un millón de dólares americanos).

(ii) Otros perjuicios: Dentro de esta partida, los Demandantes han solicitado:

(a) Que se condene a los Demandados a pagar a los Demandantes la indemnización plena, incluyendo daño emergente y lucro cesante, de los perjuicios causados con sus conductas de mala fe contractual.

(b) Que se condene a los Demandados a pagar a los Demandantes el valor de todos los perjuicios causados a los Demandantes que resulten probados en el curso del proceso, de conformidad con el principio de indemnización integral de perjuicios.

A su vez dentro de los demás perjuicios, los Demandantes han distinguido los siguientes tipos de perjuicios:

a. Daños patrimoniales;

b. Daño a la imagen, reputación y buen nombre de los Demandantes;

c. Daño moral.

515. El Laudo Arbitral resuelve cada una de estas pretensiones a continuación y en forma separada.

## A. LA APLICACIÓN DE LA CLÁUSULA PENAL

### 1. POSICIÓN DE LAS PARTES

a. Posición de los Demandantes

516. En el Memorial de Demanda los Demandantes solicitan que: (a) se declare que, como consecuencia de los incumplimientos de los Contratos de Transacción, los Demandados están obligados a pagar a los Demandantes el valor de las cláusulas penales contenidas en los mencionados contratos; (b) se condene a la Demandada Viviane Ventura a pagar a Esther Ventura de Rendón la suma de US $100.000 (cien mil dólares americanos); (c) se condene a la Demandada Viviane Ventura a pagar a Juan María Rendón la suma de cien mil dólares americanos (US $100.000); (d) se condene al Demandado Michael D. Ventura a pagar a Esther Ventura de Rendón la suma de US $1.000.000 (un millón de dólares americanos); y (e) se condene al Demandado Michael D. Ventura a pagar a Juan María Rendón la suma de US $1.000.000 (un millón de dólares americanos)[320].

517. Asimismo, a lo largo del Arbitraje y producto del debate surgido entre las Partes sobre la procedencia y alcance de la Cláusula Penal, los Demandantes se pronunciaron sobre tres aspectos que son relevantes para la determinación del Tribunal Arbitral sobre esta reclamación:

(i)     Sobre la procedencia del pago de la Cláusula Penal

518. Los Demandantes afirman que *"los Demandados están obligados a indemnizar a los Demandantes, todos los perjuicios que sus actuaciones de mala fe les han ocasionado, así como la cláusula penal prevista en los Contratos de Transacción"* (énfasis agregado)[321].

519. Los Demandantes fundan la procedencia del pago de la cláusula penal en el incumplimiento de mala fe en que habrían incurrido los Demandados al desconocer los actos de disposición de sus derechos realizados en los Contratos de Transacción pretendiendo que, en calidad de accionistas de Lafrancol, les fuese pagado un porcentaje por la venta de la empresa a CFR[322].

(ii)    Sobre la procedencia de reducción de la Cláusula Penal por su carácter de enorme

520. En relación a la solicitud de reducción de la Cláusula Penal por su carácter de enorme realizada por los Demandados en el Memorial de Contestación, los Demandantes alegan que ella resulta improcedente atendido que carece de todo sustento fáctico, pues el incumplimiento contractual de los Demandados no habría sido parcial sino que se habría dado respecto de prácticamente la totalidad de las obligaciones establecidas en los Contratos de Transacción y el incumplimiento de los Demandados debe ser considerado como un incumplimiento esencial.

521. A mayor abundamiento, los Demandantes alegan que *"la consecuencia patrimonial negativa establecida en la cláusula penal tiene la vocación de permanecer durante todo el cumplimiento contractual, sin que deba*

---

[320] Memorial de Demanda. Sección III.
[321] Memorial de Demanda. Párrafo 148.
[322] Memorial de Demanda. Párrafos 133 a 148; Memorial de Réplica. Párrafos 142 y 143: *"142. [...] Viviane Ventura pretende desconocer los actos de disposición de sus derechos que ha efectuado en el pasado y sobre los cuales ha inducido a los Demandantes a pensar que tenía la voluntad de ejecutarlos realmente. Todo ello con el fin de obtener pagos a los que no tiene derecho. Dicha mala fe es, por sí sola, suficiente para que se declare el incumplimiento contractual y se condene a Viviane Ventura al pago de la cláusula penal. 143. Michael Ventura hace parte de esta misma estrategia de desconocimiento reiterado de los compromisos contractuales asumidos"*. (énfasis del Tribunal).

*reducirse el monto de su sanción conforme transcurra el tiempo, toda vez que las obligaciones de no hacer de las partes no se satisfacen mediante un cumplimiento fraccionado, sino que se exige una conducta cumplida permanente*[323].

522. Los Demandantes también alegan que la cláusula penal, tiene por función el apremio a las partes para el cumplimiento de las obligaciones en éstos contenidas y no la estimación convencional anticipada de los perjuicios que pudieran sufrir las partes en caso de incumplimiento.

523. Asimismo, los Demandantes argumentan que el artículo 1596 del CCC, empleado por los Demandados para sustentar su pretensión, exige, para la reducción de la cláusula penal, que el acreedor haya aceptado esta parte en virtud de lo dispuesto en los artículos 1626 y 1649 del CCC. A juicio de los Demandantes, este último requisito no se habría cumplido[324].

524. Finalmente, los Demandantes sostienen que en el remoto evento en que el Tribunal considere apropiada la reducción referida, ésta debe ser mínima considerando que la naturaleza de las obligaciones de tracto sucesivo de los Contratos de Transacción implicaba, cuando menos, su cumplimiento permanente y continuado en el tiempo y el lapso por el cual los Demandados cumplieron los compromisos de tracto sucesivo a que se obligaron con el Contrato de Transacción fue mínimo[325].

    (iii)    <u>Sobre la posibilidad de reclamar la totalidad de la Cláusula Penal a cada uno de los Demandados</u>

525. Los Demandantes alegan que las cláusulas penales estipuladas en los Contratos de Transacción apremian de manera individual el cumplimiento de las obligaciones adquiridas por los Demandados respecto de cada una de las personas que fueron denominadas como el "Comprador" o "Solicitado".

526. Fundan la anterior afirmación en el hecho que, si bien en los Contratos de Transacción se agrupó bajo la definición de "partes", "comprador" y "solicitado" a un número plural de sujetos, lo cierto es que las relaciones entre cada uno de los Demandados y cada uno de los Demandantes son independientes y, por lo tanto, cada uno tiene derecho al cobro de la penalidad pactada en su favor. Lo anterior se desprendería del texto mismo de las cláusulas penales en las que se pactó que *"el simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas…. al pago de la suma de….".*

527. Los Demandantes advierten que *"en ninguna parte de las cláusulas penales se determinó que el valor total de la misma solo procedería si su valor se reclama en conjunto por todas las personas que se denominaron "Comprador" o "Solicitado" y mucho menos si el respectivo contrato se incumplía respecto de la totalidad de los sujetos que integra la partes así denominadas"*[326].

b. <u>Posición de los Demandados</u>

[323] Memorial de Réplica. Párrafo 313.
[324] Memorial de Réplica. Párrafo 317 y siguientes.
[325] Memorial de Réplica. Párrafos 322 y siguientes.
[326] Memorial de Réplica. Párrafo 327.

(i)   Sobre la procedencia del pago de la Cláusula Penal

528. En el Memorial de Contestación los Demandados alegan que resulta improcedente el pago de la Cláusula Penal toda vez que no se cumplen los presupuestos legales y contractuales para el cobro de la misma[327]. Dicho incumplimiento vendría determinado tanto por el hecho que la obligación principal a la que accede es nula —invocando el artículo 1593 del CCC—, como por el hecho que no se cumplen los requisitos de exigibilidad de la Cláusula Penal, a saber: incumplimiento de la obligación, que ese incumplimiento provenga de culpa o dolo del deudor y que el deudor esté constituido en mora.

529. En relación al argumento consistente en que la Cláusula Penal es nula atendida la nulidad de la obligación principal a la que accede, los Demandados argumentan que la obligación de renunciar al inicio de cualquier acción judicial o extrajudicial en contra de los Demandantes es nula toda vez que contraría el derecho fundamental de acceso a la justicia y el deber constitucional de no abusar de los demás.

530. Por otra parte, en relación a la renuncia a la presentación de una denuncia penal, los Demandados alegan que es imposible jurídicamente toda vez que comporta el ejercicio de deberes y cargas públicas de obligatorio cumplimiento.

531. En relación con el incumplimiento de los requisitos de exigibilidad de la Cláusula Penal, se señala que en el presente caso hay ausencia de incumplimiento de los deberes contractuales por parte de los Demandados.

(ii)   Sobre la procedencia de reducción de la Cláusula Penal por su carácter de enorme

532. Para el caso que sea considerada exigible la Cláusula Penal, los Demandados solicitan su reducción en razón de que el valor allí pactado es enorme por virtud del cumplimiento parcial de las obligaciones pactadas[328]. En definitiva, sostienen que en virtud de lo dispuesto por los artículos 1596 del CCC y 867 del C.C.Com., la Cláusula Penal es divisible frente al cumplimiento parcial de la obligación.

533. El cumplimiento parcial de las obligaciones se justificaría en que los Demandados no incumplieron el deber de adelantar acciones judiciales y extrajudiciales y no violaron el deber de confidencialidad de la información.

534. Los Demandados precisan que la reducción de la Cláusula Penal no ha sido solicitada en función del tiempo durante el cual se habrían cumplido las prestaciones pactadas en los Contratos de Transacción sino que lo que se pretende es que el Tribunal en el evento que concluyera la existencia de algún incumplimiento, evalúe el interés de acreedor, sus propios incumplimientos, y los débitos cumplidos frente a los que considerare incumplidos, a efectos de reducir proporcionalmente el monto de la pena pactada en los Contratos de Transacción[329].

---

[327] Memorial de Contestación. Párrafos 345 y siguientes.
[328] Memorial de Contestación. Párrafos 352 y siguientes.
[329] Ibídem.

(iii)    Sobre la posibilidad de reclamar la totalidad de la Cláusula Penal a cada uno de los Demandados

535. A mayor abundamiento, los Demandados alegan que la solicitud de los Demandantes en orden a que cada Demandante sea pagado el valor total de las cláusulas penales pactadas en los Contratos de Transacción no resultaría procedente por cuanto la Cláusula Penal está establecida en cada contrato en una suma única a favor de la parte cumplida y a cargo de la parte incumplida, y no para cada persona que integre la parte, en caso de parte plural[330].

536. Asimismo, en el Memorial de Cierre los Demandados señalan que la solicitud no es procedente por cuanto ningún incumplimiento se ha predicado contra Juan María Rendón[331].

2. DECISIÓN DEL TRIBUNAL

537. El Tribunal Arbitral ya ha concluido que hubo incumplimientos de los Demandados con motivo de la Segunda Conciliación, y de la Entrevista en la Radio W.

538. Los Contratos de Transacción son claros al establecer la Cláusula Penal como un remedio contractual que permite indemnizar a una parte frente al incumplimiento de las obligaciones contenidos en el mismo por la otra parte. Al respecto, establecen:

El Contrato celebrado por Viviane Ventura dispone:

"OCTAVA: Cláusula Penal. El simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas, además para declarar terminado este Contrato y por ende no verificada la transacción, para que exija a la parte incumplida, inmediatamente y a título de pena, el pago de la suma de CIEN MIL DOLARES($ U.S. 100.000,oo), suma que podrá ser exigida por la vía ejecutiva ante la jurisdicción ordinaria, con la simple presentación de este contrato y la afirmación de la parte cumplida acerca del incumplimiento de la parte incumplida y sin necesidad de requerimiento o constitución en mora, derechos estos a los cuales renuncian las Partes en su recíproco beneficio. Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados por el incumplimiento, y en consecuencia la parte cumplida tendrá derecho a cobrar la totalidad de los perjuicios ocasionados más la pena que aquí se establece. Las Partes declaran que excluyen expresamente el alcance la cláusula compromisoria pactada en este Contrato el cobro ejecutivo de esta cláusula penal".

Por su parte, el Contrato celebrado con Michael Ventura establece:

"OCTAVA: Cláusula Penal.- El simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas, además para declarar terminado este Contrato y por ende no verificada la transacción, para que exija a la parte incumplida, inmediatamente y a título de pena, el pago de la suma de UN MILLÓN DE DOLARES($ U.S. 1.000.000,oo), suma que podrá ser exigida por la vía ejecutiva ante la jurisdicción ordinaria, con la simple presentación de este contrato y la afirmación de la parte cumplida acerca del incumplimiento de la parte incumplida y sin necesidad de requerimiento o constitución en mora, derechos estos a los cuales renuncian las Partes en su recíproco beneficio. Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados por el incumplimiento, y en consecuencia la parte cumplida tendrá derecho a cobrar la totalidad de los perjuicios ocasionados más la pena que aquí se establece. Las Partes

---

[330] Memorial de Contestación. Párrafo 357.
[331] Memorial de Cierre de los Demandados. Párrafo 287.

declaran que excluyen expresamente el alcance la cláusula compromisoria pactada en este Contrato el cobro ejecutivo de esta cláusula penal".

539. A la luz de las disposiciones citadas, el Tribunal concluye, en consecuencia, que la Cláusula Penal es plenamente aplicable frente al incumplimiento de los Demandados dado que ésta se devenga por el simple incumplimiento en que incurra cualquiera de las Partes respecto de las obligaciones adquiridas en virtud de los Contratos de Transacción, y el Laudo Arbitral ha establecido que los Demandados efectivamente han incumplido tales contratos.

540. Asimismo, el Tribunal no considera que sea óbice para ello la aplicación de las normas aplicables a la Cláusula Penal bajo el derecho colombiano. Por de pronto, el Tribunal Arbitral ya ha desestimado las cláusulas contenidas en los Contratos de Transacción sean nulas, de modo que debe desestimarse el argumento planteado por los Demandados en cuanto a que resultaría improcedente el pago de la Cláusula Penal por el hecho que la obligación principal a la que accedería la referida cláusula es nula de conformidad con el artículo 1593 del CCC.

541. Por otro lado, el Tribunal Arbitral considera que, al contrario de lo alegado por los Demandados, se cumplen todos los requisitos de exigibilidad de la Cláusula Penal, a saber: (i) ha existido un incumplimiento de las obligaciones asumidas por los Demandados bajo los Contratos de Transacción, (ii) dicho incumplimiento es imputable a la negligencia o culpa de los Demandados, en tanto fueron ellos quienes deliberadamente decidieron poner en marcha la Segunda Conciliación y, en el caso de Viviane Ventura, dar la entrevista a la W Radio, y (iii) por tratarse de una obligación de no hacer, *"se incurre en la pena desde que se ejecuta el hecho de que el deudor se ha obligado a abstenerse"*[352].

542. Ahora bien, para efectos de determinar el monto que por concepto de Cláusula Penal debe imponerse a los Demandados, el Tribunal Arbitral debe zanjar dos cuestiones objeto de controversia: primero, si procede la reducción parcial del monto establecido por concepto de Cláusula Penal y; segundo, si el monto de la Cláusula Penal debe pagarse a cada uno de los Demandantes, o si se trata de una sola Cláusula Penal que se paga una sola vez a favor de ambos Demandantes.

543. Sobre el segundo aspecto, esto es, si procede condenar a los Demandados a pagar el monto de la Cláusula Penal a cada Demandado, o por una sola vez a favor de los Demandados conjuntamente, el Tribunal considera fundamental analizar el texto de los Contratos de Transacción en la parte pertinente a la aplicación de la Cláusula Penal. Al efecto, el Tribunal Arbitral advierte que el Contrato indica que el incumplimiento en que incurran las *"Partes"* de las obligaciones de los Contratos de Transacción *"dará derecho a cada una de ellas"* a reclamar la Cláusula Penal.

544. El punto de partida consiste entonces en analizar quiénes son las *"Partes"* en los respectivos Contratos. En el Contrato de Transacción suscrito entre Michael Ventura y los Demandantes, comparecen como Partes Michael Ventura como *"Vendedor"* y los Demandantes conjuntamente con Lafrancol como *"Comprador"*, término este último que aparece definido como singular. Por su parte, en el Contrato de Transacción entre Viviane Ventura y los Demandantes, comparecen como Partes Viviane Ventura en calidad de *"Solicitante"* y los Demandantes conjuntamente con Lafrancol como *"Solicitado"*, término también definido como singular.

---

[352] CCC. Artículo 1595.

545. Bajo esta estructura, es evidente que (i) el legitimado activo para reclamar la Cláusula Penal es cada "*Parte*" frente al incumplimiento de la otra Parte, (ii) las Partes en los respectivos Contratos de Transacción son "*Vendedor*" y "*Comprador*", y "*Solicitante*" y "*Solicitado*", respectivamente, y (iii) el término "*Comprador*" y "*Solicitado*" aunque agrupa a los Demandantes con Lafrancol alude una sola "*Parte*" compuesta por todas ellas, en términos que no puede considerarse a cada Demandante en forma separada e individual como un "*Comprador*" o un "*Solicitado*" pues ello sería contrario al propio lenguaje utilizado en los Contratos de Transacción.

546. En consecuencia, el Tribunal concluye que la Cláusula Penal es una sola y se establece a favor de los Demandados agrupados conjuntamente bajo la denominación del "*Comprador*" en el caso del Contrato de Transacción suscrito con Michael Ventura, y del "*Solicitado*" en el caso del Contrato de Transacción suscrito con Viviane Ventura. No procede, por ende y como lo solicitan los Demandantes, que Esther Ventura de Rendón y Juan María Rendón, gocen de derecho individual y autónomo a exigir el pago, cada uno, de la Cláusula Penal.

547. En cuanto a la reducción de la Cláusula Penal, el Tribunal advierte que no se han aportado elementos de juicio que revelen que la misma reviste el carácter de enorme. Si bien los Demandados hacen referencia a la "cláusula penal enorme", sus alegaciones no se refieren en forma alguna al monto pactado o a su reducción en cuanto exceda el duplo de la obligación principal (Artículo 1601 del CCC), sino que la "enormidad" la hacen residir en el Artículo 1596 del CCC y el Artículo 867 del C.C.Com., indicando que en cuanto hubo un cumplimiento parcial de la obligación, la Cláusula Penal sólo se podría hacer efectiva en forma parcial. En consecuencia, el Tribunal Arbitral se referirá únicamente al alegado cumplimiento parcial y a la posible reducción de la pena resultante del mismo.

548. Asimismo, los Demandantes argumentan que el artículo 1596 del CCC, empleado por los Demandados para sustentar su pretensión, exige para la reducción de la cláusula penal que el acreedor haya aceptado la parte de las obligaciones cumplidas. El Artículo 1596 establece lo siguiente:

ARTÍCULO 1596. REBAJA DE PENA POR CUMPLIMIENTO PARCIAL. Si el deudor cumple solamente una parte de la obligación principal **y el acreedor acepta esta parte**, tendrá derecho para que se rebaje proporcionalmente la pena estipulada por falta de cumplimiento de la obligación principal. (énfasis del Tribunal)

549. El Tribunal advierte que las siguientes obligaciones en cabeza de los Demandados no han sido cumplidas:(i) las obligaciones de confidencialidad, (ii) la obligación de no adelantar acciones extrajudiciales, y (iii) la obligación de no referirse a los Demandantes por parte de Viviane Ventura. En otras palabras, el Tribunal considera que ha habido un incumplimiento que puede calificarse como un incumplimiento total de las anteriores obligaciones.

550. Por lo demás, el Tribunal no está convencido de que esta sección del artículo 1596 del CCC, que señala que para la rebaja aplique, el acreedor deba aceptar la parte que se cumplió, sea aplicable en el presente caso. El Tribunal Arbitral entiende que dicha disposición se refiere fundamentalmente a obligaciones de dar en las cuales el monto de la obligación principal sea determinado o claramente determinable, en las que se acepta un pago parcial, inferior al monto total adeudado, lo cual permite reducir proporcionalmente el monto de la cláusula penal. En este caso, las obligaciones incumplidas por los Demandados son obligaciones de no hacer que no admiten la reducción proporcional con fundamento en la norma citada.

551. En todo caso, aun cuando se determinase que esta sección del artículo 1596 fuese aplicable y que los Demandados han cumplido una parte de la "obligación principal" como reza dicho precepto, la evidencia revela que los Demandados no han aceptado pacíficamente esa parte de las obligaciones cumplidas por los Demandados sino que, al contrario, tan pronto como han tomado conocimiento de los hechos relativos a la Segunda Conciliación y a la Entrevista en la Radio W, entre otros eventos, han dado inicio al presente Arbitraje atribuyendo sendos incumplimientos de los Demandados a los Contratos de Transacción. No concurre así el requisito de que el cumplimiento parcial de la obligación principal haya sido aceptado por los Demandantes en su calidad de acreedores de dicha contraprestación.

552. Los Demandados también invocan el artículo 867 del C.C.Com. que dispone:

"**Art. 867. Cláusula penal.** Cuando se estipule el pago de una prestación determinada para el caso de incumplimiento, o de mora, se entenderá que las partes no pueden retractarse.
Cuando la prestación principal esté determinada o sea determinable en una suma cierta de dinero la pena no podrá ser superior al monto de aquella.
Cuando la prestación principal no esté determinada ni sea determinable en una suma cierta de dinero, podrá el juez reducir equitativamente la pena, si la considera manifiestamente excesiva habida cuenta del interés que tenga el acreedor en que se cumpla la obligación. Lo mismo hará cuando la obligación principal se haya cumplido en parte". (énfasis del Tribunal)

553. La norma citada se aplica, en efecto, a casos en qué el valor de la obligación es inapreciable o indeterminado y otorgan al juez una amplia discreción para reducir el valor de la pena atendiendo a las circunstancias del caso y, en especial, al cumplimiento parcial de las obligaciones de los Demandados.

554. En el Arbitraje ha quedado establecido que Viviane Ventura no sólo incumplió su obligación de no iniciar acciones extrajudiciales en contra de los Demandantes (Cláusula 2.1), sino que además incumplió su deber de confidencialidad y de no referirse a las conductas de los Demandantes (Cláusulas 5 y 7.6). Esta última cláusula sólo se pactó en el contrato suscrito por Viviane Ventura y en ella claramente se establece que su incumplimiento dará lugar al cobro de la Cláusula Penal. De hecho, la Cláusula 7.6 empieza así: *"so pena que se haga exigible la cláusula penal aquí acordada..."*). Finalmente, el monto de la pena que según el Contrato corresponde a Viviane Ventura de US$100.000. En consecuencia, en atención a que Vivian Ventura incumplió varias de sus obligaciones bajo el Contrato de Transacción[333], el Tribunal Arbitral concluye que no corresponde reducir la Cláusula Penal respecto de Viviane Ventura.

555. Tratándose de Michael Ventura, éste incumplió el Contrato de Transacción por la presentación de la Segunda Conciliación. Al respecto, el Tribunal concluye que abstenerse de iniciar acciones judiciales o extrajudiciales era una de sus obligaciones principales bajo dicho contrato. Además, el Tribunal Arbitral estableció -y así lo señala el Laudo Arbitral[334]- que la intención de los Demandados con la presentación de la Segunda Conciliación fue presionar a los Demandantes para buscar un arreglo frente a puntos que ya habían sido transigidos en los Contratos de Transacción, alertando a los compradores de Lafrancol sobre la existencia de una controversia, pese a que esa controversia ya había sido materia de transacción. De hecho, así lo confesó el propio Michael Ventura durante la Audiencia. Sin embargo, este evento fue el único

---

[333] Laudo Arbitral. Párrafos 500 a 495 y 498 a 513.
[334] Laudo Arbitral. Párrafos 469 y 480 a 491.

incumplimiento por parte de Michael Ventura quien cumplió con las demás obligaciones establecidas por el contrato y, en particular, se ha abstenido de dar declaraciones o entrevistas a medios de difusión social.

556. En este contexto, y en ejercicio de la facultad otorgada por el artículo 867 inciso final del C.C.Com., el Tribunal Arbitral decide reducir en un 20% el monto de la Cláusula Penal a ser impuesta a Michael Ventura, atendido a que el incumplimiento de parte de Michael Ventura fue grave y reprochable, dadas la intención perseguida y las consecuencias del mismo, pero ponderando por otro lado que dicho Demandado cumplió en parte con sus obligaciones bajo el Contrato de Transacción.

557. En razón de todo lo anterior, el Tribunal condena a Viviane Ventura a pagar los Demandantes la suma de US$100.000 (cien mil dólares americanos), y a Michael Ventura a pagar a los Demandantes en la suma de US$800.000 (ochocientos mil dólares americanos).

## B. OTROS PERJUICIOS

### 1. POSICIÓN DE LAS PARTES

#### a. Posición de los Demandantes

558. Los Demandantes solicitan que: (a) se condene a los Demandados a pagar a los Demandantes la indemnización plena, incluyendo daño emergente y lucro cesante, de los perjuicios causados con sus conductas de mala fe contractual; y (b) se condene a los Demandados a pagar a los Demandantes el valor de todos los perjuicios causados a los Demandantes que resulten probados en el curso del proceso, de conformidad con el principio de indemnización integral de perjuicios. Dentro de tales perjuicios, los Demandantes distinguen entre: (i) daños patrimoniales, (ii) daños a la imagen, buen nombre y reputación, y (iii) daño moral.

559. Asimismo, los Demandantes se pronuncian sobre algunas cuestiones preliminares objeto de debate entre las Partes:

(i)    Acumulación de perjuicios efectivos y cláusula penal

560. Los Demandantes alegan que los Demandados están obligados a indemnizar a los Demandantes todos los perjuicios que sus actuaciones de mala fe les han ocasionado, así como la Cláusula Penal prevista en los Contratos de Transacción"[335].

561. Fundan dicha petición en el hecho que las Partes acordaron que el mero incumplimiento del Contrato de Transacción daba lugar al nacimiento de la obligación de pagar la Cláusula Penal, sin perjuicio de los demás daños que el incumplimiento pudiere generar.

---

[335] Memorial de Demanda. Párrafo 148.

562. Para tales efectos, los Demandados citando la Cláusula Octava de los Contratos de Transacción y, en particular, la sección que indica lo siguiente: *"...Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados más la pena que aquí se establece"*[336].

    (ii)   Reparación integral del daño

563. Los Demandante alegan que los Demandados incumplieron abierta y flagrantemente los Contratos de Transacción, lo cual, de acuerdo con las normas que rigen la responsabilidad civil contractual supone, que el deudor incumplido deba resarcir íntegramente los perjuicios ocasionados con su incumplimiento[337].

564. Al respecto los Demandantes argumentan que los mismos Demandados reconocen este principio en su escrito de Contestación la Demanda Principal cuando señalan que: *"La indemnización de perjuicios en materia contractual es la consecuencia cuando quiera que, el deudor de alguna obligación previamente adquirida la ha incumplido, la ha cumplido imperfectamente o ha retardado su cumplimiento, pues son estos los presupuestos que habilitan el reconocimiento de una indemnización de perjuicios en el ámbito contractual en nuestro ordenamiento jurídico positivo"*[338].

565. Asimismo, los Demandante afirman que la Corte Suprema de Justicia ha establecido con claridad que la reparación a quien ha sufrido un daño debe ser plena[339].

    (iii)   Daños patrimoniales, daño al buen nombre y daño moral

        *a. Daños patrimoniales*

566. Si bien en el Memorial de Demanda los Demandantes se refieren únicamente al daño al buen nombre, sin referirse al daño patrimonial, en el Memorial de Réplica los Demandantes señalan que algunos daños patrimoniales experimentados por ellos con ocasión del incumplimiento de los Demandados de abstenerse de iniciar acciones judiciales y extrajudiciales por las controversias terminadas en virtud de los Contratos de Transacción corresponden: al pago de honorarios de abogados asociados a su defensa en dichas reclamaciones, a la defensa de Lafrancol en la solicitud de conciliación, la cual debieron asumir en su calidad de antiguos accionistas de Lafrancol, así como su defensa frente a las reclamaciones que dicha solicitud derivó de parte de los nuevos accionistas de la compañía[340].

567. En el Memorial Posterior a la Audiencia los Demandantes aluden a otros daños patrimoniales - no incluidos en los memoriales principales- como son el hecho que los Demandantes y su familia no hubiesen recibido, a la fecha, la totalidad del precio que legítimamente les corresponde por la venta de Lafrancol, con el correspondiente costo de oportunidad y devaluación que ello acarrea, producto de que CFR congeló el cuantioso escrow que se había constituido con ocasión de la

---

336 *Ibídem.*
337 Memorial de Réplica. Párrafo 156.
338 Memorial de Contestación, página 45, citado en el Memorial de Réplica. Párrafo 156.
339 Memorial de Réplica. Párrafo 158.
340 Memorial de Réplica. Párrafo 160.

venta del laboratorio[341]; y los costos propios del trámite arbitral y los honorarios de los peritos y abogados que han participado en este trámite[342].

### b. Daño a la imagen, buen nombre y reputación

568. Los Demandantes señalan que todos los incumplimientos contractuales en que incurrieron los Demandados les produjeron serios daños a su imagen, su reputación y buen nombre. La divulgación de la disputa familiar, que adquirió connotaciones penales, llamó la atención de la generalidad de los medios de comunicación quienes hicieron múltiples reseñas en franjas de alta penetración de audiencia, todo lo cual causó serios perjuicios a la reputación y buen nombre de los Demandantes.

569. Señalan los Demandantes que el derecho al buen nombre está consagrado en el artículo 15 de la Constitución colombiana en el título II "De los Derechos, los Deberes y las Garantías" el cual dispone: *"Todas las personas tienen derecho a su intimidad personal y familiar y a su buen nombre, y el Estado debe respetarlos y hacerlos respetar. De igual modo, tienen derecho a conocer, actualizar y rectificar las informaciones que se hayan recogido sobre ellas en bancos de datos y en archivos de entidades públicas y privadas"*. Agregan que, dada la relevancia de este derecho, su regulación excede el ámbito nacional y ha sido reconocido y desarrollado en instrumentos internacionales, los cuales son vinculantes por disposición del ordenamiento interno. Así, el derecho al buen nombre está recogido en la Declaración Universal de los Derechos Humanos, en su artículo 12; en la Convención Interamericana de Derechos Humanos, en su artículo 11, en La Declaración Americana de Derechos y Deberes del Hombre, artículo V; y en El Pacto Internacional de Derechos Civiles y Políticos, en su artículo 17[343]. Es tanta la importancia del derecho al buen nombre bajo el ordenamiento jurídico colombiano, que el legislador ha consagrado los tipos penales de injuria y calumnia para proteger el bien jurídico de la "Integridad Moral", en el título V del Código Penal colombiano[344].

570. Exponen los Demandantes que Juan María Rendón y Esther Ventura ganaron su buen nombre como resultado de años de haber desplegado una buena conducta y un recto actuar ante la comunidad, actuando por varias décadas como promotores del desarrollo de la industria colombiana y de políticas públicas en materias de alto interés nacional[345].

571. En efecto, relatan que Esther Ventura es Ingeniera Industrial de la Universidad del Valle y Master en Administración Industrial en dicha Universidad a la cual posteriormente se vinculó como docente. Lafrancol, como negocio farmacéutico, fue establecido en 1911 en la ciudad de Cali, por un miembro de la familia Ventura. Mantuvo el carácter de negocio familiar y de carácter regional, especializado en la representación de productos de farmacéutica extranjeras, orientado a un mercado regional. En 1976, Esther Ventura llegó a la empresa con el cargo de Gerente General de la Compañía y de ahí en adelante, se dedicó al desarrollo de la empresa, de nuevos mercados y productos. El interés y la relación que tenía Esther Ventura con la industria farmacéutica, la llevó a participar en varias agremiaciones industriales en Colombia[346]. Por su parte, Juan María Rendón es Ingeniero Industrial de la Universidad de Los Andes, en la que

[341] Memorial de las Demandantes Posterior a la Audiencia. Párrafos 162 y 163.
[342] Memorial de las Demandantes Posterior a la Audiencia. Párrafo 164.
[343] Memorial de Demanda. Párrafos 154 y siguientes.
[344] Memorial de Demanda. Párrafo 162.
[345] Memorial de Demanda. Párrafo 166.
[346] Memorial de Demanda. Párrafos 167 y siguientes.

también se vinculó académicamente. Posee un Master en Administración Industrial de la Universidad del Valle, y de la Universidad de Miami, y Master en Business, Government and International Economy en la Universidad de Harvard. Entró a hacer parte del equipo dedicado a explotar y desarrollar la potencialidad de Lafrancol. En 1995 se convirtió en Gerente General de la Compañía y fue responsable, junto con Esther Ventura, de su crecimiento[347].

572. El trabajo de Esther Ventura, Juan María Rendón y su equipo de trabajo, llevó a posicionar a Lafrancol, en el año 2010 como el laboratorio farmacéutico número uno de las ventas en Colombia, siendo la farmacéutica líder en el país con proyección tanto nacional como internacional[348]. En 2011, Lafrancol cumplió 100 años y el Presidente de la República de Colombia condecoró a Esther Ventura con la Orden al Mérito Empresarial. Posteriormente fue objeto de entrevistas ante los medios de comunicación, los cuales reseñaban acerca de su trayectoria profesional y empresarial[349].

573. Este es el buen nombre que los Demandantes habían construido y del que gozaban para el año 2012, momento en el cual Viviane y Michael Ventura comenzaron a desplegar una serie de comportamientos que infringieron sus compromisos contractuales. Entre estos comportamientos se cuentan, principalmente la presentación de la Denuncia Penal, la Segunda Conciliación en contra de Lafrancol y las declaraciones mediante las cuales Viviane se refirió en los medios de comunicación a Esther Ventura y a la comisión de posibles delitos por su parte. Señalan que esa es la imagen y buen nombre que los Demandantes intentaron proteger al incluir las obligaciones de confidencialidad y de no divulgación en los Contratos de Transacción, y que ese fue el buen nombre que resultó afectado por los incumplimientos contractuales en los que incurrieron los Demandados[350].

574. Agregan los Demandantes que el ordenamiento jurídico establece una serie de mecanismos para proteger el derecho al buen nombre. En primer lugar, el Código Penal establece los tipos penales de injuria y calumnia cuya sanción se aumenta si dicho delito se comete a través de medios de comunicación. Además, señalan que la jurisprudencia ha establecido la procedencia de la responsabilidad civil contractual y extracontractual por violación al derecho fundamental al buen nombre ya que la afectación puede provenir, como en este caso particular, de incumplimientos de obligaciones contractuales[351].

575. Frente a la defensa de los Demandados en cuanto a que ninguna de sus actuaciones se ha dirigido contra Juan María Rendón, y que los hechos que dieron lugar a la Denuncia Penal fueron causados por la propia Esther Ventura así que no estaría legitimada para reclamar daños, los Demandantes responden, primero, que la divulgación infundada de información que distorsiona el concepto público de un individuo configura un daño al buen nombre, el que genera un daño moral para ese individuo y sus parientes cercanos, justificando así el daño sufrido por Juan María Rendón. Por otro lado, los Demandantes sostienen que vincular a una persona con hechos delictivos, sin que exista sentencia condenatoria en su contra o sin exponer los elementos probatorios necesarios, constituye, según la jurisprudencia, *"divulgación infundada de información violatoria de derechos"*[352]. Concluyen los Demandantes que tales conductas irrogan daños

---

[347] Memorial de Demanda. Párrafos 174 y siguientes.
[348] Memorial de Demanda. Párrafo 172.
[349] Memorial de Demanda. Párrafos 180 y 181.
[350] Memorial de Demanda. Párrafos 182 y siguientes.
[351] Memorial de Demanda. Párrafos 190 y siguientes.
[352] Memorial de Réplica. Párrafo 155.

y perjuicios patrimoniales, morales y al buen nombre de ambos Demandantes, los cuales deben ser reparados[353].

576. Por otro lado, ante la alegación de los Demandados de que *"el ejercicio del derecho a la libertad de expresión, opinión e información justificaría las declaraciones realizadas por Viviane Ventura (…)"*, los Demandantes responden que la misma jurisprudencia que citan los Demandados establece que la libertad de expresión no es un derecho absoluto y tiene restricciones, de modo que el ejercicio del derecho de una persona no pueda realizarse de forma irrestricta al punto de llegar a transgredir otros derechos de otras personas, como el derecho al buen nombre. Así, Viviane Ventura no sólo hizo manifestaciones públicas dando información veraz acerca de posibles conflictos penales sino que *"sostuvo categóricamente que Esther Ventura cometió un fraude"*[354].

### c. Daño Moral

577. Los Demandantes alegan que los incumplimientos contractuales de los Demandados les ocasionaron, además de perjuicios patrimoniales, un daño a su buen nombre y un daño moral[355]. Si bien el Memorial de Demanda los Demandantes se refieren únicamente al daño al buen nombre, sin referirse al daño moral y señalan que en el desarrollo jurisprudencial en Colombia respecto de la reparación por el daño al buen nombre, su indemnización ha fluctuado entre considerarlo como rubro a incluir dentro del concepto de daño moral, o disponer su reparación como un perjuicio inmaterial independiente[356], en el Memorial de Réplica los Demandantes claramente separan el daño al buen nombre del daño moral al afirmar que: *"en lo que respecta a la cuantificación de los perjuicios derivados del daño al buen nombre, debe tenerse en cuenta que la jurisprudencia ha reconocido que aquellos tienen tanto un componente patrimonial como uno extrapatrimonial, distinto del daño moral"*[357].

578. En el Memorial de Réplica, los Demandantes afirman que el daño moral –en su concepto distinto al daño al buen nombre– está demostrado[358] por cuanto los Demandados, estando expresamente obligados a no iniciar acciones judiciales ni extrajudiciales y a no referirse pública ni privadamente a los Demandantes, no han hecho otra cosa que difamarlos públicamente ante los medios de comunicación y hostigarlos a través de diferentes mecanismos, tales como la Denuncia Penal, la Segunda Conciliación, la interferencia en sus relaciones personales, profesionales, comerciales y sociales"[359]. Agregan que no hay duda de que tales actuaciones de los Demandados han generado a los Demandantes sentimientos de zozobra y angustia extrema identificados por los tribunales colombianos como base de estos daños, al verse avocados a soportar las consecuencias de acusaciones públicas en su contra que no tienen sustento y que únicamente son producto de la mala fe de los Demandados[360].

---

[353] Memorial de Réplica. Párrafos 153 y siguientes.
[354] Memorial de Réplica. Párrafos 282 y siguientes y párrafo 294.
[355] Memorial de Réplica. Párrafo 159.
[356] Memorial de Demanda. Párrafo 161.
[357] Memorial de Réplica. Párrafo 176.
[358] Memorial de Réplica. Párrafo 186.
[359] Memorial de Réplica. Párrafo 184.
[360] Memorial de Réplica. Párrafo 185.

579. Asimismo, los Demandantes alegan que la jurisprudencia ha determinado que el medio probatorio que resulta más idóneo es la presunción simple, sin que ello signifique que ésta sea la única probanza admisible.[361]

580. En respuesta a la alegación de los Demandados de que no se solicitó la reparación del daño moral en el escrito de demanda, por lo que sería improcedente establecer una reparación por este rubro, los Demandantes afirman en el Memorial Posterior a la Audiencia que de una simple lectura de las pretensiones número 2, 3, 16 y 20 del Memorial de Demanda se extrae que se elevaron pretensiones tendientes a obtener una indemnización plena e integral de los perjuicios, indemnización que claramente incluye el daño moral causado.

b. Posición de los Demandados

(i)   Acumulación de perjuicios efectivos y cláusula penal

581. En el Acta de Misión los Demandados señalan que es improcedente el cobro de las cláusulas penales y simultáneamente la indemnización de perjuicios.

582. En el Memorial de Contestación los Demandados no se pronuncian expresamente sobre la posibilidad de acumular los perjuicios efectivos y la cláusula penal. Alegan que la cláusula penal no resulta exigible y que en el presente caso no se cumplirían los elementos de la responsabilidad contractual en relación con los supuestos incumplimientos reclamados, de modo que no sería procedente la indemnización que pretenden los Demandantes[362].

(ii)   Reparación integral del daño

583. Los Demandados no se pronuncian expresamente sobre este punto, aunque reiteran que en cualquier caso no procede la indemnización de perjuicios.

584. En concreto, los Demandados advierten que para que el daño sea indemnizable debe tratarse de un detrimento o menoscabo, patrimonial o moral, que se traduzca en una situación perjudicial para quien se pretende víctima y reclama reparación, lo cual a su juicio no ocurre en el presente caso[363].

585. En el Memorial de Pronunciamiento sobre la Réplica, los Demandados advierten que los Demandantes invocan nuevos hechos y argumentos en el Memorial de Réplica en relación al daño que los Demandantes afirman haber padecido, entre los cuales se encuentran: los daños patrimoniales y los daños calificados como morales por los Demandantes los cuales no se articularon ni describieron en los escritos previos presentados durante el Arbitraje.

(iii)   Daños patrimoniales, daño al buen nombre y daño moral

---

[361] Memorial de Réplica. Párrafo 180.
[362] Memorial de Contestación. Párrafos 291 y siguientes.
[363] Memorial de Cierre de los Demandados. Párrafo 292.

586. Los Demandados no hacen ninguna otra alusión a daños patrimoniales o morales alegados específicamente por los Demandantes, salvo por el hecho que no proceden y que fueron alegados extemporáneamente.

587. Sin embargo, en cuanto al daño al buen nombre, los Demandados presentan sendos argumentos objetando su procedencia.

588. Los Demandados niegan que se hayan causado daños al buen nombre, a la reputación y a la fama de los Demandantes por causa de sus conductas y declaraciones. En primer lugar, señalan que no se ha efectuado manifestación alguna respecto de Juan María Rendón. Señalan que, en efecto, la Denuncia Penal fue interpuesta exclusivamente en contra de Esther Ventura, las declaraciones efectuadas por Viviane Ventura en su entrevista así como las publicaciones hechas por los medios de comunicación también se referían únicamente a Esther Ventura, y jamás se hizo alusión en ellas a Juan María Rendón[364].

589. Respecto al contenido del derecho al buen nombre, señalan los Demandados que la jurisprudencia define el derecho al buen nombre como *"la buena opinión o fama adquirida por un individuo en razón a la virtud y al mérito de sus propias acciones"* y que éste *"está atado a todos los actos o hechos que una persona realice y por las cuales la sociedad hace un juicio de valor sobre sus virtudes y defectos"*[365]. Al respecto, la afectación de la reputación de los Demandantes y el daño que se pudo haber causado a su fama e imagen vienen de su propia conducta y, por lo mismo, no pueden ser objeto de reparación por parte de los Demandados.

590. A mayor abundamiento, los Demandados alegan que si se considera que hubo una verdadera vulneración al derecho al buen nombre, debe probarse que la información contenida, tanto en la Denuncia Penal, como en las demás declaraciones, es *"errónea, falsa y maliciosa"*[366].

591. En este sentido, los Demandados alegan que no se vulnera la reputación o buen nombre de un individuo por el solo hecho de informar a la opinión pública las controversias reales y existentes entre las partes, aun cuando estas sean constitutivas de delitos. En efecto, si el dato revelado es veraz, no corresponde atribuir responsabilidad a la persona que ha dado esa información. Destacan los Demandados que es *"un derecho y un deber de los medios de comunicación, constitucionalmente reconocido"*[367], recibir información veraz e imparcial y poder darla a conocer. De esta manera, el sólo hecho de informar a los medios que una persona se encuentra vinculada a un proceso penal no implica *per se* una vulneración del derecho al buen nombre. El proceso penal, además, es un mecanismo que contempla la posibilidad para que una persona pueda defender su honor y su honra[368]. Agregan que existe una prevalencia de la libertad de expresión y no se puede pretender que para evitar el daño al buen nombre y a la reputación de una persona deba limitarse toda la expresión, opinión e información sobre un individuo por parte de otras personas, ya sean privadas o medios de comunicación[369].

592. Por otro lado, los Demandados señalan que no es efectiva la afirmación de los Demandantes en relación a que sólo pueda informarse acerca de hechos delictivos cuando exista sentencia

---

[364] Memorial de Contestación. Párrafo 362.
[365] Memorial de Contestación. Párrafo 359.
[366] Memorial de Cierre de los Demandados. Párrafo 301.
[367] Memorial de Cierre de los Demandados. Párrafos 303 y siguientes.
[368] Memorial de Cierre de los Demandados. Párrafo 306.
[369] Memorial de Cierre de los Demandados. Párrafo 309.

ejecutoriada. Dicen que los Demandantes llegaron a esa conclusión a partir de un extracto de una sentencia que había sido sacado de contexto[370]. Según los Demandados, la sentencia en cuestión efectivamente consideró que puede existir un daño al derecho al buen nombre al involucrar a una persona en la comisión de delitos sin exhibir evidencia o sin apoyarse en una sentencia condenatoria, pero se refería al daño causado por parte del Ministro de Hacienda a unas compañías colombianas, al acusarlas de presunta evasión de impuestos. De la sentencia citada por la mismos Demandantes, los Demandados concluyen que "*la necesidad de existir prueba idónea o sentencia judicial de condena que impute la comisión de delitos, como requisito para poder efectuar declaraciones contra personas determinadas en las cuales se les acuse de la comisión de delitos punibles, se refiere exclusivamente a los funcionarios públicos (…)*"[371].

593. En otro orden de ideas, los Demandados destacan que Esther Ventura es un personaje público que ya ha sido objeto de investigaciones. Como personaje público se encuentra expuesta a un mayor escrutinio público e interés por parte de los medios de comunicación. La opinión pública tiene derecho a conocer su comportamiento en el campo de los negocios[372]. Además, al examinar la Entrevista efectuada por Viviane Ventura, es posible apreciar que ni ella ni los medios de comunicación incurrieron en afirmaciones falsas, sino que explicaron en forma clara y veraz que el conflicto existente entre las Partes, vinculado con Lafrancol, había sido objeto de una denuncia penal, estaba siendo investigado por las autoridades y que tanto los Demandantes como sus abogados consideraban que los hechos constituían un posible fraude. Pero que nunca se manifestó o afirmó que ya hubiera sentencia condenatoria, o que se hablara con certeza de que se había cometido un delito[373].

594. Respecto a la limitación y valoración del daño al buen nombre, los Demandados señalan que se trata de un daño no patrimonial, en cuya valoración no existen parámetros matemáticos, sino que ello depende del criterio de razonabilidad del juez de la causa. El daño al buen nombre se configura cuando se demuestra la violación culposa del bien jurídico. A juicio de los Demandados, los Demandantes no han probado la vulneración al bien jurídico protegido ni que se produjera un daño por cuenta de las publicaciones en los medios de comunicación o la presentación de la Denuncia Penal o por la Entrevista en la W Radio a Viviane Ventura[374].

## 2. DECISIÓN DEL TRIBUNAL

### (i) Acumulación de perjuicios efectivos y cláusula penal

595. En relación a la posibilidad de acumular los perjuicios efectivos y la cláusula penal, el CCC señala en el artículo 1600: "*No podrá pedirse a la vez la pena y la indemnización de perjuicios, a menos de haberse estipulado así expresamente…*" (énfasis agregado).

596. Atendido que en el presente caso las Partes pactaron expresamente en la Cláusula Octava de los Contratos de Transacción que "*el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados más la pena que aquí se establece*" (énfasis agregado), el Tribunal

---

[370] Memorial de Cierre de los Demandados. Párrafos 313 y siguientes.
[371] Memorial de Cierre de los Demandados. Párrafo 321.
[372] Memorial de Cierre de los Demandados. Párrafo 325.
[373] Memorial de Cierre de los Demandados. Párrafos 327 y siguientes.
[374] Memorial de Cierre de los Demandados. Párrafos 334 y siguientes.

resuelve que las Demandantes tienen derecho a exigir los perjuicios efectivos, si los hubiesen, en conjunto con la Cláusula Penal.

(ii) Reparación integral del daño

597. A mayor abundamiento, en línea con lo resuelto por la Corte Suprema de Justicia de Colombia[375], el Tribunal estima que la reparación del daño debe ser integral, abarcando la totalidad de los daños padecidos de manera de colocar a la persona afectada en la misma situación en que se encontraba antes del incumplimiento contractual.

(iii) Daños patrimoniales, daño al buen nombre y daño moral

a. *Daños patrimoniales*

598. Los Demandantes reclaman haber sufrido daños patrimoniales con ocasión de: (i) el pago de honorarios de abogados asociados a su defensa en las acciones judiciales y extrajudiciales iniciadas en su contra por los Demandados con posterioridad a la celebración de los Contratos de Transacción; la defensa de Lafrancol en la Segunda Conciliación; y la defensa frente a las reclamaciones que dicha Segunda Conciliación derivó de parte de los nuevos accionistas de la compañía[376]; y (ii) el hecho que los Demandantes y su familia no hubiesen recibido, a la fecha, la totalidad del precio que legítimamente les corresponde por la venta de Lafrancol, con el correspondiente costo de oportunidad y devaluación que ello acarrea, producto de que CFR congeló el cuantioso escrow que se había constituido con ocasión de la venta del laboratorio[377].

599. El Tribunal Arbitral ha establecido en el Laudo Arbitral que la presentación de la Denuncia Penal no comporta un incumplimiento de los Contratos de Transacción, de modo que los gastos causados a los Demandantes por dicha acción no pueden reclamarse en este Arbitraje como daños en la medida que no hay incumplimiento.

600. La situación es distinta respecto de los gastos asociados a la Segunda Conciliación así como los eventuales daños derivados de la misma, en la medida que el Tribunal ha concluido que ella supuso un incumplimiento de los Contratos de Transacción. En este sentido, si bien el Tribunal hubiese estado abierto a considerar la indemnización de estos daños en particular de aquellos relativos a los gastos irrogados a los Demandantes con motivo de la defensa de Lafrancol en la Segunda Conciliación, así como el costo financiero o interés sobre el dinero que los Demandantes habrían perdido por los fondos congelados por CFR en una cuenta escrow derivados también de la Segunda Conciliación y de la restitución de acciones que allí reclamaban los Demandados, lo cierto es que los Demandantes no han acompañado al proceso ningún antecedente que acredite la existencia de estos daños ni que permita dilucidar su monto o cuantificación.

601. En efecto, en relación al pago de honorarios a abogados para su defensa en las acciones judiciales y extrajudiciales iniciadas en su contra, los Demandantes no acreditaron la intervención de abogados que hubiesen emitidos facturas o comprobantes de honorarios a los Demandantes

---

[375] Anexo D-DJ-5. Sentencia de la Corte Suprema de Justicia de Colombia del 5 de agosto de 2014
[376] Memorial de Réplica. Párrafo 160.
[377] Memorial de las Demandantes Posterior a la Audiencia. Párrafos 162 y 163.

derivados de la defensa de Lafrancol en la Segunda Conciliación. Tampoco acreditaron los Demandantes que hubiesen realizado pagos o abonos de suma alguna por dicho concepto.

602. Por su parte, en relación al congelamiento de los fondos que les correspondían a los Demandados por la venta de Lafrancol y que se habrían producido como consecuencia de la Segunda Conciliación, los Demandantes no han acompañado pruebas para acreditar los efectos o consecuencias pecuniarias del congelamiento de los fondos en la cuenta escrow y si éste significó realmente verse privados de una utilidad asociada al interés del dinero, y muchos menos el monto de dicha supuesta pérdida de utilidad, pues el Tribunal desconoce si dicha cuenta generará o no intereses a su favor si es que llega a liberarse. Tampoco construyeron los Demandantes esta reclamación indemnizatoria como un costo financiero derivado de la imposibilidad de usar tales sumas de dinero, ni presentaron al Tribunal elementos de juicio para cuantificar a cuánto habría ascendido dicho costo financiero o la pérdida por el no uso del dinero durante el tiempo que dure el referido congelamiento de fondos.

603. En conclusión, atendido que los Demandantes no acreditaron daño emergente o lucro cesante - los dos conceptos que típicamente configuran daños de orden patrimonial- derivados de los incumplimientos de los Contratos de Transacción por los Demandados, el Tribunal resuelve que no procede la indemnización por daños patrimoniales, debiendo desestimarse esta reclamación.

### b. *Daño a la imagen, buen nombre y reputación*

604. El Tribunal ya ha concluido que, con motivo de la Segunda Conciliación y la Entrevista en la W Radio, se incumplió el Contrato de Transacción por parte de los Demandados. Por causa de dichos incumplimientos el Tribunal Arbitral reconoció la aplicación de la Cláusula Penal.

605. La que resta por resolver, en relación con este punto, es si, además de la procedencia de la Cláusula Penal, corresponde la indemnización del daño que los Demandantes alegan que se ha producido, a su imagen, buen nombre y reputación.

606. Como una primera consideración, el Tribunal concuerda con la alegación hecha por los Demandados en orden a que las actuaciones que podrían haber afectar la imagen, el buen nombre y reputación no se se han dirigido en contra de Juan María Rendón. La Segunda Conciliación se hizo respecto de Lafrancol y no respecto de las personas de los Demandantes y las consecuencias invocadas por los Demandantes como resultado de esto habrían sido de carácter económico. Finalmente, en la Entrevista efectuada por Viviane Ventura, ésta se refirió únicamente a Esther Ventura y no hizo declaraciones relacionadas con Juan María Rendón. Por ello, no se podrían haber producido daños al buen nombre y reputación de Juan María Rendón, dado que los actos que los Demandantes estiman como dañinos para su buen nombre, no fueron dirigidos en contra de éste.

607. Por otro lado, el Laudo Arbitral ya ha desestimado que los Demandados hayan incumplido los Contratos de Transacción con ocasión de la Denuncia Penal. Por ello, tampoco corresponde en el contexto de este Arbitraje ordenar la indemnización de los daños a la imagen que los Demandantes alegan haber sufrido como consecuencia de la realización de dicha Denuncia Penal por parte de Viviane Ventura.

608. Respecto de los incumplimientos de los Demandados relativos a la Segunda Conciliación y la Entrevista en la W Radio, este Tribunal considera que los Demandantes no han probado que se hayan causado daños y perjuicios al buen nombre y fama de los Demandantes que justifiquen el pago de una indemnización adicional más allá de la Cláusula Penal a que están condenados a pagar los Demandados.

609. En efecto, en lo que respecta a la Segunda Conciliación, los Demandantes no ha aportado prueba alguno de cuál es el daño al buen nombre y reputación de Esther Ventura, más allá de la violación contractual que da lugar a la aplicación de la Cláusula Penal. En concreto, los Demandantes no han proporcionado prueba que permita inferir que se ha dañado su reputación como consecuencia de la Segunda Conciliación.

610. Lo mismo ocurre respecto de la Entrevista en la W Radio. Efectivamente dicha entrevista y su difusión constituyen un incumplimiento contractual, el cual ha dado lugar a la aplicación de la Cláusula Penal estipulada en los Contratos de Transacción, pero no existen pruebas que demuestren un daño al buen nombre y a la reputación de Esther Ventura que den lugar a la reparación de perjuicios más allá de dicha cláusula. Específicamente, los Demandantes no acreditaron en parecer del Tribunal que la referida entrevista y su difusión posterior por otros medios haya afectado el buen nombre, imagen y reputación de Esther Ventura.

611. En razón de lo anterior, el Tribunal Arbitral rechaza la solicitud de indemnización reclamada por los Demandantes por concepto del daño a su buen nombre, imagen y reputación.

### c. Daño moral

612. La única alusión por parte de los Demandantes del daño moral con independencia del daño a la imagen se encuentra en el Memorial de Réplica, en que reclaman que las difamaciones públicas ante los medios de comunicación y el hostigamiento a través de diferentes mecanismos, tales como la denuncia penal, la solicitud de conciliación, la interferencia en sus relaciones personales, profesionales, comerciales y sociales, les han generado "sentimientos de zozobra y angustia extrema".

613. El Tribunal Arbitral considera que los Demandantes (i) no especificaron con suficiente detalle de qué manera experimentaron el alegado daño moral, (ii) no aportaron criterios o premisas que permitan hacer una valoración del daño, y (iii) no acompañaron al proceso elementos que sirviesen para acreditar la existencia y gravedad del mismo (tales como declaraciones de terceros, certificados médicos, etc.).

614. A mayor abundamiento, en el presente caso no se aprecia cómo este concepto está separado del daño a la imagen, desarrollado extensamente por los Demandantes. A este respecto notamos que los mismos Demandantes reconocieron que parte de la jurisprudencia colombiana no distingue entre ambos conceptos, según se describe más arriba. Por lo mismo, nos remitimos a todas las consideraciones expuestas respecto del daño a la imagen, para resolver el rechazo de la indemnización del daño moral.

615. En conclusión, la reclamación de los Demandantes sobre la procedencia del daño moral debe desestimarse[378].

# 5.- LOS COSTOS DEL ARBITRAJE

616. Finalmente, el Tribunal Arbitral debe resolver sobre los costos del arbitraje, su monto y la distribución o proporción en que las Partes deben soportarlos.

## 1. POSICIÓN DE LAS PARTES

### 1. Posición de los Demandantes

617. En cuanto al monto de los costos, los Demandantes han presentado el siguiente detalle con motivo de los costos y gastos incurridos con motivo del Arbitraje:

a) Pagos realizados a la Cámara de Comercio Internacional:

La Provisión para gastos del Tribunal Arbitral pagada a la CCI corresponde a la suma de US $317.000[379].

b) Honorarios por asesoría y representación legal:

Los honorarios de los abogados de los Demandantes, implicaron para ellos un costo de US $300.001,19[380].

c) Otros costos y gastos incurridos en el curso del Arbitraje:

  (i) Honorarios de peritos: US$31.254,42.

  (ii) Costos de reserva de salas de audiencia y servicios de audición y transcripción prestados por la CCB: US $1.180,08.

  (iii) Gastos de envío de los memoriales y documentos anexos de conformidad con el numeral 3 del Acta de Misión de fecha 28 de julio de 2014: US$284,53[381].

618. De acuerdo a todo lo anterior los costos asociados a los honorarios de representación legal y otros gastos incurridos por los Demandantes asciende a la suma de US$332.720,22.

619. En lo relativo a la distribución de los costos del arbitraje, los Demandantes solicitan al Tribunal Arbitral ordenar a los Demandados asumir la totalidad de los costos del Arbitraje aduciendo razones tanto normativas como fácticas[382].

---

[378] El Tribunal Arbitral hace presente que los Demandantes no solicitaron el pago de interés sobre las sumas a las que resulten condenados los Demandados. Tampoco aportaron argumentos o elementos probatorios en torno a si deberían devengarse intereses, desde cuándo y hasta cuándo, ni indicaron la tasa de interés aplicable, en su caso. Por ello, el Laudo Arbitral no contiene ninguna decisión en cuanto a intereses.
[379] Escrito de los Demandantes sobre los Costos del Arbitraje y su Distribución. Página 2.
[380] Ibídem.
[381] Ibídem.
[382] Escrito de los Demandantes sobre los Costos del Arbitraje y su Distribución. Página 3.

620. Señalan que de conformidad con el artículo 37(4) del Reglamento corresponde al Tribunal Arbitral fijar en el laudo final los costos del Arbitraje y decidir acerca de la distribución de los mismos. Agregan que el artículo 37(5) del Reglamento permite al Tribunal Arbitral, al decidir sobre los costos, *"tomar en cuenta las circunstancias que considere relevantes (…)"* incluyendo la conducta que las partes hayan tenido en lo largo del proceso y la influencia de dicha conducta en los costos.

621. Por otra parte, señalan que la regla según la cual *"la parte vencida debe asumir los costos generados en el trámite arbitral"*, es plenamente reconocida y aplicada por la mayoría de los laudos dictados en conformidad con el Reglamento de la CCI. A mayor abundamiento, esta regla está reconocida en el ordenamiento jurídico colombiano. Así lo establece el artículo 392 del Código de Procedimiento Civil, el cual señala que *"se condenará en costas a la parte vencida en el proceso"*[383].

622. Los Demandantes también señalan que hay una serie de razones fácticas que justifican que los Demandados asuman la totalidad de los costos y gastos incurridos con motivo de este Arbitraje: (i) fue la conducta de los Demandados, los reiterados incumplimientos de los Contratos de Transacción, la que dio origen al presente Arbitraje; (ii) los Demandantes demostraron y acreditaron la totalidad de sus pretensiones relativas tanto a los incumplimientos de los Demandados como a la estrategia de presión desplegada por ellos y en contra de los Demandantes; (iii) se demostró que todas y cada una de las defensas de los Demandados son improcedentes; y (iv) los Demandantes actuaron de manera eficaz y expedita en el Arbitraje, a diferencia de la conducta desplegada por los Demandados la cual implicó extensiones de plazos y modificaciones al calendario procesal inicialmente acordado[384].

### 2. Posición de los Demandados

Sobre el monto de las costas

623. Los Demandados han presentado el siguiente detalle con motivo de los costos y gastos incurridos con motivo del Arbitraje:

a) Pagos realizados a la Cámara de Comercio Internacional:

Los Demandados solamente habrían pagado de la provisión para gastos del Tribunal Arbitral a la CCI la suma de US$3.000[385].

b) Honorarios por asesoría y representación legal:

Los honorarios de los abogados de los Demandados, implicaron para ellos un costo de US$58.675.

c) Otros costos y gastos incurridos en el curso del Arbitraje:

(i)     Documentación: COP $814.236.

(ii)    Envíos: COP $2.633.104.

---

[383] Escrito de los Demandantes sobre los Costos del Arbitraje y su Distribución. Páginas 3 y 4
[384] Escrito de los Demandantes sobre los Costos del Arbitraje y su Distribución. Páginas 4 y 5.
[385] Se mencionan las cantidades en la moneda en que han sido expresadas por los Demandados en el Memorial sobre Distribución de Costos de Arbitraje de fecha 24 de Julio de 2015.

(iii)    Audiencia: COP $3.312.000.

(iv)    Viajes: US $5.911; £2,159.96 y COP $16.475.689.

(v)    Traducciones: US $1.687,70.

624. En lo tocante a la distribución de los costos del arbitraje entre las Partes, los Demandados también citan los artículos 37(4) y 37(5) del Reglamento, en virtud de los cuales corresponde al Tribunal Arbitral fijar en el laudo final los costos del Arbitraje y su distribución entre las Partes así como las circunstancias que puedan ser tenidas por el Tribunal Arbitral para esa decisión.

625. En virtud de las disposiciones citadas, los Demandados solicitan al Tribunal Arbitral que declare que cada una de las Partes debe asumir los costos en los que incurrió en el presente Arbitraje y que los costos de la Corte y los honorarios de los Árbitros sean asignados en su totalidad a los Demandantes[386].

626. Los Demandados aducen una serie de razones para solicitar que cada una de las Partes soporte los costos en los que ha incurrido. En primer lugar señalan el pacto arbitral contenido en los Contratos de Transacción prevén que cada una de las partes asuma sus gastos. La cláusula compromisoria expresa que *"los gastos y costas el procedimiento, incluyendo los honorarios de los árbitros, serán asumidos por cada parte"*[387].

627. Por otro lado, y al margen de la decisión sobre la ineficacia de la cláusula compromisoria, señalan que la iniciativa de introducir una cláusula de Arbitraje ante la CCI fue exclusiva de los Demandantes. Incluso, además de la cláusula misma, la iniciativa de adelantar un proceso de Arbitraje Internacional es de los Demandantes. Exponen que Michael y Viviane Ventura han comparecido a este proceso únicamente en su calidad de Demandados, en defensa de sus derechos. La iniciativa del pacto arbitral y del Arbitraje mismo son razones por las cuales los Demandados deberían asumir la totalidad de los costos del presente Arbitraje[388].

628. En otro orden de ideas, los Demandados presentaron inicialmente una demanda de reconvención, la cual fue posteriormente retirada del Arbitraje. La razón del retiro de la Demanda Reconvencional fue la dificultad de los Demandados de solventar la interposición de dicha demanda, llevándose a cabo el proceso únicamente respecto de la Demanda principal. Esta sería, según los Demandados, una razón adicional para que los Demandantes asuman los costos del Arbitraje[389].

629. Ligado a lo anterior, señalan que el retiro de dicha Demanda Reconvencional es un ejemplo de que durante este Arbitraje ha habido, de manera objetiva, costos muy disímiles y una posición económica notoriamente diferente entre los Demandantes y los Demandados. La posición económica disminuida de los Demandados ha afectado sus derechos reales de defensa, tanto en el retiro de la demanda antedicha como en la actividad probatoria en general. Como ejemplo de lo anterior expresan que los Demandados han consultado a un gran número de expertos y han

[386] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Página 11.
[387] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Página 12.
[388] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Páginas 12 y 13.
[389] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Página 13.

aportado variados dictámenes al proceso, cuyo costo debería ser asumido únicamente por esa parte[390].

630. A mayor abundamiento, los Demandados señalan que tanto en el Reglamento como en el pacto arbitral contenido en los Contratos de Transacción, no existe regla o norma alguna que obligue o establezca que todos los costos efectuados en un Arbitraje deban ser asumidos por sólo una parte o por aquella parte que resulte vencida. En la ausencia de dicha norma y teniendo en cuenta la diferencia entre los gastos incurridos por cada parte no sería justo cargar a los Demandados con los gastos efectuados por el Demandante[391].

631. Por último, y en atención a lo señalado por el artículo 37(5) del Reglamento, los Demandados expresan que han conducido el Arbitraje en forma y expedita y eficaz en términos de costos, dando cumplimiento al cronograma previsto para las actuaciones y ciñéndose, en general, a los parámetros de eficacia que menciona el Reglamento[392].

## 2. DECISIÓN DEL TRIBUNAL

632. Conforme a lo dispuesto en el artículo 37(4) del Reglamento, será el Tribunal Arbitral, quien fijará "*los costos del arbitraje y decidirá cuál de las partes debe pagarlos o en qué proporción deben repartirse entre ellos*".

633. Por su parte, el artículo 37(5) otorga un grado de discreción al propio Tribunal en la decisión sobre estas materias, al establecer que el Tribunal Arbitral "*podrá tomar en cuenta las circunstancias que considere relevantes, incluyendo la medida en la que cada parte haya conducido el arbitraje de forma expedita y eficaz en término de costos*".

634. Como cuestión preliminar, los Demandados han alegado que la cláusula arbitral excluiría la posibilidad de que el Tribunal Arbitral pueda condenarlos a pagar los costos de representación legal y otros gastos incurridos por los Demandantes. Para ello, se basan en la siguiente frase de la cláusula arbitral: "*Los gastos y costas del procedimiento, incluyendo los honorarios de los árbitros serán asumidos por cada parte*".

635. El Tribunal Arbitral concuerda con esta interpretación. El Tribunal entiende, como lo afirman los Demandados, que la expresión contenida en la cláusula arbitral constituye un acuerdo entre las Partes sobre la distribución de los costos del Arbitraje, en términos que éstos deben ser asumidos por las Partes.

636. En efecto, la Partes pactan anticipadamente asumir las costas y gastos del procedimiento, e incluyen los honorarios de los árbitros, ello significa que distribuyen anticipadamente esos gastos y costas entre las mismas. De este modo, no podría el Tribunal modificar ese pacto para redistribuirlos entre las Partes según el resultado que obtengan en el Arbitraje, pues ello importaría modificar una cláusula contractual. La interpretación que se acepta en este Laudo Arbitral, además, es la que otorga efectos a dicho acuerdo de las Partes, pues la interpretación contraria elimina todo efecto a dicho lenguaje.

---

[390] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Páginas 13 y 14.
[391] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Página 14.
[392] Memorial sobre Distribución de Costos de Arbitraje de los Demandados. Página 14.

637. Con independencia de lo anterior se debe tener en cuenta que, salvo por los gastos relativos a la organización de la Audiencia que fueron asumidos por cada Parte, los pagos por "*gastos y costas del procedimiento, incluyendo los honorarios de los árbitros*" los han efectuado únicamente los Demandantes. En consecuencia, y de conformidad con la obligación de contribución al pago de tales costos asumida por cada Parte, corresponde que los Demandados deban reintegrar a los Demandantes la parte que éstos han pagado en sustitución de los Demandados. Asimismo, cada parte deberá asumir los costos asociados a sus propios honorarios de representación legal y otros gastos incurridos en la defensa de sus intereses en el Arbitraje.

638. En razón de lo anterior, el Tribunal Arbitral decide que (i) los Demandados deben rembolsar a los Demandantes la mitad de los costos del arbitraje asumidos por los Demandantes en sustitución de aquéllos, y (ii) cada Parte deberá soportar sus propios costos de representación legal y otros gastos incurridos en el Arbitraje. El Tribunal nota que los costos del arbitraje fueron fijados por la Corte Internacional de Arbitraje de la CCI en su sesión de fecha 12 de abril de 2016 en la suma de US$353.757, de los cuales la mitad corresponde a costos que deberían haber sido asumidos por los Demandados. Dado que los Demandados sólo han aportado la suma de US$3.000 correspondientes a dicho monto y que los Demandantes han pagado todo el resto de dicha suma, los Demandados deberán restituir a los Demandantes la suma de US$173.878,50 (esto es, la mitad de la suma total de US$353.757 menos US$3.000).

## VI. PARTE DISPOSITIVA

639. En razón de las consideraciones anteriores contenidas en el Laudo Arbitral, el Tribunal Arbitral decide:

(1) RECHAZAR las objeciones planteadas por los Demandados a la jurisdicción del Tribunal Arbitral;

(2) RECHAZAR las alegaciones y defensas de inexistencia, ineficacia y nulidad planteadas por los Demandados;

(3) DECLARAR que los Demandados han incumplido los Contratos de Transacción suscritos con los Demandantes al haber instado la Segunda Conciliación y, en el caso de Viviane Ventura, al haber intervenido en la Entrevista con la W Radio;

(4) Como consecuencia de lo anterior, CONDENAR a los Demandados al pago de la Cláusula Penal, en términos que Viviane Ventura deberá pagar la suma de US$100.000 (cien mil dólares americanos) a favor de los Demandantes, y Michael Ventura deberá pagar la suma de US$800.000 (ochocientos mil dólares americanos) a favor de los Demandantes. El pago de tales sumas hecho a favor de uno de los Demandantes extinguirá la obligación respecto del otro Demandante;

(5) RECHAZAR la indemnización de daños por concepto de daños patrimoniales, daño a la imagen, el buen nombre y la reputación, y daño moral reclamadas por los Demandantes;

(6) Dado que los Demandantes han pagado la totalidad de los costos del Arbitraje fijados por la Corte de la CCI, CONDENAR a los Demandados al pago y reembolso a los Demandantes de la mitad de dichos costos del Arbitraje, ascendentes a la suma de US$173.878,50 (ciento setenta y tres mil ochocientos setenta y ocho dólares y cincuenta centavos americanos).

(7) ORDENAR que cada Parte deberá soportar sus costos de representación legal y otros gastos incurridos en el Arbitraje.

(8) DESESTIMAR todas y cada una de las demás pretensiones y solicitudes formuladas por las Partes que no hayan sido expresamente acogidas en los numerales anteriores del presente párrafo.

**Sede del arbitraje:** Bogotá, D.C., Colombia.
**Fecha:** 27 de abril de 2016.

Rodrigo Zamora Etcharren
Coárbitro

Eduardo Zuleta Jaramillo
Coárbitro

Cristián Conejero Roos
Presidente del Tribunal Arbitral

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 29 August 2017

Alexander G. FESSAS
Secretary General

# Exhibit B

I, Carlos Julio Carrero, the undersigned, an Official English – Spanish Translator in and for the Republic of Colombia, as per Professional Certificate No. 0314 dated September 14th 2010; do hereby CERTIFY that the attached document presented to me for translation into the English language is reproduced in form and substance in the following ten (10) pages.

The translation below is a true translation into the English language of the attached original document, which I have done upon request of the interested party. In witness whereof I affix my seal and sign below in Bogotá on this twenty-ninth (29th) day Agoust, 2017.

Carlos Julio Carrero

Official Translator No. 0314

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

SETTLEMENT AGREEMENT

By and between

MICHAEL VENTURA

(hereinafter, the "Seller")

and

LABORATORIOS LAFRANCOL S.A.

ESTHER VENTURA DE RENDON

JUAN MARIA RENDON

(hereinafter, the "Buyer")

COLLECTIVELY REFERRED TO AS "THE PARTIES"

Bogota, D.C., September 21, 2010

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

Between the undersigned, to wit:

(i) LABORATORIOS LAFRANCOL S.A., a duly incorporated and existing company under the laws of Colombia, represented herein by ESTHER VENTURA DE RENDON, acting as the duly authorized legal representative to such end (hereinafter, "LAFRANCOL"), on the understanding that LAFRANCOL S.A., and its affiliates and related parties, as well as its shareholders, are referred to herein;

(ii) ESTHER VENTURA DE RENDON, of legal age, married, under current community property, Colombian, domiciled in Bogota, D.C., and identified as appears below in her signature.

(iii) JUAN MARIA RENDON, of legal age, married, under current community property, Colombian, domiciled in Bogota, D.C., and identified as appears below in his signature.

(iv) MICHAEL VENTURA, of legal age, married, under current community property, a British citizen, domiciled in London (England), and identified as appears below in his signature.

We have decided to enter into this Settlement Agreement (the "Settlement Agreement") in accordance with the following:

## RECITALS

1. Whereas the Parties have held in the past several legal and business relationships, including that of the Seller as Shareholder in LAFRANCOL S.A.;

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

2.  Whereas the Parties, in furtherance of these relationships, have had certain disagreements, which is why the Parties seek hereby to prevent eventual conflicts in connection with all of their business and corporate relationships, including in relation to the role of the Buyers as shareholders and/or managers in LAFRANCOL and its related parties.

3.  Whereas upon such purpose the Parties intend to enter into the Settlement Agreement pursuant to article 2469 et seq. of the Civil Code in the interest of preventing any eventual litigations and with the purpose that the Settlement Agreement produces *res judicata* effects, according to the following clauses:

**ONE. Purpose.** The purpose of this agreement is to definitely settle any and all existing disagreements and prevent any eventual and/or contingent litigations, (i) between the Parties, resulting from the condition of the Seller as shareholder and/or shareholders and/or managers of the Buyers. Similarly, the Parties are explicitly interested in preventing any potential judicial or extra-judicial claim or action between them and in respect of the other individuals or legal entities acting as shareholders of LAFRANCOL.

Therefore, pursuant to article 2469 et seq. of the Civil Code, the Parties enter into this settlement (the "Settlement Agreement") to definitely settle any existing disagreements and prevent any eventual litigations, with full *res judicata* effects in accordance with Colombian Law, as well as in any other Jurisdiction, Country or Territory where the Parties may commence any judicial or extra-judicial claim or action against any other signing and related parties, as well as in relation to other individuals or legal entities acting as shareholders of LAFRANCOL, in respect of whom the Parties expressly waive any such potential actions.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

**TWO. Mutual concessions by the Parties**. Upon signing below, the Parties agree, to their mutual benefit, to the following concessions:

2.1. To the benefit of the Buyer, the Seller undertakes to not commence, and if commenced to waive or withdraw, any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceedings, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Seller and/or any of its affiliates, subsidiaries, parent companies, employees, officers, insurers, directors, shareholders, advisors and/or staff;

Similarly, the Seller waives commencement of any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceedings, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Buyer and/or any of its affiliates, subsidiaries, parent companies, employees, officers, shareholders, insurers, directors, advisors and/or staff, the purpose and/or nature of which may be directly or indirectly related to

2.2 To the benefit of the Seller, the Buyer undertakes to deliver, no later than November 30, of the current year, in the form and under the conditions provided for below, the amount of THREE MILLION EIGHT HUNDRED AMERICAN DOLLARS (USD 3,800,000.00), by money order or wire transfer to the bank account notified in writing by the Seller to the Buyer no later than September 30 of the current year.

Similarly, the Buyer waives commencement of any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceedings, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Buyer (Sic) and/or against any of its affiliates, subsidiaries, parent companies, employees, officers, insurers, directors, advisors and/or staff.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

**THREE: Liability**. The Parties expressly acknowledge that this Settlement Agreement terminates any and all existing disagreements between the Parties as shareholders and/or managers in LAFRANCOL, therefore, mutually releasing them from any kind of liability for any such concepts, to the extent and scope stated above.

**FOUR: Effect**. The Parties express their will to make this Settlement Agreement have the effects of a final and enforceable judgment pursuant to article 2483 of the Civil Code, and to make the waivers contained herein have full effects, validity and legal effect, regardless of the jurisdictions where they are invoked, alleged or defended. The Parties state that they have entered into this Settlement Agreement to prevent any eventual litigation in the terms and for the purposes set forth in Title 39 of Book 4 of the Colombian Civil Code.

**FIVE: Confidentiality**.   Except as stated herein, no Party, including their officers or advisors, shall disclose or make available to a third party in any way and for no reason, any information on this Settlement Agreement, unless (i) any such information is public by the signing date; (ii) any such disclosure is requested or required by a competent authority, in which case, the relevant Party shall, before delivering the requested information, send a copy of such request to the other Parties together with the matter's background; or (iii) disclosure of any such information is authorized by the other Party, authorization that shall not be unreasonably withheld.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

**SIX: Enforceability**. The Parties represent their will to make this Settlement Agreement a collectable instrument for the performance of all of the obligations hereunder and specifically for the obligations to pay money.

**SEVEN: Representations and Warranties of the Parties**. The Parties represent and warrant as follows:

7.1    Incorporation and Existence. Each Party is a legal entity duly incorporated and existing under the laws of their jurisdiction of incorporation.

7.2    Capacity. The Parties have full powers, financial capacity, legal capacity and authority to enter into this agreement and perform obligations hereunder.

7.3    Corporate Authorizations. The Parties have the corporate authorizations to enter into this agreement and to perform obligations hereunder.

7.4    Binding effect. Once acquired and subject to conditions set forth herein, the Parties' obligations hereunder are obligations fully binding upon and enforceable against each of them in case of non-compliance.

7.5    No Breach or Conflicts. Entering into, performing and complying with this Agreement shall not cause any Party to (i) incur in a failure to comply with or breach of the provisions of any other agreement they may be a party to; or (ii) incur in a violation of any applicable law, decree, resolution, regulation and generally any applicable rules or legal or administrative order.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

**EIGHT: Penalty Clause.-** Any failure by the Parties to comply with the obligations hereunder shall entitle the other —apart from entitling them to terminate this Agreement and therefore the settlement failing to be executed— to require from the non-complying party, immediately and as a sanction, the payment of ONE MILLION DOLLARS (USD 1.000,000.00), which amount may be collected through a mandatory collection proceeding before the ordinary jurisdiction only upon presentation of this agreement and confirmation by the complying party of such non-compliance, with no need of default requirement or statement, which rights the Parties waive to their mutual benefit. It is understood that collection of the penalty clause herein shall not include or prevent collection of all damages caused upon any such non-compliance; consequently, the complying party shall be entitled to collect all damages caused plus the sanction provided for herein. The Parties represent that the enforcement of this penalty clause is expressly excluded from the scope of the arbitration clause agreed to herein.

**NINE: Applicable Law.-** This Settlement Agreement shall be governed by the laws of the Republic of Colombia.

**TEN: Notices.-** Any notice or other required or permitted communication hereunder shall be in writing and delivered in person or sent by fax or by registered or certified mail to the relevant Party to the following address (or any other address notified by the party according to this agreement):

If to the Seller:           Authorized Addressee: MICHAEL D. VENTURA

Address: Grays 354/5. 58 Davies St.

City: London W1K 5LP

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

If to the Buyer:          Authorized Addressee: ESTHER VENTURA DE RENDON

Address: Calle 108 No. 51-45

City: Bogota, D.C.

Phone number: 57-1-7424066

E-mail: erendon@lafrancol.com

**ELEVEN: Arbitration Clause.-** The Parties agree to submit any and all controversies, disagreements, disputes or claims resulting from the efficacy, execution, interpretation, modification or termination of this Settlement Agreement to an arbitral tribunal composed of three (3) arbitrators appointed upon mutual agreement by the Parties. Should no agreement be reached within ten (10) business days upon receipt of the relevant request by one Party to the other, arbitrators shall be appointed by the Center of Conciliation and Arbitration of the International Chamber of Commerce of Paris. Bogota shall be the seat of the arbitration. The arbitral tribunal shall rule according to law and shall be subject to the rules of the ICC. The arbitration cost and expenses, including the arbitrators' fees, shall be borne by each party.

**TWELVE: Condition Precedent.-** The Parties agree that the enforceability and applicability of this Settlement Agreement is conditional on meeting the following condition precedent: that the BUYER pays in cash the amount stated in clause 2.2. above.

**THIRTEEN: Special Obligation and Duty of Collaboration.** The Parties expressly acknowledge that for tax reasons and in the mutual interest of rendering this Settlement Agreement effective, it is of the essence to have both Parties committed to mutual collaboration as of the signing date hereof, with the purpose of reaching an agreement, no later than October 15th, on a tax mechanism that is both suitable for and accepted by the Parties, to enable payment in the agreed sum and date. The Parties accept that if such a mechanism involves entering into any other type of document that allows the Seller to support the payment to be collected before tax authorities, in a way that the Seller's tax burden is minimized, the Parties will proceed accordingly under the aforesaid spirit of collaboration, provided that no other contingencies of legal or patrimonial natural arise out from it.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

In witness whereof, the parties hereto have caused this agreement to be signed in two (2) counterparts in the city of Bogota, on this 22nd day of the month of September, 2010.

**By the Seller,**
[SIGNED]
By:        **MICHAEL VENTURA**
ID:        **Passport of the United Kingdom**
           **No. 094154909**

**By the Buyer,**
[SIGNED]
By:        **LABORATORIOS**
           **LAFRANCOL S.A.**
           **ESTHER VENTURA DE RENDON**
ID:        **Colombian National ID No. 38.979.831 of CALI**
Position:  **Legal Representative**

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

[SIGNED]

By:       ESTHER VENTURA DE RENDON

ID:       Colombian National ID No. 38.979.831 of CALI

[SIGNED]

By:       JUAN MARIA RENDON GUTIERREZ

ID:       Colombian National ID No. 17.125.100

WITNESS,

[SIGNED]

CARLOS ANTONIO ESPINOZA PEREZ

Colombian National ID No. 16.684.716

[SIGNED]

JOYCE VENTURA DE DURAN

Colombian National ID No. 41.458.692

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

# CONTRATO DE TRANSACCION

Por y Entre

## MICHAEL D. VENTURA

(en adelante el "Vendedor")

y

## LABORATORIOS LAFRANCOL S.A.
## ESTHER VENTURA DE RENDON
## JUAN MARIA RENDON

(en adelante el "Comprador"),

TODAS LAS ANTERIORES GENERICAMENTE DENOMINADAS "LAS PARTES"

Bogotá D.C. 21 de Septiembre de 2.010

CONTRATO DE TRANSACCION

Entre los suscritos a saber:

(i) LABORATORIOS LAFRANCOL S.A., una sociedad debidamente constituida y existente de conformidad con las leyes de Colombia, representada en este contrato por ESTHER VENTURA DE RENDON quien actúa en su calidad de representante legal debidamente facultado para el efecto (en adelante "LAFRANCOL"), en el entendido que se hace aquí referencia LAFRANCOL S.A. y a sus filiales y vinculadas, así como a sus accionistas;

(ii) ESTHER VENTURA DE RENDON, mayor de edad, casada,  con sociedad conyugal vigente, ciudadana Colombiana residente en Bogotá, D.C., identificada como aparece al pie de su firma;

(iii) JUAN MARIA RENDON, mayor de edad, casado,  con sociedad conyugal vigente, ciudadano Colombiana residente en Bogotá, D.C., identificada como aparece al pie de su firma;

(v) MICHAEL VENTURA, mayor de edad, casado, con sociedad conyugal vigente, ciudadano Británico residente en Londres (Inglaterra), identificado como aparece al pie de su firma

Hemos resuelto celebrar el presente Contrato de Transacción (la "Transacción") previas las siguientes:

## CONSIDERACIONES

1. Que las Partes han sostenido en el pasado diversas relaciones jurídicas y negociales, entre las cuales se encuentra la de Accionista del Vendedor en LAFRANCOL S.A.;

CONTRATO DE TRANSACCION

2. Que las Partes, en desarrollo de tales relaciones, han tenido algunas diferencias, razón por la cual buscan a través del presente documento precaver eventuales conflictos en torno a la totalidad de sus relaciones comerciales y societarias, incluyendo lo relacionado con el rol de los Compradores en tanto accionistas y/o administradores de LAFRANCOL y sus vinculadas.

3. Que con ese propósito, las Partes tienen la intención de suscribir un contrato de transacción en los términos del artículo 2469 y siguientes del Código Civil, en aras de precaver la totalidad de los litigios eventuales y con el fin de que el mismo tenga efectos de cosa juzgada en última instancia, en los siguientes términos:

**PRIMERA. Objeto.** El objeto del presente contrato es transigir de forma definitiva todas y cada una de las diferencias existentes, y precaver eventuales y/o contingentes litigios, (i) entre la Partes, derivados de la condición de accionista del Vendedor y/o de accionistas y/o administradores de los Compradores. Igualmente es interés explícito de las Partes precaver cualquier posible reclamación o acción, judicial o extrajudicial entre ellas y con relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL.

En consecuencia, en los términos del artículo 2469 y siguientes del Código Civil, las Partes suscriben la presente transacción (la "Transacción"), en aras de transigir de forma definitiva las diferencias existentes y precaver litigios eventuales y con plenos efectos de cosa juzgada de conformidad con lo previsto por la ley colombiana, así como en toda otra Jurisdicción, País o Territorio donde una cualquiera de las Partes pudiere incoar reclamación o acción judicial o extra judicial en contra de uno cualquiera de los demás firmantes y vinculados, así como en relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL, respecto de las cuales las Partes renuncian expresamente a tales posibles acciones.

CONTRATO DE TRANSACCION

**SEGUNDA. Concesiones recíprocas de las Partes.** Por la celebración de la Transacción, las Partes hacen en beneficio recíproco, las siguientes concesiones:

2.1   En beneficio del Comprador, el Vendedor se obliga a no iniciar o si lo hubiere hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Vendedor y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal;

En igual sentido, el Vendedor renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Comprador y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, accionistas, aseguradores, directores, asesores y/o personal, cuyo objeto y/o naturaleza se relacione con

2.2   En beneficio del Vendedor, el Comprador se obliga a entregar, no más tarde del 30 de Noviembre del año en curso, en la forma y bajo las condiciones que luego se indican, la suma de TRES MILLONES OCHOCIENTOS MIL DOLARES (U.S.$3.800.000.oo,) de los Estados Unidos de Norte América, mediante giro o transferencia a la cuenta bancaria que el Vendedor indicará por escrito al Comprador no más tarde del día 30 de Septiembre del año en curso.

En igual sentido, el Comprador renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Comprador y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, asesores, y/o personal

CONTRATO DE TRANSACCION

**TERCERA: Responsabilidad.** Las Partes reconocen expresamente que esta Transacción pone fin a todas y cada una de las diferencias existentes entre las Partes respecto de su condición de accionistas y/o administradores de LAFRANCOL S.A. y en consecuencia, se relevan mutuamente de cualquier tipo de responsabilidad por dichos conceptos, con la amplitud y alcance que en la parte anterior de este contrato se ha indicado.

**CUARTA: Efecto.** Las Partes expresan su voluntad de que esta Transacción surta los efectos de una sentencia ejecutoriada en última instancia en los términos del artículo 2483 del Código Civil, y de que las renuncias contenidas en este Contrato, surtan plenos efectos y tengan plena validez y fuerza legal, sea cual fuere la jurisdicción en que sean invocadas, alegadas o defendidas. Las Partes dejan constancia que celebran esta Transacción para precaver un litigio eventual en los términos y para los efectos previstos por el Título 39 del Libro 4o. del Código Civil Colombiano.

**QUINTA: Confidencialidad.** Salvo por lo que se determine en la presente Transacción, ninguna de las Partes, incluidos sus funcionarios o asesores, podrá divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción, a menos que (i) dicha información sea del dominio público en la fecha de suscripción del presente contrato; (ii) ello sea solicitado o exigido por la autoridad competente, en cuyo caso, antes de proceder a entregar la información solicitada, la Parte respectiva deberá enviar copia de la solicitud en cuestión a las demás Partes junto con los antecedentes del caso; ó (iii) la divulgación de la información sea autorizada por la otra Parte, autorización que no será negada de manera injustificada.

**SEXTA: Carácter Ejecutivo:** Las Partes manifiestan que es su voluntad que esta Transacción constituya título ejecutivo para el cumplimiento de todas las obligaciones en ella contenidas y específicamente de las de pagar sumas de dinero.

CONTRATO DE TRANSACCION

SEPTIMA: Declaraciones y Garantías de las Partes. Las Partes declaran y garantizan que:

7.1   Constitución y Existencia.   Cada una de las Partes es una persona jurídica debidamente constituida y existente de conformidad con las leyes del lugar de su constitución;

7.2   Capacidad. Tienen pleno poder, capacidad financiera, capacidad legal y autoridad para suscribir el presente contrato y cumplir con las obligaciones adquiridas en virtud del mismo;

7.3   Autorizaciones Corporativas. Cuentan con   las autorizaciones societarias para celebrar este contrato y para cumplir las obligaciones que en él se establecen;

7.4   Efecto Vinculante. Una vez contraídas y sujetas a las condiciones previstas en el presente contrato, las obligaciones a su cargo bajo el presente contrato son obligaciones plenamente vinculantes y exigibles respecto de cada una de ellas en caso de incumplimiento.

7.5   Ausencia de Violación o Conflictos. La celebración, ejecución y cumplimiento de este Contrato no generará para ninguna de las Partes (i) el incumplimiento o la violación de las disposiciones de cualquier contrato del que sean partes; ó (ii) la violación de alguna ley, decreto, resolución, reglamento y, en general, cualquier normatividad u orden judicial o administrativa que les fuere aplicable.

OCTAVA: Cláusula Penal.- El simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas, además para declarar terminado este Contrato y por ende no verificada la transacción, para que exija a la parte incumplida, inmediatamente y a título de pena, el pago de la suma de UN MILLON DE DOLARES ($U.S. 1.000.000,oo), suma que podrá ser exigida por la

6

CONTRATO DE TRANSACCION

via ejecutiva ante la jurisdicción ordinaria, con la simple presentación de este contrato y la afirmación de la parte cumplida acerca del incumplimiento de la parte incumplida y sin necesidad de requerimiento o constitución en mora, derechos estos a los cuales renuncian las Partes en su recíproco beneficio. Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados por el incumplimiento, y en consecuencia la parte cumplida tendrá derecho a cobrar la totalidad de los perjuicios ocasionados más la pena que aquí se establece. Las Partes declaran que excluyen expresamente del alcance de la cláusula compromisoria pactada en este Contrato el cobro ejecutivo de esta cláusula penal.

**NOVENA: Ley Aplicable.-** La presente Transacción se regirá por las leyes de la República de Colombia.

**DECIMA: Notificaciones.-** Cualquier notificación u otra comunicación necesaria o permitida por la presente Transacción deberá realizarse por escrito y deberá entregarse personalmente o ser transmitida por facsímil o enviada por correo registrado o certificado a la Parte indicada a la siguiente dirección (o cualquier otra dirección que la parte especifique mediante notificación, de Contrato con el presente):

Al Vendedor:          Destinatario Autorizado: MICHAEL D. VENTURA

                      Dirección: Grays 354/5. 58 Davies St.

                      Ciudad: London W1K 5LP

                      Teléfono:02074956868

                      Correo electrónico:

Al Comprador:         Destinatario Autorizado: ESTHER VENTURA DE RENDON

                      Dirección: Calle 108 No. 51-45

CONTRATO DE TRANSACCION

Ciudad: Bogotá, D.C.

Teléfono:57-1-7424066

Correo electrónico: erendon@lafrancol.com

**DECIMA PRIMERA: Cláusula compromisoria.-** Las Partes convienen en someter todas y cualesquiera controversias, diferencias, disputas o reclamos que surjan en torno a la eficacia, ejecución, interpretación, modificación o terminación de la presente Transacción, a un tribunal de arbitramento que estará integrado por tres (3) árbitros designados de mutuo acuerdo por las Partes, y de no ser posible lograr dicho Contrato en un término de diez (10) días hábiles contados a partir del recibo de la solicitud al respecto realizada por una Parte a la otra, designados por el Centro de Arbitraje y Conciliación de la Cámara de Comercio Internacional de París. El tribunal funcionará en Bogotá, decidirá en derecho y se sujetará a las normas procesales de la CCI. Los gastos y costas del procedimiento, incluyendo los honorarios de los árbitros, serán asumidos por cada parte.

**DECIMA SEGUNDA: Condición Suspensiva.-** Las Partes acuerdan que la exigibilidad y ejecutabilidad de la Transacción está condicionada a la siguiente condición suspensiva: Que el COMPRADOR efectúe el pago efectivo de la suma indicada en la cláusula 2.2 del Presente Contrato.

**DECIMA TERCERA: Obligación Especial y deber de Colaboración.** Las Partes reconocen que por razones de orden fiscal y en el mutuo interés de materializar la Transacción, es necesario que una y otra se presten la colaboración del caso desde el día de la firma del presente Contrato, con el objeto de poder acordar, no más tarde del 15 de Octubre, un mecanismo fiscalmente adecuado para ambas Partes y aceptado por ellas, que permita hacer el pago en la suma y fecha acordados. Las Partes aceptan que si ello implicare suscribir algún tipo de documento adicional que permita al Vendedor soportar ante las autoridades fiscales el pago a recibir de manera que se minimice su carga fiscal, a

8

CONTRATO DE TRANSACCION

ello procederán las Partes bajo el mencionado espíritu de colaboración, siempre que ello no genere contingencias de orden legal o patrimonial adicionales.

En constancia de lo anterior, se suscribe el presente contrato en dos (2) ejemplares del mismo tenor en la ciudad de Bogotá a los veintiún (21) días del mes de septiembre de 2010.

**Por el Vendedor,**

Por:                    **MICHAEL VENTURA**

Identificación:     Pasaporte del Reino Unido

No. 094154909

**Por el Comprador,**

Por:                    LABORATORIOS

LAFRANCOL S.A.

ESTHER VENTURA DE

RENDON

Identificación:     C.C. 38.979.831 CALI

Cargo:               Representante Legal

Por:                    ESTHER VENTURA DE

RENDON

CONTRATO DE TRANSACCION

Identificación:   C.C. 38.979.831 CALI

Por:   JUAN MARIA RENDON
       GUTIERREZ

Identificación:   C.C. 17.125.100

TESTIGOS,

CARLOS ANTONIO ESPINOSA PEREZ

C.C. 16.684.716

JOYCE VENTURA DE DURAN

C.C. 41.458.692

# Exhibit C

I, Carlos Julio Carrero, the undersigned, an Official English – Spanish Translator in and for the Republic of Colombia, as per Professional Certificate No. 0314 dated September 14th 2010; do hereby CERTIFY that the attached document presented to me for translation into the English language is reproduced in form and substance in the following ten (10) pages.

The translation below is a true translation into the English language of the attached original document, which I have done upon request of the interested party. In witness whereof I affix my seal and sign below in Bogotá on this twenty-ninth (29th) day Agoust, 2017.

Carlos Julio Carrero

Official Translator No. 0314

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

SETTLEMENT AGREEMENT


By and between


VIVIANE VENTURA

(hereinafter, the "Requesting Party")


and


LABORATORIOS LAFRANCOL S.A.

ESTHER VENTURA DE RENDON

JUAN MARIA RENDON

(hereinafter, the "Requested Party")


COLLECTIVELY REFERRED TO AS "THE PARTIES"


Bogota, D.C., September 22, 2010

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

Between the undersigned, to wit:

(i) LABORATORIOS LAFRANCOL S.A., a duly incorporated and existing company under the laws of Colombia, represented herein by ESTHER VENTURA DE RENDON, acting as the duly authorized legal representative to such end (hereinafter, "LAFRANCOL"), on the understanding that LAFRANCOL S.A., and its affiliates and related parties, as well as its shareholders, are referred to herein;

(ii) ESTHER VENTURA DE RENDON, of legal age, married, under current community property, Colombian, domiciled in Bogota, D.C., and identified as appears below in her signature;

(iii) JUAN MARIA RENDON, of legal age, married, under current community property, Colombian, domiciled in Bogota, D.C., and identified as appears below in his signature;

(iv) VIVIANE VENTURA, of legal age, an American citizen, domiciled in Miami (Florida), and identified as appears below in her signature

We have decided to enter into this Settlement Agreement (the "Settlement Agreement") in accordance with the following:

## RECITALS

1. Whereas the Parties have held in the past several legal and business relationships, including that of the Requesting Party as Shareholder in LAFRANCOL S.A., which capacity she lost years ago;

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

2.  Whereas the Parties have had certain disagreements, particularly concerning whether the Requesting Party would hold or not the capacity as shareholder in LAFRANCOL, S.A., which is why the Parties seek hereby to prevent eventual conflicts in connection with all of their business and corporate relationships, including in relation to the role of the Requested Party as shareholders and/or managers in LAFRANCOL and its related parties.

3.  Whereas upon such purpose the Parties intend to enter into the Settlement Agreement pursuant to article 2469 et seq. of the Civil Code in the interest of preventing any eventual litigations and with the purpose that the Settlement Agreement produces *res judicata* effects, according to the following clauses:

ONE. Purpose. The purpose of this agreement is to definitely settle any and all existing disagreements and prevent any eventual and/or contingent litigations between the Parties resulting from the discussion about whether the Requesting Party would currently hold or not the capacity as shareholder in LAFRANCOL S.A. and/or in connection with the roles of the Requested Parties as shareholders and/or managers. Similarly, the Parties are explicitly interested in preventing any potential judicial or extra-judicial claim or action between them and in respect of the other individuals or legal entities acting as shareholders of LAFRANCOL.

Therefore, pursuant to article 2469 et seq. of the Civil Code, the Parties enter into this settlement (the "Settlement Agreement") to definitely settle any existing disagreements and prevent any eventual litigations, with full *res judicata* effects in accordance with Colombian Law, as well as in any other Jurisdiction, Country or Territory where the Parties may commence any judicial or extra-judicial claim or action against any other signing and related parties, as well as in relation to other individuals or legal entities acting as shareholders of LAFRANCOL, in respect of whom the Parties expressly waive any such potential actions.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

**TWO. Mutual concessions by the Parties**. Upon signing below, the Parties agree, to their mutual benefit, to the following concessions:

2.1. To the benefit of the Requested Party, the Requesting Party undertakes to not commence, and if commenced to waive or withdraw, any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceeding, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Requesting Party and/or any of its affiliates, subsidiaries, parent companies, employees, officers, insurers, directors, shareholders, advisors and/or staff;

Similarly, the Requesting Party waives commencement of any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceedings, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Requested Party and/or any of its affiliates, subsidiaries, parent companies, employees, officers, shareholders, insurers, directors, advisors and/or staff, the purpose and/or nature of which may be directly or indirectly related to the Requesting Party's claim.

2.2 To the benefit of the Requesting Party, the Requested Party undertakes to deliver for free no later than January 30, 2011 in the form and under the conditions provided for below, the amount of ONE MILLION ONE HUNDRED AMERICAN DOLLARS (USD 1,100,000.00), by money order or wire transfer to the bank account notified in writing by the Requesting Party to the Requested Party no later than September 30 of the current year.

Similarly, the Requested Party waives commencement of any complaint, suit, report, claim, petition, demand, investigation, process, incident or similar proceeding, regardless of their nature, either judicially or extra-judicially, before arbitral or administrative authorities, against the Requested Party (Sic) and/or against any of its affiliates, subsidiaries, parent companies, employees, officers, insurers, directors, advisors and/or staff.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

**THREE. Liability**. The Parties expressly acknowledge that this Settlement Agreement terminates any and all existing disagreements between the Parties, particularly concerning the actions of the Requested Party members as shareholder and/or managers in LAFRANCOL S.A., therefore mutually releasing them from any kind of liability for any such concepts, to the extent and scope stated above.

**FOUR. Effect**. The Parties express their will to make this Settlement Agreement have the effects of a final and enforceable judgment pursuant to article 2483 of the Civil Code, and to make the waivers contained herein have full effects, validity and legal effect, regardless of the jurisdictions where they are invoked, alleged or defended. The Parties state that they have entered into this Settlement Agreement to prevent any eventual litigation in the terms and for the purposes set forth in Title 39 of Book 4 of the Colombian Civil Code.

**FIVE. Confidentiality**.   Except as stated herein, no Party, including their officers or advisors, shall disclose or make available to a third party in any way and for no reason, any information on this Settlement Agreement, unless (i) any such information is public by the signing date; (ii) any such disclosure is requested or required by a competent authority, in which case, the relevant Party shall, before delivering the requested information, send a copy of such request to the other Parties together with the matter's background; or (iii) disclosure of any such information is authorized by the other Party, authorization that shall not be unreasonably withheld.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

**SIX. Enforceability**. The Parties represent their will to make this Settlement Agreement a collectable instrument for the performance of all of the obligations hereunder and specifically for the obligations to pay money.

**SEVEN. Representations and Warranties of the Parties**. The Parties represent and warrant as follows:

7.1    Incorporation and Existence. Each Party is a legal entity duly incorporated and existing under the laws of their jurisdiction of incorporation.

7.2    Capacity. The Parties have full powers, financial capacity, legal capacity and authority to enter into this agreement and perform obligations hereunder.

7.3    Corporate Authorizations. The Parties have the corporate authorizations to enter into this agreement and to perform obligations hereunder.

7.4    Binding effect. Once acquired and subject to conditions set forth herein, the Parties' obligations hereunder are obligations fully binding upon and enforceable against each of them in case of non-compliance.

7.5    No Breach or Conflicts. Entering into, performing and complying with this Agreement shall not cause any Party to (i) incur in a failure to comply with or breach of the provisions of any other agreement they may be a party to; or (ii) incur in a violation of any applicable law, decree, resolution, regulation and generally any applicable rules or legal or administrative order.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

7.6    Mutual respect and full confidentiality. Under penalty of enforcement of the penalty clause agreed upon herein, the Parties mutually agree to keep this Agreement in secrecy and above all to omit to mention in the future, publicly or privately, the other Party's conduct, way of life, customs and activities, avoiding use of adjectives, offensive or similar phrases, all of which shall be deemed to be a material breach of contract. If possible, each Party shall simply omit to mention the other Party in the future.

**EIGHT. Penalty Clause.** Any failure by the Parties to comply with the obligations hereunder shall entitle the other –apart from entitling them to terminate this Agreement and therefore the settlement failing to be executed– to require from the non-complying party, immediately and as a sanction, the payment of ONE HUNDRED THOUSAND DOLLARS (USD 100,000.00), which amount may be collected through a mandatory collection proceeding before the ordinary jurisdiction only upon presentation of this agreement and confirmation by the complying party of such non-compliance, with no need of default requirement or statement, which rights the Parties waive to their mutual benefit. It is understood that collection of the penalty clause herein shall not include or prevent collection of all damages caused upon any such non-compliance; consequently, the complying party shall be entitled to collect all damages caused plus the sanction provided for herein. The Parties represent that the enforcement of this penalty clause is expressly excluded from the scope of the arbitration clause agreed to herein.

**NINE. Applicable Law.** This Settlement Agreement shall be governed by the laws of the Republic of Colombia.

**TEN. Notices.** Any notice or other communication required or permitted hereunder shall be in writing and delivered in person or sent by fax or by registered or certified mail to the relevant Party to the following address (or any other address notified by the party according to this agreement):

If to the Requesting Party:    Authorized Addressee: VIVIANE DIANE VENTURA
Address: 785 Crandon Boulevard, Ocean Club. Club
Tower 2, No. 602
City: Key Biscayne. Florida 33149

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

If to the Requested Party:    Authorized Addressee: ESTHER VENTURA DE RENDON

Address: Calle 108 No. 51-45

City: Bogota, D.C.

Phone number: 57-1-7424066

E-mail: erendon@lafrancol.com

**ELEVEN. Arbitration Clause.** The Parties agree to submit any and all controversies, disagreements, disputes or claims resulting from the efficacy, execution, interpretation, modification or termination of this Settlement Agreement to an arbitral tribunal composed of three (3) arbitrators appointed upon mutual agreement by the Parties. Should no agreement be reached within ten (10) business days upon receipt of the relevant request by one Party to the other, arbitrators shall be appointed by the Center of Conciliation and Arbitration of the International Chamber of Commerce of Paris. Bogota shall be the seat for arbitration. The arbitral tribunal shall rule according to law and shall be subject to the rules of the ICC. The arbitration cost and expenses, including the arbitrators' fees, shall be borne by each party.

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

**TWELVE. CONDITION PRECEDENT**. The Parties agree that the enforceability and applicability of this Settlement Agreement is conditional on meeting the following condition precedent: that the REQUESTED PARTY pays in cash the amount stated in clause 2.2. above.

In witness whereof, the parties hereto have caused this agreement to be signed in two (2) counterparts in the city of Bogota, on this 22nd day of the month of September, 2010.

By the Requesting Party,

[SIGNED]

By:        VIVIANE DIANE VENTURA

ID:        Passport No. 704555758

By the Requested Party,

[SIGNED]

By:        LABORATORIOS
           LAFRANCOL S.A.
           ESTHER VENTURA DE RENDON

ID:        Colombian National ID No. 38.979.831 of CALI

Position:  Legal Representative

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14,2010

[SIGNED]

By:     **ESTHER VENTURA DE RENDON**

ID:     Colombian National ID No. 38.979.831 of CALI

[SIGNED]

By:     **JUAN MARIA RENDON GUTIERREZ**

ID:     Colombian National ID No. 17.125.100

**WITNESS,**

[SIGNED]

**MICHAEL DAVID VENTURA**

Passport No. 094154909 of the United Kingdom

[SIGNED]

**JOYCE VENTURA DE DURAN**

Colombian National ID No. 41.458.692

Carlos Julio Carrero
Traductor Oficial Inglés-Español
Resolución No. 0314
Septiembre 14, 2010

# CONTRATO DE TRANSACCION

Por y Entre

VIVIANE VENTURA

(en adelante el "Solicitante")

y

LABORATORIOS LAFRANCOL S.A.

ESTHER VENTURA DE RENDON

JUAN MARIA RENDON

(en adelante el "Solicitado"),

TODAS LAS ANTERIORES GENERICAMENTE DENOMINADAS "LAS PARTES"

Bogotá D.C. 22 de Septiembre de 2.010

Entre los suscritos a saber:

(i) LABORATORIOS LAFRANCOL S.A., una sociedad debidamente constituida y existente de conformidad con las leyes de Colombia, representada en este contrato por ESTHER VENTURA DE RENDON quien actúa en su calidad de representante legal debidamente facultado para el efecto (en adelante "LAFRANCOL"), en el entendido que se hace aquí referencia LAFRANCOL S.A. y a sus filiales y vinculadas, así como a sus accionistas;

(ii) ESTHER VENTURA DE RENDON, mayor de edad, casada,  con sociedad conyugal vigente, ciudadana Colombiana residente en Bogotá, D.C., identificada como aparece al pie de su firma;

(iii)JUAN MARIA RENDON, mayor de edad, casado,  con sociedad conyugal vigente, ciudadano Colombiana residente en Bogotá, D.C., identificada como aparece al pie de su firma;

(v) VIVIANE VENTURA, mayor de edad, ciudadana de los Estados Unidos de Norte America, residente en Miami (Florida), identificada como aparece al pie de su firma;

Hemos resuelto celebrar el presente Contrato de Transacción (la "Transacción") previa las siguientes:

## CONSIDERACIONES

1. Que las Partes han sostenido en el pasado diversas relaciones jurídicas y negociales, entre las cuales se encuentra la de Accionista del Solicitante en LAFRANCOL S.A., calidad que este perdió años atrás;

2

2. Que las Partes han tenido algunas diferencias, específicamente en torno a si El Solicitante tendría o no la calidad de accionista de LAFRANCOL S.A, razón por la cual buscan a través del presente documento precaver eventuales conflictos en torno a la totalidad de sus relaciones comerciales y societarias, incluyendo lo relacionado con el rol de los Solicitados en tanto accionistas y/o administradores de LAFRANCOL y sus vinculadas.

3. Que con ese propósito, las Partes tienen la intención de suscribir un contrato de transacción en los términos del artículo 2469 y siguientes del Código Civil, en aras de precaver la totalidad de los litigios eventuales y con el fin de que el mismo tenga efectos de cosa juzgada en última instancia, en los siguientes términos:

**PRIMERA. Objeto.** El objeto del presente contrato es transigir de forma definitiva todas y cada una de las diferencias existentes, y precaver eventuales y/o contingentes litigios entre la Partes, derivados de la discusión en torno a si el Solicitante tendría o no en la actualidad la calidad de accionista de LAFRANCOL S.A. y/o respecto a las actuaciones como accionistas y/o administradores de los Solicitados. Igualmente es interés explícito de las Partes precaver cualquier posible reclamación o acción, judicial o extrajudicial entre ellas y con relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL.

En consecuencia, en los términos del artículo 2469 y siguientes del Código Civil, las Partes suscriben la presente transacción (la "Transacción"), en aras de transigir de forma definitiva las diferencias existentes y precaver litigios eventuales y con plenos efectos de cosa juzgada de conformidad con lo previsto por la ley colombiana, así como en toda otra Jurisdicción, País o Territorio donde una cualquiera de las Partes pudiere incoar reclamación o acción judicial o extra judicial en contra de uno cualquiera de los demás firmantes y vinculados, así como en relación a las demás personas naturales o jurídicas accionistas de LAFRANCOL, respecto de las cuales las Partes renuncian expresamente a tales posibles acciones.



3

**SEGUNDA. Concesiones recíprocas de las Partes.** Por la celebración de la Transacción, las Partes hacen en beneficio recíproco, las siguientes concesiones:

2.1   En beneficio del Solicitado, el Solicitante se obliga a no iniciar o si lo hubiere hecho, desistir de o retirar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitante y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, accionistas, asesores y/o personal;

En igual sentido, el Solicitante renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitado y/o de cualquiera de sus filiales, subordinadas, matrices, empleados, ejecutivos, accionistas, aseguradores, directores, asesores y/o personal, cuyo objeto y/o naturaleza se relacione con la reclamación del Solicitante, directa o indirectamente.

2.2   En beneficio del Solicitante, el Solicitado se obliga a entregar, a título _____, más tarde del 30 de Enero del año 2.011, en la forma y bajo _____ que luego se indican, la suma de UN MILLON CIEN MIL DOLARES (US$ 1.100.000.oo,) de los Estados Unidos de Norte América, mediante giro o transferencia a la cuenta bancaria que el Solicitante indicará por escrito al Solicitado no más tarde del día 30 de Septiembre del año en curso.

En igual sentido, el Solicitado renuncia a iniciar cualquier tipo de queja, pleito, denuncia, reclamación, petición, demanda, denuncia, investigación, trámite, incidente o procedimiento similar, de cualquier índole, bien sea judicial o extrajudicial, arbitral o administrativa, en contra del Solicitado y/o de cualquiera de sus filiales,

4

subordinadas, matrices, empleados, ejecutivos, aseguradores, directores, asesores, y/o personal

**TERCERA: Responsabilidad.** Las Partes reconocen expresamente que esta Transacción pone fin a todas y cada una de las diferencias existentes entre las Partes, en especial frente a las actuaciones de los integrantes del Solicitado en su condición de accionistas y/o administradores de LAFRANCOL S.A. y en consecuencia, se relevan mutuamente de cualquier tipo de responsabilidad por dichos conceptos, con la amplitud y alcance que en la parte anterior de este contrato se ha indicado.

**CUARTA: Efecto.** Las Partes expresan su voluntad de que esta Transacción surta los efectos de una sentencia ejecutoriada en última instancia en los términos del artículo 2483 del Código Civil, y de que las renuncias contenidas en este Contrato, surtan plenos efectos y tengan plena validez y fuerza legal, sea cual fuere la jurisdicción en que sean invocadas, alegadas o defendidas. Las Partes dejan constancia que celebran esta Transacción para precaver un litigio eventual en los términos y para los efectos previstos por el Título 39 del Libro 4o. del Código Civil Colombiano.

**QUINTA: Confidencialidad.** Salvo por lo que se determine en la presente Transacción, ninguna de las Partes, incluidos sus funcionarios o asesores, podrá divulgar ni dar a conocer a terceros de ninguna forma y por ningún motivo cualquier información relacionada con la presente Transacción, a menos que (i) dicha información sea del dominio público en la fecha de suscripción del presente contrato; (ii) ello sea solicitado o exigido por la autoridad competente, en cuyo caso, antes de proceder a entregar la información solicitada, la Parte respectiva deberá enviar copia de la solicitud en cuestión a las demás Partes junto con los antecedentes del caso; ó (iii) la divulgación de la información sea autorizada por la otra Parte, autorización que no será negada de manera injustificada.



5

**SEXTA: Carácter Ejecutivo:** Las Partes manifiestan que es su voluntad que esta Transacción constituya título ejecutivo para el cumplimiento de todas las obligaciones en ella contenidas y específicamente de las de pagar sumas de dinero.

**SÉPTIMA: Declaraciones y Garantías de las Partes.** Las Partes declaran y garantizan que:

7.1   Constitución y Existencia.   Cada una de las Partes es una persona jurídica debidamente constituida y existente de conformidad con las leyes del lugar de su constitución;

7.2   Capacidad. Tienen pleno poder, capacidad financiera, capacidad legal y autoridad para suscribir el presente contrato y cumplir con las obligaciones adquiridas en virtud del mismo;

7.3   Autorizaciones Corporativas. Cuentan con  las autorizaciones societarias para celebrar este contrato y para cumplir las obligaciones que en él se establecen;

7.4   Efecto Vinculante. Una vez contraídas y sujetas a las condiciones previstas ~~en el~~ presente contrato, las obligaciones a su cargo bajo el prese~~nte~~ obligaciones plenamente vinculantes y exigibles respecto de cada ~~una de ellas~~ caso de incumplimiento.

7.5   Ausencia de Violación o Conflictos. La celebración, ejecución y cumplimiento de este Contrato no generará para ninguna de las Partes (i) el incumplimiento o la violación de las disposiciones de cualquier contrato del que sean partes; ó (ii) la violación de alguna ley, decreto, resolución, reglamento y, en general, cualquier normatividad u orden judicial o administrativa que les fuere aplicable.

6

7.6   Respeto mutuo y reserva total: so pena que se haga exigible la clausula penal aqui acordada, las Partes se comprometen recíprocamente a mantener en sigilo este Contrato, pero sobre todo, a omitir referirse en el futuro, pública o privadamente a la conducta, modo de vida, costumbres o actividades de la otra Parte, evitando el uso de calificativos, frases ofensivas o similares, todo lo cual se considerará violación material del Contrato. De ser posible, las Partes simplemente omitirán referirse a la otra Parte en el futuro.

**OCTAVA: Cláusula Penal.-** El simple incumplimiento en que incurran las Partes respecto de las obligaciones adquiridas en virtud de esta Transacción, dará derecho a cada una de ellas, además para declarar terminado este Contrato y por ende no verificada la transacción, para que exija a la parte incumplida, inmediatamente y a título de pena, el pago de la suma de CIEN MIL DOLARES ($ U.S.100.000,oo), suma que podrá ser exigida por la vía ejecutiva ante la jurisdicción ordinaria, con la simple presentación de este contrato y la afirmación de la parte cumplida acerca del incumplimiento de la parte incumplida y sin necesidad de requerimiento o constitución en mora, derechos estos a los cuales renuncian las Partes en su recíproco beneficio. Es entendido que el cobro de la cláusula penal aquí prevista no incluye ni impide el cobro de la totalidad de los perjuicios ocasionados por el incumplimiento, y en consecuencia la parte cumplida tendrá derecho a cobrar la totalidad de los perjuicios ocasionados más la pena que aquí se establece. Las Partes excluyen expresamente del alcance de la cláusula compromisoria pactada el cobro ejecutivo de esta cláusula penal.

**NOVENA: Ley Aplicable.-** La presente Transacción se regirá por las leyes de la República de Colombia.

**DECIMA: Notificaciones.-** Cualquier notificación u otra comunicación necesaria o permitida por la presente Transacción deberá realizarse por escrito y deberá entregarse personalmente o ser transmitida por facsímil o enviada por correo registrado o certificado a

7

la Parte indicada a la siguiente dirección (o cualquier otra dirección que la parte especifique mediante notificación, de Contrato con el presente):

Al Solicitante:              Destinatario Autorizado: VIVIANE DIANE VENTURA

Dirección: 785 Crandon Boulevard, oCean Club. Club Tower 2. Apt. 602

Ciudad: Key Biscayne. Florida. 33149

Al Solicitado:              Destinatario Autorizado: ESTHER VENTURA DE RENDON

Dirección: Calle 108 No. 51-45

Ciudad: Bogotá, D.C.

Teléfono: 57-1-7424066

Correo electrónico: crendon@lafrancol.com

**DECIMA PRIMERA: Cláusula compromisoria.-** Las Partes convienen en someter todas y cualesquiera controversias, diferencias, disputas o reclamos que surjan con forma de eficacia, ejecución, interpretación, modificación o terminación de la presente transacción, a un tribunal de arbitramento que estará integrado por tres (3) árbitros designados de mutuo acuerdo por las Partes, y de no ser posible lograr dicho Contrato en un término de diez (10) días hábiles contados a partir del recibo de la solicitud al respecto realizada por una Parte a la otra, designados por el Centro de Arbitraje y Conciliación de la Cámara de Comercio Internacional de París. El tribunal funcionará en Bogotá, decidirá en derecho y se sujetará a las normas procesales de la CCI. Los gastos y costas del procedimiento, incluyendo los honorarios de los árbitros, serán asumidos por cada parte.

8

**DÉCIMA SEGUNDA: Condición Suspensiva.-** Las Partes acuerdan que la exigibilidad y ejecutabilidad de la Transacción está condicionada a la siguiente condición suspensiva: Que el SOLICITADO efectúe el pago efectivo de la suma indicada en la cláusula 2.2 del Presente Contrato.

En constancia de lo anterior, se suscribe el presente contrato en dos (2) ejemplares del mismo tenor en la ciudad de Bogotá a los veintidós (22) días del mes de septiembre de 2010.

Por el Solicitante,

Por:              **VIVIANE DIANE VENTURA**
Identificación:   **Pasaporte No.704555758**

Por el Solicitado,

Por:              **LABORATORIOS**
                  **LAFRANCOL S.A.**
                  **ESTHER VENTURA DE**
                  **RENDON**
Identificación:   **C.C. 38.979.831 CALI**
Cargo:            **Representante Legal**

9

Por:            **ESTHER VENTURA DE RENDON**

Identificación:    C.C. 38.979.831 CALI

Por:            **JUAN MARIA RENDON GUTIERREZ**

Identificación:    C.C. 17.125.100

**TESTIGOS,**

MICHAEL DAVID VENTURA

Pasaporte No.094154909 del Reino Unido

JOYCE VENTURA DE DURAN

C.C. 41.458.692

15 AGO 2013

10